**"Exhibit 2"**

**Federal Communications Commission**                              **FCC 15-72**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rules and Regulations Implementing the | ) |
| Telephone Consumer Protection Act of 1991 | ) |
| | ) |
| American Association of Healthcare | ) |
| Administrative Management | ) |
| Petition for Expedited Declaratory Ruling and | ) |
| Exemption | ) |
| | ) |
| American Bankers Association | )      CG Docket No. 02-278 |
| Petition for Exemption | ) |
| | )      WC Docket No. 07-135 |
| Coalition of Mobile Engagement Providers | ) |
| Petition for Declaratory Ruling | ) |
| | ) |
| Consumer Bankers Association | ) |
| Petition for Declaratory Ruling | ) |
| | ) |
| Direct Marketing Association | ) |
| Petition for Forbearance and | ) |
| Emergency Petition for Special Temporary Relief | ) |
| | ) |
| Paul D. S. Edwards | ) |
| Petition for Expedited Clarification and | ) |
| Declaratory Ruling | ) |
| | ) |
| Milton H. Fried, Jr., and Richard Evans | ) |
| Petition for Expedited Declaratory Ruling | ) |
| | ) |
| Glide Talk, Ltd. | ) |
| Petition for Expedited Declaratory Ruling | ) |
| | ) |
| Global Tel*Link Corporation | ) |
| Petition for Expedited Clarification and | ) |
| Declaratory Ruling | ) |
| | ) |
| National Association of Attorneys General | ) |
| Request for Clarification | ) |
| | ) |
| Professional Association for Customer | ) |
| Engagement | ) |
| Petition for Expedited Declaratory Ruling and/or | ) |
| Expedited Rulemaking | ) |
| | ) |
| Retail Industry Leaders Association | ) |
| Petition for Declaratory Ruling | ) |

| | |
|---|---|
| Revolution Messaging | ) |
| Petition for Expedited Clarification and | ) |
| Declaratory Ruling | ) |
| | ) |
| Rubio's Restaurant, Inc. | ) |
| Petition for Expedited Declaratory Ruling | ) |
| | ) |
| Santander Consumer USA, Inc. | ) |
| Petition for Expedited Declaratory Ruling | ) |
| | ) |
| Stage Stores, Inc. | ) |
| Petition for Expedited Declaratory Ruling | ) |
| | ) |
| TextMe, Inc. | ) |
| Petition for Expedited Declaratory Ruling and | ) |
| Clarification | ) |
| | ) |
| United Healthcare Services, Inc. | ) |
| Petition for Expedited Declaratory Ruling | ) |
| | ) |
| YouMail, Inc. | ) |
| Petition for Expedited Declaratory Ruling | ) |
| | ) |
| 3G Collect, Inc., and 3G Collect LLC | ) |
| Petition for Expedited Declaratory Ruling | ) |
| | ) |
| ACA International | ) |
| Petition for Rulemaking | ) |

**DECLARATORY RULING AND ORDER**

**Adopted:  June 18, 2015**                              **Released:  July 10, 2015**

By the Commission: Chairman Wheeler and Commissioner Clyburn issuing separate statements; Commissioners Rosenworcel and O'Rielly approving in part, dissenting in part, and issuing separate statements; and Commissioner Pai dissenting and issuing a statement.

**TABLE OF CONTENTS**

Paragraph #

I.   INTRODUCTION ..................................................................................................................... 1
II.  BACKGROUND ...................................................................................................................... 4
III. PETITIONS FOR DECLARATORY RULING AND EXEMPTION ................................... 10
     A.  Discussion ....................................................................................................................... 10

1.  Autodialers ...................................................................................................................... 10
2.  Maker of a Call .................................................................................................................. 25
    a.  Texting/Calling Apps .................................................................................................. 25
    b.  Collect Call Services and Prerecorded- or Artificial-Voice Messages ......................... 38
3.  Consent and Called Party .................................................................................................. 47
    a.  Establishing Consent .................................................................................................. 47
    b.  Revoking Consent ...................................................................................................... 55
    c.  Reassigned Wireless Telephone Numbers .................................................................. 71
        (i)  Meaning of "Called Party" ................................................................................... 73
        (ii) Learning of Reassigned Numbers ......................................................................... 85
4.  Prior Express Written Consent After 2012 Rule Changes ................................................... 98
    a.  DMA and Coalition ..................................................................................................... 98
    b.  RILA ........................................................................................................................ 103
5.  Text Messages as Calls .................................................................................................... 107
6.  Distinction Between Telemarketing and Informational Calls ........................................... 123
7.  Free-to-End-User Calls .................................................................................................... 125
8.  Waiver and Additional Exemption Requests .................................................................... 149
9.  Call-Blocking Technology ............................................................................................... 152
IV. PETITIONS FOR RULEMAKING ....................................................................................... 164
V.  ORDERING CLAUSES ....................................................................................................... 166

APPENDIX A – List of Commenters on American Association of Healthcare Administrative Management Petition
APPENDIX B – List of Commenters on American Bankers Association Petition
APPENDIX C – List of Commenters on Coalition of Mobile Engagement Providers Petition
APPENDIX D – List of Commenters on Consumer Bankers Association Petition
APPENDIX E – List of Commenters on Direct Marketing Association Petition
APPENDIX F – List of Commenters on Paul D. S. Edwards Petition
APPENDIX G – List of Commenters on Milton H. Fried, Jr., and Richard Evans Petition
APPENDIX H – List of Commenters on Glide Talk, Ltd. Petition
APPENDIX I – List of Commenters on Global Tel*Link Corporation Petition
APPENDIX J – List of Commenters on National Association of Attorneys General
APPENDIX K – List of Commenters on Professional Association for Customer Engagement Petition
APPENDIX L – List of Commenters on Retail Industry Leaders Association Petition
APPENDIX M – List of Commenters on Revolution Messaging Petition
APPENDIX N – List of Commenters on Rubio's Restaurant, Inc., Petition
APPENDIX O – List of Commenters on Santander Consumer USA, Inc., Petition
APPENDIX P – List of Commenters on Stage Stores, Inc., Petition
APPENDIX Q – List of Commenters on TextMe, Inc., Petition
APPENDIX R – List of Commenters on United Healthcare Services, Inc., Petition
APPENDIX S – List of Commenters on YouMail, Inc., Petition
APPENDIX T – List of Commenters on 3G Collect Petition
APPENDIX U – List of Commenters on ACA International Petition
APPENDIX V – List of Commenters on Communication Innovators Petition

## I.    INTRODUCTION

1.        Month after month, unwanted robocalls and texts,[1] both telemarketing and informational, top the list of consumer complaints received by the Commission.  The Telephone Consumer Protection Act (TCPA)[2] and our rules empower consumers to decide which robocalls and text messages[3] they receive, with heightened protection to wireless consumers, for whom robocalls can be costly and particularly intrusive.  Beyond protecting consumers, federal law and our rules protect Public Safety Answering Points (PSAPs)[4] from robocalls that can tie up critical first responder resources.[5]  With this Declaratory Ruling and Order, we act to preserve consumers' rights to stop unwanted robocalls, including both voice calls and texts, and thus respond to the many who have let us, other federal agencies, and states know about their frustration with robocalls.

2.        In enacting the TCPA, Congress made clear that "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices."[6]  Since the TCPA's enactment, calling technology has changed, and businesses have grown more vocal that modern dialing equipment should not be covered by the TCPA and its consumer protections.  At the same time, consumers have also made it clear that despite such technological changes, they still want to avoid most robocalls they have not agreed to receive.  With this order—which resolves 21 separate requests for clarification or other action regarding the TCPA or the Commission's rules and orders—we affirm the vital consumer protections of the TCPA while at the same time encouraging pro-consumer uses of modern calling technology.  Further, the clarity we provide in this Declaratory Ruling and Order will benefit consumers and good-faith callers alike by clarifying whether conduct violates the TCPA and by detailing simple guidance intended to assist callers in avoiding violations and consequent litigation.  Among other actions, we:

---

[1] In this Declaratory Ruling and Order, we refer to calls that require consumer consent under the TCPA as "robocalls," "covered calls and texts," or "voice calls and texts."  *See, e.g.*, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1831, para. 1 (2012) (*2012 TCPA Order*).  Unless otherwise indicated, the term "robocalls" includes calls made either with an automatic telephone dialing system ("autodialer") or with a prerecorded or artificial voice.  *Id.*  We may also refer to prerecorded-voice and artificial-voice calls collectively as "prerecorded calls."

[2] The TCPA is codified at section 227 of the Communications Act of 1934, as amended.  *See* 47 U.S.C. § 227.  The TCPA defines "automatic telephone dialing system" as "equipment which has the capacity--(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  *Id.* § 227(a)(1).

[3] Except where context requires otherwise, our use of the term "call" includes text messages.  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115, para. 165 (2003) (*2003 TCPA Order*).

[4] A PSAP is a "facility that has been designated to receive emergency calls and route them to emergency service personnel."  47 U.S.C. § 222(h)(4); *see also* 47 C.F.R. § 64.3000(c).

[5] *See* 47 U.S.C. §§ 1403(a), 1473(b).

[6] Pub L. No. 102-243, § 2(9) (1991).  As its very name makes clear, the Telephone Consumer Protection Act is a broad "consumer protection" statute that addresses the telemarketing practices not just of bad actors attempting to perpetrate frauds, but also of "legitimate businesses" employing calling practices that consumers find objectionable.  *See, e.g.*, Commissioner Pai Dissent at 2.  The TCPA makes it unlawful for any business—"legitimate" or not—to make robocalls that do not comply with the provisions of the statute.  While the Commission has traditionally sought to "reasonably accommodate[] individuals' rights to privacy as well as the legitimate business interests of telemarketers," *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, 8754, para. 3 (1992) (*1992 TCPA Order*), we have not viewed "legitimate" businesses as somehow exempt from the statute, nor do we do so today.

- Strengthen the core protections of the TCPA by confirming that:

  o Callers cannot avoid obtaining consumer consent for a robocall simply because they are not "currently" or "presently" dialing random or sequential phone numbers;

  o Simply being on an acquaintance's phone contact list does not amount to consent to receive robocalls from third-party applications downloaded by the acquaintance;

  o Callers are liable for robocalls to reassigned wireless numbers when the current subscriber to or customary user of the number has not consented, subject to a limited, one-call exception for cases in which the caller does not have actual or constructive knowledge of the reassignment;

  o Internet-to-phone text messages require consumer consent; and

  o Text messages are "calls" subject to the TCPA, as previously determined by the Commission.

- Empower consumers to stop unwanted calls by confirming that:

  o Consumers may revoke consent at any time and through any reasonable means; and

  o Nothing in the Communications Act or our implementing rules prohibits carriers or Voice over Internet Protocol (VoIP) providers from implementing consumer-initiated call-blocking technology that can help consumers stop unwanted robocalls.

- Recognize the legitimate interests of callers by:

  o Clarifying that application providers that play a minimal role in sending text messages are not *per se* liable for unwanted robocalls;

  o Clarifying that when collect-call services provide consumers with valuable call set-up information, those providers are not liable for making unwanted robocalls;

  o Clarifying that "on demand" text messages sent in response to a consumer request are not subject to TCPA liability;

  o Waiving our 2012 "prior express written consent" rule for certain parties for a limited period of time to allow them to obtain updated consent;

  o Exempting certain free, pro-consumer financial- and healthcare-related messages from the consumer-consent requirement, subject to strict conditions and limitations to protect consumer privacy; and

  o Providing and reiterating guidance regarding the TCPA and our rules, empowering callers to mitigate litigation through compliance and dispose of litigation quickly where they have complied.

Federal Communications Commission                                    FCC 15-72

3.      With this Declaratory Ruling and Order, we address 19 petitions[7] filed by American Association of Healthcare Administrative Management (AAHAM), American Bankers Association (ABA), Coalition of Mobile Engagement Providers (Coalition), Consumer Bankers Association (CBA), Direct Marketing Association (DMA), Paul D. S. Edwards (Edwards), Milton H. Fried, Jr., and Richard Evans (Fried and Evans), Glide Talk, Ltd. (Glide), Global Tel*Link Corporation (GTL), Professional Association for Customer Engagement (PACE), Retail Industry Leaders Association (RILA), Revolution Messaging (Revolution Messaging), Rubio's Restaurant, Inc. (Rubio's), Santander Consumer USA, Inc. (Santander), Stage Stores, Inc. (Stage), TextMe, Inc. (TextMe), United Healthcare Services, Inc. (United), YouMail, Inc. (YouMail), and 3G Collect, Inc., and 3G Collect LLC (3G Collect).  We also address a letter from the National Association of Attorneys General (NAAG), requesting clarification.[8]  Finally, we decline to grant a petition for rulemaking filed by ACA International (ACA).[9]  Because of the significant similarity of issues between some of the petitions, we address them together by issue rather than individually. [10]

---

[7] *American Association of Healthcare Administrative Management,* Petition for Expedited Declaratory Ruling and Exemption, CG Docket No. 02-278, filed Oct. 21, 2014 (AAHAM Petition); *American Bankers Association,* Petition for Exemption, CG Docket No. 02-278, filed Oct. 14, 2014 (ABA Petition); *Coalition of Mobile Engagement Providers,* Petition for Declaratory Ruling, CG Docket No. 02-278, filed Oct. 17, 2013 (Coalition Petition); *Consumer Bankers Association,* Petition for Declaratory Ruling, CG Docket No. 02-27, filed Sept. 19, 2013 (CBA Petition); *Direct Marketing Association,* Petition for Forbearance, CG Docket No. 02-278, filed Oct. 17, 2013; *Direct Marketing Association,* Emergency Petition for Special Temporary Relief, CG Docket No. 02-278, filed Oct. 17, 2013 (together DMA Petition); *Paul D. S. Edwards,* Petition for Expedited Clarification and Declaratory Ruling, CG Docket No. 02-278, filed Jan. 12, 2009 (Edwards Petition); *Milton H. Fried, Jr., and Richard Evans,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed May 27, 2014 (Fried Petition); *Glide Talk, Ltd.,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed Oct. 28, 2013 (Glide Petition); *Global Tel*Link,* Petition for Expedited Clarification and Declaratory Ruling, CG Docket No. 02-278, filed March 4, 2010 (GTL Petition); *Professional Association for Customer Engagement,* Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking, CG Docket No. 02-278, filed Oct. 18, 2013 (PACE Petition); *Retail Industry Leaders Association,* Petition for Declaratory Ruling, CG Docket No. 02-278, filed Dec. 30, 2013 (RILA Petition); *Revolution Messaging,* Petition for Expedited Clarification and Declaratory Ruling, CG Docket No. 02-278, filed Jan. 19, 2012 (Revolution Petition); *Rubio's Restaurant, Inc.,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed Aug. 15, 2014 (Rubio's Petition); *Santander Consumer USA, Inc.,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed July 10, 2014 (Santander Petition); *Stage Stores, Inc.,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed June 4, 2014 (Stage Petition); *TextMe, Inc.,* Petition for Expedited Declaratory Ruling and Clarification, CG Docket No. 02-278, filed Mar. 18, 2014 (TextMe Petition); *United Healthcare Services, Inc.,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed Jan. 16, 2014 (United Petition); *YouMail, Inc.,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed April 19, 2013 (YouMail Petition); *3G Collect Inc., and 3G Collect LLC, ,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed Oct. 28, 2011 (3G Collect Petition).

[8] Letter from Indiana Attorney General Greg Zoeller *et al.* to Tom Wheeler, Chairman, Federal Communications Commission (Sept. 9, 2014) (additional signatories include Attorneys General from Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Guam, Hawaii, Idaho, Illinois, Iowa, Kentucky, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, and Wyoming) (NAAG Letter).

[9] *ACA International,* Petition for Rulemaking, RM No. 11712 (filed Feb.11, 2014) (ACA Petition).  The ACA Petition specifically asks the Commission to "initiate a rulemaking to address significant issues related to the application of the [TCPA]." *Id.* at 1; *see also id.* at 18.  The Commission issued a Public Notice regarding the ACA Petition for Rulemaking.  *See Consumer and Governmental Affairs Bureau Reference Information Center Petition for Rulemaking Filed,* Report No. 2999, RM No. 11712 (Feb. 21, 2014).  *See* Appendix U for a list of all commenters on the ACA Petition.

[10] The Petitions and Letter filed by AAHAM, ABA, Coalition, CBA, DMA, Edwards, Fried and Evans, Glide, GTL, NAAG, PACE, RILA, Revolution Messaging, Rubio's, Santander, Stage, TextMe, United, YouMail, and 3G Collect
(continued....)

## II.    BACKGROUND

4.        Congress enacted the TCPA in 1991 to address certain practices thought to be an invasion of consumer privacy and a risk to public safety.[11]  The TCPA and the Commission's implementing rules prohibit: (1) making telemarketing calls using an artificial or prerecorded voice to *residential* telephones without prior express consent;[12] and (2) making any non-emergency call using an automatic telephone dialing system ("autodialer") or an artificial or prerecorded voice to a *wireless* telephone number without

(...continued from previous page)

were filed individually, and the Commission sought comment on each Petition and Letter individually.  *See Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling and Exemption From American Association of Healthcare Administrative Management*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 15267 (2014); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Exemption Filed by American Bankers Association*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 13673 (2014); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Declaratory Ruling from a Coalition of Mobile Engagement Providers*, CG Docket No. 02-278, Public Notice, 28 FCC Rcd 15100 (2013); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Declaratory Ruling From Consumer Bankers Association*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 12683 (2014); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Forbearance from the Direct Marketing Association*, CG Docket No. 02-278, Public Notice, 28 FCC Rcd 15103 (2013); *Consumer and Governmental Affairs Bureau Seeks Comment on Paul D. S. Edwards's Petition for an Expedited Clarification and Declaratory Ruling*, CG Docket No. 02-278, Public Notice, 24 FCC Rcd 2907 (2009); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling on Autodialer Issue From Milton H. Fried, Jr. and Richard Evans*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 8229 (2014);*Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling Filed by Glide Talk, Ltd.*, CG Docket No. 02-278, Public Notice, 28 FCC Rcd 16336 (2013); *Consumer and Governmental Affairs Bureau Seeks Comment on Global Tel*Link Corporation's Petition for Expedited Clarification and Declaratory Ruling*, CG Docket No. 02-278, Public Notice, 25 FCC Rcd 7084 (2010); *Consumer and Governmental Affairs Bureau Seeks Comment on Robocalls and Call-blocking Issues Raised by the National Association of Attorneys General on Behalf of Thirty-Nine Attorneys General*, CG Docket No. 02-278, WC Docket No. 07-135, Public Notice, 29 FCC Rcd 14329 (2014); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Establishing Just and Reasonable Rates for Local Exchange Carriers*, CG Docket No. 02-278, WC Docket No. 07-135, Order, 29 FCC Rcd 15273 (2014) (extending comment and reply comment deadlines); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking from The Professional Association for Customer Engagement*, CG Docket No. 02-278, Public Notice, 28 FCC Rcd 15869 (2013); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Declaratory Ruling Filed by Retail Industry Leaders Association*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 459 (2014);*Consumer and Governmental Affair Bureau Seeks Comment on Petition for Expedited Clarification and Declaratory Ruling from Revolution Messaging, LLC*, CG Docket No. 02-278, Public Notice, 27 FCC Rcd 13265 (2012); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling Filed by Rubio's Restaurant, Inc.*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 10106 (2014); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling Filed by Santander Consumer USA, Inc.*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 9433 (2014);*Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling Filed by Stage Stores, Inc.*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 8220 (2014); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling filed by TextMe, Inc.*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 3709 (2014); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling from United Healthcare Services, Inc.*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 1160 (2014); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling from YouMail, Inc.*, CG Docket No. 02-278, Public Notice, 28 FCC Rcd 9013 (2013); *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling From 3G Collect*, CG Docket No. 02-278, Public Notice, 27 FCC Rcd 13317 (2012).

[11] *See* 47 U.S.C. § 227; *1992 TCPA Order,* 7 FCC Rcd at 8753, para. 2.

[12] 47 U.S.C § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(3).  Certain calls, such as those by or on behalf of a tax-exempt nonprofit organization or calls subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), may be made without the prior express written consent of the called party.  47 C.F.R. § 64.1200(a)(3).

prior express consent.[13]  If the call includes or introduces an advertisement or constitutes telemarketing, consent must be in writing.  If an autodialed or prerecorded call to a wireless number is not for such purposes, the consent may be oral or written.[14]  Since the TCPA's passage in 1991, the Commission has taken multiple actions implementing and interpreting the TCPA,[15] and has issued numerous Declaratory Rulings clarifying specific aspects of the TCPA.[16]  In implementing the TCPA,[17] the Commission sought

---

[13] 47 U.S.C § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)(1).  This restriction also applies to such calls directed to emergency numbers and other specified locations.  For autodialed or prerecorded-voice telemarketing calls to wireless numbers, prior express consent must be written.  *2012 TCPA Order*, 27 FCC Rcd at 1838, para. 20.  We do not disturb the Commission's earlier decision that the TCPA's restrictions do not cover calls from wireless carriers to their customers.  *See 1992 TCPA Order*, 7 FCC Rcd at 8775, paras. 43, 45; *2012 TCPA Order*, 27 FCC Rcd at 1834, 1840, paras. 10, 27; *Ex Parte* Letter from Krista Witanowski, CTIA – The Wireless Association, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278 (filed June 5, 2015).

[14] 47 C.F.R. § 64.1200(a).

[15] *See 1992 TCPA Order*, 7 FCC Rcd 8752 (establishing safeguards for avoiding unwanted telephone solicitations to residences, and to restrict the use of automatic telephone dialing systems, prerecorded- or artificial-voice messages, and telephone facsimile machines); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No.92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391 (1995) (*1995 TCPA Order*) (clarifying rules with respect to debt collection calls, established business relationship, and facsimile service providers); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 92-90, Order on Further Reconsideration, 12 FCC Rcd 4609 (1997) (stating that a message sent by a facsimile broadcast service provider must contain the identification and telephone number of the entity on whose behalf the message was sent); *2003 TCPA Order*, 18 FCC Rcd 14014 (establishing the National Do-Not-Call Registry, setting abandoned call rates for predictive dialers, and determining that predictive dialers fall within the definition of automatic telephone dialing system); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Order, 19 FCC Rcd 19215 (2004) (*2004 TCPA Order*) (creating a limited safe harbor period from the prohibition on autodialed or prerecorded message calls to wireless numbers recently ported from wireline service); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Second Order On Reconsideration, 20 FCC Rcd 3788 (2005) (clarifying the application of the established business relationship exemption and the rules on maintaining company-specific do-not-call lists); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Junk Fax Prevention Act of 2005*, CG Docket Nos. 02-278, 05-338, Report and Order and Third Order on Reconsideration, 21 FCC Rcd 3787 (2006) (addressing the established business relationship in terms of facsimile advertisements, detailing the required notice and contact information for facsimile recipients to opt out of future transmissions from the sender, and specifying when a request to opt out complies with the Junk Fax Prevention Act); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 23 FCC Rcd 9779 (2008) (extending the National Do-Not-Call Registry so that registrations remain indefinitely); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Junk Fax Prevention Act of 2005*, CG Docket Nos. 02-278, 05-338, Order on Reconsideration, 23 FCC Rcd 15059 (2008) (discussing when facsimile numbers will be presumed to have been made voluntarily available for public distribution, and requiring the sender's opt-out mechanism be placed on the first webpage to which recipients are directed in the opt-out notice); *2012 TCPA Order* (specifying the type of consent needed for autodialed and prerecorded-voice calls to wireless and wireline numbers, requiring in-call opt-out mechanisms for prerecorded telemarketing calls, and exempting from TCPA requirements prerecorded calls to residential lines made by health care-related entities governed by HIPAA).

[16] *See, e.g., Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, FCC Docket No. 07-232, 23 FCC Rcd 559 (2008) (*ACA Declaratory Ruling*); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, SoundBite Communications, Inc., Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, 27 FCC Rcd 15391 (2012) (*SoundBite Declaratory Ruling*); *Joint Petition filed by DISH Network, LLC, The United States of America, and the States of California, Illinois, North Carolina, and Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules, et. al.*, CG Docket No. 11-50, Declaratory Ruling, 28 FCC Rcd 6574, 6574, para. 1 (2013) (*DISH Declaratory Ruling*).

[17] Unless context or the text indicates otherwise, the term "TCPA" is used herein to refer collectively to the statute as interpreted and implemented in our rules and orders.

to "reasonably accommodate[] individuals' rights to privacy as well as the legitimate business interests of telemarketers"[18] and other callers.[19]   Apart from the Commission's enforcement, the law grants consumers a private right of action, with provision for $500 or the actual monetary loss in damages for each violation, whichever is greater, and treble damages for each willful or knowing violation.[20]

5.       Despite the Commission's efforts to protect consumers without inhibiting legitimate business communications, TCPA complaints as a whole are the largest category of informal complaints we receive.[21]   Between 2010 and 2012, consumer complaints about calls to wireless phones doubled, to an average of over 10,000 complaints per month in 2012.[22]   In 2013 and 2014, the Commission received roughly 5,000 or 6,000 such complaints per month, lower than in 2011 and 2012, but still a substantial monthly total that is persistently one of the top consumer concerns.[23]   The Federal Trade Commission (FTC) reports that it received "approximately 63,000 complaints about illegal robocalls each month" during the fourth quarter of 2009, but that "[b]y the fourth quarter of 2012, robocall complaints had peaked at more than 200,000 per month."[24]   Other sources corroborate the trend; for example, Consumer Federation of America recently ranked do-not-call and telemarketing abuse issues as number eight on its list of complaints, the fastest-growing complaint subject in 2013.[25]

6.       It appears that the number of TCPA private right of action lawsuits is increasing as well.[26]   Petitioners and commenters have reported an increase in the number of TCPA-related individual and

---

[18] *1992 TCPA Order*, 7 FCC Rcd at 8754, para. 3.

[19] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Cargo Airline Association Petition for Expedited Declaratory Ruling,* CG Docket No. 02-278, 29 FCC Rcd 3432 at *6, para. 19 (2014) (*Cargo Airline Order*).  The TCPA and Commission rules establish other consumer protections not directly relevant to this order including: restrict the use of facsimile (fax) machines for unsolicited advertisements (§ 64.1200(a)(4)); specify identifying information and opt-out mechanisms that must be included in an artificial- or prerecorded-voice call (§ 64.1200(b)); set time-of-day restrictions for placing solicitation telephone calls (§ 64.1200(c)(1)); and outline procedures for compliance with the National Do-Not-Call Registry (§ 64.1200(c)(2)).

[20] 47 U.S.C § 227(b)(3).

[21] *See* Federal Communications Commission Encyclopedia, Quarterly Reports-Consumer Inquiries and Complaints, Top Complaint Subjects, *available at* http://www.fcc.gov/encyclopedia/quarterly-reports-consumer-inquiries-and-complaints (last visited May 18, 2015).

[22] *See* Federal Communications Commission Encyclopedia, Quarterly Reports-Consumer Inquiries and Complaints, *available at* http://www.fcc.gov/encyclopedia/quarterly-reports-consumer-inquiries-and-complaints (last visited May 18, 2015).

[23] *See id.*  The average number of monthly complaints about TCPA violations associated with wireless phones was 4,373 in 2010; 7,661 in 2011; 10,144 in 2012; 6,032 in 2013; and 5,339 for the first three quarters of 2014.  *Id.*

[24] Federal Trade Commission Staff's Comments on Public Notice DA 14-1700 Regarding Call Blocking, CG Docket No. 02-278, WC Docket No. 07-135, at 2 n.5 (Jan. 23, 2015).  The FTC also reports that, "[f]rom October 2013 to September 2014, [it] received an average of 261,757 do-not-call complaints per month, of which approximately 55% (144,550 per month) were complaints about robocalls."  *Id.* at 2 n.4.

[25] Consumer Federation of America North American Consumer Protection Investigators 2013 Consumer Complaint Survey Report (July 30, 2014), *available at* http://www.consumerfed.org/pdfs/2013-consumer-survey-report.pdf (last visited May 18, 2015).

[26] *See* AFSA Comments on Glide Petition at 3 (TCPA lawsuits up 116 percent between Sept. 2012 and Sept. 2013); United Reply Comments on United Petition at 17 (in Jan. 2014, 208 TCPA cases were filed, an increase of 30 percent from previous year).  These widely varying estimates regarding increases in TCPA litigation are difficult to compare or confirm.  The Commission usually does not participate in such litigation, although it sometimes files *amicus* briefs.

class-action lawsuits.[27]  Commenter American Financial Services Association reports that "TCPA lawsuits were up 116 percent in September 2013 compared to September 2012.  Echoing that trend, year-to-date TCPA lawsuits have increased 70 percent in 2013."[28]

7.        Parties who want to reach consumers using automated dialing technologies have sought clarification on an array of TCPA issues.  Dialing options can now be cloud-based,[29] and available via smartphone apps.  Calling and texting consumers *en masse* has never been easier or less expensive.[30]  With that backdrop, the Commission received 27 petitions for declaratory ruling or rulemaking that raised TCPA questions about autodialed calls from the beginning of 2012 through the end of 2014.[31]  The rise in complaints, litigation, and petitions may also be attributable to the skyrocketing growth of mobile phones, rising from approximately 140 million wireless subscriber connections in 2002 to approximately 326 million in 2012.[32]  Additionally, 39 percent of adults were wireless-only in the second half of 2013, compared to fewer than three percent of adults at the beginning of 2003.[33]

8.        These changes have placed increased attention on the TCPA's heightened protections for

---

[27] *See, e.g.*, ABA Petition at 7-8; CBA Petition at 10-11; Coalition Petition at 12; Communication Innovators (CI) Petition at 15; Glide Petition at 9; PACE Petition at 6; RILA Petition at 9-10.  *See* n. 42, *infra*, for information on CI's withdrawal of its Petition.

[28] AFSA Comments on Glide Petition at 3.

[29] The National Institute of Standards and Technology defines "cloud computing" as "a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (*e.g.*, networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction."  Peter Mell & Timothy Grance, *The NIST Definition of Cloud Computing: Recommendations of the National Institute of Standards and Technology* 2 (Sept. 2011), *available at* http://csrc.nist.gov/publications/nistpubs/800-145/SP800-145.pdf (last visited May 18, 2015).

[30] *See, e.g., Ex Parte* Letter from Mark W. Brennan, Counsel to Communication Innovators, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at Attachment A (filed May 10, 2013) (providing additional technical details about predictive dialers); Revolution Petition at 5-6, 9.

[31] *See* the Commission's Electronic Comment Filing System, *available at* http://apps.fcc.gov/ecfs/ (last visited May 18, 2015).

[32] Wireless Quick Facts, CTIA: The Wireless Association, *available at* http://www.ctia.org/your-wireless-life/how-wireless-works/wireless-quick-facts (last visited May 18, 2015).  "Wireless subscriber connections" include smartphones, feature phones, tablets, etc.  *Id.*  The Organisation for Economic Co-operation and Development (OECD) reports that, in June 2013, the United States had 299,447,000 wireless broadband subscriptions.  *See* OECD Broadband Statistics, *available at* http://www.oecd.org/internet/broadband/oecdbroadbandportal.htm (last visited May 18, 2015).

[33] Stephen J. Blumberg and Julian V. Luke, *Wireless Substitution: Early Release of Estimates From the National Health Interview Survey, July–December 2013*, Division of Health Interview Statistics, National Center for Health Statistics, July 2014, at 2; Stephen J. Blumberg and Julian V. Luke, *Wireless Substitution: Early Release of Estimates From the National Health Interview Survey, January–June 2013*, Division of Health Interview Statistics, National Center for Health Statistics, Dec. 2013, at 1; Stephen J. Blumberg and Julian V. Luke, NCHS Health E-Stat, *Wireless Substitution: Preliminary Data from the 2005 National Health Interview Survey*, at chart, *available at* http://www.cdc.gov/nchs/data/hestat/wireless2005/wireless2005.htm (last visited May 18, 2015).  The Commission's analysis of wireless data demonstrates that the number of adults who rely exclusively on mobile wireless for voice service has increased significantly in recent years to approximately 32.3 percent in the second half of 2011, compared to 27.8 percent of all adults in the second half of 2010 and 22.9 percent in the second half 2009.  *See Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993 Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, WT Docket 11-186, 28 FCC Rcd 3700, 3725 (2013).

wireless consumers.[34]  While the Commission's past interpretations have addressed nuanced aspects of the TCPA rules, changes in how consumers use their phones, how technology can access consumers, and the way consumers and businesses wish to make calls mean that we are presented with new issues regarding application and interpretation of the TCPA.  Through their complaints and comments, consumers have expressed their frustration with unwanted voice calls and texts and have asked the Commission to preserve their privacy rights under the TCPA.[35]  Members of Congress, likewise, have expressed their interest in the consumer protections of the TCPA and the TCPA petitions filed with the Commission.[36]  Through those petitions, businesses and business groups have sought clarity about the TCPA's consumer-privacy protections so they can offer potentially useful, innovative services in a cost-effective, lawful manner.[37]  We address both concerns here.

        9.      To reiterate and simplify the relevant portions of the TCPA, and as a guide to the issues we address below: if a caller uses an autodialer or prerecorded message to make a non-emergency call to a wireless phone, the caller must have obtained the consumer's prior express consent or face liability for violating the TCPA.[38]  Prior express consent for these calls must be in writing if the message is telemarketing, but can be either oral or written if the call is informational.

**III.     PETITIONS FOR DECLARATORY RULING AND EXEMPTION**

        **A.      Discussion**

                **1.      Autodialers**

                10.     We reaffirm our previous statements that dialing equipment generally has the capacity to

---

[34] *See* Letter from 35 Trade Associations and Business Groups to Tom Wheeler, Chairman, and Commissioners Clyburn, Rosenworcel, Pai, and O'Rielly, Federal Communications Commission, CG Docket No. 02-278 (Feb. 2, 2015).

[35] *See, e.g., Ex Parte* Letter from Tim Marvin, Consumers Union, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, (filed March 25, 2015) (attaching 130,000 consumer names in support of maintaining restrictions on unsolicited, non-emergency robocalls to cell phones); Coffman Comments on Glide Petition at 7 ("Expanding the growth of the mobile app industry may be desirable, but not at the expense of the privacy rights the TCPA is designed to protect."); *see also* Letter from Sens. Edward J. Markey, Charles E. Schumer, Ron Wyden, Claire McCaskill, Elizabeth Warren, Richard Blumenthal, Amy Klobuchar, Tammy Baldwin, Jeff Merkley, and Al Franken, U.S. Senate, to Tom Wheeler, Chairman, FCC, at 1 (May 14, 2015).

[36] Letter from Rep. Brian Bilbray, U.S. Congress, to Julius Genachowski, Chairman, FCC (Aug. 21, 2012); Letter from Rep. Bob Filner, U.S. Congress, to Julius Genachowski, Chairman, FCC (Sept. 26, 2012); Letter from Reps. Duncan Hunter, Scott Peters, and Juan Vargas, U.S. Congress, to Mignon L. Clyburn, Acting Chairwoman, FCC (June 19, 2013); Letter from Rep. David B. McKinley, U.S. Congress, to Tom Wheeler, Chairman, FCC (Jan. 27, 2014); Letter from Reps. Marsha Blackburn, Blaine Luetkemeyer, John Kline, Pete Olson, Mike Pompeo, Andy Barr, Michael Burgess, David McKinley, Diane Black, Jackie Walorski, Robert Hurt, Steve Stivers, Brad Wenstrup, Phil Gingrey, and Tim Walberg, U.S. Congress, to Tom Wheeler, Chairman, FCC (Aug. 1, 2014); Letter from Reps. David Price, G.K. Butterfield, and Renee Ellmers, U.S. Congress, to Tom Wheeler, Chairman, FCC (Jan. 8, 2015) (letter is misdated as Jan. 8, 2014); Letter from Sens. Edward J. Markey, Charles E. Schumer, Ron Wyden, Claire McCaskill, Tammy Baldwin, Barbara Boxer, Richard Blumenthal, Elizabeth Warren, Bernard Sanders, Kristen Gillibrand, Jeff Merkley, Amy Klobuchar, Sheldon Whitehouse, and Al Franken, U.S. Senate, to Tom Wheeler, Chairman, FCC (Jan. 28, 2015); Letter from Rep. Tim Huelskamp, U.S. Congress, to Tom Wheeler, Chairman, FCC (Feb. 6, 2015); Letter from Rep. Scott R. Tipton, U.S. Congress, to Tom Wheeler, Chairman, FCC (April 2, 2015); Letter from Sens. Edward J. Markey, Charles E. Schumer, Ron Wyden, Claire McCaskill, Elizabeth Warren, Richard Blumenthal, Amy Klobuchar, Tammy Baldwin, Jeff Merkley, and Al Franken, U.S. Senate, to Tom Wheeler, Chairman, FCC (May 14, 2015); Letter from Reps. Gus Bilirakis, Jerry McNerney, Leonard Lance, and Tony Cardenas, U.S. Congress, to Tom Wheeler, Chairman, FCC (June 11, 2015).

[37] *See, e.g.,* Glide Petition at 1-2; YouMail Petition at 14-15; United Petition at 2-3; *see also* Glide Reply Comments on Glide Petition at 8; Twilio Comments on Glide Petition at 6.

[38] *See 2012 TCPA Order*, 27 FCC Rcd at 1838-44, paras. 20-33.

store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of "autodialer") even if it is not presently used for that purpose, including when the caller is calling a set list of consumers.  We also reiterate that predictive dialers, as previously described by the Commission,[39] satisfy the TCPA's definition of "autodialer" for the same reason.[40]  We also find that callers cannot avoid obtaining consent by dividing ownership of pieces of dialing equipment that work in concert among multiple entities.[41]

11.      Glide, PACE, and TextMe[42] ask whether dialing equipment is an autodialer under the TCPA when it does not have the "current capacity" or "present ability" to generate or store random or sequential numbers or to dial sequentially or randomly at the time the call is made.  Glide asks the Commission to clarify that "equipment used to make a call is an autodialer subject to the TCPA only if it is capable of storing or generating sequential or random numbers at the time of the call."[43]  PACE seeks clarification that a dialing system's "capacity" is "limited to what it is capable of doing, without further modification, at the time the call is placed."[44]  TextMe asks the Commission to clarify that "capacity" "encompasses only equipment that, at the time of use, could in fact perform the functions described in the TCPA without human intervention and without first being technologically altered."[45]

12.      The TCPA defines "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number

---

[39] In its 2003 Declaratory Ruling, the Commission mentioned certain characteristics that, it was argued, removed equipment having those characteristics from the scope of the statutory autodialer definition.  The Commission described a predictive dialer as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls.  The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."  *2003 TCPA Order*, 18 FCC Rcd at 14091, para. 131.  The Commission also noted that the "principal feature of predictive dialing software is a timing function, not number storage or generation."  *Id.*  After discussing the TCPA's definition of "autodialer" and Congress' intent in creating the TCPA, the Commission found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."  *Id.* at 14091-92, paras. 132-33.  The Commission's finding that predictive dialers fall within the statutory autodialer definition thus focuses on whether equipment has the requisite "capacity," and therefore is not limited to any specific piece of equipment and is without regard to the name given the equipment for marketing purposes.

[40] *See* paras. 16-20, *infra*; *see also ACA Declaratory Ruling*, 23 FCC Rcd at 566, para. 13.

[41] *See* para. 23, *infra*.

[42] YouMail also raised this question in its Petition.  *See* YouMail Petition at 11.  It later requested that the Commission "set aside consideration of the ATDS argument originally raised in its Petition."  *Ex Parte* Letter from Lauren Lynch Flick, Counsel to YouMail, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 5 (filed April 14, 2014).  CI also raised this issue in a Petition for Declaratory Ruling.  *Communication Innovators,* Petition for Declaratory Ruling, CG Docket No. 02-278, filed June 7, 2012 (CI Petition).  CI withdrew its Petition after the Commission sought comment on the issues raised in the Petition.  *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Declaratory Ruling from Communication Innovators*, CG Docket No. 02-278, Public Notice, 27 FCC Rcd 13031 (2012); *Communication Innovators,* Withdrawal of Petition, CG Docket No. 02-278, filed July 14, 2014.  Comments submitted in response to that Public Notice remain part of the record in this docket, and reveal continued questions about this issue beyond the CI Petition itself.  *See* Appendix V for a list of all commenters on the CI Petition.

[43] Glide Petition at 10.

[44] PACE Petition at 4 (emphasis omitted).

[45] TextMe Petition at 3.

generator; and (B) to dial such numbers."[46]  In the *2003 TCPA Order*, the Commission found that, in order to be considered an "automatic telephone dialing system," the "equipment need only have the '*capacity* to store or produce telephone numbers.'"[47]  The Commission stated that, even when dialing a fixed set of numbers, equipment may nevertheless meet the autodialer definition.[48]

13.    In the *2003 TCPA Order*, the Commission described a predictive dialer as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls.  The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."[49]  In the 2008 *ACA Declaratory Ruling*, the Commission "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[50]  The Commission considered ACA's argument that a predictive dialer is an autodialer "only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists,"[51] and stated that ACA raised "no new information about predictive dialers that warrant[ed] reconsideration of these findings" regarding the prohibited uses of autodialers—and therefore predictive dialers—under the TCPA.[52]

14.    The Commission declined to distinguish between calls to wireless telephone numbers made by dialing equipment "paired with predictive dialing software and a database of numbers" and calls made "when the equipment operates independently of such lists and software packages."[53]  Recognizing the developments in calling technology, the Commission found that "[t]he basic function of such equipment, however, has not changed—the *capacity* to dial numbers without human intervention."[54]  The Commission found it troubling that predictive dialers, like dialers that utilize random or sequential numbers instead of a list of numbers, retain the capacity to dial thousands of numbers in a short period of time and that construing the autodialer definition to exclude predictive dialers could harm public safety by allowing such equipment to be used to place potentially large numbers of non-emergency calls to emergency numbers, a result the TCPA was intended to prevent.  The Commission concluded that the TCPA's unqualified use of the term "capacity" was intended to prevent circumvention of the restriction on making autodialed calls to wireless phones and emergency numbers and found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."[55]

---

[46] 47 U.S.C. § 227(a)(1); *see also* 47 C.F.R. § 64.1200(f)(2) ("The terms *automatic telephone dialing system* and *autodialer* mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.").

[47] *2003 TCPA Order*, 18 FCC Rcd at 14092, para. 132 (emphasis in original).

[48] *Id.* at para. 133.

[49] *2003 TCPA Order*, 18 FCC Rcd at 14091, para. 131.

[50] *ACA Declaratory Ruling*, 23 FCC Rcd at 566, para. 12.

[51] *Id.*

[52] *Id.* at 23 FCC Rcd at 566-67, para. 14.

[53] *2003 TCPA Order,* 18 FCC Rcd at 10492, para. 133.

[54] *Id.* at para. 132.

[55] *Id.* at 18 FCC Rcd at 14091-93, paras. 132-33.  *See supra* n. 39 for details of the Commission's description of predictive dialers.  We reiterate that the Commission's finding that predictive dialers fall within the statutory autodialer definition focuses on whether equipment has the requisite "capacity," and therefore is not limited to any specific piece of equipment and is without regard to the name given the equipment for marketing purposes.  *See also Ex Parte* Letter from Ellen Taverna and Margot Saunders, Counsel to National Association of Consumer Advocates and National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278 (filed Feb. 19, 2015) (the ex parte filing on behalf of eight organizations includes a list of 58,000 individuals who support the

(continued....)

15.     We agree with commenters who argue that the TCPA's use of "capacity" does not exempt equipment that lacks the "present ability" to dial randomly or sequentially.  We agree that Congress intended a broad definition of autodialer,[56] and that the Commission has already twice addressed the issue in 2003 and 2008,[57] stating that autodialers need only have the "capacity" to dial random and sequential numbers, rather than the "present ability" to do so.[58]  Hence, any equipment that has the requisite "capacity"[59] is an autodialer and is therefore subject to the TCPA.[60]

16.     In the *1992 TCPA Order*, the Commission stated that it was rejecting definitions that fit "only a narrow set of circumstances" in favor of "broad definitions which best reflect[ed] legislative intent by accommodating the full range of telephone services and telemarketing practices."[61]  The Commission rejected the narrower interpretation of "capacity" (as "current ability") when it held that predictive dialer equipment meets the autodialer definition.  In the *2003 TCPA Order*, the Commission held that predictive dialers met the definition of an autodialer because that "hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."[62]  By finding that, even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodialer, the Commission implicitly rejected any "present use" or "current capacity" test.  In other words, the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities.[63]  One dissent argues that our reading of "capacity" is flawed in the same way that saying an 80,000 seat stadium has the capacity to hold 104,000.[64]  But that is an inapt analogy—modern dialing equipment can often be modified remotely without the effort and cost of adding physical space to an existing structure.  Indeed, adding space to accommodate 25 percent more people to a building is the type of mere "theoretical" modification that is insufficient to sweep it into our interpretation of "capacity."[65]

17.     Given the scope of the Petitioners' requests, we do not at this time address the exact

(...continued from previous page)⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
statement: "Tell the FCC: No robocalls to cell phones without our consent."  The list includes a de minimis number of signatures for which an address in Canada is given.).

[56] *See, e.g.,* Kirby Comments on CI Petition at 1; Roylance Comments on CI Petition at 2; Shields Comments on Glide Petition at 5; *see also* Shields Reply Comments on YouMail Petition at 3.  *See* Appendix S for a list of all commenters on the YouMail Petition.

[57] *See, e.g.,* Shields Comments on CI Petition at 1; Worsham Comments on CI Petition at 1; *see also* Roylance Comments on YouMail Petition at 2; Shields Comments on YouMail Petition at 1.

[58] *See* paras. 12-14, *supra*.  In response to an argument raised in a dissenting statement, *see* Commissioner Pai Dissent at 3-4, we reiterate that the Commission's 2003 and 2008 statements referenced here focused not on equipment's present ability to dial randomly or sequentially, but instead on its capacity and the generally automated nature of the calling.  *See 2003 TCPA Order*, 18 FCC Rcd at 14092-93, para. 133 (purpose of capacity requirement is to avoid circumvention of autodialing restrictions).  The Commission specifically focused on the capacity to dial automatically, not on the kinds of numbers the equipment was presently configured to dial.  *Id.* at 14092, para. 132 ("The basic function of such equipment, however, has not changed—the *capacity* to dial numbers without human intervention.").

[59] *ACA Declaratory Ruling*, 23 FCC Rcd at 566, para. 13.

[60] *See* paras. 18-20, *infra*; *see also ACA Declaratory Ruling*, 23 FCC Rcd at 566, para. 12.

[61] *1992 TCPA Order*, 7 FCC Rcd at 8755, para. 6.

[62] *2003 TCPA Order*, 18 FCC Rcd at 14091, para. 131.

[63] The functional capacity of software-controlled equipment is designed to be flexible, both in terms of features that can be activated or de-activated and in terms of features that can be added to the equipment's overall functionality through software changes or updates.

[64] *See* Commissioner Pai Dissent at 4.

[65] *See* para. 18, *infra*.

contours of the "autodialer" definition or seek to determine comprehensively each type of equipment that falls within that definition that would be administrable industry-wide.  Rather, we reiterate what the Commission has previously stated regarding the parameters of the definition of "autodialer."  First, the Commission found in its original TCPA proceeding that the "prohibitions of [section] 227(b)(1) clearly do not apply to functions like 'speed dialing.'"[66]  Second, the Commission has also long held that the basic functions of an autodialer are to "dial numbers without human intervention" and to "dial thousands of numbers in a short period of time."[67]  How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.

18.     We do, however, acknowledge that there are outer limits to the capacity of equipment to be an autodialer.  As is demonstrated by these precedents, the outer contours of the definition of "autodialer" do not extend to every piece of malleable and modifiable dialing equipment that conceivably could be considered to have some capacity, however small, to store and dial telephone numbers—otherwise, a handset with the mere addition of a speed dial button would be an autodialer.[68]  Further, although the Commission has found that a piece of equipment can possess the requisite "capacity" to satisfy the statutory definition of "autodialer" even if, for example, it requires the addition of software to actually perform the functions described in the definition,[69] there must be more than a theoretical potential that the equipment could be modified to satisfy the "autodialer" definition.  Thus, for example, it might be theoretically possible to modify a rotary-dial phone to such an extreme that it would satisfy the definition of "autodialer," but such a possibility is too attenuated for us to find that a rotary-dial phone has the requisite "capacity" and therefore is an autodialer.

19.     This broad interpretation of "capacity" to include "potential ability" is consistent with formal definitions of "capacity," one of which defines "capacity" as "the potential or suitability for holding, storing, or accommodating."[70]  Furthermore, interpreting "capacity" as limited to "current capacity" or "present ability," for which Petitioners and some commenters here argue,[71] could create

---

[66] *1992 TCPA Order*, 7 FCC Rcd at 8776, para. 47.

[67] *2003 TCPA Order*, 18 FCC Rcd at 14092, para. 132-33; *see also ACA Declaratory Ruling*, 23 FCC Rcd at 566, para. 13; *SoundBite Declaratory Ruling*, 27 FCC Rcd at 15392, para. 2 n.5.

[68] *See, e.g.*, para. 21, *infra*.

[69] *See 2003 TCPA Order*, 18 FCC Rcd at 14091-93, paras. 131-133.

[70] Merriam-Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/capacity (last visited May 18, 2015); *see* Webster's Third New International Dictionary (2002) (defining "capacity" as "potentiality for production or use"); *see also Johnson v. United States*, 559 U.S. 133, 134 (2010) (when a statute does not define a term, "give the phrase its ordinary meaning").  The fact that Congress could have "add[ed] tenses and moods" to its definition of autodialer—and thereby defined autodialer as "equipment which has, has had, or could have the capacity"—does not undermine our interpretation of the term.  Commissioner Pai Dissent at 4.  Congress chose to use a noun—"capacity"—that itself can reasonably be read to include a sense of futurity or unrealized potentiality.  The use of this noun in conjunction with a verb ("has") that is in the present tense does not somehow mean that the term "capacity" must be read not to convey a sense of futurity or potentiality.  Similarly, the fact that the TCPA bars callers from using autodialers to "make any call" does not mean that the equipment must be configured such that every functionality contained in the statutory definition of "autodialer" is installed and active at the time calls are made and that the caller must actually be using those functionalities to place calls in order for the TCPA's consent requirements to be triggered.  Commissioner O'Rielly Partial Dissent at 5-6.  Instead, when a caller places a call using equipment that has the requisite "capacity" (as we construe the term here), the equipment is an autodialer and a caller using it "makes" a call "using an automatic telephone dialing system" under section 227(b)(1)(A).

[71] Glide Petition at 9-13; PACE Petition at 10-12; TextMe Petition at 10-12; ABA/CBA Comments on CI Petition at 7; ACA Comments on PACE Petition at 4-7; CenturyLink Comments on CI Petition at 3; Chamber Comments on CI Petition at 8-11; Chamber Comments on PACE Petition at 5; CI Comments on Glide Petition at 3-4; CI Comments on PACE Petition at 3-5; CI Reply Comments on TextMe Petition at 4-5; CI Comments on YouMail Petition at 4; Covington Comments on PACE Petition at 4-5; DIRECTV Comments on CI Petition at 8-11; DIRECTV Comments
(continued....)

problems for enforcing the TCPA's privacy protections with regard to proving how a system with multiple calls was actually used for multiple calls.  As the Commission has previously recognized, "the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the restriction on autodialed calls not be circumvented."[72]

20.      In light of our precedent and determination that Congress intended a broad definition of autodialer, we reject arguments[73] that: the TCPA's language on its face does not support the claim that the TCPA was meant to apply to devices that need to be configured to store numbers or call sequentially;[74] a narrow reading of the TCPA is necessary to eliminate a lack of clarity regarding what constitutes an autodialer;[75] and the term "capacity" implies present ability rather than future possibility.[76]  We reiterate that a present use or present capacity test could render the TCPA's protections largely meaningless by ensuring that little or no modern dialing equipment would fit the statutory definition of an autodialer.  We also reject PACE's argument that the Commission should adopt a "human intervention" test by clarifying that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention.  Because the Commission has previously rejected a restrictive interpretation of autodialer in favor of one based on a piece of equipment's potential ability, we find that PACE's argument amounts to a simple variation on the "present ability" arguments we reject above.

21.      PACE, TextMe, and others argue that a broad interpretation of "capacity" could potentially sweep in smartphones because they may have the capacity to store telephone numbers to be called and to dial such numbers through the use of an app or other software.[77]  Even though the

(...continued from previous page)
on PACE Petition at 2-3; Fowler Comments on PACE Petition at 1; Glide Reply Comments on PACE Petition at 6; Global Connect Comments on CI Petition at 2; Global Comments on PACE Petition at 2; Internet Comments on TextMe Petition at 2-3; MRA Comments on CI Petition at 4-7; NCHER Reply Comments on PACE Petition at 2; Nicor Comments on CI Petition at Attachment at 8; Nicor Comments on PACE Petition at 7; Noble Comments on Glide Petition at 4; Noble Comments on PACE Petition at 5; Noble Comments on TextMe Petition at 1; NSC Comments on CI Petition at 9; Path Comments on Glide Petition at 22; Twilio Comments on Glide Petition at 13; YouMail Reply Comments on PACE Petition at 4.

[72] *2003 TCPA Order,* 18 FCC Rcd at 14092-93, para. 133.  As GroupMe observes, for example, autodialer functionality might be added to equipment not merely by creating new software, but even by "unlock[ing] a dormant ATDS function."  *GroupMe, Inc.,* Petition for Expedited Declaratory Ruling and Clarification, CG Docket No. 02-278, filed Mar. 1, 2012, at 10.

[73] *See* Appendix H for a list of all commenters on the Glide Petition, Appendix K for a list of all commenters on the PACE Petition, and Appendix Q for a list of all commenters on the TextMe Petition.

[74] Glide Reply Comments on Glide Petition at 5; GroupMe Comments on Glide Petition at 6-7; Twilio Comments on Glide Petition at 13.

[75] AFSA Comments on Glide Petition at 2; CI Reply Comments on TextMe Petition at 6; Internet Comments on TextMe Petition at 3.

[76] ACA Comments on PACE Petition at 4-7; Chamber Comments on PACE Petition at 5; CI Comments on Glide Petition at 3-4; CI Comments on PACE Petition at 3-5; CI Reply Comments on TextMe Petition at 4-5; Covington Comments on PACE Petition at 4-5; DIRECTV Comments on PACE Petition at 2-3; Fowler Comments on PACE Petition at 1; Glide Reply Comments on PACE Petition at 6; Global Comments on PACE Petition at 2; Internet Comments on TextMe Petition at 2-3; NCHER Reply Comments on PACE Petition at 2; Nicor Comments on PACE Petition at 7; Noble Systems Comments on Glide Petition at 4; Noble Comments on PACE Petition at 5; Noble Comments on TextMe Petition at 1; Path Comments on Glide Petition at 22; Twilio Comments on Glide Petition at 13; YouMail Reply Comments on PACE Petition at 4.

[77] PACE Reply Comments on PACE Petition at 5; TextMe Petition at 8, 12; TextMe Reply Comments on TextMe Petition at 7-8; ACA Comments on PACE Petition at 4; ACA Reply Comments on PACE Petition at 4-5; AFSA Comments on PACE Petition at 2; Chamber Comments on PACE Petition at 4; CI Reply Comments on TextMe Petition at 6; Covington Comments on PACE Petition at 5; Internet Comments on TextMe Petition at 3; iPacesetters Comments on PACE Petition at 3; Nicor Comments on PACE Petition at 7; YouMail Reply Comments on PACE Petition at 2.

Commission has interpreted "capacity" broadly since well before consumers' widespread use of smartphones, there is no evidence in the record that individual consumers have been sued based on typical use of smartphone technology. Nor have these commenters offered any scenarios under which unwanted calls are likely to result from consumers' typical use of smartphones. We have no evidence that friends, relatives, and companies with which consumers do business find those calls unwanted and take legal action against the calling consumer. We will continue to monitor our consumer complaints and other feedback, as well as private litigation, regarding atypical uses of smartphones, and provide additional clarification if necessary.

22.     Because our decision is based on the TCPA's terms and past Commission interpretation, we need not reach the policy arguments from Glide and other commenters,[78] such as claims related to class-action lawsuits,[79] that could be viewed as being offered to support reversing the Commission's prior decisions; in a declaratory ruling we only clarify existing law or resolve controversy regarding the interpretation or application of existing law, rules, and precedents.

23.     We also find that parties cannot circumvent the TCPA by dividing ownership of dialing equipment. In their Petition, Fried and Evans seek a ruling that a combination of equipment used by separate entities to send text messages constitutes an autodialer under the TCPA.[80] The Petitioners in this case received text messages from a beauty salon that had contracted with another party, Textmunications, Inc. (Textmunications), to transmit advertisements in the form of text messages to their current and former customers.[81] Textmunications, in turn, contracted with Air2Web, a mobile messaging aggregator, to transmit the messages.[82] As described in the Fried Petition and the Referral Order, the beauty salon provided customer data to Textmunications, who stored this information on its own equipment and

---

[78] Commenters assert that clarification is warranted because of changed circumstances, including (1) an increase in the number of households that utilize only wireless telephone service and (2) mutual benefits to businesses and customers. *See, e.g.*, ABA/CBA Comments on CI Petition at 7-8; Chamber Comments on CI Petition at 5-7; Nicor Comments on CI Petition at Attachment at 3; NSC Comments on CI Petition at 5-7; *see also, e.g.*, Chamber Comments on CI Petition at 3-4; DIRECTV Comments on CI Petition at 3-5; NACUBO Comments on CI Petition at 1-2; NCHER Comments on CI Petition at 2; PRA Comments on CI Petition at 2; Varolii Comments on CI Petition at 4. This argument appears to be a request to adopt an entirely new legal interpretation of the relevant statutory terms rather than a request for declaratory ruling to terminate controversy or remove uncertainty under existing law. 47 C.F.R. § 1.2. In this regard, the Commission has noted that it expects automated dialing technology to continue to develop and that Congress clearly anticipated that the Commission might need to consider any changes in technology. *ACA Declaratory Ruling*, 23 FCC Rcd at 566, para. 13 (citing *2003 TCPA Order*, 18 FCC Rcd at 14091-92, para. 132 (citing 137 CONG. REC. S18784 (daily ed. Nov. 27, 1991) (statement of Sen. Ernest Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies."))). The Commission already has considered the question twice and found predictive dialers to be autodialers. The Commission in the *2003 TCPA Order* also noted that, regardless of changes in technology, "[t]he basic function of such equipment [] has not changed—the *capacity* to dial numbers without human intervention." *2003 TCPA Order*, 18 FCC Rcd at 14092, para. 132. This argument presents nothing to suggest that there is any uncertainty or controversy about how to apply our rules and the *2003 TCPA Order*, or that changes in technology compel a different result.

[79] Glide Petition at 1, 8-9; AFSA Comments on Glide Petition at 1, 3-4; Path Comments on Glide Petition at 4, 7-12; CI Petition at 14-16.

[80] Fried Petition at 1. This petition was filed pursuant to a primary jurisdiction referral to the Commission from the U.S. District Court for the Southern District of Texas, Civil Action No. 4:13-cv-00312 (Nov. 27, 2013) (Referral Order). In this Declaratory Ruling and Order, we clarify the broad issue regarding voluntarily separate ownership of equipment that, when used together, constitutes and autodialer; we do not rule on the facts, as alleged, of the civil case that raises this issue.

[81] *See* Referral Order at 2.

[82] *Id.* at 3.

databases.[83]  Textmunications then entered into an agreement with Air2Web to use its equipment to transmit the text messages to the recipients.[84]  In effect, the separate equipment divided the storage and calling functions between these two companies.  As a result, Air2Web and Textmunications allege that their equipment should not be considered an autodialer because neither system, acting independently, has the capacity both to store or produce numbers, and dial those numbers as required by the TCPA.[85]

24.     We conclude that such equipment can be deemed an autodialer if the net result of such voluntary combination enables the equipment to have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers.  The fact that two separate entities have voluntarily entered into an agreement to provide such functionality does not alter this analysis.  As one commenter notes, this conclusion is consistent with the statutory language and prior Commission interpretations of the TCPA.[86]  The TCPA uses the word "system" to describe the automated dialing equipment that is defined in section 227(a)(1) of the Act.[87]  The Commission noted, in concluding that a predictive dialer meets the definition of an autodialer, that "[t]he hardware, *when paired* with certain software, has the capacity to store or produce numbers and dial those numbers."[88]  As a result, the Commission has recognized that various pieces of different equipment and software can be combined to form an autodialer, as contemplated by the TCPA.  The fact that these individual pieces of equipment and software might be separately owned does not change this analysis.

### 2.     Maker of a Call

#### a.     Texting/Calling Apps

25.     Next, we clarify who makes a call under the TCPA and is thus liable for any TCPA violations.  We grant, to the extent described herein, YouMail's Petition and clarify that it does not make or initiate a text when an individual merely uses its service to set up auto-replies to incoming voicemails.[89]  By contrast, we deny Glide's Petition and find that, in at least one scenario, it is the maker or initiator of text messages inviting consumers appearing in its app user's contacts lists to use the Glide app.[90]  We grant TextMe's Petition, and clarify that TextMe does not make or initiate a call when one of the app users sends an invitational message using its app.[91]

26.     With regard to collect call services, we clarify that, where a caller provides the called party's phone number to a collect call service provider and controls the content of the call, he is the maker of the call rather than the collect-call service provider who connects the call and provides information to the called party that is useful in determining whether he or she wishes to continue the call.[92]

27.     The TCPA's consent requirement applies to short message service text messages ("SMS"

---

[83] *See* Fried Petition at 4-5.

[84] *Id.* at 5.

[85] *Id.* at 6.

[86] *See* Roylance Comments on Fried Petition at 1.  *See* Appendix G for a list of all commenters on the Fried Petition.

[87] *See* 47 U.S.C. § 227(a)(1).

[88] *See 2003 TCPA Order*, 18 FCC Rcd at 14091-93, paras. 131-133 (emphasis added).

[89] *See* paras. 31-33, *infra.*

[90] *See* paras. 34-35, *infra*; *see also DISH Declaratory Ruling,* 28 FCC Rcd at 6583, para. 27.

[91] *See* paras. 36-37, *infra.*

[92] *See* para. 40, *infra.*

or "text message") in addition to voice calls.[93]  The Commission's implementing rule states that no person or entity may "*initiate* any telephone call" to the specified recipients.[94]  The Commission, in the 2013 *DISH Declaratory Ruling*,[95] noted that neither the statute nor our rules define "initiate," and determined that "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call."[96]

28.    Commenters supporting the Petitioners argue that merely providing software or a platform that facilitates calling, or hosting a calling service, is not a TCPA violation;[97] that user choice and involvement in sending text messages is the element that causes the app provider to cease to be the maker of the call;[98] and that operators of platforms do not initiate calls, but rather users of the apps do.[99] Opposing commenters argue that where the transmission service provider is highly involved with the calling, it should be held liable as the maker of the call;[100] and the app developer does not merely facilitate the call but rather makes the call when it creates and sends pre-written text messages without the app user's authorization, knowledge, or interaction.[101]

29.    The intent of Congress, when it established the TCPA in 1991, was to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls

---

[93] *2003 TCPA Order,* 18 FCC Rcd at 14115, para. 165; *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (noting that text messaging is a form of communication used primarily between telephones and is therefore consistent with the definition of a "call").

[94] 47 C.F.R. § 64.1200(a)(1) (emphasis added).

[95] While *DISH Declaratory Ruling* interpreted and applied section 227(b)(1)(B), the Commission has recently stated that the same logic that applies to the "initiation" of calls under section 227(b)(1)(b) applies to the "making" of calls under section 227(b)(1)(A).  *See DISH Declaratory Ruling,* 28 FCC Rcd at 6575, 6583, paras. 3, 26; 47 U.S.C. § 227(b)(1).

[96] *DISH Declaratory Ruling,* 28 FCC Rcd at 6583, para. 26.  The Commission went on to clarify that, while sellers do not generally initiate calls made through a third-party telemarketer within the meaning of the TCPA, the seller "nonetheless may be held vicariously liable under federal common law principles of agency for violations of [] section 227(b) [] that are committed by third-party telemarketers."  *Id.* at 6574, para. 1.  None of the petitions addressed in this Declaratory Ruling raise the issue of vicarious liability and we do not address it.

[97] CallFire Comments on YouMail Petition at 6; Glide Reply Comments on Glide Petition at 7-8; *Ex Parte* Letter from Lauren Lynch Flick, Counsel to YouMail, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed Dec. 19, 2013).

[98] AFSA Comments on YouMail Petition at 4; Biggerstaff Comments on YouMail Petition at 4-5; CallFire Comments on YouMail Petition at 5; CTIA Reply Comments on YouMail Petition at 9; Dialing Services Comments on Glide Petition at 3; Glide Reply Comments on Glide Petition at 7; Glide Reply Comments on YouMail Petition at 9-10; Twilio Comments on Glide Petition at 4, 15; YouMail Reply Comments on YouMail Petition at 12; *Ex Parte* Letter from Lauren Lynch Flick, Counsel to YouMail, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed June 21, 2013); *Ex Parte* Letter from Lauren Lynch Flick, Counsel to YouMail, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed Mar. 4, 2014).

[99] Biggerstaff Reply Comments on YouMail Petition at 4; CallFire Comments on YouMail Petition at 4; *Ex Parte* Letter from Mitchell N. Roth, Counsel to Dialing Services, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 1 (filed Dec. 5, 2013).

[100] Biggerstaff Reply Comments on YouMail Petition at 2-3; Dialing Services Reply Comments on Glide Petition at 3; Twilio Comments on Glide Petition at 3.

[101] Coffman Comments on Glide Petition at 2, 15-17; Gold Comments on YouMail Petition at 14-15; Roylance Reply Comments on YouMail Petition at 12.

generate.[102]  Congress found that consumers consider these kinds of calls, "regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy"; that businesses also complain that these kinds of calls "are a nuisance, are an invasion of privacy, and interfere with interstate commerce"; and that banning such calls, except when made for an emergency purpose or when the called party consents to receiving the call, "is the only effective means of protecting telephone consumers from this nuisance and privacy invasion."[103]  Congress therefore put the responsibility for compliance with the law directly on the party that "makes" or "initiates" automated and prerecorded message calls.  As the Commission recognized in the *DISH Declaratory Ruling*, neither the TCPA nor the Commission's rules define "make" or "initiate," nor do they establish specific factors to be considered in determining who makes or initiates a call,[104] but noted that "initiate" suggests some "direct connection between a person or entity and the making of a call."[105]  In issuing the guidance that we provide today, we account for changes in calling technology that inure to the benefit of consumers while fulfilling the intent of Congress to prohibit nuisance calls that cause frustration and harm.

30.     Specifically, a "direct connection between a person or entity and the making of a call" can include "tak[ing] the steps necessary to physically place a telephone call."[106]  It also can include being "so involved in the placing of a specific telephone call" as to be deemed to have initiated it.[107]  Thus, we look to the totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA.[108]  In discussing below how these standards apply in the context of factual circumstances presented in petitions before us, we identify factors that are relevant to the *DISH Declaratory Ruling* analysis.  Depending upon the facts of each situation, these and other factors, such as the extent to which a person willfully enables fraudulent spoofing of telephone numbers or assists telemarketers in blocking Caller ID, by offering either functionality to clients, can be relevant in determining liability for TCPA violations.[109]  Similarly, whether a person who offers a platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have

---

[102] *See* S.Rep. No. 102-178, 1st Sess., 102nd Cong., (1991) at 2, 4–5.

[103] Telephone Consumer Protection Act, Pub L. No. 102-243, § 2 (1991).

[104] *DISH Declaratory Ruling,* 28 FCC Rcd at 6583, paras. 26-27.

[105] *Id.* at para. 26.

[106] *Id.*

[107] *Id.* at paras. 26-27 (providing the example of a seller "giving the third party specific and comprehensive instructions as to timing and the manner of the call").

[108] *Id.* at 28 FCC Rcd at 6584, para. 28.

[109] *See* 47 U.S.C. § 227(e) ("It shall be unlawful for any person within the United States . . . to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value . . . ."); 47 C.F.R. § 64.1604 (mirroring the language of 47 U.S.C. § 227(e)); 47 C.F.R. § 64.1601(e) ("Any person or entity that engages is telemarketing . . . must transmit caller identification information . . . (2) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information.").  *See* "Senators pile on the robocall criticism," The Hill, June 11, 2015, *available at* http://www.mccaskill.senate.gov/media-center/latest-headlines/senators-pile-on-the-robocall-criticism (quoting Senator Susan Collins: "If we are going to win the fight against scammers targeting our seniors, we need to get ahead of the technology that they use to generate robocalls to spoof caller IDs.") (last visited June 17, 2015); "Ringing Off the Hook: Examining the Proliferation of Unwanted Calls": Hearing before the United States Senate Special Committee on Aging (June 10, 2015), *available at* http://www.aging.senate.gov/hearings/ringing-off-the-hook_examining-the-proliferation-of-unwanted-calls (last visited June 17, 2015).

initiated them.[110]

31.     We grant to the extent described herein YouMail's Petition and clarify that YouMail does not make or initiate a call when one of its app users uses its service to send an automatic text in response to a voicemail left by someone who called the YouMail app user.  YouMail's app is reactive in nature; in relevant part, it allows its users to send a reply text message, which YouMail identifies as an "auto-reply," "in response to a voicemail message that has been left for the app [user] by the calling party."[111]  The YouMail app user determines whether to send the auto-reply text messages, which categories of callers should receive auto-replies, how the user's name should appear in the auto-reply, and whether to include a message with the auto-reply (such as when the called party will be available to return the call).[112]  YouMail states that an auto-reply is sent only if four criteria are met: (1) the YouMail user has set the app's options to send an auto-reply to some group of callers; (2) the calling party falls into that group; (3) the calling party has not previously opted out of receiving auto-replies from YouMail; and (4) "sufficient 'caller id' information is available to send the text."[113]  YouMail states that it has "no influence over the content of the message selected by the [app user]."[114]  YouMail asserts, based on these criteria, that it is "merely the service by which execution of the [app user's] call is arranged."[115]

32.     We agree with YouMail and with commenters who note that the app users choose whether to send text messages and that their involvement in the process of creating and sending the messages in response to received calls are key factors in determining whether the app provider or the app user is the initiator of the call for TCPA purposes,[116] either by taking the steps physically necessary to place the call or by being so involved in placing the call as to be deemed to have initiated it.  Based on the record before us, YouMail appears to do neither.  YouMail is a reactive and tailored service; in response to a call made to the app user, YouMail simply sends a text message to that caller, and only to that caller.  This kind of service differs from the non-consensual calling campaigns over which the TCPA was designed to give consumers some degree of control.  YouMail exercises no discernible involvement in deciding whether, when, or to whom an auto-reply is sent, or what such an auto reply says, nor does it perform related functions, such as pre-setting options in the app, that physically cause auto-replies to be

---

[110] *See DISH Declaratory Ruling*, 28 FCC Rcd at 6584, para. 28.  *Cf.* 47 C.F.R § 64.1200(a)(4)(vii) (facsimile broadcaster is liable for violations of unsolicited fax advertising prohibition if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such transmissions).  For example, if the Commission staff notifies a platform provider that its service is being used unlawfully by its clients and the platform provider then allows such usage to continue after this warning, we will consider the fact that the platform provider allowed such usage to continue after having actual notice of the unlawful activity to be a possible indicator that the platform provider is actively participating in the making or initiating of the calls at issue.  Of course, we will consider all facts and circumstances surrounding any possible violation(s) before determining how liability, if any, should be applied.

[111] YouMail Petition at 3.  YouMail states that its "data shows users and their calling partners overwhelming[ly] like this feature."  YouMail Reply Comments on YouMail Petition at 8.

[112] YouMail Petition at 3.

[113] *Id.* at 4.

[114] *Id.* at 12.

[115] *Id.* at 12.

[116] AFSA Comments on YouMail Petition at 4; Biggerstaff Comments on YouMail Petition at 4-5; CallFire Comments on YouMail Petition at 5; CTIA Reply Comments on YouMail Petition at 9; Dialing Services Comments on Glide Petition at 3; Glide Reply Comments on Glide Petition at 7; Glide Reply Comments on YouMail Petition at 9-10; Twilio Comments on Glide Petition at 4, 15; YouMail Reply Comments on YouMail Petition at 12; *Ex Parte* Letter from Lauren Lynch Flick, Counsel to YouMail, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed June 21, 2013); *Ex Parte* Letter from Lauren Lynch Flick, Counsel to YouMail, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed Mar. 4, 2014).

sent.

33.     In a supplemental filing, YouMail indicates that its auto-reply text messages include a link to the YouMail website, where the recipient of the text can access identifying information and instructions for how to opt out of receiving future auto-reply text messages from YouMail users.[117] Controlling this small portion of the content of the auto-reply text message, however, is insufficient to change our determination that the app user, and not YouMail, is the maker of the call.  What is relevant is the reactive and tailored nature of YouMail's service, and that an app user controls the bulk of the message—along with the matters of whether the auto-reply messages are sent and to whom they are sent.  Thus, YouMail is not the maker or initiator of the text because it does not control the recipients, timing, or content, but instead "merely ha[s] some role, however minor, in the causal chain that results in the making of a telephone call."[118]

34.     Glide's app and service function differently from YouMail's and warrant separate consideration.  While Glide does not make clear in its Petition or comments all the ways consumers can use its app, we find that, in at least one scenario, Glide is the maker or initiator of the text and thus liable for TCPA violations.[119]  The Glide app enables "real-time communication through video messaging."[120] Glide streams video that users can watch live or later, like a text message.[121]  Only users of the Glide app may exchange video messages over the app.  Glide's dialer "facilitates" the sending of "invitational text messages,"[122] but Glide does not include in its comments a sample of the message.  Commenter Coffman does provide an example, however, saying that he received a text message "stating that '[a Glide user] has something to show you on Glide' and which included a link to Glide's website where consumers are encouraged to download Glide's app."[123]  Coffman asserts that "prior to late July 2013, Glide automatically sent the text message solicitations to all of a user's contacts [in the address book of the user's device] unless the user affirmatively opted out."[124]  Coffman continues: "[E]ven if Glide now requires some sort of user opt-in before Glide [sends invitational texts to] the user's contacts, again there is no indication as to how such an opt-in procedure works or how clear Glide makes it to users that Glide is sending text message advertisements [for its app] to the users' contacts."[125]  Glide asserts that app users decide whether to send the invitational texts, to whom to send the invitational texts, and when to send the invitational texts.[126]  Glide states that it "provides users with suggested language" and users "can choose

---

[117] *See Ex Parte* Letter from Lauren Lynch Flick, Counsel to YouMail, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 4-5 (filed April 14, 2014).

[118] *DISH Declaratory Ruling,* 28 FCC Rcd at 6583, para. 26.

[119] The record is unclear regarding Glide's current practice of sending invitational text messages to its users' contacts and the ease with which app users can opt out of the messages.  Complaints about this practice by Glide are prevalent on the Internet.  *See, e.g.,* Sarah Perez, *Video Texting App Glide Is Going 'Viral,' Now Ranked Just Ahead of Instagram In App Store*, TechCrunch, July 24, 2013, *available at* http://techcrunch.com/2013/07/24/video-texting-app-glide-is-going-viral-now-ranked-just-ahead-of-instagram-in-app-store/ (last visited May 18, 2015).

[120] Glide Petition at 2-3.

[121] *Id.* at 3.

[122] *Id.* at 3-5, 15; *see also* Shields Reply Comments on Glide Petition at 1.

[123] Coffman Comments on Glide Petition at 4.  The Comments include the name of the person who purportedly sent the text message to Mr. Coffman.  *Id.*  The Commission assumes that the name included is that of a Glide user.  Coffman filed suit against Glide for alleged TCPA violations; the suit was filed in U.S. District Court for the Northern District of Illinois on July 19, 2013.  Glide Petition at 4 n.7.

[124] Coffman Comments on Glide Petition at 5.

[125] *Id.*

[126] Glide Petition at 15.  Based on Glide's assertions, the invitational text messages Glide's app sends are not reactive, while the auto-reply texts the YouMail app user sends through the YouMail app are reactive.

to—or choose not to—send this suggested language to selected recipients."[127]  It also states that "the Glide App now provides users with the ability to edit the suggested language as they wish, providing users with even further control."[128]  Unlike the standard language in YouMail's text messages, there is no indication that Glide's standard language is limited to opt-out information.

35.     The record detailed above sets forth two factual scenarios in which we consider whether Glide may be deemed the maker or initiator of the invitational text messages.  Under the first scenario, Glide automatically sends invitational texts of its own choosing to every contact in the app user's contact list with little or no obvious control by the user.[129]  In this scenario, the app user plays no discernible role in deciding whether to send the invitational text messages, to whom to send them, or what to say in them.  This scenario is different from the YouMail app, where the app user determines whether auto-reply messages are sent in response to a caller leaving a message for the app user, and the content of those messages.  Applying the *DISH Declaratory Ruling* and the factors we considered in the YouMail analysis, above, we conclude that, in this factual scenario, Glide makes or initiates the invitational text messages by taking the steps physically necessary to send each invitational text message or, at a minimum, is so involved in doing so as to be deemed to have made or initiated them.

36.     Finally, we grant to the extent described herein TextMe's Petition and clarify that TextMe does not make or initiate a call when one of its app users sends an invitational text message using the steps outlined below.[130]  The TextMe app and service provides access to text message and voice call services.[131]  The app allows users to send and receive text messages within the United States free of charge if both parties are app users.[132]  App users may also receive calls from any telephone number and place calls within the United States without charge.[133]  In order for an app user to make voice calls or send text messages to international phone numbers, the app user must "earn calling credits" by completing actions such as "watching videos or completing promotional videos," or by purchasing "TextMe credits."[134]  Because of the nature of its service, "the appeal of the TextMe App to users is related to its number of users and its functionality."[135]  In order to increase the number of users, the TextMe app, much like the Glide app, enables users to send invitational text messages to contacts in their phone's address book.[136]  TextMe states that app users invite friends to use TextMe "via text message by engaging in a multi-step process in which users ha[ve] to make a number of affirmative choices throughout the invite process."[137]  An app user must: (1) tap a button that reads "invite your friends"; (2) choose whether to "invite all their friends or [] individually select contacts"; and (3) choose to send the invitational text

---

[127] Glide Reply Comments on Glide Petition at 8 n.27.

[128] *Id.*

[129] *See* Glide Reply Comments on Glide Petition at 7-8; Coffman Comments on Glide Petition at 1, 5.

[130] In its Petition, TextMe requested clarification that "third party consent obtained through an intermediary satisfies the TCPA's 'prior express consent' requirement for non-commercial, informational calls or text messages to wireless numbers."  TextMe Petition at i.  TextMe later withdrew this request for clarification.  TextMe Reply Comments on TextMe Petition at i, 2.

[131] TextMe Petition at 5.

[132] *Id.* at 4.

[133] *Id.* at 4.

[134] *Id.*

[135] *Id.* at 5.

[136] TextMe has disabled the ability to send invitational text messages, pending resolution of its petition.  TextMe Petition at 5 n.6.  App users may still invite friends to use the app through email or social network services.  *Id.*

[137] *Id.* at 5.

message by selecting another button.[138]  TextMe then sends the invitational text message, which "include[s] [the] user['s] TextMe handle and invite[s] the recipient to install the App so the user and the contact invited by the user [can] call and text for free."[139]

37.     Turning again to the *DISH Declaratory Ruling* factors, we look first to the extent to which TextMe controls the content of the invitational messages.[140]  TextMe acknowledges that the language of the invitational texts has varied over time, but is clear that it, and not the app user, controls the content of the invitational text message.[141]  Relying on the *DISH Declaratory Ruling* factors we discussed in the Glide analysis, above, to the extent that TextMe controls the content of the message and the content of the message is telemarketing or a commercial advertisement for the TextMe app, TextMe may be liable for the calls.  We also consider the extent to which the app user decides whether to initiate the invitational message, which is instructive in determining whether TextMe is so involved in placing the invitational text messages as to be deemed to have made or initiated them, considering the goals and purposes of the TCPA.[142]  Here, TextMe outlines the steps the app user takes and the choices he or she makes in determining whether to send an invitational message, to whom to send an invitational message, and when that invitational message is sent.[143]  These affirmative choices by the app user lead us to conclude that the app user and not TextMe is the maker of the invitational text message.  While we agree with commenters that TextMe's control of the content of the invitational text message is a reason for concern,[144] and take into account the goals and purposes of the TCPA, we conclude that the app user's actions and choices effectively program the cloud-based dialer to such an extent that he or she is so involved in the making of the call as to be deemed the initiator of the call.  Like YouMail, TextMe is not the maker or initiator of the invitational text messages because it is not programming its cloud-based dialer to dial any call, but "merely ha[s] some role, however minor, in the causal chain that results in the making of a telephone call."[145]

**b.     Collect Call Services and Prerecorded- or Artificial-Voice Messages**

38.     The GTL and 3G Collect Petitions raise additional issues regarding the maker of a call.  Both GTL and 3G Collect seek clarification that a collect calling service provider does not make a separate call to which the TCPA applies when it uses a prerecorded message as part of the process of setting up and connecting a collect call.[146]  GTL and 3G Collect each provide collect calling services to consumers.  3G Collect's calling service is directed toward consumers seeking to call wireless telephone numbers of their choosing and have the charges for the calls billed to the call recipients.[147]  GTL provides an inmate calling service ("ICS") that enables inmates to place collect calls to both wireless and

---

[138] *Id.*

[139] *Id.* at 6.  TextMe notes that the language of the invitational texts varied over time, but that the content was always the same: "the texts identified the user and provided a link to download the App."  TextMe Reply Comments on TextMe Petition at 5.

[140] *See, e.g., DISH Declaratory Ruling,* 28 FCC Rcd at 6592, para. 46 ("It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts.").

[141] TextMe Petition at 6; TextMe Reply Comments on TextMe Petition at 5.

[142] *See DISH Declaratory Ruling,* 28 FCC Rcd at 6583, para. 27.

[143] TextMe Petition at 5; *supra* para. 36.

[144] Biggerstaff Reply Comments on TextMe Petition at 2; Roylance Comments on TextMe Petition at 2.

[145] *DISH Declaratory Ruling,* 28 FCC Rcd at 6583, para. 26.

[146] We use the term "collect call service providers" to mean an entity that has the capability of establishing an *ad hoc* billing relationship with a call recipient for the purpose of connecting a telephone call from a calling party to him or her and, once that billing relationship is established, connects the telephone call.

[147] 3G Collect Petition at 1.

residential numbers, using an automated interactive voice response ("IVR") notification system.[148]  Before connecting a user of their services to the called party, 3G Collect and GTL each play a prerecorded message that advises the called party that a collect call has been placed to the called party and, in GTL's case, that the call is from a person incarcerated in a penal institution.[149]  3G Collect asserts that it does not control whether a call is made, the timing of the call, the call recipient, or the content of the call once connected.[150]  Moreover, 3G Collect argues that were it not for the lack of a payment mechanism, the call would be carried out directly between two individuals; 3G Collect simply facilitates the completion of the call.[151]  GTL argues that the automated messages it sends to the numbers initially dialed by inmates are not the types of robocalls the TCPA seeks to prevent, but are instead steps required in GTL's contractual obligation to attempt to complete every inmate call.[152]

39.     The TCPA and the Commission's implementing rules require prior express consent for prerecorded telemarketing calls to residential telephones[153] and any robocall to a wireless telephone number.[154]  3G Collect and GTL assert that the user of their services, *i.e.*, the inmate or other person who uses their services to place a collect call, rather than 3G Collect or GTL, is the initiator of the call for purposes of the TCPA.[155]  Both 3G and GTL maintain that the prerecorded messages they use in connecting a collect call provide information to the called party to facilitate call completion and do not constitute separate calls.[156]  3G Collect further asks the Commission to declare that the TCPA and the Commission's associated rules are not applicable to the use of prerecorded messages by operator service providers[157] in the course of connecting collect callers to wireless numbers.[158]  GTL asks the Commission

---

[148] GTL Petition at 3-6.

[149] *Id.* at 3-5; 3G Collect Petition at 1-2.

[150] *See* 3G Collect Petition at 5.

[151] *See id*. at 6; *see also* 3G Collect Reply Comments at 2.

[152] GTL Petition at 8-11.

[153] 47 U.S.C § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)(3).

[154] 47 U.S.C § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)(1).  For autodialed and prerecorded telemarketing calls to wireless numbers, prior express consent must be written.  *See 2012 TCPA Order*, 27 FCC Rcd at 1838, para. 20.

[155] 3G Collect Petition at 5; GTL Reply Comments on 3G Collect Petition at 7, 15.  *See* Appendix T for a list of all commenters on the 3G Collect Petition.

[156] GTL explains that each message identifies GTL and that the call was originated by an inmate at a specific facility.  The name of the inmate is not transmitted until the called party acknowledges that he or she wants to accept the call(s) and sets up an account.  GTL points out that if the called party does not know the identity of the inmate from hearing the name of the facility, a call to GTL's toll-free number can provide assistance.  GTL Petition at 10.

[157] 3G Collect characterizes itself as an "operator service provider."  The Act and our rules define "operator services" call as "any interstate telecommunications service initiated from an aggregator location that includes, as a component, any automatic or live assistance to a consumer to arrange for billing or completion, or both, of an interstate telephone call through a method other than: (1) Automatic completion with billing to the telephone from which the call originated; or (2) Completion through an access code used by the consumer, with billing to an account previously established with the carrier by the consumer"; "aggregator" is defined as "any person that, in the ordinary course of its operations, makes telephones available to the public or to transient users of its premises, for interstate telephone calls using a provider of operator services."  *See* 47 U.S.C. § 226(a)(2), (7), 47 C.F.R. § 64.708(b), (i).  Despite its self-description, 3G Collect has not provided any information to establish that it meets the statutory definition of "operator services" because, among other things, it does not show that its service is always provided to calls from aggregator locations.

[158] 3G Collect Petition at 8.

to declare the same for its use of IVR notifications before completing inmate calls to the general public.[159] Commenters filed both in support of[160] and in opposition to[161] 3G Collect and GTL's Petitions.

40.        Based on the record and our precedent, we clarify that collect calling service providers that use prerecorded messages, on a single call-by-call basis, to provide call set-up information when attempting to connect a collect call to a residential or wireless telephone number may do so under the TCPA without first obtaining prior express consent from the called party.[162]  We find persuasive the logic in our *DISH Declaratory Ruling* analysis that "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call."[163]  We find that a person who dials the number of the called party or the number of a collect calling service provider in order to reach the called party, rather than the collect calling service provider who simply connects the call, "makes" the call for purposes of the TCPA. It is the user of such services that "takes the steps necessary to physically place a telephone call" by providing the called party's number to 3G Collect or GTL when he or she wishes to communicate with a person and by controlling the content of the call if the called party accepts the call.  We agree with 3G Collect and GTL that the types of calls at issue here[164] constitute a single end-to-end communication during which the collect calling service provider uses a prerecorded message to provide information that the called party uses to determine whether to accept the call.[165]

41.        GTL separately seeks clarification regarding collect calls to numbers for which it has no billing relationship.  Specifically, when an inmate attempts to call a number and GTL has no means to bill it to the called party, GTL advises the inmate that it cannot complete the call, terminates the call, and

---

[159] GTL Petition at 3.

[160] *See*, *e.g.*, ATT Comments on 3G Collect Petition; GTL Comments on 3G Collect Petition and GTL Petition; PayTel Comments on 3G Collect Petition; Securus Comments on 3G Collect and GTL Petition; Cargo Comments on GTL Petition; UPS Comments on GTL Petition.  *See* Appendix I for a list of all commenters on the GTL Petition.

[161] *See*, *e.g.*, Biggerstaff Comments on 3G Collect Petition and GTL Petition; Braver Comments on 3G Collect Petition and GTL Petition; Roylance Comments on 3G Collect Petition and GTL Petition; Abramson Comments on 3G Collect Petition; Shields Comments on 3G Collect; Charvat Reply Comments on 3G Collect Petition; Worshman Comments on GTL Petition; Pechnik Comments on GTL Petition.

[162] Several commenters filing in support of 3G Collect's Petition liken 3G Collect's services to those of ICS and request that the Commission declare that ICS providers are similarly permitted to use automated or prerecorded messages when attempting to establish billing relationships and complete telephone calls to call recipients.  *See* GTL Comments on 3G Collect Petition; PayTel Comments on 3G Collect Petition; Securus Comments on 3G Collect Petition.  To avoid any doubt, we note that this clarification applies to ICS providers, as well.

[163] *DISH Declaratory Ruling,* 28 FCC Rcd at 6583, para. 26.

[164] We do not address the prerecorded calls or text messages that collect calling service providers may make to bill for these calls.  According to 3G's website, *see* http://3gcollect.com/ (last visited May 18, 2015), "[y]ou are here because you received a text message invoice on your cell phone.  You recently accepted a collect call and our automated system will send a text message until payment for that call is received."  If a collect calling service provider sends covered texts to bill for calls, such texts are not part of the collect call itself and require separate consent from the recipient.  In addition, GTL recently filed a supplement to its petition concerning the application of the TCPA to voice calls or texts involving a low account balance.  *Global Tel*Link*, Supplement to Petition for Expedited Clarification and Declaratory Ruling, CG Docket No. 02-278 (filed April 3, 2015).  Because the supplemental filing raises an issue distinct from other issues in this proceeding, it will be addressed separately.

[165] *Cf. Teleconnect Co. v. Bell Tel. Co. of Pa.*, 10 FCC Rcd 1626, 1632, para. 12 (1995) ("[B]oth court and Commission decisions have considered the end-to-end nature of the communications more significant than the facilities used to complete such communications.  According to these precedents, we regulate an interstate wire communication under the Communications Act from its inception to its completion.  Such an interstate communication does not end at an intermediate switch.").

then, over the course of three days, places up to three subsequent calls to the number in an effort to establish a prepaid account with the called party.[166]  GTL uses its IVR to place these prerecorded calls to residential and wireless telephone numbers.

42.     We clarify that GTL's prerecorded follow-up calls to set up a billing relationship with a called party can be made to residential lines without being restricted by our TCPA rules.  Section 64.1200(a)(3)(iii) of our rules excepts from the restriction on making prerecorded calls to residential numbers without prior express consent those calls that are "made for a commercial purpose but [do] not include or introduce an advertisement or constitute telemarketing."[167]  The purpose of the calls at issue here is commercial, in that GTL seeks to set up a billing arrangement for a collect call.  But we do not find them to include or introduce an advertisement under the unique factual and legal circumstances here.  These calls are not intended to be the kind of generalized communication of the "commercial availability or quality of property, goods, or services" contemplated by the definition of "advertisement" in our rules.[168]  Rather, as explained more fully below, these calls are made to arrange for the billing of a specific collect call that an inmate caller has already attempted to initiate.  Similarly, in this unique context we do not interpret these calls as intended to "encourage[e] the purchase or rental of, or investment in, property, goods, or services," as our rule defines "telemarketing,"[169] but instead are intended to complete a very specific transaction—the billing of a collect call—that the caller has already initiated.  We note that this clarification helps to facilitate compliance with the 2013 *Inmate Calling Order*.[170]  There, in recognition of the particular challenges and legal constraints of the ICS marketplace, the Commission found that an ICS provider's failure to complete the kind of inmate calls at issue here would be an unjust and unreasonable practice in violation of section 201(b) of the Communications Act[171] unless the ICS provider offered an option to avoid billing-related call blocking,[172] such as the pre-paid option GTL discusses in its Petition.  We believe that the subsequent calls made by GTL to residential numbers to arrange for billing are beneficial in providing a meaningful pre-paid option and thus can be viewed as part of its effort to comply with the *Inmate Calling Order* and with its obligations under section 201(b).  Accordingly, we caution that our findings here apply only to the collect-call billing attempts to residential numbers at issue here.

43.     When GTL uses these prerecorded calls to contact wireless numbers, however, our regulations require prior express consent.  The TCPA requires prior express consent for robocalls to wireless numbers without regard to the content of the call.[173]  Moreover, in giving the Commission authority to exempt certain calls from this restriction, Congress did not provide that the content of the call should be a consideration, as it could be with the possible exemption of prerecorded calls to residential

---

[166] When incarcerated persons attempt to make a call to an individual for the first time, and that individual is not served by a local exchange carrier with which GTL has a billing arrangement, or the inmate has dialed another party's wireless phone, the call cannot be completed unless and until a billing arrangement with the called party is established.  Once the inmate dials the desired number, GTL captures the number and initiates an automated interactive voice response notification to inform the called party that an incarcerated person is attempting to contact him or her and that the called party must establish an account in order to receive the call.  GTL Petition at 4-5.  GTL maintains that it permanently abandons the notification attempts after three attempts.  *Id.* at 15.

[167] *See* 47 C.F.R. § 64.1200(a)(3)(iii).

[168] 47 C.F.R. § 64.1200(f)(1).

[169] 47 C.F.R. § 64.1200(f)(12).

[170] *See In the Matter of Rates for Inmate Calling Services,* Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 12-375, 28 FCC Rcd 14107 (2013) (*Inmate Calling Order*).

[171] 47 U.S.C. § 201(b).

[172] *Inmate Calling Order,* 28 FCC Rcd at 14168, paras. 113-14.

[173] 47 U.S.C. § 227 (b)(1); 47 C.F.R. § 64.1200(a)(1).

lines.[174]  Rather, the statute provided that the Commission can consider exemptions only for calls that are "not charged to the called party."  The GTL Petition asks the Commission to use its authority under section 227(b)(2)(C) to exempt from its prior-express-consent requirement[175] calls to a number assigned to a cellular telephone service that are not charged to the consumer, subject to conditions contemplated by the statutory exemption provision.[176]  GTL asserts that its IVR notification to wireless phone numbers is informational and serves no commercial purpose.  We agree.

44.     As noted above, we believe that GTL's follow-up calls to residential numbers seeking to make billing arrangements for a specific collect call serve to implement the Commission's policy of promoting a pre-paid calling option for ICS as set out in the *Inmate Calling Order*.[177]  We find that this rationale applies to GTL's follow-up calls to wireless telephone numbers assigned to a cellular service where GTL seeks to make billing arrangements for collect calls.  Moreover, the calls that GTL would make to arrange billing for a particular collect call would allow for completion of a collect call that has already been attempted.  We therefore conclude that exempting such calls to cellular telephone numbers from the prior express consent requirement will ensure that inmate calls can be completed in a timely manner.[178]

---

[174] *Compare* 47 U.S.C. § 227(b)(2)(B) (authorizing the Commission to exempt calls to residential lines that are not made for a commercial purpose, and calls that are made for a commercial purpose if they will not adversely affect privacy rights and do not include unsolicited advertisement) *with* 47 U.S.C. § 227(b)(2)(C) (authorizing the Commission to exempt calls to numbers assigned to a cellular telephone service if the call is not charged to the called party  and subject to conditions as necessary in the interest of the privacy rights the TCPA was intended to protect).  The TCPA applies the consent requirement to calls to "cellular telephone service."  47 U.S.C. § 227(b)(1)(A)(iii). In this Declaratory Ruling and Order we sometimes refer to that service as "wireless service" and use it to describe the nature of the service used by consumers rather than referring to only those services provided using the spectrum block licensed by the Commission under the name "Cellular Service."  We note in this regard that consumers use competing, functionally equivalent (from the consumer perspective) services using spectrum licensed under other names—such as "Personal Communication Service," "700 megahertz service," and "Advanced Wireless Service"—that did not exist at the time the TCPA was enacted.  If we were to interpret the TCPA to restrict the Commission's exemption authority to only services offered using the "Cellular Service" spectrum block, neither consumers using functionally equivalent services in other spectrum blocks nor persons who call them would enjoy the benefits of any exemption the Commission grants.  This would create the anomalous result of an exemption applying based on spectrum block names rather than on the nature of the service used by consumers.  It also would place a heavy burden on callers who wish to rely upon the exemption, before making any call, to identify the spectrum block used to serve the consumers they wish to call.  Thus, for purposes of our exemption authority under the TCPA, we focus on the consumer-facing nature of the service being used rather than on which spectrum block is used to provide the service.

[175] 47 U.S.C. § 227(b)(2)(C).

[176] GTL Petition at 13-14.

[177] *Inmate Calling Order,* 28 FCC Rcd at 14168, paras. 113-14.

[178] Contrary to the suggestion of a dissenting statement, the narrow exemption we here adopt is limited to the factual and legal context that is unique to inmate calls, and our reasoning and interpretation does not extend to other situations in which a caller might seek to establish a billing relationship in allegedly similar circumstances.  *See* Commissioner Pai Dissent at 11.  Moreover, our decision here does not create a loophole for telemarketers, but authorizes an exemption for a specific type of call and sets clear conditions on calls made pursuant to that exemption.  In addition to the condition that the exempted calls "must not include any telemarketing, solicitation, debt collection, or advertising content," para. 45, *infra*, the exemption specifically and clearly applies only in the context of calls made by an inmate who has attempted to initiate a call to a specific phone number.  The exemption permits the inmate calling services provider to make follow-up calls to only that number, limits the number of follow-up calls, and limits the timeframe within which the calls may be made—all for the purpose of facilitating the call attempted by the inmate and considering the unique circumstances that exist with regard to inmate calls.  In other words, the exempted calls are allowed only to facilitate the completion of a specific call that has been attempted by an inmate.  In no way can inmate calling services providers make generalized telemarketing calls

(continued....)

45.     As such, we adopt the following conditions for each collect call attempt notification to a cellular telephone number utilizing the exemption we grant today:

1) pursuant to section 227(b)(2)(C),[179] collect call attempt notifications to cellular telephone numbers shall not be charged to the called party;[180]

2) notifications must identify the name of the collect call service provider and include contact information;

3) notifications must not include any telemarketing, solicitation, debt collection, or advertising content;

4) notifications must be clear and concise, generally one minute or less;

5) collect call service providers shall send no more than three notifications for each inmate call, and shall not retain the called party's number upon call completion or, in the alternative, not beyond the third notification attempt; and

6) each notification call must include information on how to opt out of future calls; voice calls that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make an opt-out request prior to terminating the call; voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future notification calls; and

7) the collect call service provider must honor opt-out requests immediately.

46.     Our grant of an exemption, to the extent indicated herein, of GTL's Petition is limited to calls that the record indicates are exclusively focused on obtaining billing information for collect calls that an inmate has sought to initiate, and that we determine protect consumers' privacy interests.  The exemption applies to prerecorded calls to wireless phone numbers assigned to a cellular service and only applies so long as those calls are not charged to the consumer recipient, including not being counted against the consumer's plan limits, and the caller complies with the enumerated conditions we adopt today.  The conditions we adopt protect consumers' privacy interests and allow collect call service providers to complete inmate calls in a timely manner while providing the recipients of the follow-up calls with the opportunity to opt out of future calls, which is critical to our exercise of our statutory authority to grant an exemption under section 227(b)(2)(C).[181]

### 3.     Consent and Called Party

#### a.     Establishing Consent

47.     We clarify that the fact that a consumer's wireless number is in the contact list on another person's wireless phone, standing alone, does not demonstrate consent to autodialed or prerecorded calls, including texts.[182]  Additionally, we clarify that a called party may revoke consent at any time and through

---

(...continued from previous page)

seeking to solicit customers for their service to a number an inmate has not already attempted to call.  Likewise, no one other than inmate calling services providers who abide by these conditions may make calls under this exemption.

[179] 47 U.S.C. § 227(b)(2)(C).

[180] *See Cargo Airline Order,* 29 FCC Rcd 3432 at *3, para. 12 (stating that the Commission interprets the "no charge" requirement to "preclude exempting notifications that count against the recipient's plan minutes or texts").  The exemption applies to robocalls to wireless numbers only if they are not charged to the recipient.

[181] 47 U.S.C. § 227(b)(2)(C).

[182] *See* paras. 51-52, *infra.*

any reasonable means.  A caller may not limit the manner in which revocation may occur.[183]  Moreover, we emphasize that regardless of the means by which a caller obtains consent, under longstanding Commission precedent, if any question arises as to whether prior express consent was provided by a call recipient, the burden is on the caller to prove that it obtained the necessary prior express consent.[184]

48.      YouMail and Glide raise two distinct consent issues.  YouMail asks the Commission to consider that, when a caller leaves a voicemail message for a YouMail app user, "the leaving of a message almost universally signifies that the caller wishes to receive a return communication."[185]  The first question pertaining to consent, therefore, is whether a caller who leaves a voicemail message necessarily consents to receive an automated text message via an app in response.  Glide asks the Commission to clarify that an app provider can reasonably rely on "any consent to make social communications that the [third party] call recipient has provided to the app user."[186]  Glide asserts that app users have prior relationships with the "contacts listed in their devices' address books" and so the third party call recipient "expects to receive social calls and messages from the [app] user, and thus the [app] user should be presumed to have prior express consent to 'make' a call or message [through the app] to such a contact."[187]  Based on this argument, the second question pertaining to consent is whether an app provider can be found to have obtained prior express consent to place non-telemarketing calls to contacts in an app user's address book based on the fact that the numbers called are in that address book.

49.      Although prior express consent is required for autodialed or prerecorded non-telemarketing voice calls and texts, neither the Commission's rules nor its orders require any specific method by which a caller must obtain such prior express consent.[188]  The Commission recently held that the TCPA does not prohibit a caller from obtaining a consumer's prior express consent through an intermediary.[189]  In reaching this conclusion, the Commission relied, in part, on the *1992 TCPA Order*, which states: "[P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."[190]  The Commission reiterated in the *GroupMe Declaratory Ruling* that, while the scope of consent must be determined upon the facts of each situation, it is reasonable to interpret the TCPA to permit a texter such as GroupMe to send texts based on the consent obtained by and conveyed through an intermediary (the group organizer), with the caveat that if consent was not actually obtained, GroupMe remained liable for initiating or making autodialed text messages to wireless numbers.[191]  Importantly, the Commission emphasized that an intermediary can only convey consent that has actually been obtained, and cannot

---

[183] *See* paras. 55-70, *infra.*

[184] *See ACA Declaratory Ruling*, 23 FCC Rcd at 565, para. 10 (concluding that "[s]hould a question arise as to whether express consent was provided, the burden will be on [the caller] to show it obtained the necessary prior express consent").

[185] YouMail Petition at 13.

[186] Glide Petition at 16; *see also id.* at 5 (stating the argument slightly differently).

[187] *Id.* at 16.

[188] As stated in 2012, the TCPA and our rules require "some form of prior express consent for autodialed or prerecorded non-telemarketing calls to wireless numbers" and "leave[] it to the caller to determine, when making an autodialed or prerecorded non-telemarketing call to a wireless number, whether to rely upon oral or written consent in complying with the statutory consent requirement."  *2012 TCPA Order*, 27 FCC Rcd at 1842, para. 29.

[189] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, 29 FCC Rcd 3442 at *2, paras. 7-8 (2014) (*GroupMe Declaratory Ruling*).

[190] *1992 TCPA Order*, 7 FCC Rcd at 8769, para. 31.

[191] *GroupMe Declaratory Ruling*, 29 FCC Rcd 3442 at *4, para. 11.

provide consent on behalf of another party.[192]

50.   Turning first to YouMail's question regarding consent,[193] because we find above that it does not initiate or make the text at issue, it need not acquire the recipient consumer's consent, making its request on this point moot.  By contrast, we have found Glide to be the maker or initiator of its messages, and thus address its question on consent.  Glide asserts that it should be able to rely on "social conventions" to determine its "users' and consumers' expectations."[194]  Glide notes that, through the Glide app, invitational messages can only be sent to "recipients with whom the user has a prior relationship, as demonstrated by the fact that the recipient is in the senders' device's contact list."[195]  This "pre-existing relationship," Glide argues, "demonstrates that the recipient expected and intended to receive messages from the sender."[196]  Consequently, Glide asserts, it can reasonably rely on any consent to make "social communications" that the call recipient has provided to the Glide user, and "the user should be presumed to have prior express consent to 'make' a call or message to such a contact."[197]

51.   We agree with commenters who opposes Glide's argument and remark that a contact's presence in a contact list or address book does not establish consent to receive a message from the app platform.[198]  Commenters also argue that recipients of the invitational messages did not convey consent to Glide, nor did Glide obtain consent from the recipients of the invitational messages.[199]

52.   We clarify that the fact that a particular wireless telephone number is in the contact list on a wireless phone, standing alone, does not demonstrate that the person whose number is so listed has granted prior express consent as required by the TCPA.[200]  We disagree with Glide that consent can be "presumed."[201]  The TCPA and the Commission's rules plainly require *express* consent, not implied or "presumed" consent.[202]  For non-telemarketing and non-advertising calls, express consent can be demonstrated by the called party giving prior express oral or written consent[203] or, in the absence of instructions to the contrary, by giving his or her wireless number to the person initiating the autodialed or

---

[192] *Id.* at 29 FCC Rcd 3442 at *5, para. 14.

[193] In its Petition, YouMail does not directly ask a question regarding this issue.  Rather, it states that "the confirmatory text messages that its [app users] can choose to send via the service . . . constitute the same type of common sense, consumer-friendly messages that the Commission deemed consumers to consent to in the Soundbite decision."  YouMail Petition at 2 (referencing *SoundBite Declaratory Ruling*); *see also id.* at 13 ("YouMail's experience (as common sense suggests) shows that the leaving of a message almost universally signifies that the caller wishes to receive a return communication"), 16 ("YouMail's experience, and common sense, dictate that consumers consent to receiving auto-replies from the service").

[194] Glide Petition at 16.

[195] *Id.* at 15.

[196] *Id.* at 15-16.

[197] *Id.* at 16.

[198] Coffman Comments on Glide Petition at 2, 19; Intergovernmental Advisory Committee to the Federal Communications Commission, Advisory Recommendation No: 2015-6 at para. 9 (May 15, 2015).

[199] Coffman Comments on Glide Petition at 18; Dialing Services Comments on Glide Petition at 4; Shields Comments on Glide Petition at 7; *see also* Gold Comments on YouMail Petition at 13.

[200] This is especially true as to Glide.  Glide does not assert that it has a relationship with the consumers listed in the app user's contact list to support a claim that it has obtained consent for it to send text messages to them, nor can we discern any relationship between them and Glide.

[201] Glide Petition at 16.

[202] *2012 TCPA Order,* 27 FCC Rcd at 1838, 1841, paras. 20, 28.

[203] *Id.* at 1841, para. 28.

prerecorded call.[204]  By itself, the fact that a phone number is in a contact list fails to provide any evidence that the subscriber to that number even gave the number to the owner of the contact list.  To the contrary, the owner of the contact list could have obtained the number by any variety of means other than the subscriber providing it, such as receiving the phone number from a third party, capturing the phone number from the Caller ID of a prior call, or being forwarded an electronic contact card by a third party.[205]  Standing alone, the fact that a particular telephone number is present in a contact list is not sufficient to prove that the subscriber to that number gave oral or written prior express consent to be called by the owner of the wireless telephone or by Glide.

        53.      Petitioner Edwards asks the Commission to clarify whether a creditor may make autodialed or prerecorded message calls to a wireless number initially provided to the creditor as associated with wireline service.[206]  Edwards asserts that, where a consumer initially provides a wireline number to a creditor and thereby grants consent to be called at that number regarding the debt, but later ports[207] the wireline number to wireless service, the consent to be called regarding the debt does not apply to the wireless number.[208]

        54.      We clarify that porting a telephone number from wireline service to wireless service does not revoke prior express consent.[209]  Stated another way, if a caller obtains prior express consent to make a certain type of call to a residential number and that consent satisfies all of the requirements for prior express consent for the same type of call to a wireless number, the caller can continue to rely on that consent after the number is ported to wireless.  We agree with commenters[210] who note that, if the consumer who gave consent to be called and later ported his wireline number to wireless no longer wishes to be called because he may incur charges on his wireless number, it is the consumer's prerogative and responsibility to revoke the consent.[211]  Until such revocation occurs, the caller may reasonably rely on the valid consent previously given and take the consumer at his word that he wishes for the caller to contact him at the number he provided when the caller obtained the consent.[212]  We stress that this clarification in no way relieves a caller of the obligation to comply with the prior express consent requirements applicable to calls to wireless numbers.  Thus, for example, if a caller did not obtain prior express consent for a type of call to the number when it was residential because no prior express consent

---

[204] *1992 TCPA Order,* 7 FCC Rcd at 8769, para. 31; *ACA Declaratory Ruling,* 23 FCC Rcd at 564, para. 9 ("the provision of a cell phone number to a creditor, *e.g.,* as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt.").

[205] *See, e.g., 1992 TCPA Order,* 7 FCC Rcd at 8769, para. 31 ("[I]f a caller's number is 'captured' by a Caller ID or an ANI device without notice to the residential telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls.").

[206] *See* Edwards Petition at 3.

[207] "Porting" a telephone number, as used here, refers to assigning or transferring the telephone number between modes of service (wireline to wireless, or vice versa), or from one carrier to another within a single service mode; the subscriber to the telephone number does not change.  *See* AFSA Comments on Edwards Petition at 2; CBA Comments on Edwards Petition at 2; USTelecom Comments on Edwards Petition at 4.  We do not address changes in the subscriber to a number in this context.

[208] Edwards Petition at 2-3.

[209] This would also be true for porting a number from wireless service to wireline service.  Because of the higher level of protection afforded wireless numbers, however, it is unlikely that a consumer porting a number to wireline service would face the same concerns as a consumer porting a number to wireless service.

[210] *See* Appendix F for a list of all commenters on the Edwards Petition.

[211] *See, e.g.,* DMA Comments on Edwards Petition at 3; InfoCision Comments on Edwards Petition at 2; USTelecom at 3-4.  *See also* paras. 55-70, *infra,* discussing revocation of consent.

[212] DMA Comments on Edwards Petition at 2; USTelecom Comments on Edwards Petition at 4.

was required, but prior express consent is required for that type of call to a wireless number, the caller would have to obtain the consumer's prior express consent to make such calls after the number is ported to wireless.  These determinations and the Commission's previous statements regarding provision of consent are consistent with text of the TCPA, which states that it "shall be unlawful" to make a call to either a "telephone number assigned to . . . cellular telephone service" or "any residential telephone line" without the "prior express consent of the called party."[213]  While the TCPA states that a caller must have the prior express consent of the called party in order to make or initiate a call to a number assigned to cellular service or a residential line, it does not state that the prior express consent must be specific to the type of service being called (either wireless or wireline).  A caller will, of course, want to know whether a number is assigned to wireless or wireline service so that he may ensure he has the necessary consent to place the call;[214] that is a separate question from whether he has valid consent to place any call at all using an autodialer, prerecorded voice, or artificial voice.  We, therefore, deny Edwards' Petition and clarify that consent provided for a number assigned to wireline service remains valid after the consumer ports the number to wireless service, absent indication from the consumer that he wishes to revoke consent.[215]

### b.   Revoking Consent

55.     Next we clarify that consumers may revoke consent through any reasonable means.  Santander asks whether a party can revoke previously-given consent.  Specifically, Santander asks the Commission to "clarify and confirm that 'prior express consent' to receive non-telemarketing [voice] calls and text messages to cellular telephones sent using an [autodialer] and/or an artificial or prerecorded voice message cannot be revoked."[216]  In the alternative, Santander requests that the Commission clarify that the caller may designate the exclusive method or methods consumers must use to revoke "prior express consent" previously granted to the caller.  Santander offers the following possible revocation methods it could accept: (1) in writing at the mailing address designated by the caller; (2) by email to the email address designated by the caller; (3) by text message sent to the telephone number designated by the caller; (4) by facsimile to the telephone number designated by the caller; and/or (5) as prescribed by the Commission hereafter as needed to address emerging technology.[217]

56.     We turn first to the threshold issue of whether a consumer has the right to revoke previously-given prior express consent.  Because the TCPA does not speak directly to the issue of revocation, the Commission can provide a reasonable construction of its terms.[218]  We agree with the Third Circuit that, "in light of the TCPA's purpose, any silence in the statute as to the right of revocation should be construed in favor of consumers."[219]  We therefore find the most reasonable interpretation of

---

[213] 47 U.S.C. § 227(b)(1)(A),(B).

[214] See 47 C.F.R. § 64.1200(a)(1)-(3); see also 47 C.F.R. § 64.1200(a)(1)(iv).

[215] In a November 3, 2014, filing, Edwards raised another issue.  Edwards Comment in Docket 02-278, Nov. 3, 2014.  He asks the Commission to clarify that "prior express consent cannot be obtained or required as a condition for calling an entity to inquire about its good[s] and/or service[s]."  Id. at 2 (alteration in original).  Because Edwards did not include this issue in his Petition and the Commission did not seek comment on it, the record is inadequate for us to issue a decision.

[216] Santander Petition at 1.  Santander poses this question in the context of situations where a consumer voluntarily has provided a wireless telephone number to a caller, such as by giving the number to the caller without instructing the caller of any limits that the consumer is placing on his consent to receive robocalls at that number or by including the number on a credit application.  Id. at 2.

[217] Santander Petition at 1, 9-14.  Elsewhere in its Petition, Santander states its request differently by asking the Commission to establish a requirement that consumers use one or more of these methods to revoke prior express consent.  Id. at 4.

[218] See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

[219] Gager v. Dell Financial Services, LLC, 727 F.3d 265, 270 (3rd Cir. 2013) (Gager).

consent is to allow consumers to revoke consent if they decide they no longer wish to receive voice calls or texts. This gives consent its most appropriate meaning within the consumer-protection goals of the TCPA. By contrast, an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA and to common-law notions of consent.

57.    Our finding here is consistent with two recent Commission decisions. In the *SoundBite Declaratory Ruling*, the Commission concluded that a one-time text confirming a consumer's request to opt out of future calls did not violate the TCPA and thus emphasized the value to consumers of the right to revoke, stating that "consumer consent to receive [confirmation text] messages is not unlimited,"[220] and that "the consumer's consent to receive text messages would be fully revoked in that situation [where the consumer expressly opted out of confirmation messages] upon the sending of an opt-out request and the prior express consent would not extend to a confirmation message."[221] In the *Anda Order*, the Commission stated that a "means to revoke such prior express permission is [] important to determine whether prior express permission remains in place," noting that without a method of revoking consent, consumers would effectively be locked in "at a point where they no longer wish to receive such [communication]."[222]

58.    Our decision also finds support in the well-established common law right to revoke prior consent.[223] We agree with commenter Shields who argues that "Congress' omission of a limited form of revocation means that Congress intended for broad common law concepts of consent and revocation of consent to apply."[224] Nothing in the language of the TCPA or its legislative history supports the notion that Congress intended to override a consumer's common law right to revoke consent. We emphasize that, regardless of the means by which a caller obtains consent, under longstanding Commission precedent, the burden is on the caller to prove it obtained the necessary prior express consent if any question of consent is in dispute.[225]

59.    We also reject Santander's First Amendment arguments. It urges that common law principles of revocation do not apply because any revocation right would be statutory rather than common law and, because speech is involved, "Congress does not legislate against a background of general

---

[220] *SoundBite Declaratory Ruling*, 27 FCC Rcd at 15397, para. 11.

[221] *Id.* at 15397, para. 11 n.47; *see also 1992 TCPA Order*, 7 FCC Rcd at 8769, para. 31 (autodialed calls lawful under the TCPA so long as the called party has granted "permission to be called at the number which they have given, absent instructions to the contrary"). We note further that at least one appellate court has upheld a TCPA right-to-revoke under both Commission precedent and common law. *See, generally, Gager.*

[222] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005; Application for Review filed by Anda, Inc.; Petitions for Declaratory Ruling, Waiver, and/or Rulemaking Regarding the Commission's Opt-Out Requirement for Faxes Sent with the Recipient's Prior Express Permission,* CG Docket Nos. 02-278, 05-338, Order, 29 FCC Rcd 13998 at*6, para. 20 (2014) (*Anda Order*).

[223] *See* Restatement (Second) of Torts § 892A, cmt. i. (1979) ("[C]onsent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct.").

[224] *See* Shields Comments on Santander Petition at 11 ("An oral revocation during a telephone call is immediate. It is also easy to comply with. An automated button press can easily accomplish that goal . . . . On the other hand, a written revocation requirement will cause a delay in the revocation taking effect. It takes time for a letter to be mailed and delivered. Then it must be opened and read by someone who must then process the revocation. Any written revocation requirement will be fraught with possible errors in addressing, delivery and processing.") *Cf.* CCIA Comments on Santander Petition at 4 (arguing that callers should be given a 15-day period to act on a written revocation request). *See* Appendix O for a list of all commenters on the Santander Petition.

[225] *See ACA Declaratory Ruling*, 23 FCC Rcd at 565, para. 10 (concluding that "[s]hould a question arise as to whether express consent was provided, the burden will be on [the caller] to show it obtained the necessary prior express consent").

common law principles, but against a background of First Amendment principles . . . ."[226]  But, as we describe above, we do not rely on common law to interpret the TCPA to include a right of revocation.  We simply note our conclusion is consistent with the common law right of revocation and do not attempt to substitute common law for statutory law.

60.     Santander next argues that any restriction of its First Amendment right to communicate with its customers should be construed narrowly.[227]  Santander states that, because Congress did not "clearly provide for consumers to revoke consent, the statute must be construed so as to provide for no right of revocation."[228]  At the outset, we note that TCPA restrictions have been challenged in several instances on First Amendment grounds and upheld by the courts.[229]  Our interpretation that consumers may revoke previous consent—an interpretation already made by federal courts—establishes no new law or prohibition on speech.  Further, the Supreme Court has "repeatedly held that individuals are not required to welcome unwanted speech into their homes and that the government may protect this freedom."[230]  In particular, the government has an interest in upholding a person's right to affirmatively give notice that they no longer wish to receive communications from businesses.

61.     To take one example, in *Rowan v. United States Post Office*, the Supreme Court upheld a statute that permitted a person to require that a mailer remove his name from its mailing lists and stop all future mailings to the resident:

> The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property.  In this case the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer. . . .  In effect, Congress has erected a wall—or more accurately permits a citizen to erect a wall—that no advertiser may penetrate without his acquiescence.[231]

*Rowan* supports our finding that the government may protect a consumer's right to revoke consent and

---

[226] *Ex Parte* Letter from William H. Hurd, Counsel to Santander, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed Aug. 28, 2014) (*Santander August 28 Ex Parte*).  In making this argument, Santander cites two District Court cases (citing *Chavez v. Advantage Group*, 959 F. Supp. 2d 1279 (D. Colo. 2013) and *Saunders v. NCO Financial Systems, Inc.*, 910 F. Supp. 2d 464 (E.D.N.Y. 2012)).  These decisions merely state that the TCPA does not include a provision that allows withdrawal of consent.  Because the cases do not advance Santander's argument we do not address them in our analysis.

[227] *Santander August 28 Ex Parte* at 3.

[228] *Id.*

[229] *See, e.g., Kathryn Moser v. Federal Communications Commission*, 46 F.3d 970 (9th Cir. 1995), *cert. denied*, 515 U.S. 1161 (1995) (upholding TCPA's restrictions on prerecorded telephone calls from First Amendment challenge); *see also Osorio v. State Farm Bank*, 746 F.3d 1242 (2014); *Joffe v. Acacia Mortgage Corp.*, 121 P.3d at 841-43 (concluding that application of the TCPA's restrictions on autodialed calls to wireless numbers contacted via Internet-to-phone messaging did not violate any First Amendment rights); *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 377 (4th Cir. 2013) (holding that TCPA's disclosure requirements in Section 227(d) are constitutional).

[230] *Frisby v. Schultz*, 487 U.S. 474, 485*; see also Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 748 (1978) ("[I]n the privacy of the home, . . . the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.").

[231] *Rowan v. United States Post Office*, 397 U.S. 728 at 737-738 (1970); *see also Martin v. City of Struthers*, 319 U.S. 141 (1943), in which the Court struck down a ban on door-to-door solicitation because it "substituted the judgment of the community for the judgment of the individual householder," *id.* at 144, but noted in *dicta* that a regulation "which would make it an offense for any person to ring a bell of a householder who has appropriately indicated that he is unwilling to be disturbed" would be constitutional.  *Id.* at 148.

stop future communications from businesses.[232]  Indeed, some consumers may find unwanted intrusions by phone more offensive than home mailings because they can cost them money and because, for many, their phone is with them at almost all times.

62.        We thus find no First Amendment concerns in allowing consumers to protect their privacy from unwanted autodialed, prerecorded-voice, and artificial-voice calls.  The right of revocation does not implicate the business' right to communicate with its customers; callers may manually dial calls and thereby not invoke the TCPA's restrictions on autodialed, prerecorded-voice, and artificial-voice calls.  The TCPA does not prohibit a business from communicating with its customer through robocalling, but rather merely requires businesses to obtain prior express consent from the consumer to receive such calls.  Where the consumer gives prior express consent, the consumer may also revoke that consent.  Consequently, the speech with which Santander is concerned is not protected speech, but speech that is made only with permission of the consenting consumer.

63.        We next turn to whether a caller can designate the exclusive means by which consumers must revoke consent.  We deny Santander's request on this point, finding that callers may not control consumers' ability to revoke consent.  As an initial matter, we note the Commission's statement in the *SoundBite Declaratory Ruling* that "neither the text of the TCPA nor its legislative history directly addresses the circumstances under which prior express consent is deemed revoked."  We thus may provide a reasonable construction of the TCPA's terms, and clarify that consumers may revoke consent in any manner that clearly expresses a desire not to receive further messages, and that callers may not infringe on that ability by designating an exclusive means to revoke.

64.        Consumers have a right to revoke consent, using any reasonable method including orally or in writing.  Consumers generally may revoke, for example, by way of a consumer-initiated call, directly in response to a call initiated or made by a caller, or at an in-store bill payment location, among other possibilities.  We find that in these situations, callers typically will not find it overly burdensome to implement mechanisms to record and effectuate a consumer's request to revoke his or her consent.[233]  We conclude that callers may not abridge a consumer's right to revoke consent using any reasonable method.  The Commission has concluded as much for certain telemarketing calls, as our rules require that telemarketing calls using a prerecorded or artificial voice "provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request" and leave a "toll free number that enables the called person to call back at a later time" if the call is answered by voicemail.[234]  And when the Commission granted an exemption from the TCPA in the *Cargo Airline Order*, it required that callers give consumers a direct opt-out mechanism such as a key-activated opt-out mechanism for live calls, a toll-free number for voicemails, and a reply of "STOP" for text messages.[235]  The common thread linking these cases is that consumers must be able to respond to an unwanted call— using either a reasonable oral method or a reasonable method in writing—to prevent future calls.

65.        Santander argues that the Consumer Financial Protection Bureau's mortgage servicing

---

[232] While *Rowan* protects the right of a householder to bar unwanted communications from his property, we apply the same principle here to a consumer's right to bar unwanted communications to his or her cell phone.  Consumers can use cell phones anywhere, and they increasingly use them inside their homes as their only phone.  *Rowan*, therefore, is applicable to wireless phones despite its narrow focus on the rights of homeowners.

[233] When assessing whether any particular means of revocation used by a consumer was reasonable, we will look to the totality of the facts and circumstances surrounding that specific situation, including, for example, whether the consumer had a reasonable expectation that he or she could effectively communicate his or her request for revocation to the caller in that circumstance, and whether the caller could have implemented mechanisms to effectuate a requested revocation without incurring undue burdens.  We caution that callers may not deliberately design systems or operations in ways that make it difficult or impossible to effectuate revocations.

[234] 47 C.F.R. § 64.1200(b)(3); *see also* 47 C.F.R. § 64.1200(a)(7)(i)(B).

[235] *See Cargo Airline Order*, 29 FCC Rcd at 3438 at *5, para. 18.

rule allows the mortgage servicer to designate an exclusive means by which consumers may "submit 'qualified written requests' regarding servicing of their mortgage loans"[236] and that the Fair Credit Reporting Act "allows a furnisher of consumer information to designate an address to which the consumer must submit a dispute in writing regarding the accuracy of information furnished to consumer reporting agencies."[237]  Santander adds that, "[a]s evidenced by these various consumer protection statutes, allowing callers to designate a specific method for revoking 'prior express consent' strikes the appropriate balance between protecting the privacy of consumers and allowing legitimate communications between businesses and their own customers who have provided their "prior express consent" to be called."[238]  We do not find Santander's arguments regarding the mortgage servicing rule and the Fair Credit Reporting Act persuasive.  As the Fair Credit Reporting Act demonstrates, where Congress intends to specify the means of opting out, it does so.  The TCPA does not contain equivalent language to either the mortgage servicing rule or the Fair Credit Reporting Act and we agree with the court in *Osorio* that there is "no reason to assume that Congress intended to impose a similar in-writing requirement on the revocation of consent under the TCPA."[239]

      66.     As we have found above, the most reasonable interpretation of "prior express consent" in light of the TCPA's consumer protection goals is to permit a right of revocation.  To then interpret the same term to allow callers to designate the exclusive means of revocation would, at least in some circumstances, materially impair that right.  For example, if a caller receives a consumer's valid oral consent for certain messages but requires the consumer to fax his or her revocation to the caller, perhaps with additional conditions as to the content of such a revocation, such conditions materially diminish the consumer's ability to revoke by imposing additional burdens—especially if disclosure of such conditions is not clear and conspicuous, and not repeated to the consumer with each message.

      67.     Such a requirement would place a significant burden on the called party who no longer wishes to receive such calls, which is inconsistent with the TCPA.  Rather, the TCPA requires only that the called party clearly express his or her desire not to receive further calls.  This common-sense understanding of revocation is consistent with the Commission's requiring easy means of revocation[240] and the notion that "any silence in the statute as to the right of revocation should be construed in favor of consumers,"[241] while acknowledging that where Congress has intended that the means of revocation be limited, it has said so clearly.[242]  By contrast, granting Santander's request arguably would mean that a caller—even one with actual knowledge that a consumer has revoked previously-given consent—would be free to robocall a consumer without facing TCPA liability, despite the consumer's repeated reasonable attempts to revoke consent.

      68.     Santander advances three primary arguments in support of its position: 1) that

---

[236] Santander Petition at 12 (*citing* 12 C.F.R. § 1024.35(c); 12 C.F.R. § 1024.36(b); 12 U.S.C. § 2605(e)).

[237] Santander Petition at 14 (emphasis omitted) (*citing* 15 U.S.C. § 1681s-2(a)(D).

[238] Santander Petition at 14-15.

[239] *Osorio v. State Farm Bank*, 746 F.3d 1242, 1255 (2014) (*Osorio*) (Because the TCPA "lacks equivalent language [to the Fair Debt Collection Practices Act's requirement that requests to not be called be in writing], we have no reason to assume that Congress intended to impose a similar in-writing requirement on the revocation of consent under the TCPA.").

[240] *2012 TCPA Order*, 27 FCC Rcd at 1849 (requiring that consumers have an automated, interactive means of revoking consent on each call in part because such a mechanism is more effective for consumers than requiring a separate call to revoke).

[241] *Gager*, 727 F.3d 265 at 270.

[242] *Osorio*, 746 F.3d at 1255 (Because the TCPA "lacks equivalent language [to the Fair Debt Collection Practices Act's requirement that requests to not be called be in writing], we have no reason to assume that Congress intended to impose a similar in-writing requirement on the revocation of consent under the TCPA.").

informational calls should be treated differently from telemarketing calls in determining whether or how consumers may revoke consent, because "the TCPA was not intended to restrict business from placing informational and other non-telemarketing calls to their customers";[243] 2) that the Junk Fax Prevention Act (JFPA) revocation requirements show that Congress intended not to allow oral revocation under the TCPA;[244] and 3) that allowing for oral revocation puts defendant callers at a disadvantage in TCPA court proceedings.[245]  We address each of these arguments in turn.

69.     Contrary to Santander's argument, the Commission's policy, consistent with the plain language of the TCPA, is to treat informational and telemarketing calls to wireless phones the same.[246] We do so again today, and find no reason here to differentiate the two.  We also find misplaced its reliance on the revocation provisions of the JFPA.  The JFPA's revocation provisions override the common law standard for revocation through statutory language.[247]  Had Congress intended to do the same for calls subject to the TCPA, it could explicitly have done so as it did in the fax context.  The fact that Congress did not establish specific revocation procedures for revoking consent to receive autodialed or prerecorded calls suggests that Congress intended for the consumer's right to revoke consent in such cases to be broader.[248]  We therefore disagree with arguments that "the absence of a revocation provision for non-telemarketing calls should signal to the FCC that Congress intended no such right."[249]

70.     Finally, Santander argues that allowing oral revocation puts defendant callers at a disadvantage in "he said, she said" situations regarding revocation.[250]  We disagree. The well-established evidentiary value of business records means that callers have reasonable ways to carry their burden of proving consent.[251]  We expect that responsible callers, cognizant of their duty to ensure that they have prior express consent under the TCPA and their burden to prove that they have such consent, will maintain proper business records tracking consent.  Thus, we see no reason to shift the TCPA compliance burden onto consumers and affirm that they do not bear the burden of proving that a caller did not have prior express consent for a particular call.  We, therefore, find that the consumer may revoke his or her

---

[243] Santander Petition at 5.

[244] See Ex Parte Letter from William H. Hurd, Counsel to Santander, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3 (filed Aug. 28, 2014).

[245] See also AFSA Comments on Santander Petition at 2; CCIA Comments on Santander Petition at 5.

[246] See para. 123, infra, determining that the TCPA's restrictions on autodialed calls to wireless numbers apply equally to telemarketing and informational calls.

[247] Compare Restatement (Second) of Torts § 892A, cmt. i. (1979) ("[C]onsent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct.") with 47 U.S.C. § 227(b)(2)(E) (codification of JFPA) (requiring FCC to adopt regulation that a request not to send future unsolicited fax ads must comply with specific statutory requirements, including: identifying the phone numbers to which the request relates; making the request to the opt-out number identified on the fax; and the person making the request has not, subsequent to the request, given permission to send such advertisements to such person at such fax machine).

[248] See Neder v. United States, 527 U.S. 1 (1999); see also Osorio, 746 F.3d at 1252 ("[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms."). See also Gager, 727 F.3d 265, 270 ("in light of the TCPA's purpose, any silence in the statute as to the right of revocation should be construed in favor of consumers").

[249] Commissioner O'Rielly Partial Dissent at 12.

[250] See Santander Petition at 8.

[251] 2012 TCPA Order, 27 FCC Rcd at 1844, para. 33; Fed. R. Evid. 803(6)(B); see also 2012 TCPA Order, 27 FCC Rcd at 1844, para. 33 ("should any question about the consent arise, the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained"); Fed. R. Evid. 803(6)(B).

consent in any reasonable manner that clearly expresses his or her desire not to receive further calls, and that the consumer is not limited to using only a revocation method that the caller has established as one that it will accept.

### c.    Reassigned Wireless Telephone Numbers

71.    CBA, Rubio's, Stage, and United request clarification pertaining to reassigned wireless telephone numbers.  Specifically, they ask whether a caller making a call subject to the TCPA to a number reassigned from the consumer who gave consent for the call to a new consumer is liable for violating the TCPA.[252]  This occurs, United asserts, because "[t]here is no public wireless telephone number directory and individuals may change their phone numbers without notifying callers beforehand," and because "good faith errors" such as incorrect entry of phone numbers into computer databases may occur.[253]  United argues that this inevitably results in calls to "reassigned [wireless] telephone numbers despite efforts to contact only the specific individuals who provided 'prior express consent' for those wireless telephone numbers."[254]  While CBA, Rubio's, and United are concerned with informational calls—and United is concerned with healthcare-related informational calls in particular—Stage requests clarification for marketing calls but asserts as its own the arguments made by United and comments by Comcast and others in support of United's Petition.[255]

72.    We clarify that the TCPA requires the consent not of the intended recipient of a call,[256] but of the current subscriber (or non-subscriber customary user of the phone) and that caller best practices

---

[252] CBA Petition at 9; Rubio's Petition at 3-6; Stage Petition at 1-5; United Petition at 2-5; *see also* 47 U.S.C. § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)(1).

[253] United Petition at 3; *see* Stage Petition at 3.

[254] United Petition at 3; *see* Stage Petition at 3-4.

[255] CBA Petition at 15; Rubio's Petition at 3; Stage Petition at 1; United Petition at 3.  Commenters in support of United argue that the Commission should grant broader relief than United requests, applying any exception or safe harbor for calls to reassigned numbers to telemarketing as well as informational calls.  Comcast Comments on United Petition at 7; Dominion Comments on United Petition at 5; TWC Comments on United Petition at 3-4; *see also* Chamber Reply Comments on United Petition at 3; *Ex Parte* Letter from Stephanie L. Podey, Counsel to National Cable & Telecommunications Association, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed April 25, 2014).

Comcast styled its comment on the United Petition as a "Comment or, in the Alternative, Petition for Declaratory Ruling."  Comcast Comments on United Petition at 1.  Comcast requests that the Commission provide relief broader than that requested by United, to include any informational and telemarketing calls.  *Id.* at 1-2.  We treat Comcast's filing as a comment on United's Petition, arguing that we should grant broader relief than requested by United, rather than a Petition for Declaratory Ruling.  Although Comcast is not clear under what circumstances it wishes the Commission to treat its filing as a Petition for Declaratory Ruling, we believe it intended its filing to be a Petition for Declaratory ruling if we did not choose to address calls outside the scope of United's request (*i.e.*, calls regarding subjects other than healthcare information).  Because we do address such other calls in our decision, we treat Comcast's filing as a comment.

[256] While the Parties raise this issue in the context of calls to reassigned wireless numbers, we include in the discussion of the definition of "called party" robocalls to "wrong numbers," by which we mean numbers that are misdialed or entered incorrectly into a dialing system, or that for any other reasons result in the caller making a call to a number where the called party is different from the party the caller intended to reach or the party who gave consent to be called.  Consumers strongly support this broad interpretation.  On January 20, 2015, in response to news stories regarding this issue, 69 individuals filed comments in this docket expressing their concern that the Commission not weaken the TCPA's restrictions for "wrong number" calls to wireless numbers.  *See*, *e.g.*, comments filed on Jan. 20, 2015, by Scott Chapman, Nora Cross, Adam Fischer, Kevin Kretz, Julie Newton, David Scheir, and Michael Worsham; *see also* Letter from 25 National Advocacy Organizations and 55 State and Community Organizations to Tom Wheeler, Chairman, and Commissioners Clyburn, O'Rielly, Pai, and Rosenworcel, Federal Communications Commission, CG Docket No. 02-278 (Jan. 15, 2015); *but see* n. 262, *infra*.

can facilitate detection of reassignments before calls.  We generally agree[257] with commenters who oppose granting these requests that there are solutions in the marketplace to better inform callers of reassigned wireless numbers;[258] that businesses should institute new or better safeguards to avoid calling reassigned wireless numbers and facing TCPA liability;[259] and that the TCPA requires consent from the actual party who receives a call.[260]  We clarify, however, that callers[261] who make calls without knowledge of reassignment and with a reasonable basis to believe that they have valid consent to make the call should be able to initiate one call after reassignment as an additional opportunity to gain actual or constructive knowledge of the reassignment and cease future calls to the new subscriber.[262]  If this one additional call does not yield actual knowledge of reassignment, we deem the caller to have constructive knowledge of such.

> (i)     Meaning of "Called Party"

73.     The TCPA states that it "shall be unlawful" to "make any call" using an autodialer or an artificial or prerecorded voice, absent certain exceptions, without "the prior express consent of the called party."[263]  We find that the "called party" is the subscriber, *i.e.*, the consumer assigned the telephone

---

[257] These issues are discussed further in paras. 86-93, *infra*.  As discussed in those paragraphs, marketplace solutions for identifying reassigned numbers are not perfect; we interpret the TCPA to permit one additional call to a reassigned number, over an unlimited period of time, in order to obtain actual or constructive knowledge of the reassignment.  We permit this where the caller does not have actual knowledge of the reassignment and can show that he had consent to make the call to the previous subscriber or customary user of the number.

[258] Biggerstaff Comments on United Petition at 2-4; Lucas Comments on United Petition at 2; Mey Comments on United Petition at 1; NCLC Comments on Rubio's Petition at 2; NCLC Comments on United Petition at 2; Roylance Comments on United Petition at 2; Roylance Reply Comments on United Petition at 3, 5; Shields Comments on Rubio's Petition at 4; Shields Comments on United Petition at 2; Shields Comments on Reply Comments of United to United Petition (March 2014); Shields Reply Comments on United Petition at 2-3; Sutton Comments on United Petition at 1.

[259] Barry Comments on United Petition at 1; Lucas Comments on United Petition at 2; NCLC Comments on United Petition at 2; Roylance Comments on United Petition at 2; Sutton Comments on United Petition at 1.

[260] Biggerstaff Reply Comments on CBA Petition at 4; NCLC *et al* Comments on CBA Petition at 10; Lucas Comments on CBA Petition at 1; Shields Comments on Rubio's Petition at 5; Shields Comments on Stage Petition at 2; Shields Reply Comments to Twitter's Comments on Stage Petition at 2; Roylance Reply Comments on United Petition at 1; Shields Comments on United Petition at 4; *see also Ex Parte* Letter from Ellen Taverna and Margot Saunders, Counsel to National Association of Consumer Advocates and National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278 (filed Feb. 19, 2015) (The ex parte filing on behalf of eight organizations includes a list of 58,000 individuals who support the statement: "Tell the FCC: No robocalls to cell phones without our consent."  The list includes a de minimis number of signatures for which an address in Canada is given.).

[261] For purposes of this discussion and the one-additional-call opportunity for obtaining actual or constructive knowledge of the reassignment of a wireless number, a single caller includes any company affiliates, including subsidiaries.  Such a single caller shall be allowed to make a total of one additional call to a wireless phone number for which it reasonably believes it has valid consent.  In other words, two affiliated entities may not make one call each, but rather one call in total.

[262] While we include in the discussion of the meaning of "called party" calls to numbers that are misdialed, entered incorrectly into a dialing system, etc., the discussion of calls to reassigned wireless numbers is limited to calls for which the caller would have had the valid prior express consent of the subscriber or customary user but for the reassignment, and where the caller is unaware of the reassignment at the time the call is made.  Consequently, misdialed calls, calls where the number is entered incorrectly into a dialing system, etc., are not eligible for the opportunity to make one additional call to discover whether the number has been reassigned; the caller never had valid prior express consent from the subscriber or customary user to make any call to that misdialed or incorrectly-entered phone number.

[263] 47 U.S.C. § 227(b)(1).

number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan. Both such individuals can give prior express consent to be called at that number.[264] Thus, with the limited exception discussed below,[265] calls to reassigned wireless numbers violate the TCPA when a previous subscriber, not the current subscriber or customary user, provided the prior express consent on which the call is based.

74. As a threshold matter, we find the term "called party" to be ambiguous for TCPA purposes. The statute does not define "called party," nor does it include modifiers such as "intended" that would clarify its meaning in the way that Petitioners urge.[266] We find support in the structure of the TCPA, however, for interpreting "called party" as the subscriber and customary users. Specifically, the TCPA's restriction on autodialed, artificial-voice, or prerecorded-voice calls to wireless numbers applies, *inter alia*, to "any service for which the called party is charged for the call."[267] In a separate provision, the TCPA allows the Commission to exempt calls from the consent requirement if the called party is not charged, subject to conditions to protect consumer privacy.[268] Thus, "called party" is best understood to mean the subscriber to whom the dialed wireless number is assigned because the subscriber is "charged for the call" and, along with a non-subscriber customary user, is the person whose privacy is interrupted by unwanted calls. The TCPA's legislative history buttresses this interpretation, stating that it is the "receiving party"—not the intended party—that consents to the call.[269]

75. We find it reasonable to include in our interpretation of "called party" individuals who might not be the subscriber, but who, due to their relationship to the subscriber, are the number's customary user and can provide prior express consent for the call.[270] In construing the term "prior express consent" in section 227(b)(1)(A), we consider the caller's reasonableness in relying on consent. The record indicates that it is reasonable for callers to rely on customary users, such as a close relative on a subscriber's family calling plan or an employee on a company's business calling plan, because the subscriber will generally have allowed such customary users to control the calling to and from a particular number under the plan, including granting consent to receive robocalls.[271] The caller in this situation

---

[264] Contrary to an argument raised in a dissenting statement, our clarification of the definition of "called party" is entirely consistent with the *ACA Declaratory Ruling*. *See* Commissioner Pai Dissent at 7; *ACA Declaratory Ruling*, 23 FCC Rcd at 564, para. 9. In the *ACA Declaratory Ruling*, the Commission addressed calls made to the person (the debtor) who actually consented by providing the phone number being called. Commissioner Pai argues that the Commission interpreted "called party" to mean "intended recipient," and yet the same paragraph of the *ACA Declaratory Ruling* he cites for that proposition directly supports our finding here, with the Commission stating that "[w]e conclude that the provision of a cell phone number by a creditor . . . reasonably evidences prior express consent *by the cell phone subscriber* regarding the debt." *Id.* (emphasis added).

[265] We interpret the TCPA to permit the caller to make or initiate one additional call to a reassigned number, over an unlimited period of time, where the caller does not have actual knowledge of the reassignment and can show that he had consent to make the call to the previous subscriber or customary user of the number. *See* paras. 85-93, *infra*.

[266] 47 U.S.C. § 227(b)(1)(A); *see also* Shields Comments on Stage Petition at 2; Shields Reply Comments to Twitter's Comments on Stage Petition at 2; Shields Comments on United Petition at 4.

[267] 47 U.S.C. § 227(b)(1)(A)(iii).

[268] *Id.* § 227(b)(2)(C).

[269] Pub. L. No. 102-243, § 2(12) (1991); NCLC *et al* Comments on CBA Petition at 6-7.

[270] *See, e.g., Soulliere v. Central Florida Investments*, 2015 WL 1311046, *4 (M.D. Fla. 2015) ("Generally, the subscriber is the person who is obligated to pay for the telephone or needs the line in order to receive other calls and has the authority to consent to receive calls that would otherwise be prohibited by the statute. However, in some cases the subscriber transfers primary use of the telephone to another, as Plaintiff's employer did here. In such a case, the primary user may be the subscriber's agent, thereby permitting the primary user to consent to being called.") (internal citations omitted).

[271] *See, e.g.,* Chamber Reply Comments on CBA Petition at 3; Wells Fargo Comments on CBA Petition at 3; Wells Fargo Reply Comments on CBA Petition at 4.

cannot reasonably be expected to divine that the consenting person is not the subscriber or to then contact the subscriber to receive additional consent.  To require callers to ignore consent received from customary users in this context would undermine the full benefits of these calling plans for such users and place additional unwanted burdens on the actual subscribers.

76.      Our finding fulfills Congress's intent that the TCPA not prohibit normal business communications[272] and is consistent with the Commission's finding that providing one's phone number evidences prior express consent to be called at that number, absent instructions to the contrary.[273] Similarly, when an individual who is not the subscriber or other customary user answers the phone due to his or her proximity to those individuals, for example a passenger in the subscriber's car or the customary user's houseguest, there is no TCPA violation when the current subscriber or customary user has given the necessary prior express consent for the call.  Nothing in the TCPA suggests that Congress intended to outlaw such calls, whereas imposing liability could unduly stifle such communications and interfere with normal business communications that are "expected or desired . . . between businesses and their customers," contrary to the intent of Congress in enacting the TCPA.[274]

77.      In arriving at our decision, we reject one commenter's argument that we lack authority to clarify the meaning of "called party."[275]  NCLC argues that a clarification of "called party" as urged by the Petitioners amounts to granting an exemption from the TCPA for calls to the actual called party, and that such exemptions can only be granted pursuant to section 227(b)(2)(C) of the Act and thus must be for calls that are free to the consumer.[276]  We disagree with NCLC and find that we may simply interpret "called party" in light of its ambiguity, as detailed above, independent of the exemption provision in the Act.  Thus, whether the calls are free or not is irrelevant to our interpretation.

78.      We also reject CBA's Petition and some commenters' proposals that we interpret "called party" to be the "intended recipient" or "intended called party."[277]  We agree with the Seventh and Eleventh circuits[278] that the TCPA nowhere indicates that caller intent is relevant to the definition of

---

[272] *SoundBite Declaratory Ruling*, 27 FCC Rcd at 15395, para. 8 (quoting H.R. REP. NO. 102-317, 1st Sess., 102nd Cong. (1991) at 17).  For example, a normal business communication could involve an employee providing his or her employer-provided wireless phone number to a customer, client, or other business associate for the purpose of transacting business within the scope of his or her employment.

[273] *1992 TCPA Order,* 7 FCC Rcd at 8769, para. 31.

[274] *SoundBite Declaratory Ruling*, 27 FCC Rcd at 15395, para. 8 (quoting H.R. REP. NO. 102-317, 1st Sess., 102nd Cong. (1991) at 17).

[275] NCLC *et al* Comments on CBA Petition at 5.

[276] *See id.*; 47 U.S.C. § 227(b)(2)(C).

[277] CBA Petition at 3; AFSA Comments on CBA Petition at 2; Nonprofits Comments on Rubio's Petition at 4, 6; NRECA Comments on CBA Petition at 5; Twitter Comments on Stage Petition at 9-11; Wells Fargo Comments on Rubio's Petition at 4-8; Wells Fargo Comments on Stage Petition at 11-17.

[278] *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 639-40 (7th Cir. 2012) (noting that the phrase "intended recipient" does not appear in the TCPA, and concluding that "called party" "means the person subscribing to the called number at the time the call is made"); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251-52 (11th Cir. 2014) (rejecting the argument that the "intended recipient" is the "called party" in 47 U.S.C. § 227 and stating that only the subscriber can give consent to be called).  In *Soppet*, two plaintiffs who had subscribed to wireless numbers at least three years prior received 18 and 29 calls from debt collectors, intended for the previous subscribers to the numbers; the subscriber to the wireless number in *Osorio* received 327 calls from a debt collector over a six-month period.  *Soppet*, 679 F.3d at 639; *Osorio*, 746 F.3d at 1246; *see also Ex Parte* Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 4 (filed May 12, 2014) (discussing the rate of autodialed calls by debt collectors, noting that collectors "use automated dialing systems that will place a million calls per day" and that one loan agency "admitted that 10-20 calls per day, and 1,000 calls over several months, were not unusual or unreasonable").

"called party."  As described above, an "intended called party" standard does nothing to protect the new subscriber to a reassigned number.  Second, "intended" is a subjective standard that would render enforcement difficult, if not impossible, because evidence of intent may not be objective or available (*e.g.*, documents showing who the caller intended to call) and lies within the exclusive control of the caller.  Moreover, interpreting "called party" to mean "intended party" is inconsistent with recent Commission decisions that the consent of one party cannot be binding on another;[279] we recognize, however, that the consent of a customary user of a telephone number may bind the subscriber.  We disagree with the commenter who argues that interpreting "called party" to mean anything other than "intended recipient" would render meaningless the statutory defense of prior express consent.[280]  Callers may use prior express consent to defend against liability when they obtain such consent from the "called party," as we have interpreted that term, and, for the limited purpose described below, when they obtained consent from the previous subscriber.

79.      Our conclusion protects consumers from often voluminous, sometimes harassing calls.[281]  Robocalls can take many forms, but the record here highlights two specific types—reminder calls that may be welcome by intended recipients and debt collection calls that often are not.  Our interpretation of "called party" would nevertheless apply to all types of robocalls because the TCPA does not distinguish "called party" by content.  Were we to adopt "intended called party" as our standard, unwitting recipients of reassigned numbers might face a barrage of telemarketing voice calls and texts along with debt collection calls.  On the latter, there is clear, unrebutted evidence that these calls pose a unique concern for consumers.  Record evidence shows that when consumers complain about debt collection calls, a third of the time they complain that there is no debt to be collected, including that they never owed the debt.[282]  More than one of every five complaints is about communications tactics, including frequent or repeated calls; obscene, profane or other abusive language; and calls made after written requests to stop.[283]  And the record contains evidence, also unrebutted by Petitioners, that such calls sometimes lack a means for consumers to ask that they stop, and can even instruct the consumer to hang up if they are not the debtor, or that callers may have a policy to not speak to anyone other than the debtor.[284]

80.      By clarifying that the caller's intent does not bear on liability, we make clear that such calls are exactly the types that the TCPA is designed to stop.  We agree with commenters who argue that Petitioners' position, on the other hand, would turn the TCPA's consumer protection on its head.[285]  The

---

[279] *GroupMe Declaratory Ruling*, 29 FCC Rcd 3442 at *5, para. 14.

[280] *Ex Parte* Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 4 (filed July 21, 2014).

[281] *See, e.g.*, Intergovernmental Advisory Committee to the Federal Communications Commission, Advisory Recommendation No: 2015-6 at para. 4 (May 15, 2015).

[282] *Ex Parte* Letter from Margot Saunders, Counsel to National Consumer Law Center, to Marlene Dortch, Secretary, FCC in CG Docket No. 02-278, at 9 (filed June 6, 2014) ("[t]he Consumer Financial Protection Bureau's Annual Report for 2013 shows that 33% of debt collection complaints involved continued attempts to collect debts not owed, which include complaints that the debt does not belong to the person called" (citation omitted)).  Another CFPB report suggests that in about two-thirds of these complaints the consumer says they did not owe the debt. Consumer Financial Protection Bureau's Fair Debt Collection Practices Act, Annual Report for 2014, at 12, *available at* http://files.consumerfinance.gov/f/201403_cfpb_fair-debt-collection-practices-act.pdf (last visited May 18, 2015).

[283] Consumer Financial Protect Bureau, Consumer Response Annual Report (January 1, 2013, through December 31, 2013), at 17, *available at* http://files.consumerfinance.gov/f/201403_cfpb_consumer-response-annual-report-complaints.pdf (last visited May 18, 2015).

[284] *See* NCLC *et al* Comments on CBA Petition at 4; NCLC *et al* Reply Comments on CBA Petition at 2.

[285] Shields Comments on CBA Petition at 9-10; Shields Reply Comments to Santander Comments on CBA Petition at 3; Shields Comments on Rubio's Petition at 10; Shields Comments on Stage Petition at 4; Shields Reply Comments to Twitter's Comments on Stage Petition at 3.

only step Petitioners offer that might stop repeated, unwelcome, and potentially costly calls to unsuspecting consumers' reassigned wireless numbers is that the caller obtain actual knowledge of reassignment.[286]  Petitioners would place the burden on new subscribers to inform the caller they are the wrong party and that they do not consent to such calls.[287]  In other words, Petitioners ask us to effectively require consumers to opt out of such calls when the TCPA clearly requires the opposite—that consumers opt in before they can be contacted.

81.     Such a burden would be especially problematic for Public Safety Answering Points—a category of called party that the TCPA specifically protects from unwelcome robocalls because of the obvious public safety concerns of PSAP lines being clogged by unwanted calls.[288]  To relieve callers of liability when they robocall PSAPs would undermine the goal of that provision—to give robocallers every incentive to call the correct number and to make sure there is liability when they do tie up a PSAP line.  We reiterate that the TCPA places no affirmative obligation on a called party to opt out of calls to which he or she never consented; the TCPA places responsibility on the caller alone to ensure that he or she has valid consent for each call made using an autodialer, artificial voice, or prerecorded voice.[289]  A caller may rely on the valid consent of a consenting party until that consenting party revokes the consent and opts out of calls, but the subscriber to or customary user of a reassigned number has never consented and therefore has nothing from which to opt out.

82.     Petitioners offer no ideas on how consumers pursuing a TCPA action might prove callers had knowledge of reassignment.[290]  This is particularly problematic given evidence that callers sometimes will not honor requests of new subscribers for a caller to cease calls to the newly acquired number.[291]  For

---

[286] For example, Wells Fargo argues that "called party" should be "interpreted and clarified to mean 'intended recipient' of the call, exempting any call made in good faith to the number last provided by the intended call recipient, until such time when the . . . new party notifies the company that the number has been reassigned." *Ex Parte* Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 7 (filed July 21, 2014).  Wells Fargo offers this proposed interpretation after arguing that interpreting "called party" other than "intended recipient" "would be incompatible with the TCPA."  *Id.* at 6.  We reiterate that the text of the TCPA places no affirmative obligation on new subscribers to a reassigned wireless number to answer calls to which the previous subscriber may have consented, or to place calls in response to voicemail messages left for a previous subscriber in an effort to inform callers that the wireless number has been reassigned.  These actions could result in charges to the new subscriber to the reassigned wireless number; we thus find that a contrary view also would be at odds with the TCPA's stated goal of protecting consumers' privacy, and its unique and heightened protections for wireless consumers.  *See 1992 TCPA Order,* 7 FCC Rcd at 8753-54, paras. 2-3; *2003 TCPA Order,* 18 FCC Rcd at 14092, para. 133; *2012 TCPA Order,* 27 FCC Rcd at 1839-40, para. 25.

[287] We also note that there are good reasons that consumers may be reluctant to call back, or even speak to, callers with unfamiliar numbers.  Such calls can be pretextual for fraud schemes, including cramming.  *See, e.g.,* the Federal Trade Commission's Advice for Consumers on Robocalls, *available at* http://www.consumer.ftc.gov/articles/0259-robocalls#What_Should (advising consumers who receive a robocall to "[h]ang up the phone.  Don't press 1 to speak to a live operator and don't press any other number to get your number off the list.  If you respond by pressing any number, it will probably just lead to more robocalls.") (last visited May 18, 2015).

[288] *See, e.g.,* Intergovernmental Advisory Committee to the Federal Communications Commission, Advisory Recommendation No: 2015-6 at para. 2 (May 15, 2015).

[289] *See* 47 U.S.C. § 227(b)(1).

[290] We discuss actual knowledge and constructive knowledge in more detail in the following paragraphs.  Our understanding of both is grounded in our reasonable interpretation that the term "prior express consent" requires that the caller have either in the case of revocation of prior express consent.

[291] NCLC *et al* Comments on CBA Petition at 3; NCLC *et al* Reply Comments on CBA Petition at 2.  We reiterate that the TCPA places no affirmative obligation on a called party to opt out of calls to which he or she never consented.

example, would the consumer have to keep a written record of such requests and, if so, how would such a requirement be consistent with the TCPA's requirements that the caller obtain a consumer's opt-in consent for such calls, rather than adopting an opt-out approach?[292]  We also reject several other Petitioner arguments.  First, Petitioners and supporting commenters state that making calls to reassigned numbers subject to TCPA liability would chill such expected and desired communications.  But what is clear from the record is that the consumer who inherits the wireless number neither expects nor desires these calls.  To the extent that some desirable calls might be chilled, below we find that where certain conditions are met, the first call to a wireless number after reassignment should not be subject to liability (absent actual knowledge of reassignment), but rather may act as an opportunity for the caller to obtain constructive or actual knowledge of reassignment.[293]  Additionally, the reasonable steps we have identified for callers to significantly reduce, if not eliminate, their TCPA liability for robocalls to reassigned wireless numbers makes it more likely that callers will identify reassigned wireless numbers in a timely manner and, therefore, make it more likely that callers will refrain from making such calls.

83.    We disagree with commenters who support the Petitions[294] by arguing that despite their good faith efforts, callers that need to reach consumers will inevitably call reassigned wireless numbers because there is no public directory of wireless numbers or because consumers do not contact the organizations when they change their wireless numbers;[295] and imposing liability for something callers

---

[292] As noted above in the discussion on revoking consent, records made in the regular course of business are considered to be sufficiently reliable to be admissible as evidence.  Fed. R. Evid. 803(6)(B); *see also 2012 TCPA Order,* 27 FCC Rcd at 1844, para. 33 ("should any question about the consent arise, the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained").  Responsible callers, cognizant of their duty to ensure that they have sufficient consent under the TCPA, will likely maintain proper business records tracking consent.  The veracity of such business records is a matter for triers of fact to decide.

[293] A caller might obtain actual knowledge of reassignment in a number of ways, such as by the called party informing the caller that he or she is a new subscriber to the number or that the caller has reached a wrong phone number, by accessing a paid database that reports the number as having a high probability of reassignment, by a caller's customer reporting a new phone number prior to receiving a call, or by receiving information from a wireless carrier that the number is no longer in service or has been reassigned.  A caller receives constructive knowledge of reassignment by making or initiating a call to the reassigned number, which often can provide a reasonable opportunity for the caller to learn of the reassignment in a number of ways, including by hearing a tone indicating the number is no longer in service or hearing a name on a voicemail greeting that is different from the name of the party the caller intended to call.

[294] *See* Appendix D for a list of all commenters on the CBA Petition, Appendix N for a list of all commenters on the Rubio's Petition, Appendix P for a list of all commenters on the Stage Petition, and Appendix R for a list of all commenters on the United Petition.

[295] ABA Comments on United Petition at 3; AFSA Comments on Stage Petition at 1-2; ACA Comments on CBA Petition at 2; AFSA Comments on United Petition at 2; AHIP Comments on United Petition at 8; Angula Comments on United Petition at 1; Baird Comments on United Petition at 1; Besso Comments on United Petition at 1; CBA Reply Comments on CBA Petition at 5; CCIA Comments on CBA Petition at 4; CCIA Comments on Stage Petition at 4-5; CCIA Reply Comments on Stage Petition at 2; Cennate Comments on United Petition at 3-4; Chamber Comments on United Petition at 2; COHEAO Comments on United Petition at 2; Comcast Comments on United Petition at 3-4; CTIA Comments on United Petition at 4; DIRECTV Comments on United Petition at i; Dominion Comments on United Petition at 3; Genesys Reply Comments on CBA Petition at 2; Jacola Comments on United Petition at 1; Martinez Comments on United Petition at 1; Moore Comments on United Petition at 1; Noble Comments on United Petition at 2; NRECA Comments on CBA Petition at 5-6; Richardson Comments on United Petition at 1; Ridenour Comments on United Petition at 1; SLSA Comments on United Petition at 5; Stage Reply Comments on Stage Petition at 3, 6-7; Twitter Comments on CBA Petition at 1; Twitter Comments on Stage Petition at 7; United Comments on Rubio's Petition at 2; United Reply Comments on Stage Petition at 2-4; Wells Fargo Comments on Rubio's Petition at 3-4; Wells Fargo Comments on Stage Petition at 9.

cannot control is neither consistent with the purpose of the TCPA nor beneficial to customers.[296]  As described below, the existence of database tools combined with other best practices, along with one additional post-reassignment call, together make compliance feasible.

84.     We emphasize that the TCPA does not prohibit calls to reassigned wireless numbers, or any wrong number call for that matter.  Rather, it prescribes the method by which callers must protect consumers *if they choose* to make calls using an autodialer, a prerecorded voice, or an artificial voice.  In other words, nothing in the TCPA prevents callers from manually dialing.  Callers could remove doubt by making a single call to the consumer to confirm identity.  Even if the consumer does not answer, his or her voicemail greeting might identify him or her.  Callers can also email consumers to confirm telephone numbers.  Consumers who receive the types of messages Petitioners describe, such as bank and health-related alerts to which they have consented, can reasonably be expected to respond to such email requests to inform callers about number reassignments.  In other words, callers have options other than the use of autodialers to discover reassignments.  If callers choose to use autodialers, however, they risk TCPA liability.  Consumers switched numbers at the time Congress passed the TCPA and callers undoubtedly called wrong numbers, yet we see nothing in the law or legislative history suggesting that Congress intended lesser—or no—protection for the unfortunate consumer who inherited a new number or happened to be one digit off the intended number.

**(ii)     Learning of Reassigned Numbers**

85.     While we decline to interpret "called party" to mean "intended party," we agree with commenters who argue that callers lack guaranteed methods to discover all reassignments immediately after they occur.[297]  The record indicates that tools help callers determine whether a number has been reassigned,[298] but that they will not in every case identify numbers that have been reassigned.[299]  Even

---

[296] ABA Comments on United Petition at 4; AFSA Comments on United Petition at 2; Carrington Comments on United Petition at 1; Comcast Comments on United Petition at 6; CTIA Comments on United Petition at 6-7; COPS Comments on United Petition at 1-2; DIRECTV Comments on United Petition at ii; Mey Reply Comments on United Petition at 9; NAIB Comments on United Petition at 6-7; Noble Comments on CBA Petition at 4-5; Noble Comment on Stage Petition at 3; SLSA Comments on United Petition at 5; Twitter Comments on Stage Petition at 9.

[297] *See, e.g.*, Stage Petition at 4; Rubio's Petition at 7; United Petition at 4, 10; AFSA Comments on Stage Petition at 1; Noble Comments on Stage Petition at 5; Roylance Comments on Stage Petition at 5; United Reply Comments on Stage Petition at 3-4; Wells Fargo Comments on Stage Petition at 17-19; *see also Ex Parte* Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 1 (filed Feb. 5, 2015) (stating that Neustar is "not aware of any telecommunications industry databases that track all disconnected or reassigned telephone numbers" and that it is "not aware of any authoritative telecommunications database that links all consumer names with their telephone numbers").

[298] *See* Biggerstaff Comments on United Petition at 2-4; Lucas Comments on United Petition at 2; Mey Comments on United Petition at 1; NCLC Comments on United Petition at 2; Roylance Comments on United Petition at 2; Roylance Reply Comments on United Petition at 3, 5; Shields Comments on United Petition at 2; Shields Comments on Reply Comments of United on United Petition (March 2014); Shields Reply Comments on United Petition at 2-3; Sutton Comments on United Petition at 1; *see also* ABA Comments on United Petition at 3; AFSA Comments on Stage Petition at 1-2; AFSA Comments on United Petition at 2; CCIA Comments on Stage Petition at 4-5; CCIA Reply Comments on Stage Petition at 2; Cennate Comments on United Petition at 3-4; Chamber Comments on United Petition at 2; COHEAO Comments on United Petition at 2; Comcast Comments on United Petition at 3-4; Noble Comments on United Petition at 2; SLSA Comments on United Petition at 5; Twitter Comments on Stage Petition at 7; United Reply Comments on Stage Petition at 2-4; Wells Fargo Comments on Stage Petition at 9; *see also Ex Parte* Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2-3 (filed Feb. 5, 2015) (explaining Neustar's Verification for TCPA product, which assists customers in "understanding the strength of correlation between a name and a telephone number," and an additional recently added "capability to evaluate the likelihood of whether a telephone number has experienced a disconnect event since the date when consent was initially obtained").

where the caller is taking ongoing steps reasonably designed to discover reassignments and to cease calls, we recognize that these steps may not solve the problem in its entirety.  In balancing the caller's interest in having an opportunity to learn of reassignment against the privacy interests of consumers to whom the number is reassigned, we find that, where a caller believes he has consent to make a call and does not discover that a wireless number had been reassigned prior to making or initiating a call[300] to that number for the first time after reassignment, liability should not attach for that first call, but the caller is liable for any calls thereafter.  The caller, and not the called party, bears the burden of demonstrating: (1) that he had a reasonable to basis to believe he had consent to make the call, and (2) that he did not have actual or constructive knowledge of reassignment prior to or at the time of this one-additional-call window we recognize as an opportunity for callers to discover reassignment.

    86.     Callers have a number of options available that, over time, may permit them to learn of reassigned numbers.  For example, at least one database can help determine whether a number has been reassigned, and consumer groups have expressed strong support for full participation from carriers to make this type of option more effective.[301]  Further, callers may ask consumers to notify them when they switch from a number for which they have given prior express consent.  Nothing in the TCPA or our rules prevents parties from creating, through a contract or other private agreement, an obligation for the person

(...continued from previous page)

[299] ABA Comments on United Petition at 3; AFSA Comments on Stage Petition at 1-2; AFSA Comments on United Petition at 2; AHIP Comments on United Petition at 8; Angula Comments on United Petition at 1; Baird Comments on United Petition at 1; Besso Comments on United Petition at 1; CCIA Comments on Stage Petition at 2-5; CCIA Reply Comments on Stage Petition at 2; Cennate Comments on United Petition at 3-4; Chamber Comments on United Petition at 2; COHEAO Comments on United Petition at 2; Comcast Comments on United Petition at 3-4; CTIA Comments on United Petition at 4; DIRECTV Comments on United Petition at i; Dominion Comments on United Petition at 3; Jacola Comments on United Petition at 1; Martinez Comments on United Petition at 1; Moore Comments on United Petition at 1; Noble Comments on United Petition at 2; Richardson Comments on United Petition at 1; Ridenour Comments on United Petition at 1; SLSA Comments on United Petition at 5; Stage Reply Comments on Stage Petition at 3, 6-7; Twitter Comments on Stage Petition at 7, 12-13; United Reply Comments on Stage Petition at 2-4; Wells Fargo Comments on Stage Petition at 9; *see also Ex Parte* Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3 (filed Feb. 5, 2015) (stating that Neustar's "TCPA Mitigation service is not a silver bullet for TCPA compliance but is a tool that companies can use, in conjunction with other service, to reduce their TCPA exposure").

[300] *See DISH Declaratory Ruling,* 28 FCC Rcd at 6583, para. 26 ("a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call").  We reject the argument that this one call must connect to a person, answering machine, or voicemail, or must otherwise provide the caller with actual knowledge of reassignment.  *See, e.g., Ex Parte* Letter from Monica Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2-6 (filed June 5, 2015); *Ex Parte* Letter from Monica Desai, Counsel to ACA International, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 6-7 (filed June 11, 2015); *Ex Parte* Letter from Harold Kim, Executive Vice President of U.S. Chamber Institute for Legal Reform, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3 (filed June 11, 2015); *Ex Parte* Letter from Mark W. Brennan, Counsel to United Healthcare Services, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3 (filed June 9, 2015); *Ex Parte* Letter from Robert Biggerstaff, to Tom Wheeler, Chairman, FCC in CG Docket No. 02-278, at 3 (filed June 4, 2015).  Our rejection of this argument is not "inconsistent with the statute." Commissioner O'Rielly Partial Dissent at 8.  We interpret the statutory term "prior express consent" to *permit* callers to make or attempt one call before liability may attach.

[301] *See* Neustar Resources and Tools, *available at* http://www.neustar.biz/resources/product-literature/lead-buyers-tcpa#.U4288CjaIWF (claiming to include 80 percent of wireless and hard-to-find phone numbers, and to update information every 15 minutes in order to assist callers concerned with TCPA compliance as they seek to "confidently verify that the phone number still belongs to the individual who gave consent") (last visited May 18, 2015); *see also Ex Parte* Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2-3 (filed Feb. 5, 2015).

giving consent to notify the caller when the number has been relinquished.[302]  The record indicates that callers seeking to discover reassignments may: (1) include an interactive opt-out mechanism in all artificial- or prerecorded-voice calls so that recipients may easily report a reassigned or wrong number; (2) implement procedures for recording wrong number reports received by customer service representatives placing outbound calls; (3) implement processes for allowing customer service agents to record new phone numbers when receiving calls from customers; (4) periodically send an email or mail request to the consumer to update his or her contact information; (5) utilize an autodialer's and/or a live caller's ability to recognize "triple-tones" that identify and record disconnected numbers;[303] (6) establish policies for determining whether a number has been reassigned if there has been no response to a "two-way" call after a period of attempting to contact a consumer; and (7) enable customers to update contact information by responding to any text message they receive, which may increase a customer's likelihood of reporting phone number changes and reduce the likelihood of a caller dialing a reassigned number.[304]

87.     We find that these options, when used as a normal practice of business, make it possible in most circumstances to comply with the TCPA, given our interpretation of "called party," and to determine whether the current subscriber or customary user of a wireless number has given prior express consent.  We also note that this list of best practices and available tools for discovering reassigned wireless numbers is not exhaustive, nor are we suggesting that a reasonable caller would have implemented any particular number of items on this list; we recognize that callers are unique and that a particular tool may not be particularly effective or practical in each and every circumstance.[305]

---

[302] The failure of the original consenting party to satisfy a contractual obligation to notify a caller about such a change does not preserve the previously existing consent to call that number, but instead creates a situation in which the caller may wish to seek legal remedies for violation of the agreement.

[303] Commission rules require that numbers be recycled within 90 days for a residential number, and within 365 days for a business number.  47 C.F.R. § 52.15(f)(ii).  While the Commission's rules do not set an inner time limit, most providers do not recycle numbers for at least 30 days.  *See Numbering Resource Optimization*, CC Docket No. 99-200, Report and Order and Further Notice of Proposed Rule Making, 15 FCC Rcd 7574, 7590, para. 29 (2000).  For calls within this time period, autodialers are equipped to record "triple-tone" signals that identify that the number has been disconnected.  A manual dialer will, likewise, hear and identify a triple-tone.  *See* Joint Consumer Group Nov. 17 Comments at 10.  By recognizing such a disconnected number, callers may obtain constructive knowledge that a number for which they have received consent is no longer in service, and thus, likely to be reassigned.

[304] Carrington Comments on United Petition at 1; DIRECTV Comments on United Petition at i, 7-8; NCLC Comments on United Petition at 2; United Reply Comments on Stage Petition at 4-5; United Reply Comments on United Petition at 12-13; Wells Fargo Comments on Stage Petition at 18-19; *Ex Parte* Letter from Mark W. Brennan, Counsel to United Healthcare Services, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 4-6 (filed July 28, 2014); *Ex Parte* Letter from Mark W. Brennan, Counsel to United Healthcare Services, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2-3 (filed Sept. 30, 2014); *Ex Parte* Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 8-9 (filed July 31, 2014); *Ex Parte* Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, 11 (filed June 6, 2014); *see 2012 TCPA Order*, 18 FCC Rcd at 1848-50, paras. 44-49; Intergovernmental Advisory Committee to the Federal Communications Commission, Advisory Recommendation No: 2015-6 at para. 8 (May 15, 2015); *see also* Shields Comments on Stage Petition at 5 (stating that wireless numbers are not reassigned immediately, but stay in a pool of unassigned numbers 30 to 90 days); Shields Reply Comments to CCIA Comments on Stage Petition at 1 (stating that, during the time wireless numbers are reassigned, "robocalls will get a disconnect notice and a text message will get an undeliverable notice"); Stage Reply Comments on Stage Petition at 7 ("numbers do not stay in an unassigned pool for any particular or mandatory length of time").

[305] *See* United Reply Comments on CBA Petition at 6; United Comments on Rubio's Petition at 2; Wells Fargo Comments on Stage Petition at 18; *Ex Parte* Letter from Mark W. Brennan, Counsel to United Healthcare Services, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3 (filed May 7, 2014); *Ex Parte* Letter from Mark W. Brennan, Counsel to United Healthcare Services, Inc., to Marlene H. Dortch, Secretary, FCC in CG

(continued....)

88.     We acknowledge that callers using the tools discussed above may nevertheless not learn of reassignment before placing a call to a new subscriber.  The record provides little guidance regarding the length of time following the first call to a reassigned number that would reasonably enable a caller to discover the reassignment, and the record similarly offers little on how to balance the interests of called parties who might receive unwanted calls during this time.  Most commenters support an all-or-nothing approach where the caller is only liable after receiving actual knowledge of reassignment, or the caller is liable for every call made after reassignment.[306]  We find both positions unworkable.  The record shows that many calls can be made before there is actual knowledge of reassignment[307] and that, once there is actual knowledge, callers may not honor do-not-call requests.[308]  On the other hand, making every call after reassignment subject to liability fails to acknowledge that no one perfect solution exists to inform callers of reassignment.

89.     We therefore agree with United that we should find a middle ground where the caller would have an opportunity to take reasonable steps to discover reassignments and cease such calling before liability attaches.[309]  We disagree, however, that callers should be permitted up to a year to discover reassignments before facing liability.[310]  We conclude that giving callers an opportunity to avoid liability for the first call to a wireless number following reassignment strikes the appropriate balance.

90.     This additional opportunity to discover a reassignment acknowledges the possibility that in some cases callers may not learn of reassignment via available tools or from the new or previous subscriber. We find that the one-call window provides a reasonable opportunity for the caller to learn of the reassignment, which is in effect a revocation of consent to be called at that number, in a number of ways.[311]  One call represents an appropriate balance between a caller's opportunity to learn of the reassignment and the privacy interests of the new subscriber to avoid a potentially large number of calls to which he or she never consented.[312]

---

(...continued from previous page)
Docket No. 02-278, at 5 (filed July 28, 2014); *Ex Parte* Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 9 (filed July 31, 2014).

[306] *See, e.g.*, *Ex Parte* Letter from Monica S. Desai, Counsel to Abercrombie & Fitch Co., and Hollister Co., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2-3 (filed May 13, 2015); Letter from Sens. Edward J. Markey, Charles E. Schumer, Ron Wyden, Claire McCaskill, Elizabeth Warren, Richard Blumenthal, Amy Klobuchar, Tammy Baldwin, Jeff Merkley, and Al Franken, U.S. Senate, to Tom Wheeler, Chairman, FCC (May 14, 2015).

[307] *See, e.g., Ex Parte* Letter from Margot Saunders, Counsel to National Consumer Law Center, to Marlene Dortch, Secretary, FCC in CG Docket No. 02-278 at 8 (filed Dec. 18, 2014) (citing a company that called consumers 10 to 20 times per day).

[308] *See supra* para. 79 and n. 283.

[309] *See Ex Parte* Letter from Mark W. Brennan, Counsel to United Healthcare Services, Inc., to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278 (filed Sept. 30, 2014).

[310] United Reply Comments on CBA Petition at 6-7.

[311] *See* n. 293, *supra*.

[312] In striking this balance, we do not presume that a single call to a reassigned number will always be sufficient for callers to gain actual knowledge of the reassignment, nor do we somehow "expect callers to divine from [the called consumer's] mere silence the current status of a telephone number."  Commissioner O'Rielly Partial Dissent at 8. Instead, we are simply determining which party—the caller or the called party—bears the risk in situations where robocalls are placed to reassigned wireless numbers and the called party has not given his or her prior express consent.  In addressing this issue, the Commission could have interpreted the TCPA to impose a traditional strict liability standard on the caller: *i.e.*, a "zero call" approach under which no allowance would have been given for the robocaller to learn of the reassignment.  For the reasons set forth in this item, however, we believe we can reasonably interpret the TCPA not to require a result that severe.  Specifically, the TCPA anticipates the caller's ability to rely on "prior express consent," 47 U.S.C. 227(b)(1), and we interpret that to mean reasonable reliance,

(continued....)

91.     Our approach acknowledges that the caller must have a reasonable opportunity to discover the effective revocation, and is consistent with the common law principle that revocation of consent must be communicated to the other party in a reasonable manner.[313]  When the new subscriber to a reassigned number has not consented to the calls to that number, the caller may reasonably be considered to have constructive knowledge—if not actual knowledge—of the revocation of consent provided by the original subscriber to the number when the caller makes the first call without reaching that original subscriber.

92.     Our approach not only reflects a reasonable interpretation of the key statutory term "called party," but also balances our duty to make compliance feasible with the TCPA's goals of protecting consumers from unwanted and potentially costly calls.[314]  In this case, the opportunity for callers engaging in best practices to avoid liability for the first call following reassignment acknowledges callers' need for a reasonable opportunity to discover a reassignment using available tools, while ensuring that those callers who have not taken the steps available to avoid making calls to reassigned numbers do not have, effectively, the ability to make unlimited calls in a manner that contravenes the consumer protection goals of the TCPA.

93.     Considering the foregoing, we deny CBA's Petition, Rubio's Petition, Stage's Petition, and United's Petition requesting that we exempt from liability autodialed, artificial-voice, and prerecorded-voice calls made to wireless numbers reassigned from a consumer who previously gave consent.[315]  Calls to wireless numbers, where the caller does not have the consent of the called party—

(...continued from previous page)
and the balancing we adopt herein reflects our construal of reasonable reliance.  We find no basis in the statute or the record before us to conclude that callers can reasonably rely on prior express consent beyond one call to reassigned numbers.  Subject to this one-call threshold, we find that when a caller chooses to make robocalls to a wireless number that may have been reassigned, it is the caller—and not the wireless recipient of the call—who bears the risk that the call was made without the prior express consent required under the statute.  For these and other reasons, this interpretation of the statute also is not undercut by prior Commission precedent in other contexts implementing the TCPA so as not to "demand[] the impossible."  *See* Commissioner Pai Dissent at 7; *2004 TCPA Order*, 19 FCC Rcd at 19218-19, para. 9 (interpreting and implementing the TCPA so that "the statute would [not] 'demand the impossible.'") (citations omitted).  In addition to the forgoing, the scenario at issue in the *2004 TCPA Order* dealt with calls to numbers ported from wireline to wireless service, which had the effect of altering the governing legal regime.  *See 2004 TCPA Order*, 19 FCC Rcd at 19216, para. 3; 47 U.S.C. § 227(b)(1)(A), (B).  Here, by contrast, where numbers are reassigned from one wireless subscriber to another, the governing legal regime remains the same, better enabling callers to gauge and account for the risk in this scenario.  Further, our interpretation of the statute based on the record here does not prejudge what rules the Commission might adopt to implement the TCPA based on some future record.  *See 2004 TCPA Order*, 19 FCC Rcd at 19216-20, paras. 3-13 (discussing the Commission's 2003 interpretation and implementation of the TCPA, which did not include any 'safe harbor' for numbers ported from wireline to wireless service; its subsequent FNPRM seeking comment on the possible need for such a safe harbor; and the record evidence persuading the Commission of the merits of the safe harbor rule adopted there).

[313] *See* Williston on Contracts § 5:9 (4th ed.) ("ordinarily it is necessary for the offeror to communicate the revocation of an offer to the offeree").

[314] *See 1992 TCPA Order*, 7 FCC Rcd at 8754, para. 3.

[315] In reaching this conclusion, we necessarily reject two of the options United presents in its Petition: (1) that the "Commission [] find that when a caller has obtained valid 'prior express consent of the called party' to call that party's telephone number, such 'prior express consent' encompasses non-telemarketing, informational calls to the telephone number provided until the caller learns that the telephone number has been reassigned" and (2) that the Commission confirm that the term "called party" "encompass[] both the consenting party and the new subscriber to a reassigned number, until the caller learns that the two parties are not the same."  United Petition at 10.  We also reject United's request that the Commission "confirm that a good faith exception from TCPA liability exists for informational, non-telemarketing calls to telephone numbers that have been reassigned from a prior express consenting party (until the caller learns of the reassignment)."  United Petition at 10; *see also Ex Parte* Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 6

(continued....)

meaning the current subscriber or customary user, as defined above—violate the TCPA, absent some exception.[316]

94.      Although we have already addressed certain issues raised by Rubio's, it includes two additional arguments in its Petition.  Rubio's states that it obtains prior express consent from its employees to use a remote messaging system to send "Quality Assistance" alerts[317] to its employees' own wireless phone numbers.[318]  These alerts inform employees when a food safety concern affecting a particular restaurant has been reported in a confidential electronic system so that the employees can log in to the system to obtain the report.[319]  When an employee's wireless phone number is reassigned to a new subscriber and that employee does not alert Rubio's that he or she no longer subscribes to that wireless number, the remote messaging system continues to send alerts to the reassigned number.[320]  Rubio's asserts that when one of its employees lost his wireless phone, the number was reassigned, and "hundreds of Remote Messaging alerts were received by the wireless subscriber with the reassigned number" by the time Rubio's "was aware of the problem."[321]  Rubio's asserts that the new subscriber to the number "advised Rubio's that he had solved the problem by blocking calls from the originating number used by the Remote Messaging system—and, therefore, no corrective action was needed."[322]  Rubio's "reasonably relied upon this assurance that no corrective action was needed,"[323] and appears to have continued sending alerts until the new subscriber to the number filed suit.[324]

95.      Rubio's first argues that the Commission should add "an affirmative, bad-faith defense that vitiates liability upon a showing that the called party purposefully and unreasonably waited to notify the calling[ ]party of the reassignment in order [to] accrue statutory penalties."[325]  We decline to do so.  Neither the TCPA nor our related rules place any affirmative obligation on the user of a wireless number to inform all potential callers when that number is relinquished or reassigned; uninvolved new users of reassigned numbers are not obligated under the TCPA or our rules to answer every call, nor are they required to contact each caller to opt out in order to stop further calls.[326]  Furthermore, once the new

---

(...continued from previous page)

(filed July 31, 2014).  We do not create a good faith exception, but rather recognize an opportunity for callers to avoid liability for the first call following reassignment in order to give effect to our reasonable interpretation of "prior express consent" in section 227(b)(1)(A), balancing the commercial interest of callers in having a reasonable opportunity to learn of reassignments against the privacy interest of the consumer to whom the number is reassigned in not receiving unwanted calls for which they provided no prior express consent.  *See* 47 U.S.C. § 227(b)(1)(A).  We also necessarily reject Stage's request for "an exception to liability under the TCPA for autodialed marketing calls, including text messages, made to reassigned wireless numbers where the caller had obtained prior express consent to make such marketing calls, but the wireless number has been reassigned without notice to the caller . . . ." Stage Petition at 4.

[316] *See* 47 U.S.C. § 227(b)(1)(A) (listing exceptions as "a call made for emergency purposes or made with the prior express consent of the called party").

[317] In its petition, Rubio's does not indicate whether the "alerts" are voice calls or text message calls.

[318] *See* Rubio's Petition at 1-2.

[319] *Id.* at 2.

[320] *Id.* at 2-3.

[321] *Id.* at 3.

[322] *Id.*

[323] *Id.* at 7.

[324] Rubio's states that the subscriber to the new number had "received approximately 876 alerts" when he filed suit against Rubio's.  *Id.*at 3.

[325] *Id.*at 7.

[326] *See* para. 81, *supra.*

subscriber to the wireless number informed Rubio's that the number had been reassigned, Rubio's had actual knowledge that the prior express consent of its employee was no longer valid.  At that point, it was incumbent upon Rubio's to take action to update its remote messaging system and remove the number.  The new subscriber's statement that he had "solved the problem"[327] was immaterial if Rubio's knew that the prior express consent of its employee was no longer valid and it took no action to update its system to cease calling that wireless number.[328]  We, therefore, deny Rubio's Petition based on this argument.

96.     Rubio's second argument is that "the TCPA does not apply to intra-company messaging systems which are not aimed at consumers and [are] never intended to reach the public."[329]  As discussed above, the TCPA is not concerned with the intended audience of the call, but rather with the called party, *i.e.* the subscriber to or customary user of a wireless number at the time the call is made.  If such wireless calls are made without prior express consent, the statute broadly applies to "*any* call . . . to *any* telephone number."[330]  In any event, although Rubio's states that its messaging system sends the remote alerts to its employees' wireless phone numbers, it also admits that calls to reassigned numbers do reach members of the public.  As such, while Rubio's may not intend to reach members of the public, it nonetheless does, and consequently impacts the privacy of those called parties.  We, therefore, deny Rubio's Petition based on this argument.

97.     Finally, we cannot grant United's request for clarification that pertains specifically to healthcare-related calls, as distinguished from all other calls.[331]  As we stated in the *ACA Declaratory Ruling*, the restriction set forth in section 227(b)(1)(A)(iii) applies "regardless of the content of the call."[332]

### 4.     Prior Express Written Consent After 2012 Rule Changes

#### a.     DMA and Coalition

98.     Three petitioners seek relief from or clarification of the prior-express-written-consent rule that became effective October 16, 2013.  That rule requires prior express written consent for telemarketing calls; to get such consent, telemarketers must tell consumers the telemarketing will be done

---

[327] Rubio's Petition at 7.

[328] *See* para. 85, *supra.*

[329] Rubio's Petition at 4, 7-8.

[330] 47 U.S.C. § 227(b)(1)(A).

[331] United Petition at 3.

Having declined in this Declaratory Ruling to grant United's request for a clarification that calls to reassigned numbers are exempt from TCPA liability, we also decline its request, made without elaboration, that the Commission "exercise its ancillary authority under Title I of the Communications Act [of 1934]" to grant its request, because that request is "reasonably ancillary to the effective performance of the Commission's statutorily mandated responsibilities under the TCPA."  *Id.* at 11 (internal quotation marks omitted); *see also* 47 U.S.C. § 154(i) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.").  The Commission's ancillary jurisdiction is limited to circumstances where: (1) the Commission's general jurisdictional grant under Title I covers the subject of the regulations and (2) the regulations are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities.  *See American Library Ass'n v. FCC*, 406 F.3d 689, 700 (D.C. Cir. 2005).  As we have discussed here in considerable detail, the statute in this case prohibits autodialed or prerecorded non-emergency calls to wireless numbers without the prior express consent of the called party.  As such, granting United's request that we recognize an exception for such calls from the statutory requirement would not be reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibility to implement that requirement, but would instead undermine the statute.

[332] *ACA Declaratory Ruling,* 23 FCC Rcd at 565, para. 11; *see* 47 U.S.C. § 227 (b)(1)(A)(iii).

with autodialer equipment and that consent is not a condition of purchase.[333]  Coalition[334] seeks clarification that the revised TCPA rule that became effective October 16, 2013,[335] does not "nullify those written express consents already provided by consumers before that date"[336] and therefore mobile marketers need not take additional steps to obtain the revised forms of written consent from existing customers who have already provided express written consent (under the previous rule) that does not meet the standards of the revised rule.[337]  In its request for forbearance, DMA states that "[the new rule] require[s] disclosure, informing consumers, that sales are not conditioned on consent and that the seller is using an [autodialer], in connection with marketers['] existing written consent agreements."[338]  In its Petition, DMA argues that, while the Commission "stated that its primary goal in revising [the TCPA rule] was to make [its rule] consistent with those of the Federal Trade Commission (FTC),"[339] this new rule departs from the FTC's formulation.[340]  DMA maintains that the Commission's rule "requires that a marketer affirmatively **disclose** to its customer that it is not acting to condition sale on the written agreement."[341]  In support of its Petition, DMA also notes that the cost of obtaining new express written consent with the required disclosures would be exorbitant and would cause confusion among its customers.[342]

99.     Several commenters support both Coalition's[343] and DMA's[344] arguments that the 2012

---

[333] 47 C.F.R. § 64.1200(a)(2), (f)(8)(i).

[334] The Coalition "consists of communications infrastructure, technology, and professional services companies that work with brands, retailers, banks, online services, and companies of all types to engage with and interact with their customers using mobile messaging and other channels for communication with consumers via mobile phones." Coalition Petition at 2.

[335] *2012 TCPA Order*, 27 FCC Rcd 1830.

[336] Coalition Petition at 1.

[337] Coalition Petition at 1-2.

[338] DMA Petition at 1.  Although this filing is captioned as a "Petition for Forbearance," it does not cite or refer to the Commission's "Section 10" regulatory forbearance authority, *see* 47 U.S.C. § 160, which specifically concerns forbearance from applying provisions of the Communications Act or the Commission's rules to telecommunications carriers or services.  Further, the petition fails to provide the required support and justification to support the requisite showing necessary for forbearance from the Commission's rules.  Because the DMA Petition appears to seek a more general form of relief to resolve the alleged uncertainty which it describes, we do not treat this request as a "section 10" forbearance request but rather, on our own motion, elect to treat this request as a Petition for Declaratory Relief and resolve it herein.  *See* 47 C.F.R § 1.2.  DMA Petition at 1.

DMA also filed an Emergency Petition for Special Temporary Relief requesting the Commission to stay amended 47 C.F.R. Sections 64.1200(f)(8)(i)(A) and (B) until it clarifies the application of its amended rules.  *See Direct Marketing Association*, Emergency Petition for Special Temporary Relief, CG Docket No. 02-278 (filed Oct. 17, 2013) (DMA Emergency Petition).  There were no comments received on this petition.  As discussed *infra,* because we provide the Petitioner with some alternate relief, we deny DMA the relief it seeks in its Emergency Petition.  *See infra* at paras. 100-102.

[339] DMA Petition at 2.

[340] *Id.* at 5.

[341] *Id.* at 4 (emphasis in original).

[342] *Id.* at 5.

[343] AFSA Comments on Coalition Petition at 1; BAA Comments on Coalition Petition at 1; Brachtenbach Comments on Coalition Petition at 1; Coalition Comments on Coalition Petition at 1-2; Connor Comments on Coalition Petition at 1; CTIA Comments on Coalition Petition at 1-2; Phunware Comments on Coalition Petition at 1; MMA Comments on Coalition Petition at 1; mBlox Comments on Coalition Petition at 1,4; MobileStorm Comments on Coalition Petition at 1; MAE Comments on Coalition Petition at 1; MAW Comments on Coalition Petition at 1-2; NAB Comments on Coalition Petition at 1; NRF Comments on Coalition Petition at 1; Raney

(continued....)

rule was not designed to require mobile marketers to get new consent from customers who previously gave consent for these calls.  The commenters opposing Coalition's Petition, however, state that no further relief is warranted, as Petitioners had an ample period of time to transition—in fact, an extended implementation period of over 16 months that the Commission allowed for compliance with its new prior-express-written-consent requirements.[345]

100.    We grant the Coalition and DMA Petitions to the extent described herein and clarify the rule.  Specifically, we clarify that our prior-express-written-consent requirements apply for each call made to a wireless number, rather than to a series of calls to wireless numbers made as part of, for example, a marketing or advertising campaign as a whole.  Based on the record, we recognize that some uncertainty in this regard may have existed prior to the rule's effective date and therefore take this opportunity to provide Petitioners with relief, and also clarify our prior-express-written-consent requirements.  It follows that the rule applies *per call* and that telemarketers should not rely on a consumer's written consent obtained before the current rule took effect if that consent does not satisfy the current rule.  Indeed, our rules implementing the TCPA expressly provide that no person or entity may "initiate any *telephone call*" to any of the telephone numbers described in section 64.1200(a)(1)(i) through (iii), which includes "any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call."[346]

101.    We nevertheless acknowledge evidence of confusion on the part of Petitioners, and believe it is reasonable to recognize a limited period within which they could be expected to obtain the prior express written consent required by our recently effective rule.  Specifically, the Commission stated in the *2012 TCPA Order* that "[o]nce our written consent rules become effective . . . an entity will no longer be able to rely on non-written forms of express consent to make autodialed or prerecorded voice telemarketing calls, and thus could be liable for making such calls *absent prior written consent*."[347]  We agree with Coalition that the italicized language could have reasonably been interpreted to mean that written consent obtained prior to the current rule's effective date would remain valid even if it does not satisfy the current rule.[348]

102.    The National Association of Broadcasters (NAB) states that the relief under waiver should also grant limited prospective relief and continue for some reasonable period of time (*e.g.*, 90 days) going forward to enable parties to obtain new consents under the new rule without running the risk of being subjected to pointless and expensive class action litigation."[349]  We agree.  Thus, for good cause shown and the reasons discussed above, we grant Petitioners (including their members as of the release date of this Declaratory Ruling) a retroactive waiver from October 16, 2013, to release of this Declaratory Ruling, and then a waiver from the release of the Declaratory Ruling through a period of 89 days

---

(...continued from previous page)
Comments on Coalition Petition at 1; RILA Comments on Coalition Petition at 1-2; RIBA Comments on Coalition Petition at 1; Weeden Comments on Coalition Petition at 1; *see also* VAB Reply Comments on Coalition Petition at 1-2; Neustar Reply Comments on Coalition Petition at 2.  *See* Appendix C for a list of all commenters on the Coalition Petition.

[344] AFSA Comments on DMA Petition at 1; BAA Comments on DMA Petition at 1; Brachtenbach Comments on DMA Petition at 1; MAE Comments on DMA Petition at 1; MAW Comments on DMA Petition at 1-2; NAB Comments on DMA Petition at 1; Phunware Comments on DMA Petition at 1; RIBA Comments on DMA Petition at 1; Weeden Comments on DMA Petition at 1; *see also* VAB Reply Comments on DMA Petition at 1-2.  *See* Appendix E for a list of all commenters on the DMA Petition.

[345] *See* Biggerstaff Comments on Coalition Petition at 1-2; Roylance Comments on Coalition Petition at 2.

[346] 47 C.F.R. § 64.1200(a)(2) (emphasis added); *see also* 47 C.F.R. § 64.1200(a)(1)(iii).

[347] *2012 TCPA Order,* 27 FCC Rcd at 1857, para. 68 (emphasis added).

[348] Coalition Petition at 6-7.

[349] NAB Comments on Coalition Petition at 7-8; NAB Comments on DMA Petition at 7-8.

following release of this Declaratory Ruling to allow Petitioners to rely on the "old" prior express written consents already provided by their consumers before October 16, 2013 (the effective date of new requirement).  The "old" written express consents provided by consumers before October 16, 2013, remain effective for a period of 89 days following release of this Declaratory Ruling.  Petitioners must come into full compliance within 90 days after release of this Declaratory Ruling for each subject call, which we believe is a reasonable amount of time for Petitioners to obtain the prior express written consent required by the current rule.

### b.   RILA

103.     We find that a one-time text message sent immediately after a consumer's request for the text does not violate the TCPA and our rules.  RILA asks the Commission to clarify the prior-express-written-consent rule that became effective October 16, 2013, requiring that callers get prior express *written* consent for telemarketing after disclosing that the marketing will be done with autodialers and that consent is not conditioned on any purchase.  RILA's members are retail companies that utilize "on-demand text services" to facilitate consumer purchases.[350]  RILA describes "on demand text offers" that are provided through an on-demand text service as immediate, one-time replies sent to consumers via text message in response to a consumer-initiated text request.[351]  For example, a consumer might see an advertisement or another form of call-to-action display and respond by texting "discount" to the retailer, who replies by texting a coupon to the consumer.[352]  RILA notes that the reply text sent to the consumer does not include marketing material unrelated to the information specifically requested by the consumer or additional offers.[353]  RILA argues that sending a one-time, on-demand text offer in response to a consumer's specific request does not constitute "initiating a call" for TCPA purposes,[354] and that a one-time, on-demand text sent in response to a consumer's request is not telemarketing for TCPA purposes.[355]

104.     We agree with commenters supporting RILA's Petition who believe that consumers welcome such text messages,[356] and grant RILA's request, albeit on somewhat different grounds than those proposed in the Petition.  Specifically, we find that the on-demand text sent by retailers under the facts described by RILA is not telemarketing, but instead fulfillment of the consumer's request to receive the text.  As RILA describes it, the consumer requests the communication by sending an initial text request in response to a call-to-action marketing display.[357]  Immediately after receipt of the initial consumer request, the business sends an autodialed reply in the form of a one-time text message.[358]  When a consumer makes his or her initial request, the consumer requests and expects to receive the on-demand text message promptly in response, and expects the message to contain only the coupon requested.[359]

---

[350] RILA Petition at 2-3.

[351] *Id.* at 3.

[352] *Id.* at 3.

[353] *Id.*

[354] *Id.* at 3.

[355] *Id.* at 4-6.

[356] AFSA Comments on RILA Petition at 1-2; Brandtone Comments RILA Petition at 1-2; CTIA Comments on RILA Petition at 2; Moore Comments on RILA Petition at 1; NAB Comments on RILA Petition at 3; NACDS Comments on RILA Petition at 1-2; NFIB Comments on RILA Petition at 2; RILA Comments on RILA Petition at 1; Vibes Comments on RILA Petition at 1; *see also* ABA Reply Comments on RILA Petition at 2-3.  *See* Appendix L for a list of all commenters on the RILA Petition.

[357] *See* RILA Petition at 3.

[358] *Id.*

[359] *See, e.g.*, AFSA Comments on RILA Petition at 1; Brandtone Comments on RILA Petition t 1-2; CTIA Comments on RILA Petition at 2.

Upon viewing the call-to-action, a consumer may choose to act on it by sending a text message to the business.  The reply text merely contains the discount coupon in fulfillment of the consumer's request and thus does not constitute a telemarketing communication.  RILA members therefore need not make the two required disclosures to consumers to obtain consent, and the consumer's initiating text clearly constitutes consent to an informational reply in fulfillment of the consumer request.

105.    Our conclusion is consistent with TCPA legislative history that indicates the law is not intended to disrupt communications that are "expected or desired . . . between businesses and their customers," including messages that "advise a customer (at the telephone number provided by the customer) that an ordered product had arrived, a service was scheduled or performed, or a bill had not been paid."[360]  We find our reasoning is consistent with and analogous to our *SoundBite Declaratory Ruling.*  In the *SoundBite Declaratory Ruling,* the Commission clarified that "allow[ing] organizations that send text messages to consumers from whom they have obtained prior express consent to continue the practice of sending a final, one-time text to confirm receipt of a consumer's opt out request" does not violate the TCPA or the Commission's rules so long as the confirmation text has the specific characteristics described in the SoundBite Petition.[361]  In that decision, the Commission required, among other things, that the confirmation text be sent within five minutes of receipt of an opt-out request in order to be presumed to fall within the consumer's prior express consent and noted that if it took longer to send the confirmation text, the sender would have to make a showing that such delay was reasonable.[362]

106.    Similarly, we find that a one-time text sent in response to a consumer's request for information does not violate the TCPA or the Commission's rules so long as it: (1) is requested by the consumer; (2) is a one-time only message sent *immediately* in response to a specific consumer request; and (3) contains only the information requested by the consumer with no other marketing or advertising information.[363]  We emphasize that this ruling applies only when the on-demand text message has been expressly requested by the consumer in the first instance.  The TCPA was enacted to protect consumers from unwanted calls; in this instance, however, because the consumer requests the information in the first instance, the potential for consumer harm, which the prior-express-written-consent requirement is designed to minimize, is substantially mitigated.

### 5.    Text Messages as Calls

107.    Glide raises the issue of whether SMS text messages are subject to the same consumer protections under the TCPA as voice calls.  We reiterate that they are.  Glide asserts that the Commission's "affirmation that text messages are the same as voice calls may make sense for many purposes under the TCPA, but perhaps does not hold in all cases.  Text messages are more akin to instant messages or emails than voice calls."[364]  Based on this assertion, Glide argues that "some limitations and concerns under the TCPA that are appropriate for voice calls may need to be approached differently for

---

[360] H.R. REP. NO. 102-317, 1st Sess., 102nd Cong. (1991) at 17.

[361] *SoundBite Declaratory Ruling,* 27 FCC Rcd at 15391, para. 1.

[362] *Id.* at 15397, para. 11.

[363] We note that some businesses include, in their call-to-action displays for on-demand texting programs, the small amount of wording necessary to make the disclosures required by the Commission's rules concerning prior express written consent for autodialed or prerecorded telemarketing calls.  *See, e.g.,* http://www1.macys.com/shop/coupons-deals (visited Feb. 10, 2015) (disclosures under "get texts details": "By texting COUPON from my mobile number, I agree to receive marketing text messages generated by an automated dialer from Macy's to this number.  I understand that consent is not required to make a purchase.").  Our ruling today allows businesses to voluntarily provide these simple disclosures to consumers in a call-to-action before sending a single on-demand text in response to a consumer's request.  If the business sends more than a single text as a response to the consumer, however, our rules require prior express written consent with the specified disclosures.

[364] Glide Petition at 6 n.11.

text messages."[365]  Glide, therefore, "urges the Commission to examine and clarify these distinctions."[366]  As the commenter opposing Glide's argument indicates, the Commission in 2003 determined that the TCPA applies to SMS texts.[367]  Thus, we find no uncertainty on this issue, and view Glide's request as seeking reversal of the Commission's prior ruling regarding text messages as calls rather than seeking clarification, and therefore inappropriate for declaratory ruling.

108.     Second, we clarify that the equipment used to send Internet-to-phone text messages as described by Revolution Messaging is an autodialer under the TCPA.[368]  Revolution Messaging asks the Commission to clarify that Internet-to-phone text messaging technology is a type of autodialer under the TCPA, and therefore consumer consent is required for Internet-to-phone texts.[369]  We find that Internet-to-phone text messages, including those sent using an interconnected text provider, require consumer consent.[370]

109.     Revolution Messaging contends that: (1) Internet-to-phone text messaging technology involves the collection and storage of cellular telephone numbers that are then associated with domain names assigned by each wireless carrier for their mobile service messages;[371] (2) users of such technology can create millions of addresses and send an unlimited number of unsolicited text messages, resulting in charges to the recipient;[372] and (3) Internet-to-phone messaging has become an increasingly popular means to contact wireless consumers that can be sent at minimal cost to the sender.[373]

110.     In the *2003 TCPA Order*, the Commission concluded that the consent must be obtained for SMS calls (or "text messages")[374] to wireless numbers.[375]  Revolution Messaging contends that

---

[365] *Id.*

[366] *Id.*

[367] *2003 TCPA Order,* 18 FCC Rcd at 14115, para. 165; *see also* 47 U.S.C § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(1)(iii); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) (noting that text messaging is a form of communication used primarily between telephones and is therefore consistent with the definition of a "call").

[368] *See* paras. 109-122, *infra*.  Although Revolution Messaging and commenters refer to "Internet-to-phone text messaging technology," the TCPA addresses the capacity of the "equipment" used to make a call.  47 U.S.C. § 227(a)(1).  Our analysis therefore addresses whether the equipment used to send Internet-to-phone text messages has the requisite capacity.

[369] *See* Revolution Petition at 4.  As described in the Petition and discussed herein, Internet-to-phone text messaging technology enables the sending of messages from a computer to a wireless phone.  The messages originate as electronic mail (e-mail) sent to a combination of the recipient's unique telephone number and wireless provider's domain name.  They are automatically converted by the wireless provider into a text message format that is delivered to the consumer's wireless phone over the wireless provider's network.  Alternatively, the message enters the wireless provider's network via the carrier's web portal and is then converted to a text-message format and delivered to the consumer's wireless phone over the wireless provider's network.  *Id.* at 2 n.1, 4-5.

[370] Interconnected text messaging services are services that enable consumers to send text messages to and receive text messages from all or substantially all text-capable U.S. telephone numbers, including through the use of applications downloaded or otherwise installed on mobile phones.  47 C.F.R. § 20.18(n)(1).

[371] Revolution Petition at 4-5.

[372] *Id.* at 5.

[373] *Id.* at 6-9; CDT Comments on Revolution Petition at 2-3.  *See* Appendix M for a list of all commenters on the Revolution Petition.

[374] SMS is commonly known as text messaging.  The Commission used "Internet-to-phone SMS" to refer to all messages that are converted to SMS messages from messages sent or directed to an address with an Internet domain reference, including both those sent as "e-mail" and those entered at a provider's website interface.  *See Rules and Regulations Implementing the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003*,

(continued....)

Internet-to-phone texts require consumer consent because they use an autodialer.  This is so, Revolution Messaging argues, because the technology necessarily and inherently requires the collection and storage of telephone numbers and has the capacity to dial such numbers by initiating calls to specified cellular phone numbers associated with a domain name.[376]  Revolution Messaging argues that Congress intended the Commission to have authority to apply TCPA protections to future technologies, including Internet-to-phone texts.[377]  Lastly, Revolution Messaging notes that the CAN-SPAM Act, which generally requires consent for email sent for commercial purposes without addressing non-commercial email, states expressly that it does not override the TCPA.[378]

111.    We grant Revolution Messaging's request to the extent described below.  We conclude that the equipment used to originate Internet-to-phone text messages to wireless numbers via email or via a wireless carrier's web portal is an "automatic telephone dialing system" as defined in the TCPA, and therefore calls made using the equipment require consent.[379]  We agree with commenters who argue that such equipment meets the first element of the autodialer definition because it has the capacity to store *or* produce telephone numbers to be called, using a random or sequential number generator.[380]  Wireless phone numbers are a necessary and unique identifier in each Internet-to-phone text message sent to a wireless recipient.  The record confirms that Internet-to-phone text messaging campaigns have purportedly sent tens of thousands of such messages to wireless consumers.[381]  The equipment used to send these messages thus must necessarily store, or at least have the capacity to store, large volumes of numbers to be called, and nothing in the record suggests otherwise.[382]  CTIA states that "the equipment 'stores' and 'produces' the wireless telephone numbers to be called, and it does so using random or sequential number generators to populate potential domain name addresses (e.g.,

(...continued from previous page)———————————————

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket Nos. 04-53, 02-278, Order, 19 FCC Rcd 15927, 15933, para. 14 n.48 (2004) (*CAN-SPAM Order*).

[375] *See 2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165; *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) (noting that text messaging is a form of communication used primarily between telephones and is therefore consistent with the definition of a "call").

[376] Revolution Petition at 11-12 (noting that Congress provides no definition of "to dial" in the TCPA).

[377] *Id.* at 12 (citing Sen. Hollings: "[t]he FCC is not limited to considering existing technologies.  The FCC is given flexibility to consider what rules should apply to future technologies as well as existing technologies," *see* 137 CONG. REC. S18784 (daily ed. Nov. 27, 1991)).

[378] *Id.* at 16 (citing the *CAN-SPAM Order*).

[379] *See* 47 U.S.C. § 227(a)(1).  As noted, the Commission previously has concluded that the TCPA's restriction on using autodialers to "call" wireless telephone numbers encompasses text messages.  As a result, the issue of whether a text message constitutes a "call" is not at issue here.  So long as the initiating device has the requisite capacity to meet the statutory definition of an autodialer and sends a text message, which the Commission has deemed a call, the fact that the message is initiated from a phone versus some other device is not relevant.  *See 2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165; *see also Joffe v. Acacia Mortgage Corporation*, 121 P.3d 831 at 836-37 (Az. Ct. App. 2006), *cert. denied*, 549 U.S. 1111 (2006); Intergovernmental Advisory Committee to the Federal Communications Commission, Advisory Recommendation No: 2015-6 at para. 10 (May 15, 2015).

[380] *See, e.g.*, Revolution Petition at 11; CDT Comments on Revolution Petition at 3; CTIA Comments on Revolution Petition at 5; Shields Comment on Revolution Petition at 1-5.

[381] *See, e.g.*, Revolution Petition at 7 (citing examples of various texting campaigns including press reports of an entity claiming to have contact information for 120 million people, such as www.americanindependent.com/153498/nc-text-messages-from-americans-in-contact-pac-flood-shuler-kissell-districts); *see also* Shields Comments on Revolution Petition at 2 (noting that ccAdvertising has sent millions of political text messages to cell phones).

[382] *See, e.g.*, CDT Comments on Revolution Petition at 5; CTIA Comments on Revolution Petition at 5.

5551212@randomcarrierdomain.com)."[383]  Even assuming that the equipment does not actually use a random or sequential number generator, the capacity to do so would make it subject to the TCPA.[384]  One commenter who opposes the Petition and addresses the autodialer definition does not contest that Internet-to-phone messaging technology has at least the capacity to store or produce numbers using a random or sequential number generator.[385]  Instead, the commenter argues that the second part of the test—dialing—is not met here.[386]

112.    We also agree with commenters that such equipment has the capacity to dial numbers and thus meets the second element of the TCPA's autodialer definition.[387]  At the outset, we note that neither the TCPA nor the Commission's rules define "dial."  Where a statute's plain terms do not directly address the precise question at issue and the statute is ambiguous on the point, the Commission can provide a reasonable construction of those terms.[388]  We find it reasonable to interpret "dial" to include the act of addressing and sending an Internet-to-phone text message to a consumer's wireless number.  We note that a typical definition of "dial" is to "make a telephone call *or connection.*"[389]

113.    There is no dispute that Internet-to-phone text messaging technology is used to initiate calls that ultimately are carried over wireless carriers' networks to wireless consumers via their respective unique telephone numbers.  Rather than using a wireless phone to initiate the call, the sender has chosen to initiate text messages using equipment that nevertheless "dials" numbers in a fashion required by and compatible with the technical characteristics, features, and functionalities of the wireless carrier's network.[390]  The TCPA's text and legislative history reveal Congress's intent to give the Commission broad authority to enforce the protections from unwanted robocalls as new technologies emerge.[391]  We therefore believe Congress intended the word "dial" to mean initiating a communication with consumers through use of their telephone number by an automated means that does not require direct human intervention, recognizing that the specific actions necessary to do so will depend on technical requirements of the carrier's network.  The carrier's domain name performs the same function as routing data existing within the telephone network and used in a "traditional" voice or text call to identify the called party's carrier so that the call can be routed to the correct carrier for completion to the called party's wireless telephone number.  The fact that a component of the call that is invisible to the called party involves using a domain name to identify the wireless carrier does not change this analysis.

---

[383] CTIA Comments on Revolution Petition at 5.

[384] *See* paras. 10-20, *supra.*

[385] *See* ccAdvertising comments on Revolution Petition at 11 (disputing only whether the information that is stored constitutes telephone numbers).

[386] *See id.*

[387] *See, e.g.*, CDT Comments on Revolution Petition at 3-4; Shields Comments on Revolution Petition; AFL Reply Comments on Revolution Petition at 2.

[388] *See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-46 (1984).

[389] *See* http://www.merriam-webster.com/dictionary/dial (emphasis added).

[390] This analysis is consistent with our clarifications regarding the end-to-end nature of communications involving 3G and GTL, *see* paras. 39-40, *supra*, and the Commission's long-standing approach of viewing communications on an end-to-end basis, without regard to intermediate steps.  *See, e.g., Teleconnect Co. v. Bell Tel. Co. of Pa.*, 10 FCC Rcd 1626, 1632, para. 12 (1995) ("[B]oth court and Commission decisions have considered the end-to-end nature of the communications more significant than the [intermediate] facilities used to complete such communications.").

[391] *See 2003 TCPA Order*, 18 FCC Rcd at 14091-92, paras. 131-133; *see also* H.R. REP. NO. 633, 2nd Sess., 101st Cong. (1990)  ("It should be noted that the bill's definition of 'automatic telephone dialing system' is *broad*, not only including equipment which is designed or intended to be used to deliver automatically-dialed prerecorded messages, but also including equipment which has the 'capability' to be used in such manner.") (emphasis added); *see also* CTIA Comments on Revolution Petition at 6.

114.    We conclude that by addressing a message using the consumer's wireless telephone number (*e.g.*, 5555551111@sprint.messaging.net or entering a message on a web portal to be sent to a consumer's wireless telephone number) and sending a text message to the consumer's wireless telephone number, the equipment dials a telephone number and the user of such technology thereby makes a telephone call to a number assigned to a wireless service as contemplated in section 227(b)(1) of the Act.[392]  We disagree, therefore, with the commenter who suggests that equipment used to originate Internet-to-phone text messages does not meet the second element of the TCPA's autodialer definition because that technology does not use a "traditional" dialing technique.[393]

115.    From the recipient's perspective, Internet-to-phone text messaging is functionally equivalent to phone-to-phone text messaging, which the Commission has already confirmed falls within the TCPA's protection.[394]  And the potential harm is identical to consumers; unwanted text messages pose the same cost and annoyance to consumers, regardless of whether they originate from a phone or the Internet.  Finding otherwise—that merely adding a domain to the telephone number means the number has not been "dialed"—when the effect on the recipient is identical, would elevate form over substance, thwart Congressional intent that evolving technologies not deprive mobile consumers of the TCPA's protections, and potentially open a floodgate of unwanted text messages to wireless consumers.

116.    Consistent with this analysis, we clarify that other types of text messages that pose the same consumer harms are subject to TCPA consumer protections.[395]  Specifically, consumer consent is required for text messages sent from text messaging apps that enable entities to send text messages to all or substantially all text-capable U.S. telephone numbers, including through the use of autodialer applications downloaded or otherwise installed on mobile phones.[396]  Consumers face the same privacy impact and may incur data costs from such texts.  To free these texts from the TCPA's protection would leave a glaring gap in the statute's coverage.

117.    Our finding is consistent with the First Amendment.  The TCPA's protections have been in place for over two decades and have withstood multiple First Amendment challenges.[397]  We see no new constitutional issue posed by the application of this restriction on Internet-to-phone text messaging technology and note that the TCPA's restriction on the use of autodialers to contact wireless numbers creates a content-neutral time, place, and manner restriction on speech.  Such a restriction survives a First Amendment challenge if it "furthers an important governmental interest that is unrelated to the suppression of free expression, and the incidental restriction on alleged First Amendment freedom is no

---

[392] 47 U.S.C. § 227(b)(1).

[393] *See* ccAdvertising Comments on Revolution Petition at 10.

[394] *See 2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[395] *See id.* ("This encompasses both voice calls and *text calls to wireless numbers including, for example*, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service.") (emphasis added).

[396] 47 C.F.R. § 20.18(n)(1).

[397] *See, e.g., Joffe*, 121 P.3d at 841-43 (concluding that application of the TCPA's restrictions on autodialed calls to wireless numbers contacted via Internet-to-phone messaging did not violate any First Amendment rights); *Wreyford v. Citizens for Transp. Mobility, Inc.*, 1:12-CV-2524-RLV, 2013 WL 3965244 (N.D. Ga. Aug. 1, 2013); *In re Jiffy Lube Intern., Inc., Text Spam Litigation*, 847 F. Supp. 2d 1253, 1262 (S.D. Cal. 2012); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1169-70 (N.D. Cal. 2010); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1010-12 (N.D. Ill. 2010*); Abbas v. Selling Source, LLC*, 2009 WL 4884471, at *7-8 (N.D. Ill. Dec. 14, 2009); *Strickler v. Bijora, Inc.*, 2012 WL 5386089, at *5 (N.D. Ill. Oct. 30, 2012); *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 377 (4th Cir. 2013) (holding that TCPA's disclosure requirements in Section 227(d) are constitutional).

greater than is essential to the furtherance of that interest."[398]

118.    The benefits to wireless consumers of protection from unwanted robocalls and texts are significant.  By enacting the TCPA and its specific prohibition on autodialed, artificial-voice, and prerecorded-voice calls to wireless numbers, Congress has expressed a significant governmental interest in protecting wireless consumers from the use of autodialers, which can generate a substantial number of calls that can impose costs, public safety risks, and privacy intrusions on the unwilling recipients of such calls.[399]  In addition to the invasion of consumer privacy for all wireless consumers, the record confirms that some are charged for incoming calls and messages.[400]  These costs can be substantial when they result from the large numbers of voice calls and texts autodialers can generate.  The massive growth in the use of wireless devices by consumers since the TCPA was enacted serves only to increase the number of wireless consumers potentially impacted by the use of autodialers and, thus, the governmental interest in protecting wireless consumers from the costs and privacy intrusions of unwanted voice calls and text messages.[401]

119.    The TCPA does not ban the use of autodialing technologies to dial telephone numbers.  Through the TCPA's restrictions, Congress narrowly tailored its restriction on autodialers to those consumers most vulnerable to harm while expressly exempting calls for an emergency purpose and leaving open alternative modes of communicating with these consumers, *e.g.*, obtaining consumer consent or manual dialing.  Autodialers can quickly dial thousands of numbers, a function that costs large numbers of wireless consumers money and aggravation.  And while we are encouraged by carrier efforts to implement protections against unwanted text messages, the record indicates these measures have not stemmed the tide of unwanted messages to wireless phones.[402]

120.    We disagree with commenters who suggest that, by enacting the CAN-SPAM Act after the TCPA, Congress intended only the CAN-SPAM Act, and not the TCPA, to apply to Internet-to-phone text messages sent to wireless phone numbers.[403]  The CAN-SPAM Act protects consumers from unwanted commercial e-mail, including unwanted messages to wireless devices.[404]  The CAN-SPAM Act directed the Commission to issue rules protecting wireless consumers from "unwanted mobile service commercial messages."[405]  Neither the law's text nor legislative history, however, supports the contention

---

[398] *See, e.g.*, *Turner Broadcasting v. FCC*, 512 U.S. 622 (1994).

[399] *See, e.g., Moser*, 46 F.3d at 974 (citing *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 331: "[w]hen Congress makes findings on essentially factual issues . . . those finding are of course entitled to a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amount of data bearing on such an issue"); *see also* CTIA Comments on Revolution Petition at 7-8 ("[C]onfirming that parties must have prior express consent before sending political campaign text messages would enhance the goals of the TCPA and CAN-SPAM Act.  For example, it would support the TCPA's goals of protecting individual privacy by preventing thousands (if not millions) of unwanted autodialed text messages sent directly to mobile devices.").

[400] *See, e.g.*, AFL Reply Comments on Revolution Petition at 2; IBT Reply Comments on Revolution Petition; RM Reply Comments on Revolution Petition at 13; VPC Comments on Revolution Petition at 1.

[401] Data from the Commission's annual report on mobile services indicate that, from 1992 to 2011, the number of wireless subscribers/connections grew from approximately 11 million to over 300 million.  *See Implementation of Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993 Annual Report and Analysis of Competitive Market Conditions with Respect to Commercial Mobile Services*, First Report, 10 FCC Rcd 8844 (1995); *Annual Report and Analysis of Competitive Market Conditions in Respect to Mobile Wireless, Including Commercial Mobile Service*, WT No. 11-186, Sixteenth Report, 28 FCC Rcd. 3700 (2013).

[402] *See* CTIA Comments on Revolution Petition at 12.

[403] *See* ccAdvertising Comments on Revolution Petition at 12-13.

[404] *See* CAN-SPAM Act, section 14(b), codified at 15 U.S.C. § 7712(b).

[405] *See* 15 U.S.C. § 7712(a).

that Congress intended the CAN-SPAM Act to be the only regulation to apply to all unsolicited text messages.[406]  To the contrary, Congress stated that "[n]othing in this Act shall be interpreted to preclude or override the applicability of [the TCPA]."[407]

121.    We also note that the CAN-SPAM Act's coverage is different from the TCPA's.  CAN-SPAM applies only to commercial messages, and to such messages even if they are not sent with an autodialer, the latter of which is beyond the TCPA's reach in some contexts.[408]  As a result, application of the TCPA to Internet-to-phone texts does not render the CAN-SPAM Act's regulations superfluous, as suggested by ccAdvertising, even as applied to mobile service commercial messages.[409]  While ccAdvertising argues that, "if . . . all messages sent using [I]nternet-to-text were already prohibited [under the TCPA], then there would be no need to include [the CAN-SPAM provision against mobile service commercial messages],"[410] we note that neither the TCPA nor our rules prohibit "all messages sent using [I]nternet-to-text."  Rather, the TCPA prohibits only those Internet-to-text messages that are sent without prior express consent using an autodialer, other than calls made for an emergency purpose.[411]

122.    We also find no support for the contention that the TCPA is not broad enough to encompass Internet-to-phone text messaging.[412]  Although the Commission has concluded that Internet-to-phone messages directed to an Internet domain name are subject to the CAN-SPAM Act, notably absent in the Commission's Order implementing the CAN-SPAM rules is any statement or suggestion that the language of the TCPA is not sufficiently broad to apply to Internet-to-phone text messages.[413]  In other words, nothing in the *CAN-SPAM Order* indicates that the TCPA is inapplicable to this situation.  We conclude, therefore, that nothing in the statutory language, the legislative history, or the Commission's implementation of the CAN-SPAM Act demonstrates that Congress intended only for the CAN-SPAM Act to apply to text messaging calls to wireless devices.

### 6.    Distinction Between Telemarketing and Informational Calls

123.    We reject arguments that the TCPA's protections are limited to telemarketing calls to wireless numbers and should not require consent for non-telemarketing robocalls made with a predictive dialer.[414]  The TCPA's restrictions on autodialed, artificial-voice, and prerecorded-voice calls to wireless

---

[406] *See also* CDT Comments on Revolution Petition at 4; Shields Comments on Revolution Petition at 6-7; RM Reply Comments on Revolution Petition at 10-11.

[407] *See* 15 U.S.C. § 7712(a).

[408] We note that, while the CAN-SPAM Act and the TCPA may overlap in certain areas (such as in the case of mobile service commercial messages sent with an autodialer), they do not overlap for autodialed messages that are non-commercial.  We also note the general rule of statutory construction that two overlapping statutes may both be given effect so long as there is no "positive repugnance" between them.  *Connecticut National Bank v. Germain*, 503 U.S. 249, 254 (1992) ("Redundancies across statutes are not unusual events in drafting, and where . . . there is no positive repugnancy between two laws, a court must give effect to both.").

[409] *See* ccAdvertising Comments on Revolution Petition at 13.

[410] *Id.*

[411] *See* 47 C.F.R. § 64.1200(a)(1).

[412] *See* ccAdvertising Comments on Revolution Petition at 13.

[413] *See, e.g., CAN-SPAM Order*, 19 FCC Rcd at 15932, para. 17 (clarifying that the TCPA's restriction "applies to all autodialed calls made to wireless numbers, including audio and visual services, *regardless of the format* of the message") (emphasis added)).

[414] This issue was first raised in the CI Petition.  *See* n. 42, *supra.*  CI later withdrew its Petition.  *Communication Innovators,* Withdrawal of Petition, CG Docket No. 02-278, filed July 14, 2014.  In the interest of removing uncertainty on this issue, the Commission raises the issue on its own motion.  *See* 47 C.F.R. § 1.2(a) ("The Commission may, in accordance with section 5(d) of the Administrative Procedure Act, on motion or on its own motion issue a declaratory ruling terminating a controversy or removing uncertainty.").

numbers apply equally to telemarketing and informational calls.[415]  With the exception of calls made for emergency purposes or with the prior express consent of the called party, the TCPA broadly prohibits calls made using "any automatic telephone dialing system" to "any telephone number assigned to a . . . cellular telephone service" without limiting that restriction to telemarketing calls.[416]

124.    We agree with the commenter who disputes arguments favoring such a distinction, stating: "[s]imply because the calls are not telemarketing calls does not lessen the cost to the recipients or lessen the invasion of privacy caused by the automated calls."[417]  We recognize that the TCPA did not establish this same level of protection from robocalls for residential line consumers.  As the Commission has previously observed, the TCPA contains "unique protections" for wireless consumers because autodialed and prerecorded calls are "increasingly intrusive in the wireless context, especially where the consumer pays for the incoming call."[418]  Moreover, the intrusion on the consumer's privacy from unwanted calls may actually be greater with wireless than wireline calls, where the calls are received on a phone that the consumer may carry at all times.

### 7.    Free-to-End-User Calls

125.    We exempt from the TCPA's consumer consent requirements, with conditions, certain pro-consumer messages about time-sensitive financial[419] and healthcare issues.[420]  With respect to healthcare calls, we also provide clarification, as requested by AAHAM, on the issue of whether provision of a phone number to a healthcare provider constitutes prior express consent for healthcare calls, and on the issue of whether a third party may consent to receive calls on behalf of an incapacitated patient.[421]

126.    Section 227(b)(2)(C) of the TCPA authorizes the Commission to exempt from its consent requirement[422] calls to a number assigned to a cellular telephone service that are not charged to the consumer, subject to conditions the Commission may prescribe "as necessary in the interest of" consumer privacy rights.[423]

127.    *ABA*.  ABA, on behalf of its member banks and other financial institutions,[424] asks the Commission to exempt calls concerning: (1) "transactions and events that suggest a risk of fraud or identity theft; (2) possible breaches of the security of customers' personal information; (3) steps consumers can take to prevent or remedy harm caused by data security breaches; and (4) actions needed to arrange for receipt of pending money transfers."[425]  ABA asserts that these calls serve consumers'

---

[415] *See* 47 U.S.C. § 227(b)(1); 47 C.F.R. § 64.1200(a); *2012 TCPA Order,* 27 FCC Rcd at 1838-1844, paras. 20-34; *ACA Declaratory Ruling,* 23 FCC Rcd at 565, para. 11.

[416] 47 U.S.C. § 227(b)(1).

[417] Shields Comments on CI Petition at 2.

[418] *2012 TCPA Order*, 27 FCC Rcd at 1839-40, para. 25.

[419] *See* paras. 127-139, *infra.*

[420] *See* paras. 143-148, *infra; see also* Intergovernmental Advisory Committee to the Federal Communications Commission, Advisory Recommendation No: 2015-6 at para. 13 (May 15, 2015).

[421] *See* paras. 140-142, *infra.*

[422] *See* 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(1)(iii).

[423] 47 U.S.C. § 227(b)(2)(C).

[424] For purposes of this exemption, we accept ABA's proposed definition of "financial institution" as "any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956."  *See* 15 U.S.C. § 6809(3)(A); *see also Ex Parte* Letter from Charles H. Kennedy, Counsel to ABA, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3 (filed Feb. 5, 2015).

[425] ABA Petition at 3.

interests and "can be conveyed most efficiently and reliably by automated calls to consumers' telephones, which increasingly are wireless devices,"[426] and would be made by financial institutions free to the end user without the recipient's prior express consent.  The calls would be made "subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights the [TCPA] is intended to protect."[427]  ABA states that "financial institutions will work with wireless carriers and third-party service providers to ensure that recipients of notices under the requested exemption are not charged for those messages,"[428] and thus satisfies the TCPA's "no charge" requirement, which includes ensuring that "notifications [do not] count against the recipient's plan minutes or texts."[429]

128.     We look to whether the messages in question can be exempted from the TCPA's prior-express-consent requirement while still protecting consumers' privacy interests.  ABA cites research indicating that 98 percent of text messages are opened within three minutes of delivery, and that this can "enabl[e] consumers and financial institutions to react promptly to time-critical information and contain any potential damage that might be caused by a fraudulent transaction, data security breach, or other event."[430]  According to the ABA, when financial institutions communicate with customers, they can prevent identity thieves from exploiting stolen data, and thereby reduce identity theft.[431]  Supporting commenters affirm that sending messages to consumers' cellular telephone numbers is the best and most efficient method of reaching them in a timely manner—which is important because "[e]ffective fraud and identity theft prevention requires the earliest possible contact with the customer."[432]  Opposing commenters counter that banks can provide consumers with information on the benefits of these messages and, if consumers find the messages desirable, they may provide consent.[433]

129.     For the reasons set forth below, we exempt these calls.  For calls intended to prevent fraudulent transactions or identity theft, ABA indicates that financial institutions use "experience-based algorithms to identify [] events that present an increased risk," such as purchases that are unusual for the customer, purchases of goods that can readily be converted to cash, or changes of address closely followed by a request for new payment cards.[434]  Upon identifying one of these suspicious activities, a financial institution seeks to contact the customer as quickly as possible "with the goal of verifying identity and immediately accommodating the customer's request" for services such as the establishment of a new credit plan or an extension of credit where a fraud alert has been placed on the customer's file.[435]  The majority of commenters agree that "[s]econds count in these situations and immediate notifications can help contain any potential damage that might result from a fraudulent transaction."[436]  While one commenter argues that the messages are not truly time-sensitive, but are merely marketing, we note that

---

[426] *Id.*

[427] *Id.*

[428] *Id.* at 17.

[429] *Cargo Airline Order,* 29 FCC Rcd 3432 at *3, para. 12.

[430] ABA Petition at 5.

[431] *Ex Parte* Letter from Charles H. Kennedy, Counsel to ABA, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 4 (filed Jan. 26, 2015).

[432] Visa Comments on ABA Petition at 2; ABA Reply Comments on ABA Petition at 12; Chamber Comments on ABA Petition at 3; CUNA Comments on ABA Petition at 2-3; MasterCard Comments on ABA Petition at 5; ICUL Comments on ABA Petition at 1; Identity Comments on ABA Petition at 1; Leagues Comments on ABA Petition at 1; OTA Comments on ABA Petition at 2.  *See* Appendix B for a list of all commenters on the ABA Petition.

[433] NCLC *et al* Comments on ABA Petition at 2, 4; Roylance Comments on ABA Petition at 1.

[434] ABA Petition at 10-11.

[435] *Id.* at 10.

[436] CUNA Comments on ABA Petition at 3.

the restrictions imposed on the exemption requires that the messages include no marketing or advertising, and that each message include information regarding how to opt out of future messages.[437]

130.    The second category involves data security breaches.  These calls are intended to alert consumers to data breaches at retailers and other businesses, which pose a security threat to the customer's financial account information.[438]  A breach may occur when a merchant or other organization identifies that the personal information it maintains about its customers has been accessed without authorization.[439]  The calls for which ABA seeks exemption would notify customers "of the breach and any remedial action to be taken."[440]

131.    Third are calls conveying measures consumers may take to prevent identity theft following a data breach,[441] including: placing fraud alerts on a credit report, subscribing to credit monitoring services, notice of receipt of new payment cards, information on activation of new payment cards, and "how to take other steps that will ensure the availability of secure card transactions."[442]  Because of the increase in data breaches, these types of calls are intended to "help mitigate the[] effects" of such breaches and "better enable consumers to protect their private information."[443]  We caution, however, that these calls may not contain telemarketing, cross-marketing, solicitation, debt collection, or advertising content of any kind.  Informing a consumer of an instance of identity theft or even measures he or she may take to address that instance of identity theft is distinct from marketing products a consumer may use to prevent or rectify identify theft.[444]  The exempted calls may not be used for marketing purposes.

132.    These three types of calls are all intended to address exigent circumstances in which a quick, timely communication with a consumer could prevent considerable consumer harms from occurring or, in the case of the remediation calls, could help quickly mitigate the extent of harm that will occur.  Under such circumstances, we find that the requirement to obtain prior express consent could make it impossible for effective communications of this sort to take place.  We disagree with opposing commenters who argue that banks could solve this problem by providing consumers with information on the benefits of these messages and allowing consumers to opt in to receiving these messages through providing prior express consent.[445]  Instead, we consider the urgency associated with these calls, the unpredictable timing of the underlying problems, the financial repercussions associated with those problems, and the risk that consumers may not have fully understood information provided to them regarding consenting to these calls.  As such, we conclude that these calls should be exempted from the prior-express-consent requirement, with consumer privacy interests being protected instead by the conditions contemplated by the statutory exemption provision that we specify below.

133.    Fourth, ABA requests exemption for calls regarding money transfers.  These messages include notification to the recipient of steps to be taken in order to receive the transferred funds.[446]  They

---

[437] Shields Comments on ABA Petition at 1.

[438] ABA Petition at 13.

[439] *Id.*

[440] *Id.*

[441] ABA Petition at 14.

[442] ABA Petition at 14-15.

[443] FPF Comments on ABA Petition at 5.

[444] *See Ex Parte* Letter from Margot Saunders, Counsel to National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3-4 (filed April 28, 2015).

[445] NCLC *et al* Comments on ABA Petition at 2, 4; Roylance Comments on ABA Petition at 1.

[446] ABA Petition at 15.

may also include a receipt for the money transfer to the transferring party.[447]  According to the Petition, money transfers "often must be delivered to persons who do not have an ongoing relationship with the sending institution and therefore have not consented to receive automated calls from that institution."[448]  We also find exigency in these calls.  Both the transferring party and the recipient of the transferred money undoubtedly are interested in the details of the money transfer.  Money transfers can be especially time-sensitive in emergency situations where consumers may need immediate notification that they have received money from another party.

134.    *Conditions on ABA's request.*  We next consider what conditions are appropriate for the exempted calls.  ABA argues that these calls are different from the exempted calls in the *Cargo Airline Order* and the categories are different from each other, and that they therefore warrant different conditions.[449]  In that Order, we specified that a caller must limit the frequency of the exempted calls to either one or three notifications.[450]  ABA argues that a single message is not always sufficient to convey the necessary information.[451]  It notes that financial institutions have no incentive to send "an excessive number of these messages," and that the Commission will "protect consumers if it does not [] impose arbitrary limitations on the number of automated fraud-related calls or texts that may be sent."[452]  By way of example, ABA indicates that a financial institution may send up to three alerts a day for three days when it is attempting to reach a non-responsive consumer regarding identity theft or breach notifications.[453]  It also notes that some automated messages require a response from the consumer—such as for the consumer to press "1" or "2"—and that the consumer's response indicates whether additional messages are necessary.[454]  And in messages concerning remediation measures, where the financial institution may want to communicate multiple pieces of information to the consumer, ABA asks that financial institutions be permitted "to send as many messages as are needed to complete the process of breach notification and remediation and to respond to consumer messages that are part of that process."[455]

135.    We decline to grant the exemption without limitations on frequency, as ABA requests.[456]  To do so would be to diminish consumers' privacy rights, which we are required by statute to consider.[457]  We limit the exempted calls to not more than three calls over a three-day period from a single financial institution to the owner of an affected account.[458]  These limits apply per event necessitating the exempted

---

[447] *Id.*

[448] *Id.*

[449] *See Cargo Airline Order,* 29 FCC Rcd 3432 at *5, para. 18; ABA Petition at 17-21.

[450] *See Cargo Airline Order,* 29 FCC Rcd 3432 at *4, para. 15.

[451] ABA Petition at 18.

[452] *Id.* (emphasis omitted).

[453] *Id.* at 19.

[454] *Id.* at 19-20.

[455] *Id.* at 20.

[456] ABA argues that the "Commission will *protect* consumers if it does not impose arbitrary limitations on the number of automated fraud-related calls or texts that may be sent."  ABA Petition at 18.  It also asks that the exemption for breach and fraud-related communications "should permit three such messages to be sent for a maximum of three days, if the consumer fails to respond" and that financial institutions be permitted "to send as many messages as are needed to complete the process of breach notification and remediation and to respond to consumer messages that are part of that process."  *Id.* at 19-20.

[457] *See* 47 U.S.C. § 227(b)(2)(C).

[458] If a customer is the owner of more than one affected account at a given financial institution, the total number of exempted calls is limited to three calls per event per affected account per three-day period, not three calls total per

(continued....)

calls, whether that be a fraud or identity theft event, data security breach event, or event giving rise to the need for remediation measures.  We anticipate that the content of these three messages over a three-day period will be different, based on ABA's statement that a financial institution needs these multiple messages to "complete the process of breach notification and remediation" or to "respond to a customer message or otherwise complete the fraud-prevention process."[459]  A financial institution may, of course, choose whether to use voice calls or text messages for these communications.  Any message beyond this limited number of three calls per event, over a three-day period, is not exempt and requires the consent of the called party.[460]

136.    ABA proffered no opt-out condition in its Petition.[461]  Subsequently, ABA stated that it would "accept and implement a requirement that the relief requested . . . be conditioned upon offering and honoring recipients' requests not to receive future automated messages."[462]  ABA requests, however, that "a consumer's opt-out request apply only to the account and to the category of message in response to which the request was made."[463]  It states, by way of example, that a consumer's request to opt out of future security breach notifications should not foreclose a financial institution from sending future exempted messages concerning out-of-pattern activity alerts on the same account.[464]

137.    Consistent with ABA's opt-out proposal and our precedent, we require financial institutions to include in their messages a mechanism for recipients to easily opt out of future calls.  We agree with ABA that a consumer's opt-out request should not be construed so broadly that opting out of one category of financial calls effectively opts that consumer out of all financial calls for that account.  Consequently, financial institutions may tailor the opt-out notice so that a consumer is aware that a choice to opt out of future calls is specific to one of the four categories of financial calls we address.

138.    In light of these considerations, we adopt the following conditions for each exempted call (voice call or text message) made by a financial institution:

1) voice calls and text messages must be sent, if at all, only to the wireless telephone number provided by the customer of the financial institution;

2) voice calls and text messages must state the name and contact information of the financial institution (for voice calls, these disclosures must be made at the beginning of the call);

3) voice calls and text messages are strictly limited to purposes discussed in paras. 129-137 above and must not include any telemarketing, cross-marketing, solicitation, debt collection, or advertising content;

4) voice calls and text messages must be concise, generally one minute or less in length for voice calls (unless more time is needed to obtain customer responses or answer customer questions) and 160 characters or less in length for text messages;

5) a financial institution may initiate no more than three messages (whether by voice call or text

(...continued from previous page)———————————————

three-day period.  If an account is not affected by a data security breach or identity theft alert, then no exempted calls are needed and that account may not be the basis for additional calls in a three-day period.

[459] ABA Petition at 19-20; *Ex Parte* Letter from Charles H. Kennedy, Counsel to ABA, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed June 8, 2015).

[460] *See* 47 C.F.R. § 64.1200(a)(1).

[461] ABA Petition at 21.

[462] *Ex Parte* Letter from Charles H. Kennedy, Counsel to ABA, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3 (filed Feb. 5, 2015).

[463] *Id.*

[464] *Id.*

message) per event over a three-day period for an affected account;

6) a financial institution must offer recipients within each message an easy means to opt out of future such messages, voice calls that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the call recipient to make an opt-out request prior to terminating the call, voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future calls, text messages must inform recipients of the ability to opt out by replying "STOP," which will be the exclusive means by which consumers may opt out of such messages; and,

7) a financial institution must honor opt-out requests immediately.

139.    We emphasize that the exemption is limited to messages with the purposes discussed in paras. 129-137 above.  The exemption applies to robocalls and texts to wireless numbers only if they are not charged to the recipient, including not being counted against any plan limits that apply to the recipient (*e.g.*, number of voice minutes, number of text messages) and the financial institution complies with the enumerated conditions we adopt today.

140.    *AAHAM.*  AAHAM first asks the Commission to clarify and confirm that "the provision of a telephone number by an individual to a healthcare provider constitutes 'prior express consent' for non-telemarketing, healthcare calls to that telephone number by or on behalf of the healthcare provider."[465]  AAHAM also asks that the Commission confirm that, for healthcare calls subject to HIPAA protections, provision of a telephone number to a healthcare provider establishes prior express consent under the TCPA not only for the healthcare provider, but also for calls "by or on behalf of the 'covered entity' as well as its 'business associates.'"[466]

141.    The Commission has stated that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."[467]  In the *ACA Declaratory Ruling*, the Commission clarified that a party who provides his wireless number to a creditor as part of a credit application "reasonably evidences prior express consent by the cell phone subscriber to be contacted at the number regarding the debt."[468]  That consent is valid not only for calls made by the original creditor, but also for those made by a third party collector acting on behalf of that creditor.[469]  More recently, in the *GroupMe Declaratory Ruling*, the Commission stated that "the scope of consent must be determined upon the facts of each situation."[470]  Nothing in these previous statements regarding consent prohibits us from granting the clarification AAHAM and supporting commenters request.[471]  We note, however, that "covered entity" and "business

---

[465] AAHAM Petition at 1-2.  AAHAM defines "healthcare provider" to include "hospitals, emergency care centers, medical physician or service offices, poison control centers, and other healthcare professionals."  *Id.* at 1 n.4.

[466] AAHAM Petition at 5.

[467] *1992 TCPA Order,* 7 FCC Rcd at 8769, para. 31.

[468] *ACA Declaratory Ruling,* 23 FCC Rcd at 564, para. 9.

[469] *See id.* at 565, para. 10.

[470] *GroupMe Declaratory Ruling,* 29 FCC Rcd 3442 at *4, para. 11.

[471] NACDS Comments on AAHAM Petition at 4; PCMA Comments on AAHAM Petition at 2-3; Rite Aid Comments on AAHAM Petition at 3-4; *see also* Letter from Rep. Scott R. Tipton, U.S. Congress, to Tom Wheeler, Chairman, FCC, at 1-2 (April 2, 2015).  *See* Appendix A for a list of all commenters on the AAHAM Petition.

In its comments, Rite Aid asks the Commission to address certain additional issues.  Rite Aid Comments on AAHAM Petition at 1.  It asks the Commission to "resolve [] confusion by declaring that the exemption for HIPAA-related calls to wireless numbers is the same as that for residential lines, i.e., that no prior consent is required."  *Id.* at 7.  It also asks the Commission to grant a retroactive waiver to it "and other similarly situated parties who have been

(continued....)

associates" are defined terms in the HIPAA privacy rules.[472]  The clarification we grant extends only to those terms within the scope of HIPAA, which is not necessarily as broad as the scope AAHAM requests. We clarify, therefore, that provision of a phone number to a healthcare provider constitutes prior express consent for healthcare calls subject to HIPAA[473] by a HIPAA-covered entity and business associates acting on its behalf, as defined by HIPAA, if the covered entities and business associates are making calls within the scope of the consent given, and absent instructions to the contrary.[474]

142.    AAHAM also asks the Commission to clarify consent with regard to incapacitated patients.  AAHAM asserts that in situations such as where a patient may be incapacitated and unable to provide a telephone number directly to a healthcare provider, but a third party intermediary provides the number, the provision of the phone number by the third party should constitute prior express consent "for healthcare calls to that number unless and until the patient requests otherwise."[475]  The Commission has stated that "an intermediary may only convey consent that has actually been provided by the consumer; the intermediary cannot provide consent on behalf of the consumer."[476]  We recognize that in certain healthcare situations, however, it may be impossible for a caller to obtain prior express consent.  We clarify, therefore, that where a party is unable to consent because of medical incapacity,[477] prior express consent to make healthcare calls subject to HIPAA may be obtained from a third party—much as a third party may consent to medical treatment on an incapacitated party's behalf.  A caller may make healthcare calls subject to HIPAA during that period of incapacity, based on the third party's prior express consent. Likewise, just as a third party's ability to consent to medical treatment on behalf of another ends at the time the patient is capable of consenting on his own behalf, the prior express consent provided by the third party is no longer valid once the period of incapacity ends.  A caller seeking to make healthcare calls

(...continued from previous page)━━━━━━━━━━━━━━

subject to TCPA-related litigation involving any alleged prior express consent requirement for HIPAA-related calls to wireless numbers to the extent necessary."  *Id.* at 7-8.  We decline to fully address this request for clarification and retroactive waiver raised in a comment to a pending Petition.  Rather, we point to footnote 7 of the Public Notice for the AAHAM Petition, and suggest a comparison between 47 C.F.R. § 64.1200(a)(1), § 64.1200(a)(2), and § 64.1200(a)(3)(v).  *See Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling and Exemption From American Association of Healthcare Administrative Management*, CG Docket No. 02-278, Public Notice, 29 FCC Rcd 15267 at *1 n.7 (2014).

[472] *See* 45 C.F.R. § 160.103; *see also* 47 C.F.R. § 64.1200(a)(2).

[473] *See* 45 C.F.R. § 160.103 (definition of "health care").  While AAHAM indicates that HIPAA's privacy rules define "health care messages," we find no such definition in the rules.  *See* AAHAM Petition at 3 n.7.  The definition AAHAM provides in its Petition is the definition of "health care."  We note, additionally, that insurance-coverage calls, which are included in AAHAM's list of "healthcare calls," are not necessarily among the topics in HIPAA's definition of "health care."  AAHAM Petition at 3; *see also* Shields Comments on AAHAM Petition at 2. Our clarification extends only to calls that are subject to HIPAA.

[474] By "within the scope of consent given, and absent instructions to the contrary," we mean that the call must be closely related to the purpose for which the telephone number was originally provided.  For example, if a patient provided his phone number upon admission to a hospital for scheduled surgery, then calls pertaining to that surgery or follow-up procedures for that surgery would be closely related to the purpose for which the telephone number was originally provided.

[475] AAHAM Petition at 7.

[476] *GroupMe Declaratory Ruling,* 29 FCC Rcd 3442 at *5, para. 14.  In stating this previous determination, we note that Commenter NACDS asks that we clarify that a telephone number provided to a pharmacy by a doctor's office in lieu of a patient who is too ill to do so, is prior express consent.  NACDS Comments on AAHAM Petition at 7.  We reiterate that, according to the Commission's clarification in *GroupMe*, an intermediary may only convey consent that was provided by the consumer.  *See GroupMe Declaratory Ruling,* 29 FCC Rcd 3442 at *5, para. 14.

[477] When we refer to "incapacity," we use the term in its legal sense under the applicable statutes, common law, or judicial decisions.  We do not speak of "incapacity" in some loose colloquial sense.  Thus, the relevant contours of "capacity"—including the duration of any "incapacity"—are to be assessed with reference to those legal indicia.

subject to HIPAA to a patient who is no longer incapacitated must obtain the prior express consent of the called party.

143.     Finally, AAHAM asks the Commission to exempt from the TCPA's prior-express-consent requirement certain non-telemarketing, healthcare calls that are not charged to the called party.[478] AAHAM notes that the calls provide vital, time-sensitive information patients welcome, expect, and often rely on to make informed decisions[479] including: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, home healthcare instructions, available payment options, insurance coverage payment outreach and eligibility, account communications and payment notifications, Social Security disability eligibility, and "health care messages" as defined by HIPAA.[480]  AAHAM points out that non-telemarketing healthcare calls and healthcare calls subject to HIPAA are already exempt from the TCPA's restrictions on prerecorded voice message calls to residential numbers, which is an indication of the public interest in receiving these calls by means of a limited exemption.[481]  AAHAM also references the conditions the Commission set forth in the *Cargo Airline Order* for each free-to-end-user voice call or text message call, and agrees to conditions consistent therewith.[482]

144.     Following the analysis the Commission established in the *Cargo Airline Order*, we consider whether AAHAM's members are capable of satisfying the first part of our section 227(b)(2)(C) inquiry—that is, proposed healthcare message notifications will "not [be] charged to the called party."[483] AAHAM states that its members are capable of providing these calls by, among other options, "using third-party solutions identified by [Cargo Airline Association] that can be deployed for subscribers of the four nationwide wireless carriers."[484]  As the Commission did in the *Cargo Airline Order*, we interpret the TCPA's "no charge" requirement to "preclude exempting notifications that count against the recipient's plan minutes or texts."[485]

145.     Next, we consider whether AAHAM's proposal will allow us to grant the requested exemption while protecting consumers' privacy interests through conditions, as the statutory exemption provision contemplates.[486]  First, we consider the content of the messages.  AAHAM notes that the calls provide vital, time-sensitive information patients welcome, expect, and often rely on to make informed decisions.[487]  A supporting commenter states that the "uncharged, informational healthcare messages it and other healthcare providers may send are [] the kind of communications that consumers desire, expect,

---

[478] AAHAM Petition at 2.

[479] *Id.* at 10.

[480] *Id.* at 2-3.  Regarding "health care messages," *see* n. 473, *supra*.

[481] *Id.* at 9-10.  In the *2012 TCPA Order*, the Commission exempted from its consent, identification, time-of-day, opt-out, and abandoned call requirements "all prerecorded health care-related calls to residential lines that are subject to HIPAA."  *2012 TCPA Order*, 27 FCC Rcd at 1852, para. 57; *see* 47 C.F.R. § 64.1200(a)(2), (a)(3)(v). Subsequent to that *Order*, HIPAA-covered autodialed, prerecorded voice, and artificial voice calls to a wireless number are exempt from the TCPA's written consent requirement but are still covered by the general consent requirement.  *Compare* 47 C.F.R. § 64.1200(a)(2) *with* 47 C.F.R. § 64.1200(a)(1).

[482] AAHAM Petition at 11.

[483] 47 U.S.C. § 227(b)(2)(C).

[484] AAHAM Petition at 11.

[485] *Cargo Airline Order,* 29 FCC Rcd 3432 at *3, para. 12.

[486] 47 U.S.C. § 227(b)(2)(C); *Cargo Airline Order,* 29 FCC Rcd 3432 at *4, para. 13.

[487] AAHAM Petition at 10.

and benefit from."[488]

146.     While these statements regarding the public's interest in and need for timely receipt of these calls are likely true regarding the majority of the types of calls AAHAM lists in its Petition, we are concerned that these policy arguments are not true for all types of calls AAHAM wishes to make under the TCPA's exemption provision.  For example, while we recognize the exigency and public interest in calls regarding post-discharge follow-up intended to prevent readmission, or prescription notifications, we fail to see the same exigency and public interest in calls regarding account communications and payment notifications, or Social Security disability eligibility.[489]  While this second group of calls regarding billing and accounts may convey information, we cannot find that they warrant the same treatment as calls for healthcare treatment purposes.  Timely delivery of these types of messages is not critical to a called party's healthcare, and they therefore do not justify setting aside a consumer's privacy interests in favor of an exemption for them.  We grant the exemption, with the conditions below, but restrict it to calls for which there is exigency and that have a healthcare treatment purpose, specifically: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions.[490]  We also clarify that HIPAA privacy rules shall control the content of the informational message where applicable, such as where the message attempts to relate information of a sensitive or personal nature; as one commenter cautions: "the information provided in these exempted voice calls and texts must not be of such a personal nature that it would violate the privacy" of the patient if, for example, another person received the message.[491]  We therefore grant the exemption for calls subject to HIPAA, but limit this exemption by excluding any calls contained therein that include telemarketing, solicitation, or advertising content, or which include accounting, billing, debt-collection, or other financial content.[492]

147.     *Conditions on AAHAM's Request.*  We adopt the following conditions for each exempted call (voice call or text message) made by or on behalf of a healthcare provider:

> 1) voice calls and text messages must be sent, if at all, only to the wireless telephone number provided by the patient;

---

[488] Rite Aid Comments on AAHAM Petition at 9-10 (internal quotation marks omitted).

[489] AAHAM Petition at 3.  While calls regarding Social Security disability eligibility may, in fact, raise issues regarding the timely provision of medical treatment, these issues are not readily apparent.  Nothing in the record indicates what the content of these calls may be—whether they relate to eligibility for treatment, eligibility for non-healthcare services, or eligibility for other services.  Without additional information, we are not able to determine whether the calls contain exigent information for a true healthcare treatment purpose, as opposed to information regarding billing and accounts information that is not of a true healthcare treatment purpose.

[490] *See id*. at 2-3. For example, from the list AAHAM includes in its Petition, the following types of calls would likely be exempt because of exigency and a true healthcare purpose: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions. *See* AAHAM Petition at 2-3.

[491] *See Ex Parte* Letter from Margot Saunders, Counsel to National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 3-4 (filed April 28, 2015) (expressing concern that "if the call is health related—a test result necessitating a doctor's appointment, the need to fill a prescription—it would be a serious breach of privacy for one person to hear about these issues when they apply to another); *Ex Parte* Letter from Victoria Di Tomasco, AAHAM President, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 2 (filed June 11, 2015).

[492] *See Ex Parte* Letter from Margot Saunders, Counsel to National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC in CG Docket No. 02-278, at 5 (filed Feb. 23, 2015) (objecting to granting AAHAM protection for "non-telemarketing calls that healthcare providers ordinarily make, including debt collection calls").

2) voice calls and text messages must state the name and contact information of the healthcare provider (for voice calls, these disclosures would need to be made at the beginning of the call);

3) voice calls and text messages are strictly limited to the purposes permitted in para. 146 above; must not include any telemarketing, solicitation, or advertising; may not include accounting, billing, debt-collection, or other financial content; and must comply with HIPAA privacy rules ;

4) voice calls and text messages must be concise, generally one minute or less in length for voice calls and 160 characters or less in length for text messages;

5) a healthcare provider may initiate only one message (whether by voice call or text message) per day, up to a maximum of three voice calls or text messages combined per week from a specific healthcare provider;

6) a healthcare provider must offer recipients within each message an easy means to opt out of future such messages, voice calls that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the call recipient to make an opt-out request prior to terminating the call, voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future healthcare calls, text messages must inform recipients of the ability to opt out by replying "STOP," which will be the exclusive means by which consumers may opt out of such messages; and,

7) a healthcare provider must honor the opt-out requests immediately.

148.    We emphasize that the exemption is limited to messages with the purposes discussed in para. 146 above. The exemption applies to robocalls and texts to wireless numbers only if they are not charged to the recipient, including not being counted against any plan limits that apply to the recipient (*e.g.*, number of voice minutes, number of text messages) and the healthcare providers complies with the enumerated conditions we adopt today.

### 8.    Waiver and Additional Exemption Requests

149.    In a footnote to its Petition, Glide states: "If the Commission declines to issue the requested declaratory ruling, it should grant [Glide] a retroactive waiver for the [a]pp's invitation mechanism."[493]  As support for this waiver request, Glide cites to Section 1.3 of the Commission's rules, which provides that "[t]he provisions of this chapter may be . . . waived for good cause shown, in whole or in part, at any time by the Commission."[494]  In this Declaratory Ruling and Order, we decline to issue the clarification Glide has requested.  We also decline to grant a retroactive waiver for the Glide app's invitational message function.

150.    The Commission may waive any of its rules for good cause shown.[495]  A waiver may be granted if:  (1) special circumstances warrant a deviation from the general rule and (2) the waiver would better serve the public interest than would application of the rule.[496]  Glide has not pled—much less pled with particularity—facts and circumstances that warrant a waiver.[497]  Its entire argument for waiver

---

[493] Glide Petition at 5 n.9.

[494] 47 C.F.R. § 1.3.

[495] *Id.* § 1.3; *WAIT Radio v. FCC,* 418 F.2d 1153, 1157 (D.C. Cir. 1969), *appeal after remand*, 459 F.2d 1203 (D.C. Cir. 1972), *cert. denied*, 409 U.S. 1027 (1972) (citing *Rio Grande Family Radio Fellowship, Inc. v. FCC,* 406 F.2d 664 (D.C. Cir. 1968)); *Northeast Cellular Tel. Co. v. FCC,* 897 F.2d 1164 (D.C. Cir. 1990).

[496] *Northeast Cellular Tel. Co.*, 897 F. 2d at 1166.

[497] *See* Glide Petition at 5 n.9; *WAIT Radio,* 418 F.2d at 1157 (stating that an applicant seeking a waiver faces a "high hurdle" and "must plead with particularity the facts and circumstances which warrant such action") (citation and internal quotation marks omitted).

consists of the single sentence quoted above, which merely asks that the Commission grant the waiver.[498] Glide has not attempted to establish that special circumstances warrant a deviation from the general rule, or that such deviation will serve the public interest. Because Glide's request for waiver fails to demonstrate the required information, we deny its request for retroactive waiver of the TCPA's consent requirement for robocalls and texts to wireless numbers.

151.    Alongside its request for retroactive waiver, Glide asks that the Commission "exempt from the TCPA rules" the invitational message function of its app. The TCPA includes a provision allowing the Commission to exempt certain calls from the restrictions on calls made by autodialers or using an artificial or prerecorded voice to, among others, cellular telephone numbers.[499] In its request for waiver, Glide cites to the provision of the Act that permits exemption of "calls to a telephone number assigned to a cellular telephone service that are not charged to the called party."[500] Glide has not alleged or established, however, that the persons who receive its invitational messages are never charged for the texts.[501] We, therefore, decline to grant an exemption under section 227(b)(2)(C) of the Act.[502]

### 9.    Call-Blocking Technology

152.    In this section, we affirm that nothing in the Communications Act or our rules or orders prohibits carriers or VoIP providers from implementing call-blocking technology that can help consumers[503] who choose to use such technology to stop unwanted robocalls. Consumers currently have the choice to use call-blocking technology to block individual numbers or categories of numbers, and may continue to do so.[504] Additionally, in the interests of public safety, we strongly encourage carriers, VoIP providers, and independent call-blocking service providers to avoid blocking autodialed or prerecorded calls from public safety entities, including PSAPs, emergency operations centers, or law enforcement agencies; blocking these calls may compromise the effectiveness of local and state emergency alerting and communications programs.[505] We expect that, with this clarification, consumers will benefit from improved call-blocking options that complement our decisions in this Declaratory Ruling and Order by deterring unwanted calls.

153.    Thirty-nine Attorneys General, including states, the District of Columbia, and Guam,

---

[498] *See* Glide Petition at 5 n.9.

[499] 47 U.S.C. § 227(b)(2)(C).

[500] *Id.*

[501] The most Glide asserts is that, when users send invitational messages through its app rather than as text messages outside the app, "the administrative burden on users" is reduced and it "enabl[es] them to avoid potential fees that may be charged by their carriers for sending text messages." Glide Petition at 15 n.37. The TCPA is not concerned, however, with reducing expenses of persons placing calls, but with "inappropriately shift[ing] marketing costs from sellers to consumers." *2003 TCPA Order,* 18 FCC Rcd at 14092, para. 133.

[502] 47 U.S.C. § 227(b)(2)(C).

[503] Our use of "consumers" in this context encompasses both residential or individual customers as well as business customers of the service providers.

[504] Consumer choice has been important to the Commission in previous decisions, and continues to be important. *See Protecting and Promoting the Open Internet*, GN Docket No. 14-28, FCC 15-24, Report and Order on Remand, Declaratory Ruling, and Order, 2015 WL 1120110 at *63, para. 220 (2015) ("broadband providers may also implement network management practices that are primarily used for, and tailored to, addressing traffic that is unwanted by end users").

[505] *See, e.g.*, Call Control Comments on NAAG Letter at 5 ("Call Control, for example, identifies incoming emergency calls and is programmed to always allow these calls. Furthermore, in Call Control when a user dials 911, Call Control is placed in Emergency Mode whereby all call blocking is temporarily disabled to ensure return calls from emergency officials are not blocked inadvertently.").

seek clarification through a letter from NAAG.[506]  They ask what legal or regulatory prohibitions, if any, prevent telephone carriers[507] from implementing call-blocking technology and the relevance, if any, of customers affirmatively "opting in" to use it.[508]  They also ask whether telephone carriers may legally block certain types of calls—such as telemarketing calls—at a customer's request if "technology is able to identify incoming calls as originating or probably originating from a telemarketer."[509]  Finally, they ask whether USTelecom's description of the Commission position as "strict oversight in ensuring the unimpeded delivery of telecommunications traffic"[510] is accurate and, if so, upon what basis the Commission claims that telephone carriers may not "block, choke, reduce, or restrict telecommunications traffic in any way[.]"[511]  As the Attorneys General note, a USTelecom representative stated in Congressional testimony that "[t]he current legal framework simply does not allow [phone companies] to decide for the consumer which calls should be allowed to go through and which should be blocked."[512]

154.    We grant the Attorney Generals' request for clarification and clarify that there is no legal barrier to stop carriers and providers of interconnected and one-way VoIP services from implementing call-blocking technology and offering consumers the choice, through an informed opt-in process, to use such technology to block individual calls or categories of incoming calls that may be part of a mass unsolicited calling event.  As such, we find that telephone carriers[513] may legally block calls or categories of calls at a consumer's request if available technology identifies incoming calls as originating from a source that the technology, which the consumer has selected to provide this service, has identified.[514]

---

[506] *See* n. 8, *supra*.

[507] While the Attorneys General ask about "telephone carriers'" obligations, the Commission's call completion obligations extend to interconnected and one-way VoIP service providers.  *See Rural Call Completion*, WC Docket No. 13-39, 28 FCC Rcd 16154, para. 18 (2013) (*citing Connect America Fund*, WC Docket Nos. 10-90, 07-135, 05-337, 03-109, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663, 18028-29, para. 973-74 (2011) (*2011 Report and Order*) (stating that interconnected and one-way VoIP service providers are subject to the call blocking limitations)), *modified on reconsideration, Rural Call Completion*, WC Docket No. 13-39, 29 FCC Rcd 14026, para. 38 (2014) (rejecting Sprint's assertion that the Commission has not adequately identified prohibited practices and restating that the Commission addressed the prohibition on call blocking and, *inter alia*, made clear that the prohibition applies to VoIP-to-PSTN traffic and providers of interconnected VoIP and "one-way" VoIP services).

[508] NAAG Letter at 2.  The Attorneys General, in their letter, list three particular call-blocking technologies—Nomorobo, Call Control, and Telemarketing Guard—as examples of the kinds of call-blocking technologies about which they inquire.  *Id.* at 2.  These three services offer consumers the ability to block calls that the respective service providers identify as being robocalls.  We consider such call-blocking technologies generally and do not make any rulings or findings with respect to particular services or the specific technologies they use, nor do we decide whether any specific service or technology is lawful under our ruling today.

[509] NAAG Letter at 2-3.

[510] *Id.* (quoting Letter from USTelecom to Senator Claire McCaskill, Chairwoman, U.S. Senate Subcommittee on Consumer Protection, Product Safety, and Insurance, at 5 (Oct. 15, 2013)).

[511] NAAG Letter at 3 (largely quoting *Establishing Just and Reasonable Rates for Local Exchange Carriers; Call Blocking by Carriers*, WC Docket No. 07-135, Declaratory Ruling and Order, 22 FCC Rcd 11629, 11631, para. 6 (WCB 2007) (*2007 Declaratory Ruling*) (stating: "Specifically, Commission precedent provides that no carriers, including interexchange carriers, may block, choke, reduce or restrict traffic in any way.").

[512] NAAG Letter at 1; FTC Staff Comments on NAAG Letter at 5; *see also Stopping Fraudulent Robocall Scams: Can More Be Done? Hearing Before the Subcomm. on Consumer Protection, Product Safety, and Insurance of the Comm. on Commerce, Science, and Transportation*, 113th Congress, at 36 (July 10, 2013).  *See* Appendix J for a list of all commenters on the NAAG Letter.

[513] References in this section to "carriers" include VoIP providers, unless otherwise indicated.

[514] We do not distinguish between technology that blocks individual numbers or categories of numbers, or that relies on carrier-provided lists of numbers versus crowd-sourced black lists of numbers.  For purposes of this statement of
(continued....)

155.    We agree with the large number of consumer commenters and the Federal Trade Commission that consumers need new and better tools to stop robocalls to their homes and wireless numbers.[515]  Consumers Union, for example, submitted electronic signatures of 50,077 consumers who agree with the statement: "Please authorize the phone companies to block unwanted robocalls before they come to me."[516]  Likewise, Telephone Science Corporation includes in its comment a list of 425,000 consumers who ask for its call-blocking service, which currently works only on VoIP services, to be implemented on "traditional copper landlines and wireless phones" as well.[517]  Commenters describe the cost of unwanted robocalls, including per-minute charges that can especially hurt low-income consumers.[518]  Other commenters emphasize that unwanted robocalls disturb their productivity or privacy,[519] or can threaten their physical safety.[520]

156.    FTC staff states that it sees "no legal barriers or policy considerations [that] prevent common carriers from offering technology that allows their customers to block unwanted calls."[521]  The FTC notes that a determination from this Commission that common carriers can offer call-blocking services will allow common carriers to be more responsive to their consumers, and that "[u]ltimately, widespread availability and use of call-blocking technology will substantially reduce the number of unwanted and illegal telemarketing calls received by consumers."[522]  Even carriers, notwithstanding industry testimony quoted above, agree that consumers have a right to block calls that is not inconsistent with their call completion obligations under section 201(b) of the Act.[523]  Commenters who addressed section 214(a) of the Act likewise found no barrier if consumers acknowledge and accept the risk of inadvertent blocking.[524]  Indeed, there appears to be no legal dispute in the record that the Communications Act or Commission rules do not limit consumers' right to block calls, as long as the

(...continued from previous page)————————————————————————
clarification, if the consumer is informed of the risk that the technology may inadvertently block desired calls (including both the existence of the risk and the approximate magnitude of the risk, where ascertainable), then nothing in our rules prohibits a carrier from offering a consumer the choice to use the technology.

[515] *See, e.g.*, Hull Comments on NAAG Letter at 1; Hearshen Comments on NAAG Letter at 1; Schrank Comments on NAAG Letter at 1; Delton Comments on NAAG Letter at 1; Borkan Comments on NAAG Letter at 1; Lipton Comments on NAAG Letter at 1; Wilson Comments on NAAG Letter at 1; Arnold Comments on NAAG Letter at 1; Wuzburg Comments on NAAG Letter at 1; Vinson Comments on NAAG Letter at 1; Strother Comments on NAAG Letter at 1; Adams Comments on NAAG Letter at 1.

[516] Consumers Union Comments on NAAG Letter at 1.

[517] TSC Comments on NAAG Letter at 3.  TSC's call-blocking service is Nomorobo, which uses "simultaneous ring technology" to route incoming calls to both the consumer's home phone and the Nomorobo server; "[i]f Nomorobo determines that [the caller] is a robocaller, Nomorobo answers the call on behalf of the user" and the "subscriber only hears a single ring in their home." *Id.* at 1.

[518] *See, e.g.*, Weiss Comments on NAAG Letter at 1; Friedman Comments on NAAG Letter at 1; Black Comments on NAAG Letter at 1; Turner Comments on NAAG Letter at 1; *see also* TracFone Reply Comments on NAAG Letter at 2 (explaining how unwanted robocalls deplete the monthly minute allocations of federal Lifeline program participants).

[519] *See, e.g.*, Ruddy Comments on NAAG Letter at 1; Foxworthe Comments on NAAG Letter at 1; Bratton Comments on NAAG Letter at 1; Petit Comments on NAAG Letter at 1; Scanlan Comments on NAAG Letter at 1; Maslea Comments on NAAG Letter at 1; McQuaid Comments on NAAG Letter at 1.

[520] *See, e.g.*, Knott Comments on NAAG Letter at 1; Briggs Comments on NAAG Letter at 1; Riter Comments on NAAG Letter at 1.

[521] FTC Staff Comments on NAAG Letter at 1.

[522] *Id*.

[523] AT&T Comments on NAAG Letter at 9; Verizon Comments on NAAG Letter at 9.

[524] AT&T Comments on NAAG Letter at 9-13; Call Control Comments on NAAG Letter at 4.

consumer makes the choice to do so.

157.    We clarify that services that allow consumers to designate categories of incoming calls (not just individual telephone numbers) to be blocked, such as a "telemarketer" category, also constitute consumer choice within their right to block calls.  Limiting that right to individual numbers would leave consumers without the ability to block most unwanted calls.  While individual number blocking is useful—*e.g.*, to avoid harassing calls from known individuals—it cannot help consumers avoid mass unsolicited calling, such as by telemarketers or scammers, known to cause consumers problems.  Carriers and VoIP providers already offer blocking services that go beyond individual numbers, including services that block calls without Caller ID, block all calls except those from numbers specified by the consumer, and block all calls.[525]  Regardless of how a blocking technology obtains the individual phone numbers within these categories, a consumer may choose to subscribe to a blocking service as long as the carrier offering the service or coordinating with the technology provider adequately discloses to the consumer the risks of inadvertent blocking.  We strongly encourage carriers, VoIP providers, and independent call-blocking service providers to avoid blocking autodialed or prerecorded calls from public safety entities, including PSAPs, emergency operations centers, or law enforcement agencies.  Blocking such calls may compromise the effectiveness of local and state emergency alerting and communications programs.

158.    The actions of carriers and VoIP providers in offering these services are consistent with the Commission's precedent in this area.  The Commission has established that *consumers* have a right to block calls.  In 1991, the Commission stated that local exchange carriers (LECs) could offer blocking and screening services to assist in the prevention of toll fraud, to which aggregators such as payphone owners could subscribe, but declined to require all LECs to provide such services.[526]  In 2004, the Commission stated that telecommunications relay services (TRS) providers "are capable of providing anonymous call rejection . . . as long as the TRS consumer seeking to use [this] feature[], whether the calling party or the called party, subscribes to the service."[527]  And in 2007 the Wireline Competition Bureau stated that, while "no carriers . . . may block, choke, reduce or restrict traffic in any way,"[528] that had "no effect on the right of individual end users to choose to block incoming calls from unwanted callers."[529]  In 2011 and 2012, the Commission reiterated that previous call-blocking concerns had arisen as carriers attempted "self-help" methods for avoiding certain access charges, intercarrier compensation charges,[530] or termination charges through the discriminatory blocking of calls to rural rate-of-return local exchange carriers.[531]  In other words, these call-blocking concerns related to carriers or their underlying providers blocking calls at their own discretion without providing consumers any choice or, indeed, even awareness of the practice.  We therefore agree with the NTCA, which represents many rural local exchange carriers

---

[525] *See e.g.*, AT&T Comments on NAAG Letter at Appendix A at 2; FTC Staff Comments on NAAG Letter at 6.

[526] *Policies and Rules Concerning Operator Service Access and Pay Telephone Compensation*, CG Docket No. 91-35, Report and Order and Further Notice of Proposed Rule Making, 6 FCC Rcd 4736, 4741, para. 15 (1991); *see also Policies and Rules Concerning Operator Service Access and Pay Telephone Compensation*, CG Docket No. 91-35, Third Report and Order, 11 FCC Rcd 17021, 17031, para. 16 (1996) (declining to require LECs to provide international blocking to residential customers).

[527] *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 90-571, 98-67, 03-123, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 19 FCC Rcd 12475, 12508, para. 74 (2004).

[528] *2007 Declaratory Ruling*, 22 FCC Rcd at 11631, para. 6.

[529] *Id.* at 11632, para. 7 n.21.

[530] *2011 Report and Order*, 26 FCC Rcd at 18029, para. 973 n.2038 (citing *2007 Declaratory Ruling*, 22 FCC Rcd at 11632, para. 7).

[531] *Developing an Unified Intercarrier Compensation Regime*, CC Docket No. 01-92, *Establishing Just and Reasonable Rates for Local Exchange Carriers*, WC Docket No. 07-135, Declaratory Ruling, 27 FCC Rcd 1351, 1354, para. 9 (WCB 2012).

affected by such call blocking, that "the policy implications raised in this proceeding are separate and distinct from the requirement of carriers to complete calls and refrain from engaging in abusive and anticompetitive practices."[532]  We also note that in its *2011 Report and Order*, the Commission cited the Wireline Competition Bureau's 2007 statement that a previous call-blocking decision had "'no effect on the right of individual end users to choose to block incoming calls from unwanted callers.'"[533]  The Commission's most recent statements on call completion, as they relate to inmate calling services, again address provider-initiated blocking, rather than a consumer's choice to block.[534]

159.    Thus, the sole issue appears to be the efficacy of current call-blocking technology. USTelecom, for example, states that, while "the Commission's precedent establishes an affirmative right for 'individual end users' to choose to 'block incoming calls from unwanted callers,'"[535] phone companies grapple with relying on call mitigation technologies that may be overly-inclusive or -exclusive and attempt to ensure that they do not "inadvertently block, choke, reduce or restrict legitimate traffic in the network."[536]  CTIA likewise is concerned about privacy and the blocking of non-robocallers by the blocking technologies currently available.[537]  AT&T also expresses concerns regarding the inadvertent blocking of non-robocallers,[538] and asks that the Commission not require carriers to implement consumer-directed or consumer-managed call blocking services.[539]  Verizon describes steps it takes to stop "illegal robocalls at their source" and states that it offers its "wireline and wireless customers various tools they can use to stop receiving" such calls.[540]  Verizon specifically states that the "Commission's existing policies are not impeding the work Verizon and others are already doing to take millions of robocalls off the [public switched telephone network (PSTN)] by shutting down illegal robocall operations, nor are they constraining consumers' ability to use existing robocall mitigation products to directly protect themselves from unwanted robocalls."[541]

160.    We agree with the FTC that, "[t]he fact that current call-blocking technology is not perfect [] does not prevent telephone carriers from being able to offer [it] to their customers. . . .  So long as providers of call-blocking services provide accurate disclosures to consumers when they sign up for these services that certain calls they want to receive may be blocked, consumers can decide for themselves whether to risk the disruption of those calls."[542]  As long as the carrier offering its own product or coordinating with another product provider offers adequate disclosures, such as that the technology may inadvertently block wanted calls, consumers have the right to choose the technology—

---

[532] NTCA comments on NAAG Letter at 3.

[533] *2011 Report and Order,* 26 FCC Rcd at 18029, paras. 973-74.

[534] Specifically, the Commission found that "billing-related call blocking by interstate ICS providers that do not offer an alternative to collect calling to be an unjust and unreasonable practice under section 201(b)" of the Act of 1934, as amended. *Inmate Calling Order,* 28 FCC Rcd at 14168, para. 113; 47 U.S.C. § 201(b).

[535] USTelecom Comments on NAAG Letter at 8.

[536] *Id.* at 8-9.

[537] CTIA Comments on NAAG Letter at iii, 14-15 (explaining that privacy concerns arise where screening technology "would require the carrier to allow the solution administrator to screen subscribers' incoming calls to determine whether they are from an unwanted robocaller, a permitted robocaller, or a live individual," which could raise questions concerning "a carrier's traditional responsibility to avoid intercepting or divulging the content of communications").

[538] AT&T Comments on NAAG Letter at 4.

[539] *Id.* at 16.

[540] Verizon Comments on NAAG Letter at 3-5.

[541] *Id.* at 9.

[542] FTC Staff Comments on NAAG Letter at 7.

whether it is offered by a carrier, VoIP provider, or third party as part of a carrier service.[543]  The carriers' current blocking options and third-party options alike are subject to problems caused by Caller ID spoofing, yet those services appear popular with consumers.  Moreover, consumers can easily drop those services or choose services that send a call directly to voicemail, giving them options to decide the level of error they are willing to accept.  The disclosures we require are of "factual and uncontroversial information,"[544] which "do[] not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests."[545]  Consequently, these required disclosures satisfy the *Zauderer* standard, which the Supreme Court has held applies to the required disclosure of purely factual, non-controversial information that does not suppress speech.[546]

161.     In order to aid customers in making such informed choices, we encourage technologies designed for blocking incoming calls that are part of mass unsolicited calling events to provide features that will allow customers to ensure that calls that are solicited, such as municipal and school alerts, are not blocked, and that will allow customers to check what calls have been blocked and easily report and correct blocking errors.  Additionally, in the interests of public safety, we strongly encourage carriers and VoIP providers, as well as independent call-blocking service providers, to develop protocols and technology so that PSAP calls and other emergency calls are not blocked.

162.     We therefore disagree with commenters who suggest that the Commission should avoid clarifying carrier obligations until all voice service is Internet Protocol.[547]  While we recognize that the IP transition presents the possibility of improved call blocking that results from improved Caller ID,[548] robocalls present a current and significant problem for consumers.  We take action today to encourage increased use of call-blocking technology to help consumers, and see no need for delay.  To be clear, we do not require that carriers or other providers offer call blocking to consumers.  While carriers and VoIP providers are not required to offer call-blocking technology, our rules and policy do not prevent them from offering or allowing the use of such technology.

163.     We do, however, strongly encourage carriers and VoIP providers, as well as independent call-blocking service providers, to develop protocols and technology so that PSAP calls and other emergency calls are not blocked.  We also do not offer a view on any specific call-blocking technology or product.  But the considerable interest in call blocking as a consumer self-help tool complements our TCPA decisions that can only stop unwanted calls from those who are deterred by TCPA liability.  Call-blocking technology offers the possibility of stopping calls from those who seek to defraud consumers, oftentimes specifically targeting vulnerable consumers.  Our decision here gives consumers the right to help protect themselves and seeks to thereby create a regulatory environment where such solutions can grow and improve.  While we do not at this time require carriers to offer consumers call-blocking tools, we will continue to watch the development of such tools.  We will also watch closely the steps carriers and VoIP providers take to protect their customers from unwanted calls.

---

[543] We recognize the concern of MRA that consumers who use blocking technology will not only block unlawful robocalls but "will potentially block all manner of non-telemarketing telephone calls, including calls for survey, opinion and marketing research purposes."  MRA Comments on NAAG Letter at 3.

[544] *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650 (1985) (*Zauderer*).

[545] *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001); *New York State Restaurant Ass'n. v. New York City Bd. Of Health*, 556 F.3d 114, 132 (2d Cir. 2009).

[546] *Milavetz Gallop & Milavetz v. United States*, 130 S. Ct. 1324, 1339 (2010).

[547] AT&T Comments on NAAG Letter at 7-8; USTelecom Comments on NAAG Letter at 13; *see also* MRA Comments on NAAG Letter at 3.

[548] *See, e.g.,* AT&T Comments at 8 (describing industry efforts to address caller ID spoofing for VoIP, stating, for example that "The IETF STIR Working Group has identified ways for attaching a secure identity to VoIP phone calls, and it has developed requirements putting this security feature into place.").

## IV.    PETITIONS FOR RULEMAKING

164.    PACE filed its Petition as a Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking.[549]  Because we have addressed Pace's Petition on its merits as a Petition for Declaratory Ruling, we need not consider it in its alternative as a Petition for Expedited Rulemaking.

165.    ACA filed its Petition as a Petition for Rulemaking.[550]  In it, ACA asks the Commission to "initiate a rulemaking" to address four issues: "(1) confirm that not all predictive dialers are categorically [autodialers]; (2) confirm that 'capacity' under the TCPA means present ability; (3) clarify that prior express consent attaches to the person incurring a debt, and not the specific telephone number provided by the debtor at the time a debt was incurred; and (4) establish a safe harbor for autodialed 'wrong number' non-telemarketing calls to wireless numbers."[551]  In this Declaratory Ruling and Order, we have addressed these four issues and have provided clarification on each.[552]  We, therefore, do not see a need to grant ACA's Petition for Rulemaking at this time.  ACA's Petition, accordingly, is denied.

## V.    ORDERING CLAUSES

166.    For the reasons stated above, IT IS ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling and Exemption filed by American Association of Healthcare Administrative Management in CG Docket No. 02-278 on October 21, 2014, IS GRANTED IN PART and OTHERWISE DENIED to the extent indicated herein.

167.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Exemption filed by American Bankers Association in CG Docket No. 02-278 on October 14, 2014, IS GRANTED to the extent indicated herein and OTHERWISE DENIED.

168.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as AMENDED, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Declaratory Ruling filed by the Coalition of Mobile Engagement Providers CG Docket No. 02-278 on October 17, 2013 IS GRANTED IN PART and OTHERWISE DENIED to the extent indicated herein.

169.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Declaratory Ruling filed by Consumer Bankers Association in CG Docket No. 02-278 on September 19, 2014, IS DENIED.

170.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as AMENDED, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, the Emergency Petition for Special Temporary Relief filed by the Direct Marketing Association in CG Docket No. 02-278 on October 17, 2013, IS DENIED.

171.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as AMENDED, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the

---

[549] *See* note 7, *supra.*

[550] *See* note 9, *supra.*

[551] ACA Petition at 1-2.

[552] *See supra* paras. 10-24 (providing clarification on the definition of "autodialer"), 12-20 (providing clarification on the meaning of "capacity"), 73-97 (providing clarification on the meaning of "prior express consent"), and 73-97 (discussing autodialed calls to reassigned wireless numbers and other "wrong number" calls to wireless numbers).

Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, the Petition for Forbearance filed by the Direct Marketing Association in CG Docket No. 02-278 on October 17, 2013, IS GRANTED IN PART and OTHERWISE DENIED to the extent indicated herein.

172.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Clarification and Declaratory Ruling filed by Paul D. S. Edwards in CG Docket No. 02-278 on January 12, 2009, IS DENIED.

173.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling filed by Milton H. Fried, Jr., and Richard Evans in CG Docket No. 02-278 on May 27, 2014 IS GRANTED to the extent indicated herein and OTHERWISE DENIED.

174.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling filed by Glide Talk, Ltd., in CG Docket No. 02-278 on October 28, 2013, IS DENIED.

175.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Declaratory Ruling and Exemption filed by Global Tel*Link Corporation in CG Docket No. 02-278 on March 4, 2010, IS GRANTED IN PART and OTHERWISE DENIED or DISMISSED to the extent indicated herein.

176.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the request for clarification filed by National Association of Attorneys General in CG Docket No. 02-278 on September 9, 2014, IS GRANTED to the extent indicated herein and OTHERWISE DENIED.

177.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking filed by Professional Association for Customer Engagement in CG Docket No. 02-278 on October 18, 2013, IS DENIED IN PART and OTHERWISE DISMISSED to the extent indicated herein.

178.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as AMENDED, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Declaratory Ruling filed by Retail Industry Leaders Association in CG Docket No. 02-278 on December 30, 2013, IS GRANTED IN PART and OTHERWISE DISMISSED to the extent indicated herein.

179.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Clarification and Declaratory Ruling filed by Revolution Messaging in CG Docket No. 02-278 on January 19, 2012, IS GRANTED to the extent indicated herein and OTHERWISE DENIED.

180.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling filed by Rubio's Restaurant, Inc., in CG Docket No. 02-278 on August 15, 2014, IS DENIED.

181.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling filed by Santander

Consumer USA, Inc., in CG Docket No. 02-278 on July 10, 2014, IS DENIED.

182.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling filed by Stage Stores, Inc., in CG Docket No. 02-278 on June 4, 2014, IS DENIED.

183.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling and Clarification filed by TextMe, Inc., in CG Docket No. 02-278 on March 18, 2014, IS GRANTED IN PART and OTHERWISE DENIED to the extent indicated herein.

184.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling by United Healthcare Services, Inc., in CG Docket No. 02-278 on January 16, 2014, IS DENIED.

185.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling filed by YouMail, Inc., in CG Docket No. 02-278 on April 19, 2013, IS GRANTED IN PART and OTHERWISE DISMISSED to the extent indicated herein.

186.    IT IS FURTHER ORDERED, pursuant to sections 1-4 and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Expedited Declaratory Ruling filed by 3G Collect, Inc., and 3G Collect LLC, in CG Docket No. 02-278 on October 28, 2011, IS GRANTED IN PART and OTHERWISE DISMISSED to the extent indicated herein.

187.    IT IS FURTHER ORDERED, pursuant to sections 1-4, 201, 227, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 201, 227, and 403,and sections 1.2 and 64.1200 of the Commission's rules, 47 C.F.R. §§ 1.2, 64.1200, that the Petition for Rulemaking filed by ACA International in CG Docket No. 02-278 on February 11, 2014, IS DENIED.

188.    IT IS FURTHER ORDERED that this Declaratory Ruling and Order shall be effective upon release.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX A**

**List of Commenters on American Association of Healthcare Administrative Management Petition**

The following parties filed comments in response to the December 17, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| **American Association of Healthcare Administration Management** | **AAHAM** |
| National Association of Chain Drug Stores | NACDS |
| **Nebraska Hospital Association** | **NHA** |
| Peter Panagakis | Panagakis |
| Pharmaceutical Care Management Association | PCMA |
| Rite Aid | Rite Aid |
| Joe Shields | Shields |
| Silver Users Association | SUA |
| Virginia Chapter of AAHAM | Virginia |
| Waverly Health Center | Waverly |

One hundred ninety-one individuals also filed comments regarding this petition, generally in the nature of one of three form letters.

\* filing both comments and reply comment (bold - reply comments only).

**APPENDIX B**

**List of Commenters on American Bankers Association Petition**

The following parties filed comments in response to the November 6, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| **American Bankers Association** | **ABA** |
| American Financial Services Association | AFSA |
| **Robert Biggerstaff** | **Biggerstaff** |
| California and Nevada Credit Union Leagues | Leagues |
| Consumer Bankers Association | CBA |
| Credit Union National Association | CUNA |
| Financial Services Roundtable | FSR |
| First Bank | First Bank |
| First Tennessee Bank National Association | Tennessee |
| Future of Privacy Forum | FPF |
| Identity Theft Council | Identity |
| Independent Bankers Association of Texas | IBAT |
| International Bancshares Corporation | IBC |
| Iowa Credit Union League | ICUL |
| Michelle Lathrop | Lathrop |
| MasterCard Incorporated | MasterCard |
| National Consumer Law Center, National Association of Consumer Advocates, Americans for Financial Reform, Consumer Action, Consumers Union, Public Citizen, U.S. Public Interest Research Group* | NCLC *et al* |
| Noble Systems Corporation | Noble |
| Online Trust Alliance | OTA |
| **Scott D. Owens** | **Owens** |
| PSCU | PSCU |
| Gerald Roylance | Roylance |
| SAFE Credit Union | SAFE |
| Joe Shields* | Shields |
| The Internet Association | Internet |
| **U.S. Chamber of Commerce** | **Chamber** |
| Visa, Inc. | Visa |

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX C**

**List of Commenters on Coalition of Mobile Engagement Providers Petition**

The following parties filed comments in response to the November 1, 2013, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| American Financial Services Association | AFSA |
| Robert Biggerstaff* | Biggerstaff |
| Steven Brachtenbach | Brachtenbach |
| Brand Activation Association, Inc. | BAA |
| Coalition of Mobile Engagement Providers * | Coalition |
| Jay Connor | Connor |
| CTIA-The Wireless Association | CTIA |
| Marketing Arm's Wireless | MAW |
| mBlox Incorporated | mBlox |
| Mr. Alan's Elite | MAE |
| Mobile Marketing Association | MMA |
| MobileStorm, Inc. | MobileStorm |
| National Association of Broadcasters | NAB |
| National Retail Federation | NRF |
| **Neustar, Inc.** | **Neustar** |
| Phunware | Phunware |
| William Raney | Raney |
| Retail Industry Leaders Association | RILA |
| Rhode Island Broadcasters Association | RIBA |
| Gerald Roylance | Roylance |
| **Virginia Association of Broadcasters, Ohio Association of Broadcasters, North Carolina Association of Broadcasters** | **VBA** |
| Kristi Weeden | Weeden |

\* filing both comments and reply comment (bold - reply comments only).

## APPENDIX D

### List of Commenters on Consumer Bankers Association Petition

The following parties filed comments in response to the October 17, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| ACA International* | ACA |
| American Bankers Association | ABA |
| American Financial Services Association | AFSA |
| **Robert Biggerstaff** | **Biggerstaff** |
| Computer & Communications Industry Association | CCIA |
| Consumer Bankers Association* | CBA |
| **Financial Services Roundtable** | **FSR** |
| Genesys Communications Laboratories, Inc.* | Genesys |
| **Vincent Lucas** | **Lucas** |
| National Consumer Law Center, National Association of Consumer Advocates, Americans for Financial Reform, Consumer Action, Consumers Union, Public Citizen, U.S. Public Interest Research Group* | NCLC *et al* |
| National Rural Electric Cooperative Association | NRECA |
| Noble Systems Corporation | Noble |
| Santander Consumer USA, Inc. | Santander |
| Joe Shields* | Shields |
| Stage Stores, Inc. | Stage |
| **United Healthcare Services, Inc.** | **United** |
| U.S. Chamber of Commerce | Chamber |
| Wells Fargo* | Wells Fargo |

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX E**

**List of Commenters on Direct Marketing Association Petition**

The following parties filed comments in response to the November 1, 2013, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| American Financial Services Association | AFSA |
| Steven Brachtenbach | Brachtenbach |
| Brand Activation Association, Inc. | BAA |
| Marketing Arm's Wireless | MAW |
| Mr. Alan's Elite | MAE |
| National Association of Broadcasters | NAB |
| Phunware | Phunware |
| Rhode Island Broadcasters Association | RIBA |
| Gerald Roylance | Roylance |
| **Virginia Association of Broadcasters, Ohio Association of Broadcasters, North Carolina Association of Broadcasters** | **VBA** |
| Kristi Weeden | Weeden |
| Michael Worsham | Worsham |

\* filing both comments and reply comment (bold - reply comments only).

## APPENDIX F

### List of Commenters on Paul D. S. Edwards Petition

The following parties filed comments in response to the March 3, 2009, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| ACA International* | ACA |
| Allied Global Holdings, Inc. | Allied |
| American Bankers Association | ABA |
| American Financial Services Association | AFSA |
| American Revenue Management | ARM |
| Robert Biggerstaff* | Biggerstaff |
| Amina Brandt | Brandt |
| William Brush | Brush |
| Robert Bulmash | Bulmash |
| Catherine Bushman | Bushman |
| Chris Carrington | Carrington |
| Consumer Bankers Association | CBA |
| Jonnie Crivello | Crivello |
| DCS Financial, Inc. | DCSF |
| Jeff Delaney | Delaney |
| Nick Dey | Dey |
| Direct Marketing Association | DMA |
| FMA Alliance, Ltd. | FMA |
| Fresno Credit Bureau | Fresno |
| Ramona Fryer | Fryer |
| Levi Gillespie | Gillespie |
| Kenlyn T. Gretz | Gretz |
| Arvid Grinbergs | Grinbergs |
| Jim Happe | Happe |
| David Harvey | Harvey |
| Matt Heller | Heller |
| Randal Hisatomi | Hisatomi |
| Brian House | House |
| InfoCision Management Corporation | InfoCision |
| Jae Kim | Kim |
| Mike Kirte | Kirte |
| David Kneedy | Kneedy |
| Tom Lane | Lane |
| Brooke Larsen | Larsen |
| Gary Long | Long |
| Scott Maddern | Maddern |
| Merchants Credit Association | Merchants |
| Mid Continent Credit Services | MCCS |
| Brian Moore | Moore |
| National Council of Higher Education Loan Programs | NCHELP |
| Recovery One | Recovery |
| Linda O. Richards | Richards |
| Bryan Richardson | Richardson |
| Gerald Roylance* | Roylance |

| | |
|---|---|
| Carol Schemo | Schemo |
| Don Schlosser | Schlosser |
| Kendall Smith | Smith |
| Jamie Snyder | Snyder |
| SoundBite Communications | SoundBite |
| Jake Sparling | Sparling |
| **Sprint Nextel Corporation** | **Sprint Nextel** |
| Jimmy A. Sutton | Sutton |
| The Alarm Industry Communications Committee | Alarm |
| The CBE Group, Inc.* | CBE |
| United Services Automobile Association | USAA |
| United States Telecom Association | USTelecom |
| Dan Voss | Voss |
| Jendi Watson | Watson |
| Bruce Werner | Werner |
| West Asset Management, Inc. | West |
| Lori Wiggen | Wiggen |
| Michael C. Worsham | Worsham |

One hundred seventy individuals also filed comments regarding this petition.

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX G**

**List of Commenters on Milton H. Fried, Jr., and Richard Evans Petition**

The following parties filed comments in response to the July 9, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| Computer & Communications Industry Association | CCIA |
| Crunch of San Diego, LLC | Crunch |
| ExactTarget, Inc. | ExactTarget |
| Noble Systems Corp. | Noble |
| Path, Inc. | Path |
| Gerald Roylance | Roylance |
| Joe Shields* | Shields |

In addition, several individual consumers filed brief comments supporting the petition.

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX H**

**List of Commenters on Glide Talk, Ltd., Petition**

The following parties filed comments in response to the December 2, 2013, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| American Financial Services Association | AFSA |
| Anthony Coffman | Coffman |
| Communication Innovators | CI |
| Dialing Services, LLC* | Dialing Services |
| **Glide Talk, Ltd.** | **Glide** |
| GroupMe, Inc. | GroupMe |
| Noble Systems Corporation | Noble |
| Path, Inc. | Path |
| Joe Shields* | Shields |
| Twilio, Inc. | Twilio |

    * filing both comments and reply comment (bold - reply comments only).

**Federal Communications Commission** **FCC 15-72**

---

**APPENDIX I**

**List of Commenters on Global Tel*Link Corporation Petition**

The following parties filed comments in response to the June 15, 2010, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| Robert Biggerstaff | Biggerstaff |
| Robert H. Braver | Braver |
| Cargo Airline Association | Cargo |
| Global Tel*Link Corporation | GTL |
| Thomas Pechnik | Pechnik |
| Gerald Roylance* | Roylance |
| Securus Technologies, Inc. | Securus |
| United Parcel Service | UPS |
| Michael C. Worsham | Worsham |

* filing both comments and reply comment (bold - reply comments only).

## APPENDIX J

### List of Commenters on National Association of Attorneys General Letter

The following parties filed comments in response to the November 24, 2014, Public Notice (CG Docket 02-278, WC Docket No. 07-135):

| Commenter | Abbreviation |
|---|---|
| AT&T | AT&T |
| Robert Biggerstaff | Biggerstaff |
| Call Control | Call Control |
| Consumers Union | Consumers Union |
| CTIA-The Wireless Association | CTIA |
| Federal Trade Commission | FTC Staff |
| Global Tel*Link | GTL |
| **InCharge Systems, Inc.** | **InCharge** |
| Vincent Lucas | Lucas |
| Marketing Research Association | MRA |
| Numbercorp | Numbercorp |
| NTCA-The Rural Broadband Association | NTCA |
| Pindrop Security | Pindrop |
| Telephone Science Corporation | TSC |
| **TracFone Wireless, Inc.** | **TracFone** |
| Trading Advantage, LLC | Trading Advantage |
| United States Telecom Association* | USTelecom |
| Verizon | Verizon |
| ZipDX | ZipDX |

In addition, 388 individual consumers filed brief comments regarding the letter.

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX K**

**List of Commenters on Professional Association for Customer Engagement Petition**

The following parties filed comments in response to the November 19, 2013, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| ACA International* | ACA |
| American Financial Services Association | AFSA |
| American Insurance Association | AIA |
| Aspect Software, Inc. | Aspect |
| **BetterWRX** | **Better** |
| Robert Biggerstaff* | Biggerstaff |
| Communication Innovators | CI |
| Jay Connor | Connor |
| Covington & Burling, LLP | Covington |
| DialAmerica Marketing, Inc. | DialAmerica |
| DIRECTV, LLC | DIRECTV |
| Tammy Glover Fowler | Fowler |
| **Glide Talk, Ltd.** | **Glide** |
| Global Connect LLC | Global |
| Heritage Company | Heritage |
| InfoCision Management Corporation, Inc. | InfoCision |
| iPacesetters, LLC | iPacesetters |
| National Consumer Law Center | NCLC |
| **National Council of Higher Education Resources** | **NCHER** |
| Nicor Energy Services Company* | Nicor |
| Noble Systems Corporation* | Noble |
| **Professional Association for Customer Engagement** | **PACE** |
| Results Companies, LLC | Results |
| Gerald Roylance | Roylance |
| Twilio, Inc. | Twilio |
| U.S. Chamber of Commerce | Chamber |
| Michael C. Worsham | Worsham |
| **YouMail, Inc.** | **YouMail** |

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX L**

**List of Commenters on Retail Industry Leaders Association Petition**

The following parties filed comments in response to the January 22, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| Stewart Abramson | Abramson |
| **American Bankers Association** | **ABA** |
| American Financial Services Association | AFSA |
| Robert Biggerstaff | Biggerstaff |
| Brandtone, Inc. | Brandtone |
| CTIA-The Wireless Association | CTIA |
| Brian Moore | Moore |
| National Association of Broadcasters* | NAB |
| National Association of Chain Drug Stores | NACDS |
| National Federation of Independent Business | NFIB |
| Retail Industry Leaders Association* | RILA |
| Gerald Roylance | Roylance |
| Joe Shields | Shields |
| Vibes Media, LLC | Vibes |

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX M**

**List of Commenters on Revolution Messaging Petition**

The following parties filed comments in response to the October 23, 2012, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| **Stewart Abramson** | **Abramson** |
| **AFL-CIO** | **AFL** |
| Americans in Contact PAC | American PAC |
| **Robert Biggerstaff** | **Biggerstaff** |
| ccAdvertising* | ccAdvertising |
| Center for Democracy & Technology | CDT |
| CTIA-The Wireless Association | CTIA |
| **International Brotherhood of Teamsters** | **IBT** |
| PocketSpammers.com | Pocket Spammers |
| **Revolution Messaging** | **RM** |
| **Rock the Vote** | **RTV** |
| Gerald Roylance* | Roylance |
| Joe Shields* | Shields |
| Voter Participation Center | VPC |

In addition, several individual consumers filed brief comments supporting the petition.

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX N**

**List of Commenters on Rubio's Restaurant, Inc., Petition**

The following parties filed comments in response to the August 25, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| ACA International | ACA |
| **National Consumer Law Center** | **NCLC** |
| National Council of Nonprofits | Nonprofits |
| Gerald Roylance | Roylance |
| Joe Shields* | Shields |
| Twitter, Inc. | Twitter |
| **United Healthcare Services, Inc.** | **United** |
| U.S. Chamber of Commerce and U.S. Chamber Institute for Legal Reform | Chamber |
| Wells Fargo | Wells Fargo |

\* filing both comments and reply comment (bold - reply comments only).

**APPENDIX O**

**List of Commenters on Santander Consumer USA, Inc., Petition**

The following parties filed comments in response to the August 1, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| American Financial Services Association | AFSA |
| Computer & Communications Industry Association | CCIA |
| Mortgage Bankers Association | MBA |
| Gerald Roylance | Roylance |
| Santander Consumer USA, Inc. | Santander |
| Joe Shields | Shields |

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX P**

**List of Commenters on Stage Stores, Inc., Petition**

The following parties filed comments in response to the July 9, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| American Financial Services Association | AFSA |
| Computer & Communications Industry Association* | CCIA |
| Genesys Communications Laboratories, Inc. | Genesys |
| National Consumer Law Center | NCLC |
| Noble Systems Corporation | Noble |
| Gerald Roylance | Roylance |
| Joe Shields* | Shields |
| **Stage Stores, Inc.** | **Stage** |
| Twitter, Inc. | Twitter |
| **United Healthcare Services, Inc.** | **United** |
| Wells Fargo | Wells Fargo |

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX Q**

**List of Commenters on TextMe, Inc., Petition**

The following parties filed comments in response to the April 7, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| **Robert Biggerstaff** | **Biggerstaff** |
| **Communication Innovators** | **CI** |
| **Computer & Communications Industry Association** | **CCIA** |
| Noble Systems Corporation | Noble |
| Gerald Roylance* | Roylance |
| Joe Shields | Shields |
| Al Smith | Smith |
| **TextMe, Inc.** | **TextMe** |
| The Internet Association | Internet |
| Wireless Research Services | Wireless |

\* filing both comments and reply comment (bold - reply comments only).

APPENDIX R

List of Commenters on United Healthcare Services, Inc., Petition

The following parties filed comments in response to the February 6, 2014, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| American Bankers Association | ABA |
| American Financial Services Association | AFSA |
| America's Health Insurance Plans | AHIP |
| Divesh Angula | Angula |
| Bruce Baird | Baird |
| Bron Barry | Barry |
| Alixson Bell | Bell |
| Jim Besso | Besso |
| Robert Biggerstaff | Biggerstaff |
| William Brush | Brush |
| Christopher Carrington | Carrington |
| **Ceannate Corp, Coalition of Higher Education Assistance Organizations, National Association of College and University Business Officers, and National Council of Higher Education Resources** | **Ceannate** |
| U.S. Chamber of Commerce* | Chamber |
| Coalition of Higher Education Assistance Organizations | COHEAO |
| Comcast Corporation | Comcast |
| C.O.P.S. Monitoring | COPS |
| CTIA-The Wireless Association | CTIA |
| DIRECTV, LLC | DIRECTV |
| Dominion Enterprises of Virginia | Dominion |
| Manuela P. Gann | Gann |
| Denise Gillis | Gillis |
| Michael Jacobs | Jacobs |
| Catherine Jacola | Jacola |
| Vincent Lucas | Lucas |
| Nora Martinez | Martinez |
| Diana Mey* | Mey |
| Brian Moore | Moore |
| **National Association of Industrial Bankers** | **NAIB** |
| National Consumer Law Center | NCLC |
| Noble Systems Corporation | Noble |
| Jeremy Parker | Parker |
| Claude Remboski | C. Remboski |
| Pamela Remboski | P. Remboski |
| Bryan Richardson | Richardson |
| Lynn Ridenour | Ridenour |
| Gerald Roylance* | Roylance |
| Deb Schlier | Schlier |
| Joe Shields* | Shields |
| Leslie F. Smith | Smith |
| Rebecca Standish | Standish |
| William Studley | Studley |

**Federal Communications Commission**          **FCC 15-72**

Student Loan Servicing Alliance                    SLSA
Jimmy Sutton                                       Sutton
Time Warner Cable, Inc.                            TWC
**United Healthcare Services, Inc.**               **United**


\* filing both comments and reply comment (bold - reply comments only).

## APPENDIX S

### List of Commenters on YouMail, Inc., Petition

The following parties filed comments in response to the June 25, 2013, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| American Financial Services Association | AFSA |
| Robert Biggerstaff* | Biggerstaff |
| CallFire, Inc. | CallFire |
| Phil Charvat | Charvat |
| Communication Innovators | CI |
| **CTIA-The Wireless Association** | **CTIA** |
| **Glide Talk, Ltd.** | **Glide** |
| Megan Gold* | Gold |
| GroupMe, Inc.* | GroupMe |
| Nicor Energy Services, Inc. | Nicor |
| Gerald Roylance* | Roylance |
| Joe Shields* | Shields |
| **YouMail, Inc.** | **YouMail** |

* filing both comments and reply comment (bold - reply comments only).

### APPENDIX T

### List of Commenters on 3G Collect Petition

The following parties filed comments in response to the October 23, 2012, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| Stewart Abramson | Abramson |
| AT&T Corp. | ATT |
| **AT&T Services, Inc.** | **AT&T** |
| Robert Biggerstaff* | Biggerstaff |
| Robert H. Braver | Braver |
| **Philip J. Charvat** | **Charvat** |
| Global Tel*Link Corporation | GTL |
| Pay Tel Communications | PayTel |
| Gerald Roylance* | Roylance |
| Securus Technologies, Inc | Securus |
| Joe Shields* | Shields |
| **3G Collect, Inc.** | **3G Collect** |

* filing both comments and reply comment (bold - reply comments only).

**APPENDIX U**

**List of Commenters on ACA International Petition**

The following parties filed comments in response to the February 21, 2014, Public Notice (Report No. 2999):

| Commenter | Abbreviation |
|---|---|
| A Better 401k Plan, Inc. | 401k |
| ACA International | ACA |
| Affiliated Group, Inc. | Affiliated |
| American Association of Healthcare Administrative Management | AAHAM |
| American Bankers Association | ABA |
| American Financial Services Association | AFSA |
| Robert Biggerstaff | Biggerstaff |
| Boom 702 | Boom |
| Ceannate Corp, Coalition of Higher Education Assistance Organizations, National Association of College and University Business Officers, and National Council of Higher Education Resources | Ceannate |
| Clark County Collection Service, LLC | Clark County |
| Coalition of Higher Education Assistance Organizations | COHEAO |
| Comcast Corporation | Comcast |
| Communication Innovators | CI |
| County of San Diego's Office of Revenue and Recovery | San Diego |
| Credit Bureau Data, Inc. | CDB |
| Global Connect | Global |
| Gulf Coast Collect Bureau | Gulf Coast |
| Hilton Worldwide | Hilton |
| Brian Melendez | Melendez |
| Tony Muscato | Muscato |
| National Association of Industrial Bankers | NAIB |
| National Association of Retail Collection Attorneys | NARCA |
| Portfolio Recovery Associates, LLC | PRA |
| Professional Association for Customer Engagement | PACE |
| Christopher S. Publow | Publow |
| Christopher Rickman | Rickman |
| Gerald Roylance | Roylance |
| Santander Consumer USA, Inc. | Santander |
| Joe Shields | Shields |
| Student Loan Servicing Alliance | SLSA |
| Time Warner Cable, Inc. | TWC |
| United Healthcare Services, Inc. | United |
| U.S. Chamber of Commerce | Chamber |
| Wells Fargo | Wells Fargo |

APPENDIX V

**List of Commenters on Communication Innovators Petition**

The following parties filed comments in response to the October 16, 2012, Public Notice (CG Docket 02-278):

| Commenter | Abbreviation |
|---|---|
| **Stewart Abramson** | **Abramson** |
| **American Bankers Association and Consumer Bankers Association** | **ABA/CBA** |
| **American Financial Services Association** | **AFSA** |
| **Robert Biggerstaff** | **Biggerstaff** |
| **Robert Bulmash** | **Bulmash** |
| CenturyLink | CenturyLink |
| **Philip J. Charvat** | **Charvat** |
| **Communication Innovators** | **CI** |
| Direct Marketing Association | DMA |
| DIRECTV, LLC | DIRECTV |
| **Edison Electric Institute/American Gas Association** | **EEI/AGA** |
| **David Elchert** | **Elchert** |
| **Mark Fitzhenry** | **Fitzhenry** |
| Global Connect LLC | Global Connect |
| Global Tel*Link Corporation | GTL |
| **Dave Jensen** | **Jensen** |
| **Phil Kempthorne** | **Kempthorne** |
| **Albert H. Kirby** | **Kirby** |
| **Sherry Lary** | **Lary** |
| Marketing Research Association | MRA |
| **Andy Mckevitz** | **Mckevitz** |
| **National Association of Attorneys General** | **NAAG** |
| National Association of College University Business Officers/ Coalition of Higher Education Assistance Organizations | NACUBO |
| **National Council of Higher Education Resources** | **NCHER** |
| **Nicor Energy Services Company** | **Nicor** |
| Noble Systems Corporation | Noble |
| **Portfolio Recovery Associates, LLC** | **PRA** |
| Gerald Roylance* | Roylance |
| **Rosanna Santiago** | **Santiago** |
| **Service Employees International Union** | **SEIU** |
| Joe Shields* | Shields |
| **Jimmy Sutton** | **Sutton** |
| U.S. Chamber of Commerce | Chamber |
| Varolii Corporation | Varolii |
| **Michael Worsham** | **Worsham** |

\* filing both comments and reply comment (bold - reply comments only).

## STATEMENT OF

## CHAIRMAN TOM WHEELER

**Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, WC Docket No. 07-135**

The American public has asked us – repeatedly – to do something about unwanted robocalls. Today we help Americans hang up on nuisance calls.

We use our telephones – increasingly, our indispensable smart phones – to talk to family and friends, to take care of business, to make plans, to share good news, and sometimes, when things don't go well, to make a complaint. Over the past several years, hundreds of thousands of consumers have made their voices heard by complaining to the Commission about unwanted telephone calls – calls they didn't ask for, that they don't want, and that they can't stop. Today, we help them gain some of their privacy back.

Complaints under the Telephone Consumer Protection Act (TCPA), the law that makes unwanted robocalls and texts illegal, are together the largest complaint category we have at the Commission. Last year alone, we received more than 215,000 such complaints. The data reveal the scale of the robocall problem. The individual stories behind them reveal the costs.

Consider Brian, who writes: "Robocalls are a daily occurrence on both my landline, and increasingly, on my mobile number. These interruptions impact my productivity. Each call takes me off task and further time is lost trying to pick up where I left off when the interruption occurred. . . . We The Consumers pay for these telephony services; these are our phones and we deserve to be allowed to control who calls us."

Or how about Peggy, who writes: "I live in a large home and have many medical issues . . . . [T]hese robocalls . . . cause me to stress out because I can't get to the phone . . . . Simply put, it's stalking. . . . It's more than just annoying, it's unethical. . . . They are invading my privacy, period."

And it's not just calls, it's text messages too. One consumer told us they received 4,700 unwanted texts over a 6-month period.

Our vehicle for helping consumers today is resolving an unprecedented number of requests for clarification. We rule on 21 separate matters that collectively empower consumers to take back control of their phones. These rulings have a simple concept: you are the decision maker, not the callers.

For the first time, we clarify that there is no legal reason carriers shouldn't offer their customers popular robocall-blocking solutions, so that consumers can use market-based approaches to stop unwanted calls. We also clarify that callers cannot skirt their obligation to get a consumer's consent based on changes to their calling equipment or merely by calling from a list of numbers. We make it clear that it should be easy for consumers to say "no more" even when they've given their consent in the past.

And if you have the bad luck of inheriting a wireless number from someone who wanted all types of robocalls, we have your back. We make it clear first that callers have a number of tools to detect that the number has changed hands and that they should not robocall you, and we provide the caller one single chance to get it wrong before they must get it right. This is critical because we have heard from

consumers that getting stuck with a reassigned number can lead to horrible consequences.  One consumer received 27,809 unsolicited text messages over 17 months to one reassigned number, despite their requests to stop the texts.

Some argue that we have not updated the TCPA to reflect modern calling and consumer expectations in an increasingly mobile-phone world, and this hurts businesses and other callers.  Quite the contrary:  we provide the clarifications that responsible businesses need to responsibly use robocalling equipment.  Indeed, we interpret the TCPA in a commonsense way that benefits both callers and consumers.  Exhibit A is that we clear the way for time-sensitive calls about consumer healthcare and bank accounts, so that consumers can get the information as quickly as possible.  With important conditions on the number of calls and opt-out ability, we prove that both consumers and businesses can win under the TCPA.

We all love our phones, and we now carry them wherever we go.  Today, we give consumers their peace back.  It's simple: consumers should be able to make the decision about whether they receive automated calls.  If they want them, they can consent.  And if they don't consent, they should be left alone.

Thank you to my colleagues for their excellent input on this item, and for sending a clear message that this Commission will continue to act on behalf of consumers.

And thank you to our Consumer and Governmental Affairs Bureau for their hard work on behalf of consumers – and for the diligent efforts of the Commission staff who assisted CGB with this item.

**STATEMENT OF**

**COMMISSIONER MIGNON CLYBURN**

*Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135

Today, the Commission responds to 21 petitions by a number of companies and trade associations for relief and clarification on compliance with the Telephone Consumer Protection Act.  "Robocalls," or pre-recorded messages delivered by a computerized autodialer, which are covered by the TCPA, are the subject of the highest number of complaints received at the Commission.  Our record clearly demonstrates that just as companies are aggressively using these autodialers to reach consumers in a lawful manner, consumer advocates (including Members of the Legislative Branch) are – with equal vigor – expressing concern about the persistence of high volumes of unwanted communications.

I am pleased that this Declaratory Ruling makes clear that we will maintain the consumer protections the Act intended.  I understand that many companies feel that this ruling does not go far enough in delineating exactly how far and, within what guidelines a business may communicate with consumers using autodialer technology.  I believe, however, that by reaffirming our broad interpretation of the definition of "autodialer," and by affirming our commitment to Congressional intent, we will further incentivize businesses to take the necessary steps to obtain prior consent when it comes to these communications.

The Commission is striking a difficult, but necessary balance with this item.  Over the course of this proceeding, my office has received significant feedback from companies that are trying to reach consumers who gave prior consent to be contacted, but then that consent is effectively revoked when that person's number is reassigned.  I am sympathetic to the challenges these companies face since the absence of a comprehensive database of reassigned phone numbers may be an issue.  I also appreciate how the Commission has attempted to provide some buffer for companies acting in good faith, by allowing them one call, post reassignment, in order to affirm any number reassignment.  But I would like to see more.

I am not going so far as to mandate that any provider participate in maintenance of a database of reassigned numbers, however, I would encourage voluntary participation by all providers in some type of comprehensive database for reassigned numbers.  Another option suggested in the record, that might have merit, would be that carriers establish a minimum time period before reassigning numbers.

Another issue raised is the limited "free to end user" call exemptions we provide here, today, in the cases of exigent notifications regarding financial services and healthcare matters.  These exemptions ensure that consumers do not suffer dramatic harm to their personal or financial health and security because of lack of access to timely alerts.  Even so, I agree with commenters who are concerned, that even these alerts could annoy consumers who have not provided prior consent.  So, I believe the required immediate opt out mechanisms and the limited number of calls permitted balance the need for urgent information with the risk of intrusion.

Finally, I believe that the decision to provide the clarity requested by thirty-nine state attorneys general is a win.  The Commission finds no legal barrier to carriers wishing to offer their customers access to consumer call-blocking tools in this ruling.  And providing consumers with tools that empower them to take control over the communications they receive is consistent with the intent of TCPA and is exactly the type of offering that we want to encourage carriers to provide.

**Federal Communications Commission**                                    **FCC 15-72**

For those concerned that today's decision to reaffirm the broad application of TCPA, may result in consumers losing access to valued communications, I simply say, we will remain vigilant.  Consumers have not hesitated to express their concerns about receiving unwanted calls through our complaint process, and I have no doubt that they will do the same if access is unintentionally lost.

I would like to thank the staff of the Consumer and Government Affairs Bureau for their hard work on this item, in particular, former Bureau Chief, Kris Monteith.  Your passion and commitment are evident in this particular item.  I also wish to officially welcome new Bureau Chief, Alison Kutler, to our team.

STATEMENT OF

COMMISSIONER JESSICA ROSENWORCEL

APPROVING IN PART, DISSENTING IN PART

*Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135

Picture this.  A family sits down to the dinner table.  It's more than an occasion to eat.  It's a chance to tell tales of the day and reconnect in a busy world where the demands on our time can feel unrelenting.  I know this scene well.  Because in my household, with two parents, two jobs, two kids, and too little time in the day, the dinner hour is sacred.  But all too often the bliss of this ritual is interrupted—by Rachel from cardmember services, by an announcement that we've been pre-approved for a cruise or credit card, or by any number of other robocalls presenting us with information we did not ask for, do not want, and do not need.

I detest robocalls.  I'm not alone.  Year-in and year-out, Telephone Consumer Protection Act complaints are the largest single category of complaints that consumers lodge with us here at the Commission.  We receive thousands of complaints a month about robocalls.  Our friends across town at the Federal Trade Commission receive tens of thousands more—at one point receiving nearly 200,000 in a single month.

Ugh.  It's time—long past time—to do something about this.  This is exactly why Congress passed the Telephone Consumer Protection Act which paved the way for the Do-Not-Call Act and registry.  Like any law, these are not fool-proof.  But if we update our policies we can not only give them modern meaning but we can find new ways to honor our cherished right to be left alone.

In some ways, we achieve this lofty goal today, but in others we fall short.

First, the good stuff.  We bring clarity to the law and empower consumers with tools to avoid unwanted and harassing calls.  Specifically, we make clear that nothing in the law prevents phone companies from deploying the latest technologies to block unwanted robocalls.  We also make clear that consumers have the right to revoke any prior consent to receive robocalls.  So when a consumer no longer wants to receive a company's robocalls they have the unequivocal right to say stop.  These efforts will help consumers manage robocalls, reduce unwanted intrusions, and bring a little more peace to the dinner hour.

Next, the imperfect.  Consumers have made clear—abundantly clear—they want fewer robocalls.  So I do not understand why for some sectors of the economy this Commission gives the green light for more robocalls when consumers want a red one.

The Telephone Consumer Protection Act is straightforward: it requires a company to get a consumer's prior express consent before making robocalls to their number.  But today we do away with this requirement for big banks, healthcare providers, and pharmaceutical companies.  They get a loophole.  The Order couches this exemption in high-minded rhetoric about informing consumers about upcoming healthcare appointments and threats to their credit.  But despite this rhetoric, the result is obvious— consumers can expect to receive more robocalls from healthcare providers and banking institutions.

Moreover, this puts the Commission in the ridiculous business of policing speech made in these calls and itemizing the number of calls permitted by these entities.  The same result could be

accomplished through private contract.  Every one of us knows that.  Every one of us signs countless forms to see a doctor or set up a bank account or arrange a loan.  Giving our consent on these forms is not only sensible—it would get this agency out of the business of enumerating what calls can be made and what can be said on those calls.  Because I think we need fewer robocalls and not more, on this aspect of today's decision I dissent.

Finally, I want to note that we have more work to do.  Just last week, the Senate Special Committee on Aging held a hearing about robocalls and scams in which bad actors prey on consumers by faking or "spoofing" caller ID information.  Call spoofing can be a pernicious tactic, confusing consumers who believe they are getting calls from a legitimate government agency or company when in fact it is a scammer on the other end of the line.  We need to crack down on this predatory behavior—and if we lack the tools to do so, we need to revise our policies or seek help from Congress to better protect consumers.

In addition, we need to give serious consideration to how our robocall policies impact schools.  To prevent truancy and create early warning for possible child abduction, many school districts call parents to alert them when students are not in class.  But their efforts are getting caught in a web of lawsuits and the Commission needs to take a hard look at how to fix this.

I know this has been a rollicking effort and a contentious proceeding.  But in many ways, today's efforts will bring a little more relief from commercial solicitation, a little more quiet in our homes, and a little more peace to the dinner hour—to the extent it does, today's decision has my support.

### DISSENTING STATEMENT OF
### COMMISSIONER AJIT PAI

***Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991**, CG Docket No. 02-278, WC Docket No. 07-135*

Congress passed the Telephone Consumer Protection Act (TCPA) to crack down on intrusive telemarketers and over-the-phone scam artists.  It prohibits telemarketing in violation of our Do-Not-Call rules and prohibits any person from making calls using the tools that telemarketers had at their disposal in 1991.  And the TCPA includes a three-prong enforcement mechanism for remedying violations:  States, the FCC, and individual consumers can all take illegal telemarketers to court with statutory penalties starting at $500 per violation.[553]

Yet problems persist.  Last year, the FCC received 96,288 complaints for violations of federal Do-Not-Call rules, more than any other category of complaints.[554]  On June 10, the Senate Special Committee on Aging held a hearing on ending the epidemic of illegal telemarketing calls.[555]  At that hearing, the Attorney General of Missouri testified that the *number one* complaint of his constituents is illegal telemarketing.  His office alone received more than 52,000 telemarketing complaints in 2014.[556]  And the Federal Trade Commission has reported that "increasingly, fraudsters, who often hide in other countries in an attempt to escape detection and punishment, make robocalls that harass and defraud consumers."  The FTC noted that a single scam artist made over 8 million deceptive robocalls to Americans.[557]

The bottom line is this:  Far too many Americans are receiving far too many fraudulent telemarketing calls.  I know because my family and I get them on our cellphones during the day and on our home phones at night.  It's a problem that's only getting worse.

And none of this should be news to the FCC.  As I remarked in this very room back in January:  "Unwanted telemarketing calls in violation of the National Do-Not-Call Registry are on the rise.  In fact, such complaints made up almost 40 percent of consumer complaints in our latest report—and the number of complaints jumped dramatically last year from 19,303 in the first quarter to 34,425 in the third.  Let's fix this problem."[558]  What has the Commission done since then to enforce the rules?  It has issued a single citation to a single potential violator of federal Do-Not-Call rules.[559]  That's not going to solve the problem.

The courts haven't been better.  The TCPA's private right of action and $500 statutory penalty could incentivize plaintiffs to go after the illegal telemarketers, the over-the-phone scam artists, and the

---

[553] 47 U.S.C. §§ 227(b)(3), 227(c)(5), 227(g), 503(b).

[554] *See* FCC, Quarterly Reports – Consumer Inquiries and Complaints, http://go.usa.gov/3VFkB (summing complaints for 2014 from the "Top Complaint Subjects" tables).

[555] Hearing before U.S. Senate Special Committee on Aging, "Ringing Off the Hook: Examining the Proliferation of Unwanted Calls" (June 10, 2015), *available at* http://go.usa.gov/3wVHY.

[556] Overview of Statement of Attorney General Chris Koster, Special Committee on Aging Panel Discussion, at 1 (June 10, 2015), *available at* http://go.usa.gov/3VFkQ.

[557] Federal Trade Commission, Prepared Statement on Combatting Illegal Robocalls: Initiatives to End the Epidemic, United States Senate Special Committee on Aging, at 4 (June 10, 2015), *available at* http://go.usa.gov/3VFkw.

[558] Statement of Commissioner Ajit Pai on FCC Consumer Help Center: A New Consumer Gateway (Jan. 29, 2015), *available at* http://go.usa.gov/3VF9k.

[559] *FreeEats.com Inc.*, File No. EB-TCD-13-00007717, Citation and Order, 30 FCC Rcd 2659 (Enf. Bur. 2015).

foreign fraudsters.  But trial lawyers have found legitimate, domestic businesses a much more profitable target.  As Adonis Hoffman, former Chief of Staff to Commissioner Clyburn, recently wrote in *The Wall Street Journal*, a trial lawyer can collect about $2.4 million per suit by targeting American companies.[560]  So it's no surprise the TCPA has become the poster child for lawsuit abuse, with the number of TCPA cases filed each year skyrocketing from 14 in 2008 to 1,908 in the first nine months of 2014.

Here's one example.  The Los Angeles Lakers offered its fans a fun opportunity:  Send a text-message to the team, and you might get to place a personalized message on the Jumbotron at the Staples Center.  The Lakers acknowledged receipt of each text with a reply making clear that not every message would appear on the Jumbotron.  The trial bar's response?  A class-action lawsuit claiming that every automated text response was a violation of the TCPA.

Or here's another.  TaxiMagic, a precursor to Uber, sent confirmatory text messages to customers who called for a cab.  Each message indicated the cab's number and when the cab was dispatched to the customer's location.  Did customers appreciate this service?  Surely.  But one plaintiffs' attorney saw instead an opportunity to profit, and a class-action lawsuit swiftly followed.

Some lawyers go to ridiculous lengths to generate new TCPA business.  They have asked family members, friends, and significant others to download calling, voicemail, and texting apps in order to sue the companies behind each app.  Others have bought cheap, prepaid wireless phones so they can sue any business that calls them by accident.  One man in California even hired staff to log every wrong-number call he received, issue demand letters to purported violators, and negotiate settlements.  Only after he was the lead plaintiff in over 600 lawsuits did the courts finally agree that he was a "vexatious litigant."

The common thread here is that in practice the TCPA has strayed far from its original purpose.  And the FCC has the power to fix that.  We could be taking aggressive enforcement action against those who violate the federal Do-Not-Call rules.  We could be establishing a safe harbor so that carriers could block spoofed calls from overseas without fear of liability.  And we could be shutting down the abusive lawsuits by closing the legal loopholes that trial lawyers have exploited to target legitimate communications between businesses and consumers.

Instead, the *Order* takes the opposite tack.  Rather than focus on the illegal telemarketing calls that consumers really care about, the *Order* twists the law's words even further to target useful communications between legitimate businesses and their customers.[561]  This *Order* will make abuse of the TCPA much, much easier.  And the primary beneficiaries will be trial lawyers, not the American public.

I respectfully dissent.

---

[560] Adonis Hoffman, "Sorry, Wrong Number, Now Pay Up," *The Wall Street Journal* (June 16, 2015), *available at* http://on.wsj.com/1GuwfMJ; *see also* John Eggerton, "FCC's Hoffman Looks Back, Moves Forward," *Broadcasting & Cable* (Mar. 23, 2015), *available at* http://bit.ly/1GEQYNR (quoting Hoffman as saying "This consumer protection, anti-telemarketing statute has been leveraged by aggressive plaintiffs' lawyers to line their pockets lavishly with millions, while consumers usually get peanuts. . . . I think the TCPA should be known by its real acronym—'Total Cash for Plaintiffs' Attorneys.'  This is just one example where the public interest is not being advanced responsibly.").

[561] The *Order* notes that the "TCPA makes it unlawful for any business—'legitimate' or not—to make robocalls that do not comply with the provisions of the statute."  *Order* at note 6.  Of course it does; rare is the statute that limits its scope to only illegitimate businesses.  The point is that *Order* redirects the TCPA's aim away from undesirable practices commonly used by telemarketers (the elimination of which benefits consumers) and toward desirable communications between businesses and consumers (litigation against which benefits trial lawyers).  As the very name makes clear, the TCPA is a consumer protection statute, not a trial-lawyer protection statute.

I.

The *Order* dramatically expands the TCPA's reach. The TCPA prohibits a person from making "any call" to a mobile phone "using any automatic telephone dialing system,"[562] except in certain defined circumstances. The statute defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[563] As three separate petitions explain, trial lawyers have sought to apply this prohibition to equipment that *cannot* store or produce telephone numbers to be called using a random or sequential number generator and that *cannot* dial such numbers.[564]

That position is flatly inconsistent with the TCPA. The statute lays out two things that an automatic telephone dialing system must be able to do or, to use the statutory term, must have the "capacity" to do.[565] If a piece of equipment *cannot* do those two things—if it *cannot* store or produce telephone numbers to be called using a random or sequential number generator and if it *cannot* dial such numbers—then how can it possibly meet the statutory definition? It cannot. To use an analogy, does a one-gallon bucket have the capacity to hold two gallons of water? Of course not.

That's long been the FCC's approach. When the Commission first interpreted the statute in 1992, it concluded that the prohibitions on using automatic telephone dialing systems "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services[], because the numbers called *are not generated in a random or sequential fashion*."[566] Indeed, in that same order, the Commission made clear that calls not "dialed using a random or sequential number generator" "are not autodialer calls."[567]

Confirming this interpretation (what some proponents call the "present capacity" or "present ability" approach[568]) is the statutory definition's use of the present tense and indicative mood. An

---

[562] 47 U.S.C. § 227(b)(1)(A)(iii).

[563] 47 U.S.C. § 227(a)(1). A random number generates numbers randomly: 555-3455, 867-5309, etc. A sequential number generator generates numbers in sequence: 555-3455, 555-3456, etc.

[564] TextMe, Inc. Petition for Expedited Declaratory Ruling and Clarification, CG Docket No. 02-278 (Mar. 18, 2014); Glide Talk, Ltd. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (Oct. 28, 2013); Professional Association for Customer Engagement Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking, CG Docket No. 02-278 (Oct. 18, 2013).

[565] *See* Webster's New International Dictionary at 396 (2nd ed. 1958) (defining "capacity" in relevant part to mean "power of receiving, containing, or absorbing," "extent of room or space," "ability," "capability," or "maximum output").

[566] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, 8776, para. 47 (1992) (emphasis added).

[567] *Id.* at 8773, para. 39.

[568] *See, e.g.*, Chamber Comments on PACE Petition at 5; CI Comments on Glide Petition at 3–4; Covington Comments on PACE Petition at 4–5; DIRECTV Comments on PACE Petition at 2–3; Fowler Comments on PACE Petition at 1; Glide Reply Comments on PACE Petition at 6; Global Comments on PACE Petition at 2; Internet Association Comments on TextMe Petition at 2–3; NCHER Reply Comments on PACE Petition at 2; Nicor Comments on PACE Petition at 7; Noble Systems Comments on Glide Petition at 4; Path Comments on Glide Petition at 22; Twilio Comments on Glide Petition at 13; YouMail Reply Comments on PACE Petition at 4; Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1–2 (June 11, 2015); Letter from Steven A. Augustino, Counsel to Five9, Inc., to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1–2 (June 11, 2015); Letter from Monica S. Desai, Counsel to ACA International, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 2–6 (June 11, 2015); Letter from Stephanie L. Podey, Vice President and Associate General Counsel, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 2–3 (June 10, 2015); Letter from Jennifer D. Hindin, Counsel to Sirius XM Radio, Inc., to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 2 (June 8, 2015).

automatic telephone dialing system is "equipment which has the capacity" to dial random or sequential numbers,[569] meaning that system actually can dial such numbers at the time the call is made. Had Congress wanted to define automatic telephone dialing system more broadly it could have done so by adding tenses and moods, defining it as "equipment which has, has had, or could have the capacity."[570] But it didn't. We must respect the precise contours of the statute that Congress enacted.[571]

The *Order* reaches the contrary conclusion and holds that the term "automatic telephone dialing system" includes equipment that *cannot* presently store or produce telephone numbers to be called using a random or sequential number generator and that *cannot* presently dial such numbers. The apparent test is whether there is "more than a theoretical potential that the equipment could be modified to satisfy the 'autodialer' definition."[572] To put it kindly, the *Order*'s interpretation is a bit of a mess.

*For one*, it dramatically departs from the ordinary use of the term "capacity." Although the *Order* points to dictionaries to suggest that the word "capacity" means "the potential or suitability for holding, storing, or accommodating,"[573] those definitions in fact undermine the *Order*'s conclusion. No one would say that a one-gallon bucket has the "potential or suitability for holding, storing, or accommodating" two gallons of water just because it could be modified to hold two gallons. Nor would anyone argue that Lambeau Field in Green Bay, Wisconsin, which can seat 80,000 people, has the capacity (i.e., the "potential or suitability") to seat all 104,000 Green Bay residents just because it could be modified to have that much seating.[574] The question of a thing's capacity is whether it can do something presently, not whether it could be modified to do something later on.

*For another*, the *Order*'s expansive reading of the term "capacity" transforms the TCPA from a statutory rifle-shot targeting specific companies that market their services through automated random or sequential dialing into an unpredictable shotgun blast covering virtually all communications devices. Think about it. It's trivial to download an app, update software, or write a few lines of code that would modify a phone to dial random or sequential numbers. So under the *Order*'s reading of the TCPA, each and every smartphone, tablet, VoIP phone, calling app, texting app—pretty much any calling device or software-enabled feature that's not a "rotary-dial phone"[575]—is an automatic telephone dialing system.[576]

---

[569] 47 U.S.C. § 227(a)(1).

[570] *See, e.g.*, *United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes."); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57 (1987) ("Congress could have phrased its requirement in language that looked to the past . . . , but it did not choose this readily available option.").

[571] *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 93–94 (2002) (explaining that "like any key term in an important piece of legislation, the [statutory provision in question] was the result of compromise between groups with marked but divergent interests in the contested provision" and that "[c]ourts and agencies must respect and give effect to these sorts of compromises"); *see also* John F. Manning, *Second-Generation Textualism*, 98 Cal. L. Rev. 1287, 1309–17 (2010) (arguing that respecting legislative compromise means that courts "must respect the level of generality at which the legislature expresses its policies").

[572] *Order* at para. 18.

[573] *See Order* at para. 19.

[574] The *Order* responds that the analogy is "inapt" because "modern dialing equipment can often be modified remotely without the effort and cost of adding physical space to an existing structure." *Order* at para. 16. This misses the point. If asked the seating capacity of Lambeau Field, no one would first study whether one could seat more than 80,000 "without the effort and cost of adding physical space" (perhaps by adding benches). Instead, they'd respond with how many the stadium could seat as is, without *any* modification.

[575] *Order* at para. 18.

[576] Indeed, the *Order* both acknowledges that smartphones are swept in under its reading, *Order* at para. 21, and explicitly sweeps in all Internet-to-phone text messages via email or via a web portal, *Order* at para. 111.

Such a reading of the statute subjects not just businesses and telemarketers but almost all our citizens to liability for everyday communications.  One need not bother with the legislative history to realize that lawmakers did not intend to interfere with "expected or desired communications between businesses and their customers."[577]  And one need not be versed in the canon of constitutional avoidance[578] to know that courts and administrative agencies normally eschew statutory interpretations that chill the speech of every American that owns a phone.[579]  Yet the *Order*'s interpretation does precisely that.

Let me give just one example.  Jim meets Jane at a party.  The next day, he wants to follow up on their conversation and ask her out for lunch.  He gets her cellphone number from a mutual friend and texts her from his smartphone.  Pursuant to the *Order*, Jim has violated the TCPA, and Jane could sue him for $500 in statutory damages.

In response, the *Order* tells smartphone owners not to worry:  "We have no evidence that friends, relatives, and companies with which consumers do business find those calls unwanted and take legal action against the calling consumer."[580]  That's little solace.  There is no evidence of smartphone class-action suits because no one has thought the TCPA prohibited the ordinary use of smartphones—at least not before now.  Now that they do, the lawsuits are sure to follow.[581]

The *Order* then protests that interpreting the statute to mean what it says—that automatic telephone dialing equipment must be able to dial random or sequential numbers—"could render the TCPA's protections largely meaningless by ensuring that little or no modern dialing equipment would fit the statutory definition of an autodialer."[582]  But what the Commission deems defeat is in fact a victory for consumers.  Congress expressly targeted equipment that enables telemarketers to dial random or sequential numbers in the TCPA.  If callers have abandoned that equipment, then the TCPA has accomplished the precise goal Congress set out for it.  And if the FCC wishes to take action against newer technologies beyond the TCPA's bailiwick, it must get express authorization from Congress—not make up the law as it goes along.

---

[577] Report of the Energy and Commerce Committee of the U.S. House of Representatives, H.R. Rep. 102-317, at 17 (1991) (*House Report*).

[578] *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (describing the canon as "a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

[579] *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . ."). Notably, the constitutional question is not whether this interpretation of the TCPA would meet the less strict standard governing "commercial speech," *see Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562–63 (1980), because the TCPA restricts the making of "*any* call"—not just commercial calls—using an automatic telephone dialing system, 47 U.S.C. § 227(b)(1)(A) (emphasis added).  Instead, the question is whether this interpretation is "narrowly tailored to serve the government's legitimate, content-neutral interests."  *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).  How could anyone answer that question in the affirmative given that the majority of Americans carry a smartphone (what the *Order* now labels an automatic telephone dialing system) in their pockets?

[580] *Order* at para. 21.

[581] This is underscored by the *Order* itself, which opens by emphasizing its position that the TCPA applies not "just [to] bad actors attempting to perpetrate frauds, but also [to] 'legitimate businesses' employing calling practices that consumers find objectionable," and that the FCC "[has] not viewed 'legitimate' businesses as somehow exempt from the statute, nor do we do so today." *Order* at note 6.  Having opened the door wide, the agency cannot then stipulate restraint among those who would have a financial incentive to walk through it.

[582] *Order* at para. 20.

Next, the *Order* seeks refuge in Commission precedent, claiming that it has "already twice addressed the issue."[583]  Not quite.  Those two rulings both involved "predictive dialers," which the FCC described as having "the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."[584]  In 2003, the FCC explained that pairing automatic telephone dialing equipment "with predictive dialing software and a database of numbers" (and calling the combination a predictive dialer) would not exclude that equipment from the statutory prohibition.[585]  And in 2008, the FCC found that using such equipment was still prohibited even "when it dials numbers from customer telephone lists" and not "randomly or sequentially."[586]  The key issue in each decision was that the equipment *had the capacity* to dial random or sequential numbers at the time of the call, even if that capacity was not in fact used.  Or, as the Commission phrased it later, it doesn't matter "whether or not the numbers called actually are randomly or sequentially generated or come from a calling list"[587]; if the equipment has the requisite capacity, it's an automatic telephone dialing system.  That's exactly what the statute requires, and it's a far cry from the issue we confront here.

In short, we should read the TCPA to mean what it says:  Equipment that cannot store, produce, or dial a random or sequential telephone number does not qualify as an automatic telephone dialing system because it does not have the capacity to store, produce, or dial a random or sequential telephone number.  The *Order*'s contrary reading is sure to spark endless litigation, to the detriment of consumers and the legitimate businesses that want to communicate with them.

## II.

The *Order* opens the floodgates to more TCPA litigation against good-faith actors for another reason as well.  There is no TCPA liability if a caller obtains the "prior express consent of the called party."[588]  Accordingly, many businesses only call consumers who have given their prior express consent.  But consumers often give up their phone numbers and those numbers are then reassigned to other people.  And when that happens, consumers don't preemptively contact every business to which they have given their number to inform them of the change.  So even the most well-intentioned and well-informed business will sometimes call a number that's been reassigned to a new person.  After all, over 37 million telephone numbers are reassigned each year.[589]  And no authoritative database—certainly not one maintained or overseen by the FCC, which has plenary authority over phone numbers—exists to "track all disconnected or reassigned telephone numbers" or "link[] all consumer names with their telephone numbers."[590]  As four separate petitions explain, trial lawyers have sought to apply a strict liability

---

[583] *Order* at para. 15.

[584] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14091, para. 131 (2003) (*2003 TCPA Order*).

[585] *See id.* at 14092, para. 133.

[586] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, 23 FCC Rcd 559, 566, para. 12 (2008) (*2008 TCPA Order*).

[587] *Implementation of the Middle Class Tax Relief and Job Creation Act of 2012; Establishment of a Public Safety Answering Point Do-Not-Call Registry*, CG Docket No. 12-129, Report and Order, 27 FCC Rcd 13615, 13629, para. 29 (2012).

[588] 47 U.S.C. § 227(b)(1)(A); *see also* 47 U.S.C. § 227(b)(1)(B) (only prohibiting calls made "without the prior express consent of the called party").

[589] Alyssa Abkowitz, "Wrong Number? Blame Companies' Recycling," *The Wall Street Journal* (Dec. 1, 2011), *available at* http://on.wsj.com/1Txmowl.

[590] Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (Feb. 5, 2015).

standard on good-faith actors—so even if a company has no reason to know that it's calling a wrong number, it'll be liable.[591]

Imposing strict liability is not usually how the law works. Indeed, the Commission has previously rejected an interpretation of the TCPA that would have imposed strict liability on callers after a consumer ports his number from a landline to a wireless phone.[592] Instead, the FCC endorsed the view that "[i]t is a flawed and unreasonable construction of any statute to read it in a manner that demands the impossible."[593] That logic should apply here.

Perhaps more to the point, the statute takes into account a caller's knowledge. Recall that the statute exempts calls "made with the prior express consent of the called party." Interpreting the term "called party" to mean the expected recipient—that is, the party expected to answer the call—is by far the best reading of the statute.[594]

Start with an example of ordinary usage. Your uncle writes down his telephone number for you and asks you to give him a call (what the TCPA terms "prior express consent"). If you dial that number, whom would you say you are calling? Your uncle, of course.

No one would say that the answer depends on who actually answers the phone. If your uncle's friend picks up, you'd say you were calling your uncle. So too if the phone is picked up by the passenger in your uncle's vehicle or your uncle's houseguest. Nor would your answer change if your uncle wrote down the wrong number, or he lost his phone and someone else answered it. Who is the called party in each and every one of these situations? It's obviously the person you expected to call (your uncle), not the person who actually answers the phone.

And no one would say that the answer depends on who actually pays for the service. If your uncle and aunt share a landline, you'd still say you were calling your uncle even if your aunt's name was on the bill. And if your uncle and aunt are on a wireless family plan, it's still his number you're dialing even if she's picking up the tab. In other words, it doesn't matter who the actual subscriber is; what matters when placing a call is whom you expect to answer.

Given ordinary usage, it should be no surprise that the FCC has implicitly endorsed this approach before. As the Commission wrote in 2008, "calls to wireless numbers provided by the called party . . . are made with the 'prior express consent' of the called party."[595] In other words, the called party is the person who consented to a call and the person who would ordinarily be expected to answer.

---

[591] Consumer Bankers Association Petition for Declaratory Ruling, CG Docket No. 02-278 (Sept. 19, 2013); Rubio's Restaurant, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (Aug. 15, 2014); Stage Stores, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (June 4, 2014); United Healthcare Services, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (Jan. 16, 2014).

[592] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Order, 19 FCC Rcd 19215, 19219, para. 9 (2004).

[593] *McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000).

[594] Most commenters term this the "intended recipient" approach. *See, e.g.*, CBA Petition at 3; AFSA Comments on CBA Petition at 2; Nonprofits Comments on Rubio's Petition at 4, 6; Twitter Comments on Stage Petition at 9–11; Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (June 11, 2015); Letter from Monica S. Desai, Counsel to ACA International, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 6–7 (June 11, 2015); Letter from Tracy P. Marshall, Counsel to NRECA, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 2 (June 10, 2015); Letter from Monica S. Desai, Counsel to Abercrombie & Fitch Co. and Hollister Co., to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1–4 (May 13, 2015).

[595] *2008 TCPA Order*, 23 FCC Rcd at 564, para. 9. The *Order* tries to play gotcha by claiming that the next sentence of that same ruling "directly supports our finding here." *Order* at note 264. Not quite. That sentence states that "the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably

(continued....)

The expected-recipient approach respects Congress's intent that the TCPA "balanc[e] the privacy rights of the individual and the commercial speech rights of the telemarketer."[596]  On the one hand, the expected-recipient approach gives individuals the right to stop unwanted, wrong-number phone calls in the first instance.  Once an individual informs a caller that he has the wrong number, the caller can no longer expect to reach the party that consented and no longer claim to have to consent to continue calling.  And so the expected-recipient approach rightfully sanctions the bad actors—often debt collectors[597]—that repeatedly call after an individual has told them they've got the wrong number.

On the other hand, the expected-recipient approach gives legitimate businesses a clear and administrable means of complying with the law and engaging in "normal, expected or desired communications [with] their customers."[598]  A good actor can refuse to call anyone without first securing an individual's consent, and a good actor can stop calling as soon as it learns that a number is wrong.  Although taking these steps may not always be easy, they are an administrable means of complying with the statute and a way for any legitimate business to conduct its communications lawfully.

The expected-recipient approach also aligns the incentives of all parties to welcome legitimate calls and punish bad behavior.  Businesses will have every incentive to secure prior express consent before making a call,[599] to ensure that a number is properly dialed,[600] and to stop calling as soon as they learn that a number is wrong because those actions shield businesses from strict liability.  And the approach gives individuals the incentive to tell callers that they've got the wrong number, leading to fewer intrusive calls.

Confirming the expected-recipient interpretation is the canon of avoidance, which counsels that if one interpretation of a statute "would raise a multitude of constitutional problems, the other should prevail."[601]  Here, the expected-recipient interpretation fosters useful and desirable communications

(...continued from previous page)
evidences prior express consent by the cell phone subscriber regarding the debt." *2008 TCPA Order*, 23 FCC Rcd at 564, para. 9.  Like the previous sentence in that order, its clear import is that a creditor may rely on a debtor's provision of a number to call that number (at least so long as the creditor can reasonably expect to reach the debtor at that number).  But the *Order*'s alternative reading would eviscerate that reliance since the creditor would become liable if the debtor wrote down the wrong number or if the debtor was not the subscriber but instead the customary user.  Such a result would be doubly strange since the *Order* itself claims that the TCPA "anticipates" a reliance interest on the part of callers, *Order* at note 313, and the *Order* itself rejects the notion that only the subscriber can consent to receiving calls, *Order* at para. 75.

[596] *House Report* at 10.

[597] *See, e.g.*, Letter from Margot Saunders, Counsel to National Consumer Law Center, to Marlene Dortch, Secretary, FCC, CG Docket No. 02-278, at 9 (June 6, 2014) ("The Consumer Financial Protection Bureau's Annual Report for 2013 shows that 33% of debt collection complaints involved continued attempts to collect debts not owed, which include complaints that the debt does not belong to the person called."); NCLC *et al.* Comments on CBA Petition at 4; NCLC *et al.* Reply Comments on CBA Petition at 2.

[598] *House Report* at 17.

[599] Indeed, the incentive to secure prior express consent is greater than under a strict liability approach.  Under the expected-recipient approach, consent is more valuable because it is a shield from liability for every call made in good faith.  In contrast, strict liability reduces consent's value to one free call.  Given the substantial cost of securing consent, more businesses are likely to spend the resources in an expected-recipient regime than under strict liability.

[600] Notably, the caller would be not be liable for calls where the consenting party wrote down a wrong number (since the caller would still expect to reach the consenting party by dialing the number given) but would be liable for its own mistakes (since the caller could not expect to reach the consenting party by dialing a number different than that given).

[601] *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005); *see id.* at 380 ("It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation.  The lowest common denominator, as it were, must govern.").

between businesses and their customers—communications that consumers have expressly consented to receiving. In contrast, the *Order*'s strict liability interpretation chills such communications by threatening a company with crippling liability even if it reasonably expects to reach a consenting consumer when making a call. It is difficult to see how chilling desired communications in this manner is "narrowly tailored to serve the government's legitimate, content-neutral interests."[602]

In contrast, the *Order* rejects the expected-recipient approach and endorses a mishmash interpretation. According to the *Order*, callers are subject to strict liability after a single attempted call to number that's been reassigned to a new subscriber. Its interpretation is a veritable quagmire of self-contradiction and misplaced incentives.

*For one*, the *Order*'s chief legal theory does not hold water. The *Order* insists that the "called party" for purposes of consent must be the subscriber because the TCPA elsewhere prohibits certain calls to "any service for which the called party is charged for the call" and restricts exemptions to calls "that are not charged to the called party."[603] But Congress did not use the phrase "called party" consistently throughout the TCPA. For example, the TCPA requires the FCC to prescribe technical standards for "systems that are used to transmit any artificial or prerecorded voice message via telephone" and requires those systems to release a line "within 5 seconds of the time notification is transmitted to the system that *the called party has hung up*."[604] The Commission has never interpreted this requirement to only apply when the actual subscriber hangs up the phone, which would leave a rather large loophole in the TCPA's enforcement regime. And the *Order* does not appear to embrace this absurd theory either. Instead, the law remains what it always has, that the called party for purposes of this provision is whoever picks up the phone.

What is more, the *Order* does not even subscribe to its own legal theory on the question at hand. Not one paragraph after positing the theory, the *Order* reinterprets the term "called party" to include a number's customary user even if that customary user is not charged for the call because a caller "cannot reasonably be expected to divine that the consenting person is not the subscriber."[605] But the *Order* can't have it both ways: Either the legal theory is right and a customary user is not the called party, or the legal theory is wrong.

*For another*, the *Order*'s strict liability approach leads to perverse incentives. Most significantly, it creates a trap for law-abiding companies by giving litigious individuals a reason *not* to inform callers about a wrong number. This will certainly help trial lawyers update their business model for the digital age.

This isn't mere hypothesis; it is fact. Take the case of Rubio's, a West Coast restaurateur. Rubio's sends its quality-assurance team text messages about food safety issues, such as possible foodborne illnesses, to better ensure the health and safety of Rubio's customers. When one Rubio's employee lost his phone, his wireless carrier reassigned his number to someone else. Unaware of the reassignment, Rubio's kept sending texts to what it thought was an employee's phone number. The new subscriber never asked Rubio's to stop texting him—at least not until he sued Rubio's in court for nearly half a million dollars.

---

[602] *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). As noted earlier, the constitutional question is not whether this interpretation of the TCPA would meet the less strict standard governing "commercial speech," *see Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562–63 (1980), because the TCPA restricts the making of "*any* call"—not just commercial calls—using an automatic telephone dialing system or a prerecorded or artificial voice, 47 U.S.C. §§ 227(b)(1)(A), 227(b)(1)(B) (emphasis added).

[603] *See Order* at para. 74; 47 U.S.C. §§ 227(b)(1)(A)(iii), 227(b)(2)(C).

[604] 47 U.S.C. § 227(d)(3)(B) (emphasis added).

[605] *Order* at para. 75.

The *Order*'s defenses are underwhelming.  The *Order* points out that callers have the option of "manually dialing"[606] but forgets that dialing a number by hand still violates the TCPA if the equipment is an automatic telephone dialing system (which almost all equipment is under the *Order*).[607]  The *Order* claims a one-call exemption for reassigned numbers would not "demand the impossible"[608] but then imposes liability on callers even if the new subscriber does not tell them that the number has been reassigned.  The *Order* rejects a knowledge standard as "unworkable" because "once there is actual knowledge, callers may not honor do-not-call requests"[609] but ignores the fact that good actors cannot implement a one-call standard while bad actors won't honor that standard anyway.  And the *Order* offers a laundry list of ways that a caller might determine that a number has been reassigned[610] but declines to adopt a safe harbor for good actors that carry out these practices and instead subjects them to wrong-number litigation.

Perhaps most shocking is the *Order*'s claim that the answer to wrong-number calls is for companies to turn the liability back on their own customers.  "Nothing in the TCPA or our rules prevents parties from creating . . . an obligation for the person giving consent to notify the caller when the number has been relinquished," the *Order* states before noting that "the caller may wish to seek legal remedies for violation of the agreement."[611]  In other words, companies can sue their customers.  To be sure, this will create yet more work for the primary beneficiaries of the *Order*: attorneys.  But nothing in the TCPA or our rules suggests that Congress intended the TCPA as a weapon to be used against consumers that forget to inform a business when they switch numbers.

In short, we should not inject a strict liability standard into the TCPA.  Instead, we should interpret the words of the statute in the way most would and make clear that "prior express consent of the called party" means the prior express consent of the party the caller expects to reach.  The *Order*'s contrary reading is sure to encourage yet more litigation, to the detriment of consumers and the legitimate businesses that want to communicate with them.

III.

The *Order* will also make it harder to enforce our prohibitions on illegal telemarketing.  The TCPA's chief sponsor in the Senate, Fritz Hollings, once called indiscriminate telemarketing calls "the scourge of modern civilization."[612]  So it is unsurprising that the TCPA places additional restrictions, such

---

[606] *Order* at para. 84.

[607] *See Order* at note 70 (agreeing that any call made from an automatic telephone dialing system triggers liability, even if the "functionalities" making that equipment an automatic telephone dialing system are not actually used to make a particular call).

[608] *Order* at note 312.  The authority the *Order* relies on for its one-call exemption is less than clear.  At one point, it says it is interpreting the phrase "prior express consent."  *Order* at note 300.  Elsewhere, the *Order* says that the TCPA "anticipates" a caller's "reliance" on prior express consent, which it then interprets to mean one call's worth of reliance for reassigned numbers (and zero call's worth of reliance for wrong numbers).  *Order* at note 312.  Still elsewhere, the *Order* is more forthright that it is just "balancing the caller's interest in having an opportunity to learn of reassignment against the privacy interests of consumers to whom the number is reassigned," *Order* at para. 85, which is to admit that the *Order* is rewriting the TCPA, not interpreting it.

[609] *Order* at para. 88.

[610] *Order* at para. 86.

[611] *Order* at para. 86 & note 302.

[612] 137 Cong. Rec. S9874 (daily ed. July 11, 1991) (statement of Sen. Hollings).

as compliance with federal Do-Not-Call rules,[613] on telemarketing calls whether they are "telephone solicitations" or "unsolicited advertisements."[614]

   The *Order* undermines these protections with a special carve-out for the prison payphone industry. This dispensation lets that industry repeatedly make prerecorded voice calls to consumers in order to "set up a billing relationship" to pay for future services.[615] You might have no interest in receiving phone calls from those behind bars, but prison payphone providers will be able to robocall you anyway. This exemption opens the door to more actual robocalls—the same types of robotic calls that made "Rachel from Cardholder Services" infamous.

   Indeed, the rationale provided by the Commission to justify this decision provides a roadmap for those seeking a lawful way to avoid our telemarketing rules. That's because we cannot exempt calls that "include or introduce an advertisement or constitute telemarketing."[616] So the *Order* must (and does) find that robocalling to "set up a billing relationship" is not advertising the "commercial availability . . . of . . . services" even though no one would agree to set up billing relationship to pay for a service that isn't commercially available.[617] And so the *Order* must (and does) find that robocalling to "set up a billing relationship" is not "encouraging the purchase . . . of . . . services" even though the entire point of the call is to get the consumer to agree to pay for services not yet performed.[618] What telemarketer will continue to hock goods the old-fashioned way when it can escape the TCPA's particular constraints on telemarketing by claiming to just set up billing relationships for services not yet performed? In other words, the one type of call consumers hate most—telemarketing calls—just got easier.[619]

   I do not support creating such a loophole. In my view, apart from truly exigent circumstances, the FCC should not condone new robocalls to American consumers, period.

* * *

   There is, of course, much more to the *Order*. Many of the decisions just reiterate well-known, settled law that I support. Yes, the TCPA applies to text messages as the Commission decided back in 2003.[620] Yes, consumers have the right to revoke prior express consent as we confirmed in 2012.[621] And

---

[613] *See* 47 U.S.C. § 227(c).

[614] *See* 47 U.S.C. §§ 227(a)(4)–(5).

[615] *Order* at para. 42.

[616] *See* 47 C.F.R. § 64.1200(a)(3)(iii); *see also* 47 U.S.C. § 227(b)(2)(B)(ii) (prohibiting the FCC from exempting commercial calls that "include the transmission of any unsolicited advertisement").

[617] *Order* at para. 42; 47 C.F.R. § 64.1200(f)(1).

[618] *Order* at para. 42; 47 C.F.R. § 64.1200(f)(12).

[619] In responding that it has crafted a "narrow exemption" reflecting "unique factual and legal circumstances" in a "unique context," *Order* at para. 42 & note 178, the *Order* misses the point. Of course non-prison payphone telemarketers won't qualify for this particular exemption. But telemarketers can now avoid federal Do-Not-Call regulations because the *Order* narrows the definitions of telemarketing and advertising to exclude calls to "set up a billing relationship." That's not even a loophole—that's an invitation for more robocalls.

[620] *See Order* at para. 107; *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[621] *See Order* at paras. 56–57; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; SoundBite Communications, Inc. Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, 27 FCC Rcd 15391, 15397, para. 11 (2012).

yes, a consumer may opt-in to a carrier's call-blocking services—which has been the law of the land since at least 2007.[622]  None of these are surprising outcomes, but none advance the ball.

As for the decisions that strike new ground, a few are good law—for instance, app providers won't face TCPA liability because they don't initiate calls placed by their users.[623]  But most just shift the burden of compliance away from telemarketers and onto legitimate businesses, sometimes in absurd ways.

For instance, how could any retail business possibly comply with the provision that consumers can revoke consent orally "at an in-store bill payment location"?[624]  Would they have to record and review every single conversation between customers and employees?  Would a harried cashier at McDonald's have to be trained in the nuances of customer consent for TCPA purposes?  What exactly would constitute revocation in such circumstances?  Could a customer simply walk up to a McDonald's counter, provide his contact information and a summary "I'm *not* lovin' it," and put the onus on the company?  The prospects make one grimace.

In all, the *Order* is likely to leave the American consumer, not to mention American enterprise, worse off.  That's not something anyone should support.  I certainly don't and accordingly dissent.

---

[622] *See Order* at paras. 154, 160; *Just and Reasonable Rate for Local Exchange Carriers; Call Blocking by Carriers*, WC Docket No. 07-135, Declaratory Ruling and Order, 22 FCC Rcd 11629, 11631–32, para. 6 & n.21 (Wireline Comp. Bur. 2007).

[623] *See Order* at paras. 32, 36.

[624] *Order* at para. 64.

STATEMENT OF

COMMISSIONER MICHAEL O'RIELLY

DISSENTING IN PART AND APPROVING IN PART

*Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135

Today's order has been hailed as "protecting" Americans from harassing robocalls and texts. That is a farce.  Instead, the order penalizes businesses and institutions acting in good faith to reach their customers using modern technologies.  I'm sure it will be said that we are approving half of the petitions before us.  But, that is a completely misleading point, because many of the petitions were filed due to the belief that the Commission would not do anything to properly address the two big issues:  reassigned numbers and autodialers.

I have made clear, on multiple occasions, that I do not condone abusive calling practices.  In fact, I had been working for over a year in the hopes of advancing an item that would protect consumers from unwanted communications while enabling legitimate businesses to reach individuals that wish to be contacted.  That is the balance that Congress struck when it enacted the Telephone Consumer Protection Act (TCPA) in 1991.

Unfortunately, that balance has been turned on its head by prior FCC decisions that expanded the scope of the TCPA, and through litigation across the country that, in many cases, has further increased liability for good actors.  Indeed, it has been reported that over 2,000 TCPA class action lawsuits were filed in 2014 alone.[1]  Far from protecting consumers, however, "[t]his current state of affairs, where companies must choose between potentially crushing damages under the TCPA or cease providing valuable communications specifically requested by consumers, contravenes Congress's intent for the statute not to interfere with normal, expected, and desired communications *that consumers have expressly consented to receive*."[2]  These include:[3]

- Alerts from a school that a child did not arrive at school, or that the building is on lockdown
- Product recall and safety notifications
- Notifications regarding storm alerts, utility outages, and service restoration

---

[1] Comments of Twitter, Inc. in Support of Blackboard, Inc.'s Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, at 4 (filed Apr. 22, 2015) (Twitter Apr. 22, 2015 Comments).  *See also, e.g.,* Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, FCC, CG Docket No. 02-278, at Exh. 5-6 (filed Jan. 26, 2015) (Wells Fargo Jan. 26, 2015 *Ex Parte* Letter) (providing statistics on the breadth of TCPA litigation).

[2] Letter from Monica S. Desai, Counsel to Abercrombie & Fitch Co. and Hollister Co., to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 4 (filed May 13, 2015) (Abercrombie May 13, 2015 Comments) (emphasis added).  *See also* Twitter Apr. 22, 2015 Comments at 12 ("In enacting the TCPA, Congress could not have intended for legitimate businesses…to choose between risking massive liability or denying consumers the chance to receive useful text messages that they expressly requested.").

[3] *See, e.g.,* Letter from Mark W. Brennan, Counsel to United Healthcare Services, Inc., to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 2-3 (filed July 28, 2014) (United July 28, 2014 *Ex Parte* Letter); Letter from Monica S. Desai, Counsel to Genesys Telecommunications Laboratories, Inc., to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 2 (filed June 11, 2015) (Genesys June 11, 2015 *Ex Parte* Letter); Wells Fargo Jan. 26, 2015 *Ex Parte* Letter at Exh. 4; *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189 (W.D. Wash. 2014).

- Immunization reminders for underserved, low-income populations
- Announcements from employment agencies about job openings
- Tweets (and other social media updates) and Instant Message notifications received by text
- Updates from airlines to let their customers know their flight has been delayed
- Financial alerts, including balance and overdraft information
- Text messages from taxi and ridesharing services to alert customers when their driver has arrived.

Moreover, this is despite evidence in the record of the benefits of informational calls and texts. For example:

- Health care:  "'[S]ignificantly more' patients who received automated telephone messages regarding hypertension treatment achieved blood pressure control than patients who received ordinary care only."[4]
- Financial Services:  "Borrowers that we [loan servicers] are able to auto dial have delinquency rates less than half of those that we cannot auto dial (13% versus 29%). … Borrowers that we [loan servicers] were able to auto dial in Q4 2014 had default rates 7 times lower than those we could not auto dial (0.6% versus 4.6% of dollar balance). … On an annual basis, TCPA contributes up to $2,261,900,761 in extra defaults."[5]
- Disaster-Related Communications: When a typhoon hit the Philippines in November 2013, multiple wireless carriers offered free international calling and texting to and from the Philippines in order to allow customers to call their loved ones and to facilitate the coordination of the massive international relief effort.[6] Without the use of automated text message technology, it would have been infeasible for these carriers to communicate this offer to their customers.[7]

Indeed, other federal agencies, including the Department of Health and Human Services, have been promoting text messaging as a way to benefit Americans.[8]  Some agencies even require companies to make a certain number of calls to consumers.[9]  Additionally, companies can be obligated under state law to contact their customers.[10]

---

[4] Letter from Elizabeth P. Hall, Vice President, Office of Government Affairs, Anthem, Inc., to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 5 (filed Apr. 6, 2015) (Anthem Apr. 6, 2015 *Ex Parte* Letter) (citing Teresa N. Harrison, *A Randomized Controlled Trial of an Automated Intervention to Improve Blood Pressure Control*, 15(9) J. Clinical Hypertension 650 (Sept. 2013)).

[5] Letter from Al Mottur, Counsel to Nelnet, to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 2 (filed Mar. 12, 2015).

[6] Comments of CTIA – The Wireless Association, CG Docket No. 02-278, at 2 (filed Mar. 10, 2014).

[7] *Id.*

[8] *See, e.g.,* Anthem Apr. 6, 2015 *Ex Parte* Letter at 4 (citing U.S. Department of Health and Human Services, Health Resources and Services Administration, *Using Health Text Messages to Improve Consumer Health. Knowledge, Behaviors, and Outcomes:  An Environmental Scan*, at 27 (May 2014) (Noting that HHS had reviewed more than 100 studies on the use of text messaging and concluded:  "The trends towards widespread ownership of cell phones and widespread text message use across virtually all segments of the U.S. population will continue to support the spread of health text messaging programs.  This [review of studies] provides encouraging evidence related to the use of health text messaging to improve health promotion, disease prevention, and disease management.")).

[9] Comments of Student Loan Servicing Alliance, CG Docket No. 02-278, at 5 (filed Mar. 16, 2015) ("Federal student loan servicers are required to make repeated attempts to contact delinquent borrowers to see if there are ways that the servicer can assist the borrower in avoiding delinquency and default – Is the borrower entitled to a deferment? Is there a new repayment plan that would help the borrower meet his/her obligation to repay? Would a temporary forbearance help the borrower through a difficult period?") (citing 34 C.F.R. § 682.411, which requires lenders in the federal student loan programs to make a certain number of phone calls to delinquent borrowers at various phases of delinquency); Wells Fargo Jan. 26, 2015 *Ex Parte* Letter at Exh. 3.  *See also* Comments of

(continued....)

The record also shows that these types of services are popular with consumers, as long as they provide *timely and relevant* information:

- Health Care: "One survey of users of a 'safety net' hospital's emergency room showed that patients preferred text messaging over other forms of communication, and only 15 percent did not want appointment reminders and notifications of expiring insurance."[11] "This consumer receptiveness is confirmed by Anthem's own experiences. Anthem collects 'opt-out' requests by members who do not desire to receive health-care messages. Anthem is receiving an opt-out rate for non-telemarketing calls of approximately .35 percent."[12]

- Energy: "Southern Company surveys indicate that customers would like outage and restoration notifications, and prefer communications via text message or telephone call, with email being the least requested method of contact."[13] "In fact, some utilities report that they more frequently receive complaints from customers when they have not been proactively notified of service interruptions than about having received a notification."[14]

- Education: "[A]t the beginning of each academic year, [Fairfax County Public Schools (FCPS)] requires potential message recipients to provide their telephone numbers and email addresses for contact purposes, as well as additional emergency contacts. … In many cases, the preferred method of contact is via the recipient's wireless telephone number, either as a telephone call or a text message (or both). This reflects the increasing number of students, parents, and others who rely on wireless devices to obtain information."[15] "The number of individuals requesting to have phone contacts removed from the FCPS database has been very small. Since July 1, 2014, FCPS sent 53,342 automated messages with 2,711,387 phone calls placed, drawn from a phone contact population of 449,909. Of that population, FCPS processed 634 requests to remove phone contacts from receiving future messages (0.14% of the total phone contact population)."[16]

---

(...continued from previous page)

Citizens Bank, N.A., CG Docket No. 02-278, at 11 (filed Mar. 12, 2015) (noting that President Obama's FY 2016 Budget Proposal proposed to clarify that the use of ATDS and prerecorded voice messages is allowed when contacting wireless phones in the collection of debt owed to or granted by the United States – to ensure that debt owed is collected as quickly and efficiently as possible) (citations omitted).

[10] Reply Comments of Edison Electric Institute & American Gas Association in Support of Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, at 7 (filed Apr. 10, 2015) (Edison Electric Apr. 10, 2015 Reply Comments) ("The comments demonstrate that many state regulators either mandate or strongly encourage customer notifications regarding storm alerts, outage notifications, and service restoration.").

[11] Anthem Apr. 6, 2015 *Ex Parte* Letter at 6 (citing Leah Zallman, et al., *Access to and Preferences for Text Messaging for medical and Insurance Reminders in a Safety Net Population*, Cambridge Health Alliance, Department of Medicine et al., *available at* http://chiamass.gov/assets/docs/r/pubs/14/text-sgim-final.pdf (last visited April 1, 2015)).

[12] *Id.* at 7.

[13] Edison Electric Apr. 10, 2015 Reply Comments at 3 (citing Comments of Southern Company on the Edison Electric Institute and American Gas Association Petition for Declaratory Ruling at 4, CG Docket No. 02-278 (filed Mar. 26, 2015)).

[14] *Id.* at 4.

[15] Fairfax County Comments on Blackboard, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, at 5 (filed Apr. 15, 2015) (FCPS Apr. 15, 2015 Comments).

[16] Declaration of Maribeth Luftglass, Assistant Superintendent and Chief Information Officer, Fairfax County Public Schools, in Support of Reply Comments of Blackboard Inc., CG Docket No. 02-278, at 2 (dated May 7, 2015) (FCPS Declaration) (attached to Reply Comments of Blackboard Inc., CG Docket No. 02-278 (filed May 7, 2015)).

The Commission's unfathomable action today further expands the scope of the TCPA and sweeps in a variety of communications either by denying relief outright or by penalizing companies that dial a number that, unbeknownst to them, has been reassigned to someone else.  Indeed, the order paints companies from virtually every sector of the economy as bad actors, even when they are acting in good faith to reach their customers.  Incredibly, it even concludes that consumers experience a real and cognizable harm—an intrusion of privacy—by receiving as few as two stray calls or texts.

In a quest to protect consumers against abusive debt collection calls—that are already barred by other federal laws[17]—the order will force companies acting in good faith to discontinue valuable services altogether.[18]  In fact, this is happening already.[19]  We cannot hold millions of legitimate businesses hostage to a few bad actors that will disregard the law, no matter which agency or statute is involved.

To be sure, the FCC narrowly selects certain calls and texts *it* thinks consumers should receive and allows them under very limited circumstances.  I approve of any relief contained in the item to the extent it is granted, but caution that it may not be as helpful as some would claim.  I'm not even sure it is workable.  Otherwise, the decisions today will make it much harder for consumers to receive information that they want and need, and will discourage companies from pursuing services that consumers might find beneficial.  Therefore, I strongly dissent from the remainder of the order.

Scope of the TCPA

Starting with a threshold issue, I disagree with the premise that the TCPA applies to text messages.  The TCPA was enacted in 1991 – before the first text message was ever sent.  The Commission should have had gone back to Congress for clear guidance on the issue rather than shoehorn a broken regime on a completely different technology.

Definition of Autodialers

The order also impermissibly expands the statutory definition of an "automatic telephone dialing system" (also known as an autodialer or ATDS) far beyond what the TCPA contemplated.  There are several problems with the new definition, which stem from FCC's refusal to acknowledge a simple fact: to meet the definition of an autodialer, all of the statutory elements must be present.[20]

---

[17] *See, e.g.*, Wells Fargo Jan. 26, 2015 *Ex Parte* Letter at Exh. 3 (listing a variety of statutes that govern collection practices).

[18] *See, e.g.*, Twitter Apr. 22, 2015 Comments at 12 ("In truth, the only way that Twitter can realistically avoid making "calls" to recycled cell phone numbers is simply to stop sending texts altogether. That outcome is bad for both Twitter and its users. Twitter can only imagine the backlash if it announced it was terminating the delivery of Tweets by text to users who asked to receive them that way.").

[19] *See, e.g.*, Abercrombie May 13, 2015 Comments at 3-4 ("Indeed, Abercrombie has eliminated the distribution of text messages to particular customers based solely on their carriers."); Letter from Harold Kim, U.S. Chamber Institute for Legal Reform and William Kovacs, U.S. Chamber of Commerce to Marlene H. Dortch, FCC, CG Docket No. 02-278 at 4 (filed Apr. 23, 2015).  ("Concern over TCPA liability already has led some businesses to cease communicating important and time-sensitive information via voice and text to consumers.").

[20] *See, e.g.*, Letter from Monica Desai, Counsel to ACA International, to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 3-4 (filed Jan. 20, 2015) (noting that "in order for any equipment to be an ATDS under the TCPA, it must meet the statutory definition given by Congress" and that the FCC cannot "nullify or alter the statutory definition"). Indeed, 35 trade associations and business groups, representing hundreds of thousands of U.S. companies and organizations from across the U.S. economy, noted that Congress cannot have intended these expansive readings of the TCPA, and that applying the statute in the manner that Congress intended, as expressed through the specific language Congress enacted, would "neither 'gut' the TCPA nor 'open the floodgates' to abusive calls."  Letter from 35 Associations to Chairman Wheeler, FCC, CG Docket No. 02-278, at 2-3 (filed Feb. 2, 2105).

First, the TCPA defines an autodialer as equipment that "has the capacity" to perform specific functions.  Therefore, it seems obvious that the equipment must have the capacity to function as an autodialer *when the call is made* not at some undefined future point in time.[21]  Moreover, the TCPA bars companies from using autodialers to "make any call" subject to certain exceptions.  This indicates that the equipment must, in fact, be used *as an autodialer* to make the calls.[22]

Not so according to the order.  Equipment that could conceivably function as an autodialer *in the future* counts as an autodialer *today*.  Indeed, the new definition is so expansive that the FCC has to use a rotary phone as an example of a technology that would not be covered because the modifications needed to make it an autodialer would be too extensive.  That is like the FAA regulating vehicles because with enough modifications cars and trucks could fly, and then using a skateboard as an example of a vehicle that does not meet the definition.

Multiple courts have rejected this overly expansive interpretation; for example:

> The Court declines to expand the definition of an ATDS to cover equipment that merely has the potential to store or produce telephone numbers using a random or sequential number generator or to dial telephone numbers from a list without human intervention. Equipment that requires alteration to perform those functions may in the future be capable, but it does not currently have that capacity…. The mere fact that defendants' modem could, if paired with different software, develop the requisite capability is not enough under the TCPA ….To hold otherwise would subject almost all sophisticated computers and cell phones to TCPA liability, a result Congress surely did not intend.[23]

What is the FCC's response?  That smartphones don't appear to be autodialers at this time, but the FCC will continue to monitor complaints and litigation "regarding atypical uses of smartphones".[24]  That should not provide any comfort to anyone.[25]

---

[21] *See, e.g.,* Wells Fargo June 5, 2015 *Ex Parte* Letter at 10 (clarifying that "capacity" must mean current ability – not hypothetical future ability – is consistent with the plain language of the statute (which is written in the present tense: "has" the capacity, not "could have" the capacity)).  "Otherwise, the TCPA may become vulnerable to the argument that it is constitutionally overbroad."  *Id.* (citing *Aja de Los Santos v. Millward Brown, Inc.,* United States' Memorandum in Support of the Constitutionality of the Telephone Consumer Protection Act, 2014 U.S. Dist. Ct. Pleadings LEXIS 3897 (S.D. Fl. Jan. 31, 2014); *Aja de los Santos v. Millward Brown, Inc.,* Order Denying Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint, 2014 U.S. Dist. LEXIS 88711 (S.D. Fl. June 29, 2014)).

[22] Thus, if the equipment was not used as an autodialer—for example, because the equipment lacked the present capacity or because calls were made with the aid of human intervention—then it would not meet the statutory test. *See* Letter from Steven A. Augustino, Counsel to Five9, to Marlene H. Dortch, FCC, CG Docket No. 02-278 (filed June 11, 2015) (Five9 June 11, 2015 *Ex Parte* Letter).

[23] *Gragg v. Orange Cab Co., Inc.,* 995 F. Supp. 2d 1189, 1196 (W.D. Wash. 2014).  *See also Marks v. Crunch San Diego, LLC,* 55 F.Supp.3d 1288, 1291-1292 (S.D. Cal. Oct. 23, 2014); *Glauser v. GroupMe, Inc.,* 2015 WL 475111 *3-4 (N.D. Cal. Feb. 4, 2015);

[24] *Supra* para. 21.

[25] It is also troubling that the order could sweep in other sophisticated non-ATDS equipment with beneficial features including: helping companies honor consumer preferences for receiving calls, including times of day, specific dates, and which number(s); improving the ability of callers to honor "do not call" requests; and helping govern the frequency of call attempts.  *See, e.g.,* Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 10 (filed June 5, 2015); Comments of American Financial Services Association, CG Docket No. 02-278, at 4 (filed Dec. 2, 2013) (using a predictive dialer substantially reduces the likelihood of human error); Comments of Dial America Marketing, Inc., CG Docket No. 02-278, at 4-5 (filed Dec. 13, 2013)

(continued....)

The real concern seems to be that, if capacity means "present capacity" or "current capacity", companies would game the system. Specifically, they might claim that they aren't using the equipment as an autodialer, but are secretly flipping a switch to convert it into one for purposes of making the calls. I don't think we should start with a presumption that companies are intentionally breaking the law. But it seems that this could be handled as an evidentiary matter. If a company can provide evidence that the equipment was not functioning as an autodialer at the time a call was made, then that should end the matter. For example, a company could show that the equipment was not configured as an autodialer, that any autodialer components were independent or physically separate, that use as an autodialer would require a separate log in, or that the equipment was not otherwise used in an autodialer mode.[26]

Second, the order misreads the statute by including equipment that merely has the capacity to dial from a list of numbers. That's not what the TCPA says. It makes clear that the telephone numbers must be stored or produced "using a random or sequential number generator". Therefore, calling off a contact list or from a database of customers, for example, does not fit the definition. As one court put it:

> "Random or sequential number generator" cannot reasonably refer broadly to any list of numbers dialed in random or sequential order, as this would effectively nullify the entire clause. If the statute meant to only require that an ATDS include any list or database of numbers, it would simply define an ATDS as a system with "the capacity to store or produce numbers to be called"; "random or sequential number generator" would be rendered superfluous. This phrase's inclusion requires it to have some limiting effect. When a court construes a statute it should, if possible, do so as to prevent any clause, sentence, or word, from being superfluous or insignificant. It therefore naturally follows that "random or sequential number generator" refers to the genesis of the list of numbers, not to an interpretation that renders "number generator" synonymous with "order to be called."[27]

Moreover, the fact that the FCC previously stated that dialing from a list is sufficient is unavailing because "[t]he [FCC] does not have the statutory authority to change the TCPA's definition of an ATDS."[28]

Third, the Commission previously clarified that to be considered "automatic", an autodialer must function "without human intervention".[29] Therefore, it should be clear that non-de minimis human

---

(...continued from previous page)

(computer call management equipment enables companies to ensure that numbers are dialed in an appropriate time period, to regulate the number of times the phone will ring before disconnection and to enable the tracking of call details useful in future disputes). *See also* Five9 June 11, 2015 *Ex Parte* Letter ("Interpreting an ATDS to encompass systems with the future capacity, after modification, to store or produce random or sequential numbers not only would contradict the plain language of the statute, it would deprive consumers of the benefits of call management technology.").

[26] *See, e.g., Modica v. Green Tree Servicing, LLC,* 2015 WL 1943222 *3 (N.D. Ill Apr. 29, 2015).

[27] *Marks*, 55 F.Supp.3d at 1292. *See also Griffith v. Consumer Portfolio Serv., Inc.,* 838 F.Supp.2d 723, 725 (N.D. Ill. 2011) ("'Random number generation' means random sequences of 10 digits, and 'sequential number generation' means (for example) (111) 111-1111, (111) 111-1112, and so on."); *Dominguez v. Yahoo!, Inc.,* 8 F. Supp. 3d 637, 643 (E.D. Pa. 2014) ("[Plaintiff's] definition of the term 'sequence' or 'sequential' fails to raise a material dispute of fact, since it focuses on the manner in which text messages are sent, not the way in which the numbers are generated.").

[28] *Marks*, 55 F.Supp.3d at 1292.

intervention would disqualify it from being an autodialer.[30]  This is important because there is litigation around the country regarding the level of human intervention.  Yet the order refuses to provide any additional clarity, claiming that this must be done through a case-by-case determination.  In fact, the order increases confusion by implying that calls that are manually dialed from equipment that could be used as an autodialer would still count as autodialed calls because the equipment has the potential to be an autodialer—even though the calls would not have been made absent that human intervention (i.e., the manual dialing).[31]

Fourth, the distinction drawn between different types of apps is without merit.  While it is true that different apps may require different levels of engagement by the user before sending messages to the user's contacts, no messages would be sent at all but for the user signing up for the service.  It is important that the user be aware that all contacts will receive a message.  But assuming that is true, it is the user that should be deemed to initiate the call, not the app, as these type of messages would not be made but for the human intervention of the user.  If certain recipients do not want to receive messages, it is not unreasonable to expect them to take that up with the user, not the app provider.

Reassigned Numbers

Every day, an estimated 100,000 cell phone numbers are reassigned to new users.[32]  As a result, numerous companies, acting in good faith to contact consumers that have consented to receive calls or texts, are exposed to liability when it turns out that numbers have been reassigned without their knowledge.

Today's order offers companies fake relief instead of a solution: one free pass.  That is, if a company makes a single call or text to a number that has been reassigned, the company will not be liable for that single contact.  But that construct assumes that the recipient picks up the phone or responds to the text.  In many cases, that won't happen, subjecting the company to liability for any subsequent calls or texts.  All we've done is moved the point of liability for reassigned number situations from call one to call two.  And if a call is made to a wrong number (i.e., misdialed) there's no free pass at all.

Companies have pointed out that a one free pass rule can make things worse for them and for their customers.[33]  If that one call goes to voicemail and the message doesn't state who is at the number, or if a call is answered but dropped before the recipient's identity is revealed, they have no choice but to

---

(...continued from previous page)

[29] *See, e.g., Rules and Regulations Implementing the Telephone Consumer Protection Act*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, para 132 (2003) (clarifying that the "basic function" of an ATDS is to dial numbers "without human intervention").

[30] *Gragg*, 995 F. Supp. 2d at 1194 (concluding that, if "human intervention is essential" to a system, then that system is not an autodialer).  "Commenters have noted that preview dialers, 'click to call' systems and other technologies requiring a user to select the number to be dialed." Five9 June 11, 2015 *Ex Parte* Letter (citing Comments of Sirius XM Radio Inc., CG Docket No. 02-278, at 15 (filed May 18, 2015) (preview dialing is the functional equivalent of manual dialing); Comments of the U.S. Chamber of Commerce, CG Docket No. 02-278, at 4 (filed Dec. 19, 2013) ("human intervention is the key factor;" manually entering all digits and "oneclick" dialing are equivalent processes)).

[31] The order states that nothing in the TCPA prevents callers from manually dialing; for example, to discover reassigned numbers.  However, the order also implies that calls that are manually dialed from equipment that could be used as an autodialer would still count as autodialed calls.  Therefore, manual dialing may not actually be a viable option for those seeking to avoid liability.

[32] Twitter Apr. 22, 2015 Comments at 3; Stage Stores, Inc. Petition for Expedited Declaratory Ruling and Clarifications, CG Docket No. 02-278, at 3 (filed June 3, 2014).

[33] *See, e.g.,* Wells Fargo June 5 *Ex Parte* Letter at 3-6.

refrain from contacting that number in the future.[34]  In fact, these rules even apply to calls that are not connected.  That is inconsistent with the statute.[35]  But, moreover, what is the harm in seeing a missed call on your smartphone screen?

Indeed, we may have provided a new way for consumers acting in bad faith to entrap legitimate companies.  A person could take a call, never let on that it's the wrong person, and receive subsequent calls solely to trip the liability trap.  After all, the order is very clear that there is absolutely no duty imposed on consumers to let companies know they have reached the wrong person.  In fact, the order expressly rejects a bad faith defense against call and text message recipients that intentionally deceive the caller or sender in order to induce more liability.  Therefore, it won't be long before the apps or websites that help consumers manufacture TCPA lawsuits include this as the latest example.[36]

The record shows that one free pass is particularly problematic for informational texts, such as reminders, where no response is expected or routinely provided.[37]  In those cases, companies will use up the free pass and still have zero indication as to whether they reached the right number.  Some may have no choice but to discontinue the texts.  That risks angering consumers that had specifically requested texts, for example, to remind them to pay a monthly bill, but then miss a payment because they didn't get a reminder.

Moreover, the idea that, after one call, a caller would have "constructive knowledge" that a number has been reassigned—even if there was no response—is absolutely ludicrous.  The FCC expects callers to divine from mere silence the current status of a telephone number.  In doing so, it reads the statute to "demand[] the impossible."[38]  Think about this in the context of Twitter, which consumers can set to text if anything happens involving them.  Before Twitter can even realize the number has been reassigned, they are already liable for hundreds or perhaps thousands of "violations".  The only solution is to stop the practice in its entirety.

---

[34] *See, e.g.,* Genesys June 11, 2015 *Ex Parte* Letter at 1-2 ("The 'one call attempt' standard will force companies to take customers off of calling lists, or off of texting lists, for not responding to a text or not answering a phone call.  This will result in the unintended consequence of companies having to stop numerous consumer beneficial, normal and expected communications, or risk being faced with potentially catastrophic TCPA liability.").

[35] *See, e.g.,* Wells Fargo June 5 *Ex Parte* Letter at 2 ("Congress used two different phrases in two distinct sections of the TCPA to create two distinct triggers for liability.  Under the statute, it is unlawful to 'make' a call – not merely to 'attempt' a call – to a cell phone using an automatic telephone dialing system (ATDS) without prior express consent… By contrast, Congress determined that call 'initiation' triggers liability in the context of pre-recorded voice messages to landlines even if the call is not placed through an ATDS.") (citing *Save Our Valley v. Sound Transit*, 335 F. 3d 932, 960 (9th Cir. 2003) ("We generally assume that when Congress uses different words in a statute, it intends them to have different meanings.")).

[36] For example, one Android App called "Block Calls Get Cash" – marketed by a self-described consumer protection law firm – purports to help those who download it determine whether they have a claim under the TCPA.  The app's website states that "with no out-of-pocket cost for the app or legal fees, its users will 'laugh all the way to the bank.'"  Reply Comments of the U.S. Chamber of Commerce, CG Docket 02-278, at 4 (filed Dec. 1, 2014) (citing *Lawsuit Abuse? There's an App for That*, U.S. Chamber Institute for Legal Reform (Oct. 29, 2014), http://www.instituteforlegalreform.com/resource/lawsuit-abuse-theres-an-app-for-that/).

[37] *See, e.g.,* Genesys June 11, 2015 *Ex Parte* Letter at 2 ("It does not benefit consumers to force callers to freeze such communications simply because a consumer did not pick up a call or respond to a text. Indeed, there is no expectation by consumers that they should have to respond to texts providing information such as power outage notifications or product recalls.").

[38] *Rules and Regulations Implementing the TCPA*, CG Docket No. 02-278, Order, 19 FCC Rcd 19215, 19219 (2004) (quoting *McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000)).

The FCC points to a list of suggestions in the record to help callers determine whether a number has been reassigned, such as checking a numbering database.  But then the item does not provide any relief or a safe harbor for employing these suggestions.

Many of these suggestions are good practices that a number of parties routinely employ to minimize the risk of litigation over reassigned numbers.[39]  But they are not foolproof, either individually or collectively, so without a safe harbor there is still substantial litigation risk.[40]  For example, the database contains at best 80 percent of wireless numbers and is not updated in real time.[41]

Many commenters noted the impracticality of determining whether a number has been reassigned before calling or texting.  For example:

- Fairfax County Public Schools:  "The messages FCPS sends are critical to and expected to be received by FCPS's school community, especially in a threat or emergency situation."[42]  "It would be impossible for FCPS to confirm whether a wireless telephone number is being used by the same recipient that gave FCPS consent before sending each automated message. The biggest advantage in using automated messages - reaching a large number of people as quickly as

---

[39] *See, e.g.,* Wells Fargo Jan. 26, 2015 *Ex Parte* Letter at Exh. 8.  *See also* Petition for Declaratory Ruling of Consumer Bankers Associations, CG Docket No. 02-278 (filed Sept. 19, 2014) (CBA Petition) ("[C]ompanies often employ expensive and ultimately inadequate measures to try to ascertain mobile telephone number reassignments.") (citing Letter from Monica S. Desai, Counsel to Wells Fargo to Marlene H. Dortch, CG Docket No. 02-278, at 4 (filed May 15, 2014) (Wells Fargo May 15, 2014 *Ex Parte* Letter); United July 28, 2014 *Ex Parte* Letter at 5; U.S. Chamber of Commerce Institute for Legal Reform, The Juggernaut of TCPA Litigation (October 2013)).

[40] *See, e.g.,* Wells Fargo Jan. 26, 2015 *Ex Parte* Letter at 5-6; CBA Petition at 9 ("[E]ven the most stringent compliance program cannot guarantee that the intended recipient will always be the person who answers the call.") (citing Petition for Expedited Declaratory Ruling of United Healthcare Services, Inc., CG Docket No. 02-278 (filed Jan. 16, 2014); Comments of the American Bankers Association, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of ACA International, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of the American Financial Services Association, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of America's Health Insurance Plans, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of the Coalition of Higher Education Assistance Organizations, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of Comcast Corporation, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of CTIA, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of DIRECTV, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of Dominion Enterprises of Virginia, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of Noble Systems Corporation, CG Docket No. 02-278 (filed Mar. 7, 2014); Comments of the Student Loan Servicing Alliance, CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of Time Warner Cable Inc. , CG Docket No. 02-278 (filed Mar. 10, 2014); Comments of the U.S. Chamber of Commerce, CG Docket No. 02-278 (filed Mar. 10, 2014); Reply Comments of United Healthcare Services, Inc., CG Docket No. 02-278 (filed Mar. 23, 2014); Wells Fargo May 15, 2014 *Ex Parte* Letter; Letter from Monica S. Desai to Marlene H. Dortch, CG Docket No. 02-278 (filed July 21, 2014); United July 28, 2014 *Ex Parte* Letter).

[41] *Supra* note 301.  *See also* United July 28, 2014 *Ex Parte* Letter at 5 (These databases: provide only a confidence score;  often associate incorrect names or nicknames with numbers; do not associate any name with 27% of wireless numbers; and present additional challenges when a family plan lists a single individual as the "subscriber". Moreover, subscriptions to these services are likely cost-prohibitive for small business, non-profit organizations, and other small entities); CBA Petition at 9 ("Even companies who can afford costly third party systems that purport to provide accurate data concerning reassigned numbers still cannot escape liability because the database is often incomplete and does not account for family plan holders.") (citing Wells Fargo May 15, 2014 *Ex Parte* Letter at 4; United July 28, 2014 *Ex Parte* Letter at 5; U.S. Chamber of Commerce Institute for Legal Reform, The Juggernaut of TCPA Litigation (October 2013)).

[42] FCPS Apr. 15, 2015 Comments at 1-2.

possible - would be lost if FCPS were required to make such a verification every time it sends an education-related message to a wireless telephone number."[43]

- Abercrombie: "Because there is no comprehensive database of reassigned numbers, the only way to avoid TCPA liability altogether for calls or texts related to reassigned numbers is to cease communicating. . . . Indeed, Abercrombie has [already] eliminated the distribution of text messages to particular customers based on their carriers."[44]

Alternatively, the FCC notes that companies can manually dial numbers. This is not a realistic solution for most, if not all, of today's businesses and institutions. For example:

- Twitter: "To implement this approach, a Twitter employee would need to *manually* call or text each user and verify his or her identity before *each* Tweet was automatically sent. Such a verification process would be prohibitively expensive for Twitter, and annoying and an invasion of privacy for Twitter users. Given that Twitter users can follow an unlimited number of other Twitter users and receive all of their Tweets—often dozens or more on a daily basis—Twitter could not possible implement this suggestion."[45]

- National Council of Higher Education Resources: "On average, one of the four major federal loan servicers was able to contact only 1,130 borrowers by dialing manually – but reached 13,675 delinquent borrowers per week using automated dialing technology."[46] For these companies, being forced to manually dial each call will "increase costs, place unnecessary restraints on finite resources, and, most importantly, [it would reduce] the number of consumers that can be reached and informed in a timely manner about ways to avoid default or options to resolve their default."[47]

- Marketing Research Association: "The increased time involved in cell phone research can be even more of a problem than cost. Time-sensitive studies, including most political and public opinion polling, are constantly imperiled. In situations where timely data is as critical as accurate data, information is not readily deliverable to companies, governments, and other entities that need to make swift decisions."[48]

There is simply no realistic way for a company to comprehensively determine whether a number has been reassigned.[49]

Moreover, some of the alternatives that the FCC suggests go so far as to be *anti-consumer*. For example, the FCC notes that companies could periodically email or mail requests that consumers update their contact information. But consumers also complain about getting unwanted email and mail. This just shifts the potential annoyance from one mode of communication to another and is also not foolproof because numbers could be reassigned in the interim. Furthermore, if companies actually emailed their customers enough to avoid TCPA liability (at least every day), these emails would get ignored or the

---

[43] *Id.* at n. 13. The FCPS also expressed concern that "FCPS operations are government-funded. Any expense to defend against TCPA claims would expend funds that are designated to and essential for the education of America's school children." FCPS Declaration at 3.

[44] Abercrombie May 13, 2015 Comments at 3-4.

[45] Twitter Apr. 22, 2015 Comments at 10-11.

[46] Comments of National Council of Higher Education Resources, CG Docket No. 02-278, at 3 (filed June 5, 2015).

[47] *Id.* at 5-6.

[48] Comments of Marketing Research Association, CG Docket No. 02-278, at 6 (filed Dec. 23, 2014).

[49] *See* Wells Fargo Jan. 26, 2015 *Ex Parte* Letter at Exh. 2 (noting that it is a "myth" that "[a] compliance-minded business can avoid liability for calls to recycled cell phones by using databases, or through manual calling.")

recipient would unsubscribe.  These alternatives may be a convenient dodge for the FCC, but they are not practical or desirable for businesses or consumers.[50]

Additionally, the FCC notes that companies could require consumers that give consent to notify those companies when they relinquish their numbers.  If they do not, the FCC observes that "the caller may wish to seek legal remedies for violation of the agreement."[51]  In other words, the FCC thinks it's reasonable *to have companies sue their own customers*.

Sadly, there were reasonable options that the Commission rejected.  In particular, a number of petitioners and commenters asked the FCC to interpret "called party" to mean the "intended recipient".[52]  This commonsense approach would have allowed a company to reasonably rely on consent obtained for a particular number.  Otherwise, "[i]f consent is lost through events about which the caller is totally unaware and has no control, every call carries a $500 price tag and the consent exception becomes illusory, contrary to the intent of Congress."[53]

The real concern with this obvious solution seems to be that companies would continue to make calls even after they have been informed that they've reached the wrong person.  Here again, I don't think we should start from the presumption that the vast majority of businesses are bad actors.  In fact, parties made clear in the record that there could be liability for subsequent calls made to a wrong number after actual knowledge was obtained and a reasonable time to remove the number had passed.[54]  It makes no sense that legitimate businesses would knowingly waste time calling people that aren't their customers, at least with respect to informational calls or texts.

Moreover, the idea that a recipient should have no responsibility whatsoever to notify a company that they reached the wrong person or even to be truthful and act in good faith is preposterous.  I was shocked to read one cautionary tale:

> By the time Rubio's was aware of the problem [that a number provided by an employee had been reassigned], hundreds of Remote Messaging alerts were received by the wireless subscriber with the reassigned number. Further, the subscriber with the reassigned number advised Rubio's that he has solved the problem by blocking the number assigned to the Remote Messaging system—

---

[50] In addition, to the extent the Commission suggests shifting communications to landline calls or mail, the Department of Education has pointed at that these methods of communication are particularly ineffective when trying to communicate with 18-24 year olds, as 32% of 18-24 year olds do not have a landline and students are very mobile while in college and can change addresses multiple times. Letter from Vanessa A. Burton, Office of General Counsel, U.S. Department of Education, to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 3 (filed May 21, 2010).

[51] *Supra* note 302.

[52] *See, e.g.,* Wells Fargo June 5, 2015 *Ex Parte* Letter at 7 (supporting such an interpretation and citing other commenters that agree).

[53] Twitter Apr. 22, 2015 Comments at 14 (citing H.R. Rep. No. 102-317 at 17 (1991) (explaining that the exception was designed to allow companies to send "expected or desired" messages, such as those that "advise a customer (at the telephone number provided by the customer) that an ordered product had arrived, a service was scheduled or preformed, or a bill had not been paid").

[54] *See, e.g.,* CBA Petition at 14 ("When the caller learns that a number no longer belongs to the intended recipient, further calls to the number will justifiably be subject to enforcement and private actions under the TCPA. As such, the consumer of right of action will appropriately remain intact."); Wells Fargo June 5, 2015 *Ex Parte* Letter at 7; Letter from Harold Kim, Executive Vice President, U.S. Chamber Institute for Legal Reform, to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 3-4 (filed June 11, 2015).

and, therefore, no corrective action was needed. All the while, the subscriber with the reassigned number waited until he received approximately 876 alerts before filing suit against Rubio's, thereby increasing his statutory damages against Rubio's.[55]

It is not unreasonable to expect a recipient to contact the company to inform them of the error. This could be done through the simple opt-out mechanism that the FCC points to as an example of a best practice for limiting calls to reassigned numbers—except that it should serve as a safe harbor for companies that use it. Then, once a consumer had availed itself of this option, the company would be on notice and could be liable for any subsequent communications. I fail to see how encouraging lawsuits against consumers is a better outcome than expecting consumers that receive some unintended calls or texts to take some small step to correct an inadvertent error.

Revocation of Consent for Non-telemarketing Calls

The order also decides that the TCPA includes a right to revoke consent to receive non-telemarketing calls. But this right appears nowhere in the statute. Instead, the order turns to common law tort principles to read into the statute a right to revoke consent. Talk about bureaucratic activism.

As a longtime Congressional staffer, I was stunned by this analysis. Usually, we start with the premise that a statute says what it means and means what it says.[56] If Congress did not address an issue, then the FCC should not presume to act in its stead. That is especially true when the structure of a statute and related provisions indicate that the silence was intentional. Congress amended the TCPA in 2005 to provide a right to revoke consent to receive unsolicited fax advertisements.[57] Therefore, the absence of a revocation provision for non-telemarketing calls should signal to the FCC that Congress intended no such right.

I certainly do not understand why the FCC would resort to common law principles before turning to Congress for guidance or to request a statutory fix. Clearly, this is an area where Congress has been active—not just on TCPA generally, but also on the very issue of revocation of consent. And I am particularly wary of placing a thumb on the scale here because it is evident from the legislative history that, in creating an exception for calls made with "prior express consent", Congress struck a careful balance between the privacy interests of consumers and the interests of legitimate businesses in communicating with their customers.[58]

Nevertheless, I would be remiss if I did not express concern about the way in which the Commission proceeds. Specifically, the order allows consumers to choose any reasonable means to revoke consent, which can include oral revocation, rather than permitting businesses to designate a reasonable method, such as an interactive opt-out mechanism. While verbal revocation isn't unreasonable *per se*, there have been instances where a consumer claims, often during the course of litigation, that consent was orally revoked. If the claim is not truthful, the company will have no record that consent was

---

[55] Rubio's Restaurant, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, at 3 (filed Aug. 11, 2015) (Rubio's Restaurant Aug. 11, 2015 Petition). Yet, the order rejects Rubio's request for an affirmative, bad-faith defense.

[56] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) ("In answering this question, we begin with the understanding that Congress "says in a statute what it means and means in a statute what it says there.").

[57] Junk Fax Prevention Act of 2005, Pub. L. 109-21, 119 Stat. 359 (codified at 47 U.S.C. § 227(b)(1)(C)).

[58] Santander Consumer USA, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, at 2-4 (filed July 10, 2014) (Santander July 10, 2015 Petition); H.R. Rep. No. 102-317 at 10, 17.

revoked.  Indeed, asking it to prove that consent was not withdrawn puts the company in the untenable position of having to prove a negative.  In addition, some commenters raised concerns about the prospect of consumers using non-standard responses to opt-out of texts (such as "decline" or "no thanks") that won't be recognized by their systems, which are programmed to recognize certain words that are standard in the industry (such as "STOP").[59]

Notably, other pro-consumer statutes contain provisions that require any revocation of consent be made in writing or through other methods designated by the business.[60]  Instead, the order uses those provisions as evidence that, when Congress intends to specify the means of opt-ing out, it does so.  This is maddening.  As discussed above, the TCPA doesn't contain a revocation provision, *so of course it did not specify how to exercise a non-existent right*.  Rather, the point that some commenters have made is that if the FCC decides to read revocation into the TCPA at all, then it should at least read in a written revocation requirement or allow businesses to designate a reasonable method for revocation, consistent with other statutes that expressly address this issue.[61]

Or, one need look no further than the TCPA itself, where Congress provided that recipients must submit a request to opt-out of future unsolicited fax advertisements.  Specifically, the statute and implementing rules provide that a request is effective only if it: (a) identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates; (b) is made to the telephone number, facsimile number, Web site address or e-mail address identified in the sender's facsimile advertisement; and (c) the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine.[62]

---

[59] *See* Letter from Jennifer Bagg, Counsel to Vibes Media LLC, to Marlene H. Dortch, FCC, CG Docket No. 02-278 (filed June 11, 2015) ("The systems used for mobile marketing must be pre-programmed to recognize certain words as an opt-out request. In reflection of this technological requirement, the industry standards contain a specific list of keywords that mobile marketers must recognize as a subscriber opt-out request. Specifically, mobile marketing systems must recognize the keywords STOP, CANCEL, UNSUBSCRIBE, QUIT, END, and STOPALL as a request by subscribers to opt-out of a mobile campaign. This is a widely recognized and published set of opt-out keywords that are used across the industry in calls to actions and terms and conditions.") (citations omitted).

[60] *See, e.g.,* Letter from Burton D. Brillhart, Counsel to Santander Consumer USA, to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 3 (filed Feb. 13, 2015) (noting that the Real Estate Settlement Procedures Act requires inquiries to be made in writing, which the Consumer Financial Protection Bureau concluded "strikes the appropriate balance between ensuring responsiveness' to consumer requests and complaints and mitigating the burden on servicers of following and demonstrating compliance with specific procedures with respect to oral notices of error."); Letter from Burton D. Brillhart, Counsel to Santander Consumer USA, to Marlene H. Dortch, FCC, CG Docket No. 02-278, at 3 (filed Aug. 11, 2014) (pointing to statutes that provide for revocation through a designated method, often in writing, including the Servicemembers Civil Relief Act (SCRA), the Fair Credit Reporting Act (FCRA), the Health Insurance Portability and Accountability Act (HIPAA), Fair Debt Collection Practices Act (FDCPA)).

[61] Commenters also noted the practical problems with allowing consumers to use any reasonable method.  *See, e.g,* Letter from Harold Kim, U.S. Chamber Institute for Legal Reform and William Kovacs, U.S. Chamber of Commerce to Marlene H. Dortch, FCC, CG Docket No. 02-278 at 5 (filed June 11, 2015) ("Many American companies are large entities with hundreds or thousands of employees and multiple offices, with multiple phone numbers. Is someone permitted to call any company phone number, or send a letter to any company address, or send an email to any company email address, or talk to some affiliated entity, and revoke his or her prior consent? In the middle of a technical support call, can the consumer throw in 'I revoke my consent for pre-recorded messages' in the middle of a help call, when the technical help line would have no idea what to do with such a statement? It would be impossible for a company to monitor all possible means of communications for such revocations, particularly oral ones, and so the Commission should rethink adopting a position that consumers can revoke prior consent by any means they wish.").

[62] 47 U.S.C. § 227(b)(2)(E); 47 C.F.R. § 64.1200(a)(4)(v).

If Congress and the Commission did not find such a procedure to be too burdensome for fax recipients, I fail to see how it or something similar would be too burdensome for call or text recipients. For example, one petitioner noted that this could be done (1) in writing at the mailing address designated by the caller; (2) by email to the email address designated by the caller; (3) by text message sent to the telephone number designated by the caller; (4) by facsimile to the telephone number designated by the caller and/or (5) as prescribed by the Commission hereafter as needed to address emerging technology.[63] Or, the FCC could provide a safe harbor for companies that use the interactive opt-out mechanism that it champions as a way to discover reassigned numbers.

Limited Relief for Certain Petitioners

The order does grant slight relief in a few limited circumstances and very narrowly; including to enable consumers to receive fraud alerts, data breach information, money transfer information, medical appointment and refill reminders, hospital registration and discharge information, and home healthcare instructions. I support the relief to the extent it is provided but would have gone further.

By exempting certain uses, the FCC implicitly concedes that dialing and messaging technologies can be used to create important and popular services. However, this order fails to exempt many other beneficial uses, thereby dampening incentives to create other innovative and useful messaging services.

Moreover, the order does not address a number of situations raised in the record; for example, immunization reminders, utility outage notifications, emergency alerts from schools, and countless other categories. Some of these uses could be addressed in a future item, and could eventually be deemed permissible. However, that does not provide much needed certainty or reduce litigation exposure in the meantime.

Instead, this fact-specific approach means that companies that have not yet filed petitions but need certainty will have to undertake the expense to file and pursue a petition.[64] I imagine it will be too risky for others to guess whether their circumstances are close enough, particularly given that the order engages in very granular—and, in my view arbitrary—line drawing. In many cases, they may simply discontinue beneficial services altogether.

Furthermore, even the relief granted is limited and potentially unworkable. For example, the order limits exempted calls made by financial institutions to three per event over a three day period. But I can envision a scenario where, a week later, the institution determines that the event was broader in scope than initially anticipated and the institution needs to provide updated information to its customers; for example, about additional information that was compromised. In fact, this just happened with the breach of federal government personnel information.

In addition, the relief appears to assume that the right people are contacted. If numbers are entered into a system incorrectly, for example, then we are back at square one and institutions could be liable. So a financial institution that sends three texts in a day, as permitted in the order, could still be sued for the texts. Multiply that by the number of people that may be affected by a data breach and the risk may be unacceptably high. Therefore, I question whether institutions will even avail themselves of the supposed exception.

---

[63] Santander July 10, 2015 Petition at 9-10.

[64] Indeed, the fact that similar services were addressed and exempted in the record increases uncertainty for those services that were raised but weren't granted an exemption and likely will increase these entities' litigation exposure if they even choose to continue these services at all.

It may be that the FCC was hesitant to grant more meaningful relief due to resistance from some consumer groups.  Honestly, I have to question whether these groups truly represented consumers at large on these issues.  I was struck, for example, by a consumer group letter that pushed back against relief for data breach notifications because "[a]fter a data breach there is little a consumer can do about it, other than keep an eye on her accounts and her credit."[65]  Thus, a "letter [notice] generally suffices."[66]  That position seems to be completely out-of-touch with the views of ordinary consumers, and I do not find it to be credible or useful.

* * *

In sum, I am beyond incredibly disappointed in the outcome today.  It will lead to more litigation and burdens on legitimate businesses without actually protecting consumers from abusive robocalls made by bad actors.  I dissent in part and approve in part for the reasons already discussed.

---

[65] Letter from Margot Saunders, Counsel, National Consumer Law Center to Marlene Dortch, Secretary, Federal Communications Commission, CG Docket No. 02-278, at 4 (Apr. 28, 2015) (representing NCLC and other organizations)).

[66] *Id.* at 4.