Yitzchak Zelman (Admitted *Pro Hac Vice*)
New York Bar No. (5086509)
Email: yzelman@marcuszelman.com
**MARCUS & ZELMAN, LLC**
701 Cookman Avenue
Asbury Park, New Jersey 07712
Tel:  (845)367-7146
Fax: (732)695-3282
Attorney for Plaintiff
N.L., an infant by his mother and natural guardian
SANDRA LEMOS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| N.L., an infant by his mother and natural guardian SANDRA LEMOS,<br><br>          Plaintiff,<br><br>     v.<br><br>CREDIT ONE BANK, N.A., GC SERVICES LIMITED PARTNERSHIP, IENERGIZER HOLDINGS, LIMITED, and FIRST CONTACT, LLC a/k/a IQOR HOLDINGS, INC.,<br><br>          Defendant. | **C.A. No. 2:17-cv-01512-JAM-DB**<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT..........................................................................1

II.     STANDARD OF REVIEW.............................................................................2

III.    ARGUMENT..................................................................................................3

     A. Plaintiff Is Entitled To Summary Judgment On His TCPA Claims....3

     B. Defendants Utilized An Automatic Telephone Dialing System
       In Calling The Plaintiff, In Violation Of The TCPA.............................5

     C. Plaintiff Is Entitled To Trebled Damages............................................12

IV.    CONCLUSION.............................................................................................19

**TABLE OF AUTHORITIES**

*ACA International v. FCC,*

    2018 WL 1352922 (D.C. Cir. Mar. 16, 2018)........................................................7

*Addisu v. Fred Meyer,*

    198 F.3d 1130 (9th Cir.2000)...........................................................................3

*Alea London Ltd. v. Am. Home Servs., Inc.,*

    638 F.3d 768 (11th Cir. 2011)................................................................4, 13, 14

*Anderson v. Liberty Lobby, Inc.,*

    477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)........................................2

*Arbelaez v. Capital Advance Sols., LLC,*

    No. 15-23137-CIV, 2016 WL 2625020 (S.D. Fla. Jan. 20, 2016).....................17

*Bridgeview Health Care Ctr. Ltd. v. Clark,*

    2013 WL 1154206 (N.D.Ill. Mar. 19, 2013)....................................................14

*Campbell-Ewald Co. v. Gomez,*

    136 S. Ct. 663, 193 L. Ed. 2d 571 (2016)............................................................4

*Celotex Corp. v. Catrett,*

    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)........................................2

*Coniglio v. Bank of Am., N.A.,*

    2014 WL 5366248 (M.D. Fla. Oct. 21, 2014)...................................................17

*Davis v. Diversified Consultants, Inc.,*

    2014 WL 2944864 (D. Mass. June 27, 2014)....................................................14

*Echevvaria v. Diversified Consultants, Inc.,*

    13 CIV. 4980 LAK AJP, 2014 WL 929275 (S.D.N.Y. Feb. 28, 2014).........16, 17

*Freeman v. Wilshire Commercial Capital L.L.C.,*

    No. CV 2:15-1428 WBS AC, 2018 WL 1173823 (E.D. Cal. Mar. 6, 2018)........3

*Gambon v. R & F Enterprises, Inc.,*

    No. 6:14-CV-403-ORL-18, 2015 WL 64561 (M.D. Fla. Jan. 5, 2015)...............18

*Harris v. World Fin. Network Nat. Bank,*

867 F.Supp.2d 888 (E.D.Mich.2012)....................................................14

*Hunt v. City of Los Angeles,*

638 F.3d 703 (9th Cir.2011)................................................................2

*In re Joint Petition Filed by Dish Network, LLC*,

28 FCC Rcd. 6574 (2013)....................................................................4

*Jones v. FMA Alliance Ltd.*,

2013 WL 5719515 (D. Mass., Oct. 17, 2013)....................................11

*King v. Time Warner Cable*,

113 F. Supp. 3d 718 (S.D.N.Y. 2015)...........................................15, 16

*Marks v. Crunch San Diego, LLC,*

2018 WL 4495553 (9th Cir. Sept. 20, 2018)................................1, 7, 8

*Meyer v. Portfolio Recovery Assocs., LLC*,

707 F.3d 1036 (9th Cir. 2012)...............................................................3

*Moore v. Dish Network LLC,*

57 F. Supp. 3d 639 (N.D.W. Va. Oct. 15, 2014)...........................11, 18

*Sengenberger v. Credit Control Servs., Inc.*,

2010 WL 1791270 (N.D.Ill. May 5, 2010)..........................................14

*Soppet v. Enhanced Recovery Co., LLC*,

679 F.3d 637 (7th Cir. 2012).............................................................14

*Sterk v. Path, Inc.*,

46 F. Supp. 3d 813 (N.D. Ill. 2014)....................................................11

*Tacoronte v. Tate & Kirlin Assocs.*,

No. 6:13–cv–331, 2013 WL 5970720 (M.D.Fla. Nov. 8, 2013)..........18

*Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*,

401 F.3d 876 (8th Cir.2005)..................................................................4

Statutes And Other Sources

47 USC § 227 (b)(3)...............................................................................13

47 USC § 227(A)(iii)................................................................................3

47 USC § 227(a)(1)................................................................................6

47 USC § 227(b)(2)................................................................................6

*Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    18 FCC Rcd. 14014 (July 3, 2003)......................................................6

*Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    23 FCC Rcd 559 (Jan. 4, 2008)..........................................................7

*Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    30 FCC Rcd. 7961, 2015 WL 4387780 (2015).....................................7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    **PRELIMINARY STATEMENT**

Plaintiff respectfully submits this Memorandum in support of his partial[1] motion for summary judgment against Defendants Credit One Bank, N.A., and GC Services, pursuant to FRCP 56.[2]  The Plaintiff is an eleven-year old child who received hundreds of collection calls from the Defendants, who were attempting to collect a credit card debt from an unrelated third party.  The vast majority of those calls were placed <u>after</u> the infant Plaintiff told the Defendants that he was a kid and that they were calling the wrong person.

The Complaint filed in this action alleged that Credit One Bank violated the Telephone Consumer Protection Act numerous times, in using an autodialer to repeatedly contact the Defendant without his consent.  The Amended Complaint filed in this action clarified that Credit One Bank hired outside dialer vendors such as iEnergizer and GC Services to make these calls.  It is incontrovertible that (1) Credit One hired these vendors to repeatedly call the Plaintiff's cellular phone using an 'auto-dialer' as defined by the TCPA and the Ninth Circuit's holding in *Marks v. Crunch San Diego, LLC,* 2018 WL 4495553 (9th Cir. Sept. 20, 2018), and (2) that the Plaintiff did

---

[1] Plaintiff also has asserted claims for invasion of privacy and violations of the Rosenthal Fair Debt Collection Practices Act, which claims are being left for trial.

[2] Plaintiff has settled with Defendant First Contact.  Plaintiff has further been diligently attempting to serve iEnergizer in India, using counsel specializing in service under the Hague Convention.  Those service efforts are still ongoing.  As iEnergizer is located in a foreign country, the 90-day rule for service of process does not apply.  *See,* FRCP 4(m).  Thus, while Plaintiff is not seeking summary judgment against <u>iEnergizer</u> at this time, he is still seeking summary judgment against <u>Credit One</u> for the calls made by iEnergizer on Credit One Bank's behalf.

not consent to being called by the Defendant.  As the Plaintiff is able to conclusively establish these two basic elements, an award of summary judgment in favor of the Plaintiff's claims is therefore warranted.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir.2011). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   Material facts are those that might affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Once the moving party has met its initial burden, the nonmoving party must go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. A scintilla of evidence or

evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. *Addisu v. Fred Meyer,* 198 F.3d 1130, 1134 (9th Cir.2000). Only genuine disputes over facts that might affect the outcome of the suit under the governing law—*i.e.,* "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party"—will preclude entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## III.   **ARGUMENT**

### A. Plaintiff Is Entitled To Summary Judgment On His TCPA Claims.

The Plaintiff's claim in this action arises under 47 USC § 227, commonly referred to as the Telephone Consumer Protection Act ("TCPA"). That statute provides

> "It shall be unlawful for any person ..... (A) **to make any call** (other than a call made for emergency purposes or made with the prior express consent of the called party) **using any automatic telephone dialing system** or an artificial or prerecorded voice.... (iii) **to any telephone number assigned to a** paging service, **cellular telephone service**, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."

*See,* 47 USC § 227(A)(iii) (emphasis added).

In order to prove that defendant violated the TCPA, there are three elements plaintiffs need to prove: "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Freeman v. Wilshire Commercial Capital L.L.C.*, No. CV 2:15-1428 WBS AC, 2018 WL 1173823, at *2 (E.D. Cal. Mar. 6, 2018), <u>citing</u> *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). Under the TCPA, the

plaintiff is not required to prove intent, because the initial violation itself gives rise to liability: "The TCPA is essentially a strict liability statute" that "does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir.), <u>cert. denied</u>, 132 S.Ct. 553, 181 L.Ed.2d 397 (2011); *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 882 n. 3 (8th Cir.2005) ("The [TCPA] ... makes no exception for senders who mistakenly believe that recipients' permission or invitation existed. The ... issues of knowledge and willfulness ... are material to the question of treble damages").

In this action, Defendant Credit One Bank has admitted that it directly hired outside dialer vendors such as iEnergizer and GC Services to call the Plaintiff.  Credit One therefore is vicariously liable for any violations of the TCPA committed by these dialer vendors at its behest.  *See, Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674, 193 L. Ed. 2d 571 (2016), <u>as revised</u> (Feb. 9, 2016)("the Federal Communications Commission has ruled that, under federal common-law principles of agency, there is vicarious liability for TCPA violations….and we have no cause to question it"); *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574 (2013).

It is undisputed that (1) the eleven-year-old Plaintiff never had a relationship with any of the Defendants, (2) that the Defendants were trying to reach someone other than the infant Plaintiff in making these 'wrong number' calls, and that (3) the Defendants did not have the infant Plaintiff's consent to call his cellular phone.  Discovery in this

4

action has further uncovered that GC Services placed 48 calls to the Plaintiff, while iEnergizer placed 114 calls to the Plaintiff[3]. Each of these calls were placed on behalf of Credit One Bank, and were made via the Aspect Unified IP dialing system. There is therefore a single issue to be decided, in weighing the Plaintiff's entitlement to summary judgment on liability: Did the Defendant, in calling the Plaintiff with the Aspect Unified IP dialer, utilize an 'automatic telephone dialing system', as defined by the statute? If this question is answered in the affirmative, then the Plaintiff is entitled to summary judgment in his favor, along with an award of statutory damages for each call placed by Defendants to his cellular phone.

### B. Defendants Utilized An Automatic Telephone Dialing System In Calling The Plaintiff, In Violation Of The TCPA.

Throughout the litigation conducted in this matter, Defendants have all blankly denied using an Automatic Telephone Dialing System ("ATDS") in their calls to Plaintiff. However, the record is clear that a predictive dialer was used by each of the Defendants to automatically place each call to the Plaintiff. As such, the Defendant's own testimony - along with Ninth Circuit caselaw, Plaintiff's expert witness and admissions from the manufacturer of the Aspect dialing systems used - all conclusively establish that the Defendants did in fact utilize an 'automatic telephone dialing system' in contravention of the TCPA, as set forth below.

---

[3] Defendant First Contact placed an additional 27 calls to the Plaintiff. The Plaintiff has settled with First Contact for $10,000, but the Plaintiff's claims against Credit One for those calls still remain.

5

The beginning of any inquiry into the meaning of the term 'automatic telephone dialing system' logically begins with the statute itself.  The definition of that term is contained in 47 USC § 227(a), under the heading 'Definitions', which provides: "As used in this section, the term "automatic telephone dialing system" means equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *See,* 47 USC § 227(a)(1).

The definition contained in the statute has been expanded by the FCC, in an exercise of its rulemaking powers. 47 USC § 227(b)(2) authorizes and requires the FCC to promulgate regulations to implement the requirements of the TCPA.  In 2003, the FCC exercised those powers and further defined "automatic telephone dialing system" to include predictive dialers. *See, In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 FCC Rcd. 14014, 14091–93 (July 3, 2003). "A predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, *or from a database of numbers*." *Id.* at 14091.  The Commission finds that a predictive dialer falls within the meaning and statutory definition of an 'automatic telephone dialing equipment' and the intent of Congress." *Id.* at 14093.  (emphasis added).  In a response to a request for clarification, the FCC subsequently "affirmed that a predictive dialer

constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 23 FCC Rcd 559, 566 (Jan. 4, 2008).

In 2015, the FCC issued another Order attempting to clarify its position on what capabilities a piece of equipment needs to have, in order to be considered an 'automatic telephone dialing system'.  *See, In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 2015 WL 4387780 (2015). On March 16, 2018, the D.C. Circuit issued its long-awaited decision in *ACA International v. FCC,* 2018 WL 1352922 (D.C. Cir. Mar. 16, 2018), where it set aside certain portions of the FCC's 2015 order.

All of the above background is essentially now irrelevant.  That is because the Ninth Circuit recently issued its decision in *Marks v. Crunch San Diego, LLC*, No. 14-56834, 2018 WL 4495553 (9th Cir. Sept. 20, 2018), which vastly simplified the analysis that a court must do, in order to determine whether a dialing system is considered an 'automatic telephone dialing system' under the TCPA.  The district court in *Marks* had dismissed the plaintiff's TCPA claim, because the system at issue in that case "lacked a random or sequential number generator, and did not have the potential capacity to add such a feature."  *Id.,* at *6.  Finding that "the D.C. Circuit vacated the FCC's interpretation of what sort of device qualified as an ATDS, [and that] only the statutory

definition of ATDS as set forth by Congress in 1991 remains", the Ninth Circuit concluded that "we must begin anew to consider the definition of ATDS under the TCPA." *Id.,* at *7.

After going through the statutory text and the legislative background, the Ninth Circuit rejected the notion that the statutory definition of ATDS is limited to only those devices that have the capacity to call phone numbers produced by a "random or sequential number generator." *Id.,* at *9. Instead, the Ninth Circuit found that the statute "includes devices with the capacity to dial stored numbers automatically." *Id.* Simplifying the standard for TCPA claims in the Ninth Circuit, the *Marks* court held that "accordingly, we read § 227(a)(1) to provide that the term automatic telephone dialing system means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator — and to dial such numbers." *Id.*

There is no possible dispute that the dialing systems used to call the Plaintiff in this case easily meet this definition. Discovery in this case revealed that GC Services used versions 6.7 and 7.3 of the Aspect Unified IP dialing system to call the Plaintiff, and that iEnergizer used the 7.3 version of that same Aspect system. The details and workings of the Aspect dialing system were testified to by Shon Sherman, a compliance manager and legal counsel for GC Services. As reflected by Ms. Sherman's testimony, GC Services placed forty-eight (48) calls to the Plaintiff over an eight-day period,

March 18, 2017 – March 26, 2017.  Specifically, Ms. Sherman testified that either the 'predictive' or 'preview' modes of the Aspect dialing system were used to make these calls, and that these modes are both part of the same dialing system.  *See,* Ex. G, 28:8-14.  Ms. Sherman testified that the 'manual' mode of this dialing system was not used to make these calls.  *See,* Ex. G, 31:24 – 32:1.

The Aspect system is utilized by GC Services as follows: Each day, the dialer manager employed by GC Services receives a file of accounts that Credit One wants GC Services to collect on that day.  *See,* Ex. G, 19:16-19; 44:23-25.  The dialer manager then sets parameters for the accounts and phone numbers to be called that day, for example, deciding to call all accounts that are thirty days delinquent and to call home and cell phones.  *See,* Ex. G, 45:4-11.  The Aspect system will then generate a list of phone numbers to be called, using the parameters set by the dialer manager.  *See,* Ex. G, 45:11-13; 46:8-19; 47:23-25; 53:1-3.  The Aspect system will then place calls to those phone numbers, which are <u>stored</u> in the Aspect system during that time.  *See,* Ex. G, 52:1-5; 58:17 – 59:3.

There are no agents actually on the phone when a call is made in the predictive mode of the Aspect dialing system. *See,* Ex. G, 61:14-18.  Instead, the system launches the calls automatically, working off the list created that morning.  *See,* Ex. G, 62:19-23. If the Aspect dialing system places too many calls, and there are more answered calls than available customer service representatives, the debtor who was called would then

be placed on hold until an agent becomes available to talk to those called debtors. *See,* Ex. G, 67:25 – 68:1-4. A customer service representative using the predictive mode of the Aspect dialing system does not physically input a phone number or select a specific account to call before the system calls that number. *See,* Ex. G, 70:16-23.[4]

The manufacturer of the Aspect dialing system itself swore in no uncertain terms that the Aspect system used by iEnergizer and GC Services "does have the ability to automatically dial customer-provided telephone numbers" and that the Aspect system "through the use of system algorithms, can place the correct number of automatic calls in order to correspond to the number of contact center agents who are or will become available to speak with end users". *See,* Declaration of Don Hudacek, annexed as Exhibit H, ¶5. The manufacturer further went on to state that versions 6.6, 6.7 and 7.3 of the Aspect dialing system "each have predictive dialer capabilities and the ability to automatically dial customer-provided telephone numbers." *See id.,* at ¶9. The manufacturer further confirmed that the Aspect dialing system stores these numbers, stating that "the only telephone numbers that these products can dial are those phone numbers provided by Aspect's customers and users of these products, which they load into the products.....Once the customer-provided phone numbers have been input into the Aspect Unified IP dialer, the product can dial the numbers according to the customer-defined and configured dialing rules." *See id.,* at ¶4.

---

[4] Ms. Sherman indicated that her testimony was the same for the 6.7 and 7.3 versions of the Aspect dialing systems. *See,* Ex. G, 46:10-13.

The Ninth Circuit's holding in *Marks* is directly in line with a number of courts that have focused on the dialing system's ability to make calls without human intervention, not their inability to generate or make up random numbers out of thin air. *See e.g., Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (collecting cases and stating: "the [FCC] has issued decisions stating that an ATDS may include equipment that automatically dials numbers from a stored list without human intervention, even when the equipment lacks the capacity to store or produce telephone numbers to be called, using a random or sequential number generator."); *Moore v. Dish Network LLC*, 57 F. Supp. 3d 639, 655 (finding use of ATDS on summary judgment because "lists of numbers [were] transferred from the Campaign Manager to the dialer hardware without human intervention, and the dialer hardware automatically dial[ed] numbers from those lists"); *Jones v. FMA Alliance Ltd.*, 2013 WL 5719515, at *1 n. 9 (D. Mass., Oct. 17, 2013) ("The FCC determined that 'equipment that dials a list of numbers (such as a business's list of customers), rather than dials random or sequential numbers, is still an ATDS, because 'the basic function of such dialing equipment' is the same—'the capacity to dial numbers without human intervention.'").

There can thus be no question that the Aspect Unified dialing system used by GC Services and iEnergizer in this action is an automatic dialer under the TCPA and under the Ninth Circuit's recent interpretation in *Marks*. The Defendant's testimony regarding the day-to-day usage of the system reflects that this system is a predictive dialer capable

of automatically dialing phone numbers stored in the system.  The manufacturer of the dialing system concurred that the dialing system has these functionalities.

To remove all doubt, Plaintiff even retained Randall Snyder, a dialing systems expert, who similarly opined that the dialing system "it is apparent that the Aspect UIP dialing system provides predictive dialing functionality and many other types of automatic dialing functions that are fundamentally inherent in the system." Declaration of Randall Snyder, annexed as Exhibit I, at ¶37.  Mr. Snyder further opined that the "Aspect Unified IP automatic dialing system is equipment that stored or produced telephone numbers to be called, using a random or sequential number, and dialed such numbers. In addition, the Aspect UIP automatic dialing system is equipment that dialed telephone numbers from a stored list of numbers without human intervention."  *See id.*, at ¶38.  Finally, Mr. Snyder confirmed that the Aspect systems can store phone numbers, opining that "the Aspect UIP automatic dialing system can import lists call records to be stored, (denoted "call tables") for particular dialing campaigns. These call records contain one or more phone numbers to be automatically called by the dialing system." *See id.,* at ¶36.  Defendants have not retained an expert in response.

### C. Plaintiff Is Entitled To Trebled Damages.

The TCPA provides a basic statutory award of $500.00 for each call placed in violation of the statute:  "A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State ... (B) an action to

recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater." *See,* 47 USCA § 227(b)(3)(B). The statute also contains a provision allowing for trebled damages, if the court finds that "the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection…." 47 USCA § 227 (b)(3). "The TCPA is essentially a strict liability statute" and as such, calling parties are liable even for innocent violations of the Act. *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir.), cert. denied, 132 S.Ct. 553, 181 L.Ed.2d 397 (2011). While the $500.00 per call is warranted for innocent mistakes of the law, the trebled damages available under the TCPA are appropriate when the violation is somewhat more egregious.

This is a case that warrants trebled damages. In this action, the eleven-year-old Plaintiff clearly told Credit One on February 22, 2017 that (1) he was just a kid, that (2) they had the wrong number, and that (3) they should stop calling him. Indeed, the Defendant's own account notes reflect that Credit One's representatives spoke with an unidentified 'third party' on February 22, 2017. Credit One has testified that it has no records of what occurred during the February 22nd conversation, so it cannot possibly deny the Plaintiff's sworn recollection of that event. Moreover, despite recording all of its calls, Credit One does not retain calls after ninety days, unless the call results in a payment or a promise to pay. As such, while Credit One recorded that conversation, it conveniently deleted it before this lawsuit was filed five months later, in July of 2017.

After February 22, 2017, Credit One clearly knew that it was not reaching its debtor, that it was calling the wrong person, and that the person being called desired for the calls to stop.  Credit One simply did not care, and continued to call the infant plaintiff another 181 times using automated dialers that "lack human intelligence and, like the buckets enchanted by the Sorcerer's Apprentice, continue until stopped by their true master."  *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 639 (7th Cir. 2012).

The Defendant's intentional conduct in using these automated dialing systems to blast the infant Plaintiff's cellular phone with hundreds of calls was clearly in violation of the TCPA, and was further 'willful', warranting enhanced damages of $1,500.00 per call.  "Most courts have interpreted the willful or knowing standard to require only that a party's actions were intentional, not that it was aware that it was violating the statute." *Davis v. Diversified Consultants, Inc.*, 2014 WL 2944864, at *6 (D. Mass. June 27, 2014), *citing, Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) (holding that the TCPA requires mere "knowing" conduct); *Harris v. World Fin. Network Nat. Bank*, 867 F.Supp.2d 888, 896–97 (E.D.Mich.2012); *Sengenberger v. Credit Control Servs., Inc.*, 2010 WL 1791270 (N.D.Ill. May 5, 2010); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 WL 1154206 (N.D.Ill. Mar. 19, 2013).

On February 22, 2018, the Plaintiff clearly told Credit One to stop calling him, a kid who had no relationship with Credit One.  Credit One is therefore liable in strict liability for the eight calls made up to, and including February 22, 2018, and the Plaintiff

14

should be awarded $500.00 for each of these calls.  The remaining 181 calls made to the infant Plaintiff after February 22, 2018 were all made after Credit One was specifically told that it was calling the wrong number.  Credit One apparently shrugged its collective shoulder and proceeded to act as if that conversation had never occurred, by immediately resuming the campaign of 4-8 calls per day, every day, for another four months.  Furthermore, Credit One knew that its vendors were using these automated dialers to call its customers.[5]  Under such facts, there can be no question that treble damages are warranted in this action.

Treble damages were recently awarded under closely similar circumstances in *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 726–27 (S.D.N.Y. 2015).  In that action, the plaintiff signed up for cable services with TWC and in doing so, agreed to the following terms of service: "We may call any number you provide to us (or that we issue to you) for any purpose, including marketing of our Services.... However, if you ask to have your number placed on our 'do not call' list, we will not call you at that number for marketing purposes....We may use automated dialing systems or artificial or recorded voices to call you." *Id.,* at 722. TWC then placed calls to the *King* plaintiff, mistakenly attempting to reach a different TWC customer named Luis Perez. In October of 2013, the *King* plaintiff called TWC and told them to stop calling her cellular phone. However, TWC continued to place these calls.

---

[5] *See,* Exhibit E, 71:10 – 72:19.

In finding that treble damages were properly awarded for each of the calls following the October 2013 phone conversation, the *King* court found that "After October 3, 2013, TWC had knowledge through its agent that King did not consent to further robo-calls. Therefore, Defendant's subsequent calls were knowing violations and treble damages are appropriate." *Id.,* at 727.  TWC argued against the imposition of trouble damages, claiming that "it is an unwitting victim of an unpredictable statute which was not intended to turn 'what most people think of as an innocuous call to a wrong number' into large damages awards. TWC argues that damages would deter legitimate businesses from reaching out with useful information to customers that wish to be contacted." *Id.* The *King* court rejected this argument finding that "the statute is not unpredictable; companies like TWC are on clear notice that autodialing phones is prohibited by default." *Id.* The district court pointed out that TWC could have still contacted its customer without fear of violating the statute, if it so wished: "A responsible business in TWC's position might have dispatched a live agent to reach out to Luiz Perez after the IVR failed to reach him the first several times…..The responsible company will reduce its exposure dramatically by taking proactive steps to mitigate damages, while its competitor, who unthinkingly robo-dials the same person hundreds of time over many months without pausing to wonder why it cannot reach him, cannot complain about much higher liability." *Id.*

Similar facts were again presented in *Echevvaria v. Diversified Consultants, Inc.,* 13 CIV. 4980 LAK AJP, 2014 WL 929275 (S.D.N.Y. Feb. 28, 2014).  In that action,

16

after receiving a collection call intended for another debtor, the *Echevvaria* plaintiff called the collection agency, advised that it had the wrong number and requested the calls to her cell phone cease.  The collection agency called the *Echevarria* plaintiff's phone an additional 27 times after that date.  The *Echevarria* court accordingly awarded the plaintiff $500.00 for the first call and $1,500.00 for each remaining call, finding that each call placed after that the referenced conversation was placed in willful violation of the statute.

The district court in *Coniglio v. Bank of Am., N.A.*, 2014 WL 5366248 (M.D. Fla. Oct. 21, 2014) was similarly faced with a borrower who instructed his bank to stop calling him.  Citing *Echevarria,* the *Coniglio* court awarded the plaintiff $1,051,000.00, calculated at $1,500.00 per call for each call placed following the request to the caller to cease calling the plaintiff's cell phone.  *See id.,* at \*5.[6]  The district court in *Arbelaez v. Capital Advance Sols., LLC*, No. 15-23137-CIV, 2016 WL 2625020 (S.D. Fla. Jan. 20, 2016) agreed with *Coniglio*, finding that "Plaintiff has established that Defendant knowingly and willfully violated the TCPA and that Plaintiff is entitled to treble damages for all calls received, excluding the first initial call" where the calls continued even after the defendant was specifically told to stop calling on that first call.  *See id.,*

---

[6] The *Coniglio* judgment was entered on default.  After the district court subsequently denied Bank of America's motion to vacate the default judgment, the Bank appealed to the Eleventh Circuit which reversed the denial of that motion.  *See, Coniglio v. Bank of Am., NA*, 638 F. App'x 972, 973 (11th Cir. 2016).  However, the Eleventh Circuit did not disturb or otherwise call into question the willfulness analysis of the district court.

17

at *1-2.  *See also, Tacoronte v. Tate & Kirlin Assocs.*, No. 6:13–cv–331–Orl37DAB, 2013 WL 5970720, at *8 (M.D.Fla. Nov. 8, 2013) (finding, where consumer told collection agency on the first call that they had the wrong number, that "$500 for the first call and $1,500 each for seven additional willful telephone calls," to be an appropriate award in light of the defendant's violations of the TCPA): *Gambon v. R & F Enterprises, Inc.*, No. 6:14-CV-403-ORL-18, 2015 WL 64561, at *5 (M.D. Fla. Jan. 5, 2015)(awarding $1,500.00 per call for each call placed after the *Gambon* plaintiff requested that he be removed from Defendant's dialing system).

The same facts were presented in *Moore v. Dish Network L.L.C.*, 2014 WL 5305960 (N.D.W. Va. Oct. 15, 2014).  The *Moore* plaintiff called Dish Network and requested that the calls cease.  Dish Network continued to call, using a predictive dialer.  The *Moore* court accordingly found that the calls following the call containing the cease and desist request were placed in willful violation of the statute, and accordingly awarded treble damages ($1,500 per call) for those calls.  The same result was reached in *Harris v World Fin. Network Nat. Bank*, 867 F Supp 2d 888, 891 (ED Mich 2012).  The *Harris* plaintiff had called back the debt collection agency, and requested that the calls to her cell phone cease.  The *Harris* court accordingly found that the calls made to the *Harris* plaintiff following the aforementioned telephone conversation to be made in 'willful' contravention of the statute.  *Id.* at 896.

18

The same factors raised in each of the above holdings are present in the instant action. The record is clear that Credit One started calling the infant Plaintiff, trying to reach an unrelated third party who was the prior subscriber of the Plaintiff's cellular phone. On February 22, 2018, the Plaintiff told Credit One that "to stop calling me....I told them I was a minor." *See,* Exhibit C, 44:1 – 45:24. In response the Plaintiff testified that the Credit One representatives "weren't really listening to me" and that "they were just going on about a debt I owed. But I don't owe a debt." *See id.* Even when the eleven-year-old Plaintiff tried calling back Credit One a number of times to stop these calls, he was instead confronted with a mindless interactive voice system, not a human representative. *See,* Ex. C, 30:2-5; 35:21 – 36:1; 48:1-16. Credit One's complete failure to comport to societal norms in refusing to cease its harassment of a child was willful, and as such, this is a case that warrants trebled damages under the statute.

## IV.  **CONCLUSION**

It is therefore respectfully submitted that the Plaintiff's motion for summary judgment on his claims pursuant to the TCPA be granted in its entirety. The Plaintiff has conclusively established that the Defendants called his cellular phone repeatedly using an automatic telephone dialing system without the Plaintiff's prior, express consent. It is therefore respectfully requested that this Court issue an Order, granting summary judgment to the Plaintiff, and awarding the Plaintiff $500.00 per call for each and every one of the calls placed to the Plaintiff by the Defendants. It is further

respectfully requested that the Plaintiff be awarded treble damages of $1,500.00 per call

for the 181 calls placed to the Plaintiff's cellular phone after February 22, 2018, together

with such other and further relief as this Court deems just and appropriate.

Dated:        September 20, 2018

By: /s/ Yitzchak Zelman_____
Yitzchak Zelman (YZ5857)
Marcus & Zelman, LLC
701 Cookman Avenue, Suite 300
Asbury Park, New Jersey 07712
Phone:        (845)367-7146
Fax:   (732) 298-6256
Email:        yzelman@MarcusZelman.com

*Attorney for Plaintiff N.L., an infant by his*
*mother and natural guardian SANDRA LEMOS*

20