**"Exhibit 8"**

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    SACRAMENTO DIVISION

4                        ---oOo---

5   N.L., an infant by his mother    :
    and natural guardian, SANDRA     :
6   LEMOS,                           :
                                     :
7                  Plaintiff,        :
                                     :
8            vs.                     : No.
                                     : 2:17-cv-01512-JAM-DB
9   CREDIT ONE BANK, N.D. and JOHN   :
    DOES 1-25,                       :
10                                   :
                   Defendants.       :
11  _____ :

12

13

14

15

16              DEPOSITION OF SANDRA LEMOS

17                    July 11, 2018

18

19

20

21

22

23

24  Reported by: LAURA AXELSEN, CSR NO. 6173, RMR, CRP, CRR

25  Job No: 143650

1          BE IT REMEMBERED THAT, pursuant to Notice and on

2     Wednesday, July 11, 2018 at 2:07 P.M. thereof at 1215 K

3     Street, 17th Floor, Sacramento, California, before me,

4     LAURA AXELSEN, a Certified Shorthand Reporter,

5     personally appeared

6                         SANDRA LEMOS,

7     called as a witness by the Defendants.

8                         ---oOo---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    APPEARANCES

 2

 3   FOR THE PLAINTIFF:

 4

 5        MARCUS & ZELMAN

 6        BY:  ARI MARCUS, ESQ.

 7        701 Cookman Avenue

 8        Asbury Park, NJ 07712

 9

10   FOR CREDIT ONE:

11

12        CARLSON & MESSER

13        BY:  ALEX WADE, ESQ.

14             DAVID KAMINSKI, ESQ.

15        5901 Wesy Century Boulevard

16        Los Angeles, CA 90045

17

18   FOR GC SERVICES:

19

20        BASSI EDLIN HUIE & BLUM

21        BY:  FARHEENA HABIB, ESQ.

22        500 Washington Street

23        San Francisco, CA 94111

24

25                    ---oOo---
```

1                          INDEX

2

3                                                    PAGE

4  EXAMINATION BY MR. WADE                            5

5                    INDEX OF EXHIBITS

6

7  EXHIBIT          DESCRIPTION                       PAGE

8

9  Exhibit A    Applicant                            26

10  Exhibit B    Request Submission Response          38

11  Exhibit C    Authorization for the Release of     40

12               Cellular/Mobile Phone Records

13

14

15

16                     ---oOo---

17

18

19

20

21

22

23

24

25

1                        SANDRA LEMOS

2          having been duly sworn, testified as follows:

3                    EXAMINATION BY MR. WADE

4              MR. WADE:   Q.  Okay.  Good afternoon.  My name

5      is Alex Wade.  I will be taking your deposition today.

6      Uhm, would you please state your full name for the

7      record and spell your last name?

8          A.  Sandra Simone Perreault Lemos.  L-e-m-o-s.

9          Q.  What was the second name?

10         A.  My maiden name, P-e-r-r-e-a-u-l-t.

11         Q.  Have you ever had your deposition taken before?

12         A.  I have.

13         Q.  Okay.  How many times?

14         A.  Once.

15         Q.  What was the nature of your involvement in that

16     case?

17         A.  It was a lawsuit against a spa.

18         Q.  Were you a party in that lawsuit?

19         A.  Yeah.

20         Q.  Were you plaintiff, defendant?

21         A.  Defendant.

22         Q.  Defendant.  Okay.  So someone sued you?

23         A.  Oh, no, sorry, plaintiff.

24         Q.  Plaintiff?

25         A.  Yeah.  I got burnt in the steam room from an

```
 1   exposed pipe.

 2        Q.  When did this happen?

 3        A.  Oh, 10 years ago.

 4        Q.  Who was your attorney?

 5        A.  Ken Moss.  It was in Canada.

 6        Q.  So the lawsuit occurred in Canada?

 7        A.  Uh-huh.

 8        Q.  Were you deposed in Canada?

 9        A.  Yes.

10        Q.  I assume that suit's now resolved --

11        A.  Yeah.

12        Q.  -- correct?  How did you meet Ken Moss?

13        A.  I was referred to him by a friend.  I used to

14   work at the University of Victoria law faculty.

15        Q.  I'm going to get into your -- kind of your

16   background, but, uhm, now that you've said Victoria law

17   faculty, is this law school?

18        A.  Uh-huh.

19        Q.  Is that in Canada?

20        A.  Uh-huh.

21        Q.  So you lived in Canada?

22        A.  I'm Canadian.

23        Q.  You're Canadian.  Did you -- were you born in

24   Canada?

25        A.  Uh-huh.  I have an American citizenship as
```

1   well, though.

2       Q.   Okay.   Perfect.   How long did you live in

3   Canada?

4       A.   28 years.

5       Q.   All right.   And how long did you work at

6   Victoria law faculty?   Is that the name of the law

7   school?

8       A.   So the university's name is the University of

9   Victoria, and I worked in the faculty of law doing

10  admissions.

11      Q.   Did you, yourself, ever attend law school?

12      A.   No, no, I just dated lawyers.

13      Q.   We're good guys.

14          MR. MARCUS:   Some of us.

15          THE WITNESS:   Yeah.   Not all.

16          MR. WADE:   Q.   It's a good point.   Okay.   I'm

17  going to go over and -- by the way, I'm going to get

18  into a little bit more of your background.   That was

19  just a little precursor.   I'm just going to go over a

20  few ground rules of how we're going to -- how this

21  deposition is going to proceed today, okay?   Uhm, first,

22  are you aware that the court reporter just administered

23  an oath to you?   Do you understand that that oath is the

24  same oath that would be given to you in the court of

25  law?

1       A.  I do.

2       Q.  Okay.  Do you understand that you promised to

3   tell the truth here today under the penalty of perjury?

4       A.  I do.

5       Q.  The court reporter is making a record of this

6   deposition, and she's taking down everything we are

7   saying, so it's important that you answer with a yes or

8   a no instead of shaking your head or nodding.

9       A.  Understood.

10      Q.  Uhm, okay.  The court reporter can only take

11  down one person speaking at a time.  Laura's been great.

12  She types really fast, but she can only type at, you

13  know, one person at a time.  So if you will allow me to

14  finish my question before you answer, I'll extend the

15  same courtesy to you before I ask my next question,

16  okay?

17      A.  Understood.

18      Q.  Okay.  And also I ask that you please listen to

19  my question before you respond.  Uhm, if you don't

20  understand my question, just let me know.  Uhm, and I'll

21  rephrase it or change it.  Uhm, but if you do answer my

22  question, I'll assume that you understood my question.

23      A.  Understood.

24      Q.  Okay.  At some later point, Laura is going to

25  be making a transcript of everything that we say here

1   today.  You will have an opportunity to take a look at

2   that transcript, make changes that you see fit.  Do you

3   agree to review that transcript and make any changes if

4   you need to make any changes?

5        A.  Yes.

6        Q.  Okay.  I will caution you, however, that if you

7   do make any changes, I or some other attorney may

8   comment on those changes later down the road, maybe at

9   trial.  Do you understand that?

10        A.  Yes.

11        Q.  Okay.  And if we do -- if you do make changes

12   to your testimony, that may affect your credibility

13   later down the road.

14        A.  Understood.

15        Q.  Okay.  So it's extremely important for you to

16   listen carefully to my questions and to give your best,

17   most truthful testimony today.  Do you agree to do that?

18        A.  Agreed.

19        Q.  I will be asking questions of events that may

20   have happened years ago.  I'm entitled to your best

21   estimate.  I don't want you to guess.  Uhm, do you know

22   the difference between an estimate and a guess?

23        A.  Yes.

24        Q.  Okay.  All right.  I like to give -- I'll just

25   give a quick example, because I know it's -- those two

1    words can kind of be synonymous at times, but, uhm, if I

2    asked you to -- if I asked you the size of my dining

3    room table at my house, right, you have never seen my

4    dining room table, so that would be a guess.

5          A.   Uh-huh.

6          Q.   Right?

7          A.   Understood.

8          Q.   Right.  If I asked for the size of your dining

9    room table, you would be able to give me an estimate,

10   because you've seen that, correct?

11         A.   Correct.

12         Q.   Okay.  Good.  Then if you need to take a break

13   for any reason, just let me know, and we'll accommodate

14   you as best we can.  If we're in the middle of a

15   question, I'll try to wrap it up as soon as I can, okay?

16         A.   Understood.

17         Q.   All right.  All right.  Is there any reason

18   today that you cannot give your best and most accurate

19   testimony?

20         A.   No.

21         Q.   Have you taken any medications within the past

22   12 hours which may appear -- impair your ability to

23   testify truthfully today?

24         A.   No.

25         Q.   Have you ever consumed -- have you consumed

1   alcoholic beverages in the last eight hours that may

2   affect your testimony today?

3       A.  No, but I wish.

4       Q.  Do you personally feel that you are mentally

5   competent to testify truthfully and completely as

6   required by your oath?

7       A.  Yes.

8       Q.  Is there any reason why you might not be able

9   to do so?

10      A.  No.

11      Q.  Okay.  All right.  And I know you've touched on

12  this a little bit earlier, but I'll ask it again.  Have

13  you ever gone by any other name other than Sandra Lemos?

14      A.  I was married, and I went by Sandra Donahoe.

15      Q.  Okay.  Can we back up?  So we'll start from

16  your birth name, and then we'll work up to today.  Is

17  that okay?

18      A.  Okay.  Sure.

19      Q.  So your birth name?

20      A.  Sandra Simone Perreault.

21      Q.  Okay.  And then a name after that?

22      A.  Sandra Simone Donahoe.

23      Q.  Okay.  And then your name after that?

24      A.  Sandra Simone Perreault Lemos.

25      Q.  Have you ever gone by any other name other than

1   your formal legal name?

2       A.   No.

3       Q.   Okay.  Also, for the record, what is your date

4   of birth?

5       A.   June 16th, 1979.

6       Q.   Okay.  And you said you were born in Canada?

7       A.   Correct.

8       Q.   Lived there for 28 years.  And then where did

9   you move -- where did you move after you lived in

10  Canada?

11      A.   The Bay Area.

12      Q.   The Bay Area.  Okay.  And you've been in the

13  Bay Area ever since?

14      A.   No, we live in -- here, Sacramento.  Granite

15  Bay, to be specific.

16      Q.   Okay.  Are you married?

17      A.   Filed for divorce.

18      Q.   Okay.  And what's your current husband's name?

19      A.   Calvin Carey Lemos.

20      Q.   And when did you file for divorce?

21      A.   Approximately four months ago.

22      Q.   I know that's very personal, so I'm not going

23  to get much into that.  Do you have any children?

24      A.   Two.

25      Q.   Okay.  What are their names?

1        A.   Noah Lemos and Joshua Lemos.

2        Q.   What is your current residential address?

3        A.   6252 Calle Montalvo Circle, Granite Bay.

4        Q.   And how long have you lived there?

5        A.   Approximately three years.

6        Q.   Okay.  This may be -- I want to go back to your

7   residences, uhm, if we can, in the past 20 years.  Would

8   that be -- I don't know if you've moved around and I

9   could -- based off your testimony we could limit that,

10  but for the past 20 years, can we start from, say, the

11  year 2000 to today?

12       A.   Yes.

13       Q.   Okay.  Let's start with the year 2000.  Where

14  did you live?

15       A.   Victoria.

16       Q.   And for how long did you live in Victoria,

17  Canada?

18       A.   Four years.

19       Q.   Then after that, where did you --

20       A.   Vancouver.

21       Q.   Vancouver.  And how long did you live in

22  Vancouver?

23       A.   Eight years, approximately.

24       Q.   Approximately.  Okay.  So that eight years --

25  so that brings us to about 2012 time frame?

1      A.   Uh-huh.

2      Q.   Okay.

3      A.   Maybe it was six years.  Like I said,

4   approximately.

5      Q.   Okay.  So like 2010, maybe?

6      A.   I moved to the U.S. -- let's backtrack from

7   when I moved here.  I moved here when I was 28.  So --

8      Q.   You think it's easier to go from your current

9   residence back?

10     A.   Yeah.

11     Q.   Okay.  Let's do that.  So we have 6252 Calle --

12     A.   Montalvo Circle.

13     Q.   Montalvo Circle.  And you lived there for three

14   years?

15     A.   Uh-huh.

16     Q.   Before then, where did you live?

17     A.   Rocklin, California.

18     Q.   And how many years did you live in Rocklin?

19     A.   Seven.

20     Q.   And before then, before Rocklin, where did you

21   live?

22     A.   Castro Valley, California for approximately a

23   year to a year and a half.

24     Q.   Trying to get a time frame of the year.  So --

25   okay.  So three years ago is 2015.  So around 2015,

1    moved to Granite Bay.  Seven years.  So 28 -- 2008, you

2    moved to Rocklin.  So 2008 to 2015 you lived in Rocklin,

3    approximately.  Uhm, and then Castro Valley, you lived

4    there for a year.  So that would have been from 2007 to

5    2008?

6         A.  Uh-huh.

7         Q.  Okay.  And before then, where did you live?

8         A.  Vancouver.

9         Q.  Okay.  So you moved to the United States in

10   2007?

11        A.  Yes.

12        Q.  Okay.

13        A.  To the best of my memory.

14        Q.  Okay.  Okay.  Uhm, now, I'm going to go back --

15   uhm, okay.  What's your telephone number?

16        A.  (510) 708-9155.

17        Q.  Is that a cell phone?

18        A.  Yes.

19        Q.  Do you have any other phone numbers?

20        A.  No.

21            MS. HABIB:  Excuse me.

22            MR. WADE:  Bless you.

23            MS. HABIB:  Thank you.

24            MR. WADE:   Q.  Do you have a land line?

25        A.  We do at our home, which I do not know.

1      Q.   Do you ever use your land line?

2      A.   No.

3      Q.   You predominantly use your cell phone only?

4      A.   Uh-huh.

5      Q.   How long have you had that cell phone number?

6      A.   Since I moved to the U.S.

7      Q.   So 2007?

8      A.   Yeah, it's a Bay Area area code.

9      Q.   Have you ever had any other phone numbers other

10  than the 510 -- excuse me -- strike that.

11          Have you ever had any other cell phone numbers

12  other than your (510) 708-9155 phone number?

13      A.   No, not in the U.S.

14      Q.   Okay.  Okay.  So when you were in Canada.

15  Okay.  So when you moved to the U.S., that's when you

16  got the 9155 number?

17      A.   Uh-huh.

18      Q.   Okay.  And from 2007 to present, that was the

19  only number you've had?

20      A.   Correct.

21      Q.   You never used any like -- the throwaway phones

22  or anything like that, did you?

23      A.   No, I'm not that shady.

24      Q.   Okay.  All right.  Uhm, going back to your

25  current residence, uhm, do you rent or do you own?

1        A.   Own.

2        Q.   Who do you live with?

3        A.   My two sons, Noah and Josh, and my ex-husband,

4    Carey Lemos.

5        Q.   Did you review any documents in preparation of

6    your deposition today?

7        A.   No.

8        Q.   Aside from -- aside from Noah's attorney, who

9    is also maybe your attorney today -- he's representing

10   you in this deposition -- uhm, have you spoken to anyone

11   today about your deposition?

12       A.   No.

13       Q.   Did you make any notes to maybe refresh your

14   memory --

15       A.   No.

16       Q.   -- before -- did you bring any documents with

17   you to this deposition?

18       A.   No.

19       Q.   Okay.  And I kind of touched on this.  My next

20   question was related to have you ever been involved in

21   any type of legal proceeding?  I know you've been -- you

22   sued a spa company because you got burnt.  That matter

23   is now resolved, but that was back when you were in

24   Canada, correct?

25       A.   Correct.

1       Q.   You haven't had any other legal proceeding?

2       A.   No.

3       Q.   And now you filed for divorce, correct?

4       A.   Correct.

5       Q.   Okay.  You've never been sued?

6       A.   No.  Oh, yes.

7       Q.   When were you sued?

8       A.   Uhm, not really sued.  I don't -- I don't know

9    the legal terms for it, but I had an ex-business partner

10   who was -- I bought her out, and then she was trying to

11   change the terms of payment for the partnership, so she

12   did a small claim, you know?  So I was just served, but

13   not sued.  I don't know if that counts.

14      Q.   Okay.

15      A.   Never went to court.  Two years ago.

16      Q.   Two years ago.  Whatever happened with that?

17      A.   I just negotiated different terms.

18      Q.   So you settled?

19      A.   Uh-huh.

20      Q.   And you resolved it?

21      A.   Uh-huh.

22      Q.   Okay.  Did that ever go to trial?

23      A.   No.

24      Q.   You never went to court?

25      A.   No.

1          Q.   Were you ever -- did you do any depositions in

2     that?

3          A.   No.

4          Q.   Okay.  Have you ever filed for bankruptcy?

5          A.   No.

6          Q.   Have you ever been arrested or convicted of any

7     crime?

8          A.   No.

9          Q.   Ever convicted of a felony?

10         A.   No.

11         Q.   And who represents you in your divorce

12    proceeding?  Who is your attorney?

13         A.   It's a mediator.  Sandra Amara.

14         Q.   You don't have an attorney?

15         A.   Uh-uh.  It's amicable.

16         Q.   How long were you married to Calvin?

17         A.   13 years.

18         Q.   So, uhm -- so we're going back -- looks like

19    2007-ish is when you married, so when you first moved to

20    the states?

21         A.   Uh-huh.

22         Q.   You got married to Calvin?

23         A.   Uh-huh.

24         Q.   Okay.  What does Calvin do?

25         A.   CEO of a software company.

1      Q.   What software company?

2      A.   Retail Pro.  Point of sale.

3      Q.   All right.  I want to get into your -- a little

4   bit of your background.  What's your highest level of

5   education?

6      A.   Bachelor's degree.

7      Q.   Where did you get your Bachelor's from?

8      A.   University of Victoria.  I should say -- yes,

9   but then I also did continuing education at University

10  of British Columbia.  I did software engineering.  So I

11  guess -- so I did like an 18 month certification

12  software engineering after.

13     Q.   You said eight months?

14     A.   Eighteen months.

15     Q.   Eighteen months.  And you got your Bachelor's

16  in what, in what field?

17     A.   Business and economics.

18     Q.   Business economics.  And did you -- did you

19  obtain a software certificate?

20     A.   Uh-huh.

21     Q.   I know you attended school for the 18 months,

22  and you completed that and got your certificate?

23     A.   Correct.

24     Q.   Okay.  Do you have any other degrees, diplomas,

25  certificates?

1        A.   I'm a certified Pilates instructor.

2        Q.   Okay.  All right.  Are you currently employed?

3        A.   Self-employed.

4        Q.   What do you do?

5        A.   I own a yoga/Pilates/barre studio.

6        Q.   How long have you been doing that?

7        A.   10 years.

8        Q.   Do you have a -- what number -- do your clients

9   call you if they want to get a hold of your --

10       A.   The studio number.

11       Q.   Okay.  What's your studio number?

12       A.   I would have to look it up, to be honest.

13       Q.   Do you know any of the digits, the last four?

14       A.   No, I don't, because it's saved in my phone.

15       Q.   Okay.  So the number you give to your clients,

16   it's a business phone number --

17       A.   Yeah.

18       Q.   -- that you give to them for them to call if

19   they need to get a hold of you, correct?

20       A.   Correct.  Some have my cell phone.

21       Q.   Where did you work before you worked -- before

22   you were self-employed as a Pilates instructor?

23       A.   The last place I was employed was called

24   Unisoft Software Company in Vancouver, and they were a

25   retailer for -- or a reseller for Accpac software.

1    Q.  What years did you work for Unisoft?

2    A.  The year before I moved here.

3    Q.  So 2006?

4    A.  Yeah, approximately.

5    Q.  So you moved here in 2006 -- well, you worked

6    at UNICEF -- UNICEF?

7    A.  Unisoft.

8    Q.  Soft.  That's what I thought I heard.  You

9    worked there for a year in 2006.  In 2007, you moved

10   here?

11   A.  Uh-huh.

12   Q.  Uhm, you were self-employed for 10 years, so

13   2008 -- so you were unemployed for about a year when you

14   moved to the states?

15   A.  Correct, because I did not have my green card.

16   Q.  Okay.  Got it.

17   A.  Hence the birth of baby Stewie.  That's my

18   secret nickname for Noah.

19   Q.  For Noah, okay.  I figured, because he's the

20   oldest.  And you got your green card after?

21   A.  Uh-huh.

22   Q.  Okay.  How did you meet your husband?

23   A.  We both worked in software.

24   Q.  Okay.  He just continued to work his way up?

25   A.  Uh-huh.

1       Q.   Okay.

2       A.   He was the V.P. of sales --

3       Q.   Okay.

4       A.   -- for the company that I was selling for.

5       Q.   Got it.

6       A.   The business partner.

7       Q.   Okay.

8       A.   Because they don't do direct.

9       Q.   Okay.  So --

10      A.   It's a channel business.

11      Q.   Okay.  So you guys were both involved in

12   software.  Okay.

13      A.   Uh-huh.

14      Q.   And you guys -- okay.  It was about 2008.  All

15   right.  What's your -- well, you're self-employed.  What

16   are your job duties?  Are you a Pilates -- your current

17   job that you have, your self-employment.  And what's the

18   name of your studio again?

19      A.   Exercise Elevate.

20      Q.   What's your job duties there?  Are you strictly

21   a Pilates instructor?

22      A.   I do everything.

23      Q.   I do everything?

24      A.   Payroll, HR, hiring, training.

25      Q.   How many employees do you have?

1      A.   Five currently.

2      Q.   And you've ran -- you've been self-employed --

3  has that Pilates studio grown over the years, or has it

4  been relatively smaller?

5      A.   I had three studios at one time.

6      Q.   Oh, wow.

7      A.   I sold one.  I closed one.  And I just have the

8  downtown studio, which I was granted 150K by the City to

9  come and open downtown.

10     Q.   Okay.  Since you're self-employed, what title

11 do you give yourself?

12     A.   Owner.

13     Q.   Owner.  Okay?

14     A.   CEO of Sandra Enterprises.

15     Q.   Sandra Enterprise.  Is that the business entity

16 that you have your yoga studio under?

17     A.   No, it's called Three Second, LLC.

18     Q.   When did you open that LLC?

19     A.   Ten years ago.

20     Q.   And you opened that LLC with the purpose of

21 opening your own --

22     A.   Uh-huh.

23     Q.   -- Pilates studio, correct?  And you mentioned

24 Sandra, Incorporated or --

25     A.   I was just kidding.

1    Q.  Okay.  Got it.

2    A.  Just being facetious.

3    Q.  Nah, I figured.

4    A.  But that is a good one for the next move.

5    Q.  Three Second, LLC.  Okay.  And is Three Second,

6  LLC still the business entity that your Pilates studio

7  currently runs under?

8    A.  Correct.

9    Q.  Okay.  Have you ever had a Credit One credit

10  card?

11         MR. KAMINSKI:  Credit One Bank credit card.

12         THE WITNESS:  No, not to the best of my

13  recollection.  I've had quite a few credit cards over

14  the years but --

15         MR. WADE:   Q.  Okay.  To the best of your

16  recollection, what credit cards have you had?

17    A.  Visa.  Mastercard.

18    Q.  Do you know the entities that owned those

19  credit cards?  Visa is usually the actual -- do you know

20  if it was --

21    A.  I don't.  I'd have to log into my bank to find

22  out what the d/b/a is, you know?  Because I have an Ann

23  Taylor card, and I have no idea who -- I think Chase.

24    Q.  Chase.  Well, any names.  So Ann Taylor, you

25  have?

1        A.   So Wells Fargo.

2        Q.   Okay.

3        A.   Chase.  Ann Taylor.  Nordstrom.  Macy's.

4   Victoria's Secret.  Banana Republic.  Kohl's.  There's a

5   lot.  And that's the best of my recollection.

6        Q.   Okay.  You do not remember having -- opening an

7   Credit One Bank credit card?

8        A.   No.

9             MR. WADE:  Okay.  I'm going to show you --

10   we'll mark this as -- maybe we should continue the

11   exhibits, or should we go back to A, since that is

12   different deposition?  We could continue on our -- in

13   order and mark this as Exhibit D?

14             MR. MARCUS:  It's your deposition.

15             MR. WADE:  I'm going to mark it as Exhibit D.

16   Okay.

17             MS. HABIB:  I would start over since it's

18   separate.

19             MR. WADE:  Okay.  Yeah.  Let's start over.

20   We'll mark it as Exhibit A.

21             (EXHIBIT A WAS MARKED FOR IDENTIFICATION.)

22             MR. MARCUS:  Do you have any more copies?

23             MR. WADE:  Yes, I have one more.

24             MS. HABIB:  That's fine.

25             MR. MARCUS:  I guess we'll share.

1          MS. HABIB:  Yeah.

2          MR. WADE:   Q.  If you could please take a look

3   at that before I ask my questions.

4        A.  Uh-huh.

5        Q.  Okay.  I would like to advise to you that this

6   is a screenshot of an application for Credit One Bank,

7   okay?

8        A.  Uh-huh.

9        Q.  Uhm, what does the -- where it says first name

10  and last name, what does it say?

11       A.  Sandra Lemos.

12       Q.  And under that, do you see an address?

13       A.  Correct.

14       Q.  Can you read the full address?

15       A.  1295 So. Fillmore Avenue, Bloomington,

16  California.

17       Q.  Have you ever lived at that address?

18       A.  No.  May I say something?

19       Q.  Sure.

20       A.  This is awesome.  My husband's prior wife was

21  Sandra Lemos.

22          MR. KAMINSKI:  Oh.

23          THE WITNESS:  How does that happen?  Right.

24          MR. WADE:   Q.  Interesting.  Very interesting.

25       A.  It was an ugly divorce.  She opened up a whole

1   bunch of credit cards right before separation was filed,

2   because he was doing business in Mexico City.  So I

3   don't know if that has anything to do with it, but I

4   have a sneaking suspicion that any Credit One credit

5   card was opened up by Sandra Lemos.  What is her last

6   name now?  Becker.  Sandra Becker.

7            MR. KAMINSKI:  Sandra Becker.  You wouldn't

8   happen to know her Social Security number or her current

9   whereabouts?

10            THE WITNESS:  Her current whereabouts is in

11   Murphys, California.

12            MR. MARCUS:  Do you know her date of birth.

13            THE WITNESS:  I don't, but my obvious

14   husband -- ex-husband would know.

15            MR. MARCUS:  What about her middle name?

16            THE WITNESS:  I don't.

17            MR. MARCUS:  Okay.

18            MR. KAMINSKI:  Thank you.

19            MR. WADE:   Q.  Can you read that phone number?

20   And when I say that, on Exhibit A that we're looking at,

21   could you just read it for the record, please?

22       A.   █████████████ .

23       Q.  Oh, my apologies.  There's a number under

24   Bloomington.

25       A.   █████████████ .

Page 29

1      Q.   And then can you read the other number that you

2   just read?

3      A.   ██████████████ .

4      Q.   Do any of those phone numbers look familiar?

5      A.   Uh-uh.

6      Q.   Can you read the Social Security number,

7   please?

8      A.   ████████████ .

9      Q.   Is that your Social Security number?

10     A.   No.

11     Q.   Does that Social Security number look familiar?

12     A.   No.

13          MR. MARCUS:  Can I just ask a question?

14          MR. WADE:  Sure.

15          MR. MARCUS:  In 2001, was your name Sandra

16   Lemos?

17          THE WITNESS:  No.

18          MR. MARCUS:  Okay.  I think this was opened in

19   2001.  Look on the bottom right.  Unless that's

20   indicating something else.

21          MR. WADE:   Q.  Right.  Right.  What did your

22   soon to be ex-husband -- when did he divorce from his

23   first wife or from Sandra Lemos?

24     A.   I don't know.  Approximately seven years before

25   we met.

1      Q.   How many times has your current husband been

2   married?

3      A.   Just twice.

4      Q.   Twice?

5      A.   To the best of my knowledge.

6      Q.   So we'll call you Sandra 2.  And no offense.

7   You're just second in line.

8      A.   Oh, this is so good.  This is going to be some

9   good dinner party talk tonight.

10      Q.   So there's only been a Sandra one -- he's only

11   been married to Sandra 1 and Sandra 2, correct?  He has

12   been married to --

13      A.   Correct.

14           MR. MARCUS:  His mom's name is not Sandra, is

15   it?

16           THE WITNESS:  No.

17           MR. MARCUS:  Okay.

18           THE WITNESS:  That would be really creepy.

19           MR. MARCUS:  Uh-huh.

20           MS. HABIB:  If she knows her date of birth --

21           MR. KAMINSKI:  We did.  We did.

22           MR. WADE:   Q.  Did you personally know Sandra

23   Lemos 1?  I hate to say it any other way but that's --

24      A.   I've had contact with her because I have a

25   stepson.

1     Q.   Okay.

2     A.   So I threw a graduation dinner for him when he

3  graduated, and I've had contact with her a handful of

4  times when he was a minor.

5     Q.   What's your stepson's name?

6     A.   Connor.

7     Q.   And what's his last name?

8     A.   Lemos.

9     Q.   How many kids does your husband -- your current

10 husband have?

11    A.   Three.

12    Q.   And what are their names?

13    A.   Noah Lemos, Joshua Lemos, Connor Lemos.

14    Q.   Okay.  Okay.  I kind of want to go back to your

15 credit cards a little bit.  You did a good job of names.

16 I have eight credit cards here.  Uhm, did you ever fall

17 behind on any of those credit cards?

18    A.   Not to the best of my knowledge.  But, well, I

19 mean, maybe once or twice.

20    Q.   Did any of these companies call you regarding

21 your debt?

22    A.   No.

23    Q.   Did they ever call you?

24    A.   Well, I've had reminder from Chase for my

25 business banking.

1       Q.   Okay.

2       A.   I get confused paying a lot of bills, and

3  because my mail goes to a doorman -- because the

4  mailman, when he delivers mail, I'm not always open or

5  there.  So it goes to the 800 Jay Loft.  It's an

6  apartment building.  And half of the time, it never

7  makes it to me.

8       Q.   So it's safe to say you've paid your bills on

9  time for the most part?

10      A.   Yes.

11      Q.   I think -- and aside from your business line of

12  credit with Chase Bank, you paid your other bills on

13  time?

14      A.   Correct.

15      Q.   And those companies have not called you seeking

16  to --

17      A.   Correct.

18      Q.   -- for you to repay a debt?

19      A.   Correct.

20      Q.   And they haven't called you, aside from the

21  Chase reminders for your business line, correct?

22      A.   Correct.

23      Q.   When you applied for those credit cards did you

24  provide a phone number?

25      A.   Yes.

1       Q.   What number did you provide?

2       A.   (510) 708-9155.

3       Q.   And that's the only number you would have

4   provided, right?

5       A.   Correct.

6       Q.   Would you provide your husband's cell phone

7   number, your current husband's cell phone number?

8       A.   No.

9       Q.   Was he ever a user on these accounts, on these

10  credit cards?

11      A.   No.

12      Q.   Were any of your sons ever users of these

13  credit cards?

14      A.   No.

15      Q.   Did your sons ever use any of these credit

16  cards?

17      A.   No.

18      Q.   Never?

19      A.   No.

20      Q.   Okay.

21      A.   They may have tried unsuccessfully, or

22  connected them to in-app purchases.

23      Q.   How do you make payments on these credit cards?

24  Do you --

25      A.   Wells Fargo on-line banking.

1       Q.   Is it like an automatic pay thing?

2       A.   (Nods head.)

3       Q.   Do you ever use your cell phone to make

4  payments on these?

5       A.   Yes.

6       Q.   And -- and do you call the actual company or do

7  you just --

8       A.   Do it on the app.

9       Q.   On the app, all through Wells Fargo?

10      A.   Yeah.

11      Q.   Okay.  Okay.  I just want to make sure I'm

12  clear.  The only time you fell behind on a debt was with

13  your business line of credit with Chase Bank, correct?

14      A.   Correct.  There is potential that I was -- I

15  fell behind on a personal when I was traveling.

16      Q.   But they never contacted you?

17      A.   Not to the best of my knowledge.

18      Q.   Who is your cell phone provider?

19      A.   Metro PCS.

20      Q.   Since you first obtained the phone in 2007?

21      A.   No.  It was AT&T, and then when I acquired the

22  phones for the -- my sons, I switched over to Metro.

23      Q.   What's Josh's cell phone number?

24      A.   I would have to look it up.

25      Q.   What's Noah's cell phone number?

1        A.   I would have to look it up.  If you want me to,

2    I can.

3        Q.   No, that's okay.

4        A.   But I don't have it memorized.  Such a shame

5    that we don't memorize numbers anymore.

6        Q.   When did you switch over from AT&T to Metro

7    PCS?

8        A.   Approximately a year and a half ago.  The date

9    was when Noah and Josh's numbers were issued.

10       Q.   So you were with AT&T from, say, 2007 -- year

11   and a half ago brings us to early 2017, late 2016?

12       A.   Correct.

13       Q.   And then you're currently with Metro PCS?

14       A.   Uh-huh.

15       Q.   What type of calling plan do you have?

16       A.   Four lines for $100.

17       Q.   And those four lines -- who are on those four

18   lines?

19       A.   My mother, Noah, Josh, and myself.

20       Q.   What's your mother's name?

21       A.   Elaine Greggain, G-r-e-g-g-a-i-n.

22       Q.   What's your father's name?

23       A.   Wayne.

24       Q.   Last name?

25       A.   Perreault.

1      Q.   And what type of plan?  Is it an unlimited

2   plan?

3      A.   Correct.

4      Q.   Who pays for your cell phone bill, the Metro

5   PCS cell phone bill?

6      A.   Me.

7      Q.   You pay for all four lines?

8      A.   Correct.

9      Q.   Why did you get your son -- sons -- son Noah --

10   I'll specify Noah.  Why did you get Noah a cell phone?

11      A.   Because he was starting to stay home alone or

12   go to friends or go to the mall and shop, wander by

13   himself when I was at the mall.  I would sit at Gordon

14   Biersch.

15      Q.   So you got Noah and Josh a phone at the same

16   time?

17      A.   Correct.

18      Q.   Although Josh is a little bit younger?

19      A.   Correct.

20      Q.   Was your personal cell phone -- are all four

21   lines -- they're all cell phone numbers, correct?

22      A.   Uh-huh, correct.

23      Q.   And you simply applied with Metro PCS, and you

24   were able to keep your same number that you had with

25   AT&T?

1        A.   Correct.

2        Q.   And how did the other three get their phone

3   numbers?

4        A.   They were just randomly assigned.

5        Q.   Randomly assigned by Metro PCS?

6        A.   Yes.

7        Q.   Whose name is in your -- whose name is on your

8   cell phone bills?

9        A.   Mine.

10        Q.   Just your name?

11        A.   Correct.

12        Q.   Not your current husband's name?

13        A.   Correct.  Ex.

14        Q.   Well, he's technically still?

15        A.   Technically.

16        Q.   I hate to say.

17        A.   I --

18        Q.   We can call him your ex-husband.  How about

19   that?

20        A.   Can we, please?  Because to be honest, I feel

21   like I want to be from, like, a middle eastern country

22   where I can just say I divorce, we divorce, I divorce

23   you, and that's it.  And then we don't have to file or

24   go through any ugly proceedings.

25        Q.   Right.  I hear you.

1       A.   Like when you're done, you're done.

2       Q.   I agree.  So your number was the only number

3   that you were able to keep from AT&T to Metro PCS?

4       A.   Yes.

5       Q.   Okay.  Does anyone else use your cell phone

6   number?

7       A.   No.

8       Q.   Just you?

9       A.   Uh-huh.

10      Q.   Okay.  Did you ever use your son's cell phone?

11      A.   No.

12      Q.   Never?

13      A.   Uh-uh.

14      Q.   Did you ever call Credit One Bank?

15      A.   No.

16           MR. WADE:  All right.  I want to mark this as

17   Exhibit B, another --

18           THE WITNESS:  I can't wait to see what that is.

19           MR. WADE:  It's a surprise.

20           (EXHIBIT B WAS MARKED FOR IDENTIFICATION.)

21           (Discussion off the record.)

22           MR. WADE:   Q.  Give it to Ari first for him to

23   take a look.  And Farheena, if you can take a look.

24           Let me know when you're ready.

25      A.   Uh-huh.  I'm ready.

1      Q.   Oh, you're ready?

2      A.   Uh-huh.

3      Q.   I'd like to advise to you that this is part of

4   the, uhm -- we subpoenaed Noah's cell phone records, and

5   as you can see, it says T-Mobile at the top.  Uhm, these

6   are the records that T-Mobile provided to us.  Okay.

7      A.   Understood.

8      Q.   Uhm, are you the subscriber of the 9847 number?

9      A.   I believe so.  But since I don't know the other

10  numbers, I can't say a hundred percent.

11     Q.   Okay.  Let's go down to the address.  What does

12  that address say?

13     A.   6252 Calle Montalvo Circle, Granite Bay,

14  California.

15     Q.   Is that your current address?

16     A.   Correct.

17     Q.   Now, you said there was another Sandra Lemos.

18  Do you -- to the best of your knowledge, do you know if

19  the other Sandra Lemos ever lived at the 6252 Calle

20  Montalvo Circle address?

21     A.   No, not to the best of my knowledge.  Certainly

22  not when I've been living there.

23     Q.   Did you provide this address to -- well, Metro

24  PCS -- it looks like T-Mobile bought Metro PCS.

25     A.   Okay.

Page 40

1      Q.   Okay.  Did you provide this address to -- we'll

2   call it T-Mobile.  Is that fair?

3      A.   Sure.

4      Q.   Did you provide that address to T-Mobile?

5      A.   Yes.

6           MR. WADE:  Okay.  And I'm going to mark this as

7   Exhibit C.

8           (EXHIBIT C WAS MARKED FOR IDENTIFICATION.)

9           (Discussion off the record.)

10           MR. WADE:   Q.  Give that to Farheena.

11           Let me know when you're ready.

12      A.   Gotcha.

13      Q.   Does this form look familiar to you?

14      A.   Yes.

15      Q.   Okay.  What is it?

16      A.   Authorization for the release of cellular

17   mobile phone records.

18      Q.   Did you sign this document?

19      A.   Yes.

20      Q.   What's the phone number that you see at the

21   bottom?

22      A.   (916) 308-9847, which is -- must be Noah's

23   phone number.

24      Q.   And did you handwrite in that address as well?

25      A.   Yes.

1      Q.   Okay.  So now we could -- for the record, we

2  could say that the (916) 308-9847 number is Noah Lemos's

3  cell phone number?

4      A.   Yes.

5      Q.   Okay.  Can we go back to Exhibit B, please?  If

6  you look under device detail.  Okay.

7      A.   Uh-huh.

8      Q.   It says, "Phone model ICCIMSIMDN."  If you go

9  all the way down to MSISDNNO, could you please read that

10  number?

11      A.   (916) 308-9847.

12      Q.   Is that Noah's cell phone number?

13      A.   Yes.

14      Q.   Okay.  Are you the subscriber of the 9847 phone

15  number?

16      A.   Yes.

17      Q.   Do you know if anyone else uses the 9847 phone

18  number?

19      A.   No.

20      Q.   Does your husband use the 9847 number?

21      A.   No.  Ex.

22      Q.   Ex-husband.

23      A.   For the record.  Strike that.

24      Q.   I'll get that right.  Did you ever personally

25  write to Credit One Bank?

1      A.   No.

2      Q.   Did you ever mail anything to Credit One Bank?

3      A.   No.

4      Q.   Did Credit One ever call you?

5      A.   No, not to the best of my knowledge, but I only

6  answer phone calls if I know the number.

7      Q.   Okay.  Did you have an actual telephone

8  conversation with Credit One?

9      A.   No.

10      Q.   And you never made a call to Credit One Bank,

11  correct?

12      A.   No.

13      Q.   And earlier you stated that, uhm, your son Noah

14  Lemos never used your credit cards, correct?

15      A.   Correct.

16      Q.   Are you aware that -- are you aware of Noah

17  Lemos allegedly receiving calls from Credit One Bank?

18      A.   I am.

19      Q.   And how do you know?

20      A.   Because his phone would ring up to 10 times a

21  day.

22      Q.   And how do you know it would ring up to 10

23  times a day?

24      A.   Because I'm his mother and he lives with me.

25      Q.   So you would hear his phone ring 10 times a

1    day?

2         A.   Uh-huh.

3         Q.   Or -- did Noah ever tell you about these calls?

4         A.   Yes.

5         Q.   What did he say?

6         A.   He's being harassed by Credit One.

7         Q.   What did you do?

8         A.   I told him to tell them to stop calling.

9         Q.   Did you ever tell Credit One to stop calling?

10        A.   Not personally.  He did.

11        Q.   Why didn't you call Credit One Bank back if

12   your son were receiving harassing calls -- allegedly

13   receiving harassing calls?

14        A.   Because he did.

15        Q.   He did?

16        A.   Uh-huh.

17        Q.   When did he?

18        A.   We were driving home from school one day, and I

19   heard him --

20        Q.   You heard him?

21        A.   -- tell them that they have the wrong number.

22   He doesn't have any debt, and he's a minor.

23        Q.   Do you know when that was?

24        A.   February.

25        Q.   February?

1        A.   Around February 21st to the 28th.

2        Q.   What year?

3        A.   Approximately 2017.

4        Q.   What -- and just for clarification purposes,

5   did Noah call Credit One Bank, or was that an alleged

6   call from --

7        A.   It was an alleged call from Credit One.

8        Q.   Do you know what time of day?

9        A.   Afternoon.

10       Q.   Okay.  And how many times have you heard Noah

11   pick up the phone and say -- or have a conversation with

12   a person alleging to be Credit One.

13       A.   Three, to the best of my knowledge.

14       Q.   So what happened on the other two occasions,

15   and when?

16       A.   I only specifically remember the 21st.  And

17   shortly thereafter, I remember him receiving a call and

18   kind of reiterating the same thing and saying stop, stop

19   calling me.  And -- but he's a prankster, so sometimes

20   he pretends -- if a creditor calls him, he'll say, Can I

21   please order a large pepperoni pizza?

22       Q.   Okay.

23       A.   So I never know if he's joking or serious, but

24   I do know on February 21st.

25       Q.   That -- and you said other creditors would call

1   him.  Do you know what other creditors were calling his

2   phone?

3        A.  I don't.

4        Q.  Did he get a lot of calls from creditors?

5        A.  Uh-huh.

6        Q.  And you don't know who they were?

7        A.  No.

8        Q.  When you say a lot, how many are we talking?

9        A.  Well, like I said, 10 a day.  Sometimes

10  anywhere from 2 to 10.

11       Q.  And are you with Noah all day?

12       A.  No, he's at school.

13       Q.  So since you testified your personal knowledge

14  that you've heard him get 10 calls a day, is it fair to

15  say that all those calls would be when he's home after

16  school during the afternoon?

17       A.  No.

18       Q.  Okay.

19       A.  Those are just the ones that I was around for.

20  I do know that his phone would go off at school, because

21  he takes his phone to school with him.

22       Q.  So you, yourself, personally heard 10 calls in

23  a day?

24       A.  Approximately.

25       Q.  Approximately.  And that would be --

1        A.   Five to 10.

2        Q.   -- after --

3        A.   After school.

4        Q.   After school.   Okay.

5        A.   And so there was some happening during school.

6        Q.   During school.   Okay.   And when I say after

7    school, what time do you pick -- strike that.

8             Do you pick Noah up from school?

9        A.   Yes.

10       Q.   What time do you pick him?

11       A.   2:30.

12       Q.   Every day?

13       A.   Yes.

14       Q.   Okay.   Does he do any sports?

15       A.   Yes.

16       Q.   What does he do?

17       A.   Tennis.

18       Q.   And when's his tennis practice?

19       A.   Thursdays.

20       Q.   What time?

21       A.   5:30.

22       Q.   'Til?

23       A.   7:00.

24       Q.   Aside from -- and is that every Thursday?

25       A.   Yes.

1      Q.   For how long for the past?

2      A.   Two years.

3      Q.   Two years?

4      A.   Three.  Maybe three.

5      Q.   Does he do anything else other than tennis?

6      A.   He takes viola lessons.

7      Q.   Okay.  When are his viola lessons?

8      A.   Tuesdays at 3:05.

9      Q.   Until?

10     A.   3:45.

11     Q.   Is it fair to say you pick him up every day

12  Monday through Friday at 2:30?

13     A.   Yes.

14     Q.   And then on Tuesdays you take him to his viola

15  lessons, correct?

16     A.   Uh-huh.

17     Q.   And then on Thursdays you take him to his

18  tennis?

19     A.   Tennis.

20     Q.   At 5:30?

21     A.   Yeah.

22     Q.   So on Tuesdays it seems like it's a quick

23  turnaround.  He has school, and he has to go right to

24  viola lessons, correct?

25     A.   Yeah.

1      Q.   And he's there for about 45 minutes to an hour?

2      A.   Uh-huh.

3      Q.   And you pick him up again?

4      A.   Uh-huh.

5      Q.   Aside from Tuesdays and Thursdays, does Noah do

6   anything else after school?

7      A.   No, not currently.

8      Q.   And what does he do after school when you pick

9   him up?

10      A.   Comes home, does his homework, has a snack, and

11   games.

12      Q.   Okay.

13      A.   If he's not hanging out with a friend.  And if

14   he's hanging out with a friend, he's probably gaming

15   too.

16      Q.   Okay.  Have you ever taken Noah's cell phone

17   away?

18      A.   Yes.

19      Q.   Do you know when?

20      A.   No.

21      Q.   Do you know how often?

22      A.   You only have to once or twice.

23      Q.   Okay.

24      A.   They figure it out.

25      Q.   How long would you say you took his phone away

Page 49

1   for?

2       A.   A couple of days.

3       Q.   A couple of days each time?

4       A.   Yeah.   To the best of my memory.   It's pretty

5   comical when you take a kid's phone away and the world

6   comes to an end.   And that's when you explain what first

7   world problems are.

8       Q.   I agree.   Do you -- and so Monday, Wednesday,

9   Friday, you pick him up from school at 2:30.   He goes

10  home, does homework.   Plays video games.   What time do

11  you guys eat dinner?

12      A.   Usually between 5:00 and 6:00.

13      Q.   Does he have his cell phone at the dinner

14  table?

15      A.   Sometimes.

16      Q.   Sometimes?

17      A.   I discourage it.

18      Q.   Okay.   And do you -- does Noah have a bedtime?

19      A.   Yes.

20      Q.   What's his bedtime?

21      A.   9:00.

22      Q.   Does he have a time where you don't allow him

23  to go on his cell phone after a certain period of time?

24      A.   He's not supposed to go on it after 9:00.

25      Q.   Okay.

1      A.   I -- you would have to ask him if he goes on it
2  after 9:00.
3      Q.   And in your opinion from 2:30 -- we'll say
4  2:30, because I'm keeping -- he's in school from 8:30 to
5  2:30.
6      A.   Uh-huh.
7      Q.   Is he always on his phone?
8      A.   No.
9      Q.   On average, how many calls a day do you think
10 he gets?
11     A.   Now that Credit One doesn't call him anymore,
12 zero.
13     Q.   Okay.  How many calls do you think he makes a
14 day?
15     A.   Pretty close to zero.
16     Q.   When did the calls from Credit One stop -- or
17 the calls allegedly from Credit One stop?
18     A.   I don't know.
19     Q.   Do you have an estimate?  Two months ago?
20 Three months ago?
21     A.   I really -- like I would -- some months ago.
22 But I don't really remember.  It was probably like three
23 to four months, potentially, after he got the phone.  So
24 those calls happened in a very short time span.  I think
25 once he figured out the, like, app is when they stopped.

1        Q.  Uhm, let's go back to Exhibit B, please.

2   Exhibit B.

3        A.  Uh-huh.

4        Q.  Excuse me.  Okay.  That's it.  What -- so we

5   earlier talked about that that's Noah Lemos's cell

6   phone, correct?

7        A.  Right.

8        Q.  What's the date that you see on there?

9        A.  The date of --

10       Q.  Subscriber name, effective date.

11       A.  Subscriber name, December 19th, 2016.

12       Q.  Does that sound about right, when Noah first

13   got his phone?

14       A.  Uh-huh.

15       Q.  So December 19th, 2016, Noah gets his cell

16   phone.  When did he start receiving calls from --

17   alleged calls from Credit One?

18       A.  Immediately after, I think, or shortly after.

19       Q.  So into the new year or at the end of the?

20       A.  I would say probably within that week or two.

21       Q.  And how long did those calls persist?

22       A.  Until -- I'm going to estimate March.

23       Q.  March what year?

24       A.  2017.  Possibly April.

25       Q.  And you never answered any of those calls,

Page 52

1    correct?

2         A.   Correct.

3         Q.   Okay.  I want to get into this.  You mentioned

4    an app.  What app are you referring to?

5         A.   There's a native app to Metro PCS that's on

6    your phone, and I believe it's a call blocker, stop

7    calling.  I've never used or seen it.

8         Q.   Do you know what the app is called?

9         A.   I don't.

10        Q.   It's like a call blocker?

11        A.   Uh-huh.

12        Q.   And how did you learn of this app?

13        A.   Through Noah.

14        Q.   Do you have that app on your phone?

15        A.   Not to the best of my knowledge.

16        Q.   Have you ever used that app on your personal

17   phone?

18        A.   No.

19        Q.   And when did Noah tell you about this app?

20        A.   When Kevin Crick called the number, I was

21   picking him up from school, approximately 2:30.  He

22   answers the phone and says, Mom, a lawyer's on the phone

23   and wants to talk to you.  And I was like thinking it

24   was one of his pranks.  And he goes as far as to have

25   his friends prank call so they can prank me.  So I

1    literally was like, don't prank a prankster.  But when I

2    started to talk to Kevin, he was like I'll send you some

3    information.  I'll send it to your e-mail.  And I

4    realized it wasn't a kid on the phone.  So that's how

5    the engagement started.

6        Q.   Kevin Crick.  That's the first time I've heard

7    the name.  Who is Kevin Crick?

8        A.   He is the first attorney.

9        Q.   How do you spell his last name?

10       A.   I believe it's C-r-i-c-k.

11       Q.   And when did you speak with Kevin Crick for the

12   first time?

13       A.   I don't recall.  It was probably in January.

14       Q.   Of 2017.

15       A.   Yeah.

16       Q.   To give you the time frame, Noah got his phone

17   in 2016.  You said the calls probably went from late

18   December 2016 to March 2017.  Knowing that time frame,

19   when do you believe Kevin -- when do you believe you

20   first spoke with Kevin Crick?

21       A.   Say the second week of January, approximately,

22   or in January.

23       Q.   In January 2017?

24       A.   Yeah.

25       Q.   Okay.  What did -- so Noah passed the phone to

1  you, correct?  His phone number.  The 9847 phone number,

2  correct?

3       A.  Uh-huh.

4       Q.  What did you say to Kevin Crick?

5       A.  Hi, why are you calling my son?

6       Q.  And what did he say to you?

7       A.  I'm an attorney that represents harassment

8  calls, particularly to minors and your son reported

9  harassing calls through the Metro PCS app.

10      Q.  Okay.  What did you do after that?  Did you

11 follow up with Kevin Crick?

12      A.  I did.  It was Kevin Crick that sent me this, I

13 believe.

14      Q.  Okay.  What's the date on -- when you say

15 "this," what exhibit is that?

16      A.  Exhibit C.

17      Q.  And what's the date on that?

18      A.  January 30th, 2018.

19      Q.  So is it fair to say that Kevin Crick was still

20 your attorney on January -- January of 2018?

21      A.  Yes.

22      Q.  And when I say your attorney -- my apologies.

23 Is it fair to say -- because this is Noah's lawsuit, is

24 it fair to say that Kevin Crick was still Noah's

25 attorney as of January 30th, 2018?

1      A.  Correct.

2      Q.  What law firm was Kevin Crick with?  Are you

3  aware?

4      A.  Marcus and Zelman.

5      Q.  Okay.  And where is Kevin Crick located?

6      A.  New York.

7      Q.  And how do you know that?

8      A.  He told me.

9      Q.  Did you get a little worried that you had a

10 lawyer calling you from New York?

11     A.  Originally, but then when I verified who he

12 was, you know, and to contact me, not Noah, I was fine

13 with that.

14     Q.  So Kevin Crick works with Marcus and Zelman,

15 correct?

16     A.  To the best of my knowledge.

17     Q.  What did Kevin Crick tell you -- or excuse me.

18 Strike that.

19         Uhm, why didn't you call Credit One for the

20 alleged calls that they kept calling Noah?

21     A.  Because Noah told them to stop.

22     Q.  And as his mother, you didn't feel the need to

23 call Credit One Bank back and tell them -- ask them to

24 stop calling?

25     A.  No.

1       Q.  Do you know a person by the name of D█████

2   V█████?

3       A.  No.

4       Q.  Do you know anyone with the last name V██████?

5       A.  Ah, not to my knowledge.

6       Q.  Have you ever heard of the name D████ V██████?

7       A.  No.

8       Q.  Do you know a person by the name of Dwayne

9   Wilson?

10      A.  No.

11      Q.  Have you ever heard of the name Dwayne Wilson?

12      A.  No.

13      Q.  Okay.  I usually like to take a break after

14  about an hour.  So -- I don't foresee going much longer.

15      A.  Okay.

16      Q.  Is it all right if we take a little break?

17      A.  Yes, no, I could use the restroom.

18          MR. WADE:  Okay.  Perfect.  We'll take a break.

19  Whenever you guys are ready to convene, we'll convene.

20          THE WITNESS:  Thanks.  Awesome.

21          (The deposition was in recess from 3:08 to

22          3:15.)

23          MR. WADE:   Q.  We'll go back on the record.  I

24  always like to -- whenever we come back from a break --

25  do you understand that the oath that you gave today is

1   the same oath that you would be giving if you were

2   testifying in a court of law?

3        A.   Correct.

4        Q.   Do you agree to tell the truth --

5        A.   Correct.

6        Q.   -- under the penalty of perjury?

7        A.   Correct, yes.

8        Q.   I looked over my notes.  I'm pretty much -- I'm

9   done, but Farheena, my co-counsel, is going to ask you

10  some questions.  I'll continue to look at my notes and

11  see if there's anything else I missed, okay?

12       A.   Okay.

13        EXAMINATION BY Attorney

14          MS. HABIB:   Q.   Good afternoon, Ms. Lemos.

15  Are you okay to continue?

16       A.   Yes.

17       Q.   I just had a few follow-up questions from what

18  Alex asked you.  So just so I have it right, the first

19  time Noah told you about the calls was around when?

20       A.   The week he got the phone, approximately.

21       Q.   And what was his demeanor when he told you

22  about the calls?

23       A.   Agitated.

24       Q.   The very first time he told you about it?

25       A.   Yeah.

1      Q.   And how many calls had he gotten up to that
2   point?
3      A.   I don't know, because, of course, I'm not with
4   him 24/7.  So I think quite a few for him to be agitated
5   to tell me.
6      Q.   Did you ever suggest that he talk to, like, a
7   school counselor or anyone like that?
8      A.   Not over this.
9      Q.   Okay.  And you never took him for any therapy
10  or counseling over these calls?
11     A.   Not over the calls.
12     Q.   Okay.  Uhm, and you mentioned earlier that you,
13  yourself, heard between 5 and 10 calls a day.  Do you
14  remember around what time of day that was?
15     A.   Well, it would have been the calls I heard
16  between 2:30 and 9:00 p.m.
17     Q.   And did it -- was it particular hours in the
18  evening or did it just continue?
19     A.   Random.
20     Q.   And how many times approximately during the
21  four month time period he was getting calls did you and
22  Noah talk about this issue?
23     A.   Probably like a dozen.
24     Q.   And what would you talk about?
25     A.   Just told him to tell them to stop, and that

1   happens all the time, you know?  And then I also

2   explained that blocking one number -- how telephone

3   systems work, that sometimes the same person will call

4   through a different number.

5        Q.   Okay.  Uhm, what kind of fee agreement do you

6   have with your current attorneys?  Are you paying them

7   per hour?  Is it contingency?  How --

8        A.   Contingency.

9        Q.   Uhm, have you heard of a company by the name of

10  GC Services Limited Partnership?

11       A.   No.

12       Q.   Okay.  And you don't have any reason to believe

13  that GC Services Limited Partnership ever called Noah,

14  correct?

15       A.   Correct.

16       Q.   Okay.  I think that's all my questions.

17       A.   Okay.

18            MR. WADE:  I think I'm done as well.

19            MR. KAMINSKI:  Could we just take -- I'm so

20  sorry -- a one-minute break?  Ari, could you step out

21  with your client just for one minute?

22            MR. MARCUS:  Sure.

23            MR. KAMINSKI:  Thanks so much.  Greatly

24  appreciate it.

25            (The deposition was in recess from 3:18 to

1          3:22.)

2          MR. WADE:  Okay.  We'll go back on the record.

3  I have two more questions.  All right.

4          MR. MARCUS:  Hold you to it, then.

5          MR. WADE:  Three.

6          MR. MARCUS:  Okay.

7          MR. WADE:  If you're going to hold me to it,

8  three.

9          MR. MARCUS:  All right.

10          FURTHER EXAMINATION BY Attorney

11          MR. WADE:   Q.  All right.  Ms. Lemos, do you

12  agree to tell the truth today under the penalty of

13  perjury?

14       A.  I do.

15       Q.  Do you know when Noah first used the app to

16  block calls?

17       A.  I do not.

18       Q.  Did he get calls after he used the app?

19       A.  He did, I believe.

20       Q.  You stated that you remember conversation on

21  February -- February 2017?

22       A.  21st.

23       Q.  21st, 2017.  How do you know -- how do you

24  remember that exact date?

25       A.  Because we submitted a call log shortly

1   thereafter.

2        Q.   Submitted a call log to whom?

3        A.   An attorney.

4        Q.   Was it safe to say that the attorney was Kevin

5   Kirk -- Crick?  Excuse me.  Kevin Crick.

6        A.   Either him or Yitz.  Is that what you call him?

7             MR. MARCUS:  Yitz, yeah.

8             MR. WADE:   Q.  When did you submit that log?

9        A.   I don't recall.

10       Q.   Was it shortly -- you said you remembered

11  February 21st --

12       A.   It was on or around February or March.  Could

13  be April.  It took us a while to sit down and have the

14  time to do it.

15       Q.   What were you looking at when you were sitting

16  down and making the log?

17       A.   Noah's phone screen log.

18       Q.   Screen log.

19       A.   Of, like, recent, missed, answered calls.

20            MR. WADE:  I think I'm all done.

21            MS. HABIB:  I'm done.

22            THE WITNESS:  Okay.

23            MR. MARCUS:  I got nothing.

24            MR. WADE:  All right.  For the record, same

25  stipulation as we did for Noah Lemos's that once we give

1   you this transcript you will return it to us within 15

2   days.

3            MR. MARCUS:  Sure.

4            MR. WADE:  Okay.  And if we don't receive it

5   within 15 days, we'll assume that no changes are being

6   made to the deposition transcript.

7            MR. MARCUS:  That's fine.  And I'll order an

8   electronic copy.

9            (The deposition was concluded at 3:25 p.m.)

10

11

12

13

14            _____

              SANDRA LEMOS

15

16

17

18

19

20

21

22

23

24

25

1                             CERTIFICATE

2

3              I, the undersigned, a Certified Shorthand

4    Reporter, State of California, hereby certify that the

5    witness in the foregoing deposition was by me first duly

6    sworn to testify to the truth, the whole truth, and

7    nothing but the truth in the within-entitled cause; that

8    said deposition was taken at the time and place therein

9    stated; that the testimony of the said witness was

10   reported by me, a disinterested person, and was

11   thereafter transcribed under my direction into

12   typewriting; that the foregoing is a full, complete, and

13   true record of said testimony; and that the witness did

14   not request an opportunity to read it and, if necessary,

15   correct said deposition and to subscribe the same.

16             I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21             Executed this 23rd day of July, 2018.

22

23             _____

24             LAURA AXELSEN, C.S.R. 6173

25

1     ERRATA SHEET FOR THE TRANSCRIPT OF:

2   Case Name:  NL vs. Credit One

3   Dep.  Date: July 11, 2018

4   Deponent: Sandra Lemos

5   Pg.   Ln.   Now reads        Should read     Reason

6   _____  _____  _____  _____  _____

7   _____  _____  _____  _____  _____

8   _____  _____  _____  _____  _____

9   _____  _____  _____  _____  _____

10  _____  _____  _____  _____  _____

11  _____  _____  _____  _____  _____

12  _____  _____  _____  _____  _____

13  _____  _____  _____  _____  _____

14  _____  _____  _____  _____  _____

15  _____  _____  _____  _____  _____

16  _____  _____  _____  _____  _____

17

18                      _____

19                      SIGNATURE OF DEPONENT

20  SUBSCRIBED AND SWORN BEFORE ME

21  THIS_____DAY OF_____, 2018

22

23  _____

24   (Notary Public)   MY COMMISSION EXPIRES:_____

25