# "Exhibit 10"

Shon Sherman
June 6, 2018

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

N.L., an infant by his mother ) CIVIL CASE NO.:
and natural guardian        )2:17-cv-01512-JAM-DB
SANDRA LEMOS,               )
    Plaintiff,   )
                 )
vs.              )
                 )
CREDIT ONE BANK, N.A., GC   )
SERVICES LIMITED PARTNERSHIP )
IENERGIZER HOLDINGS, LIMITED, )
and FIRST CONTACT, LLC a/k/a )
IQUOR HOLDINGS, INC.    )

ORAL DEPOSITION

CORPORATE REPRESENTATIVE OF GC SERVICES LTD PARTNERSHIP

SHON SHERMAN

June 6, 2018

VOLUME 1

ORAL DEPOSITION OF SHON SHERMAN, produced as a

witness at the instance of the Plaintiff and duly sworn,

was taken in the above-styled and numbered cause on

June 6, 2018, from 9:59 a.m. to 12:24 p.m., before

Jill M. Vaughan, Certified Shorthand Reporter in and for

the State of Texas, reported by computerized stenotype

machine at the offices of Stratos Legal Services,

4295 San Felipe, Suite 125, Houston, Texas, pursuant to

the Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

## Page 2

APPEARANCES

FOR THE PLAINTIFF:

    Mr. Yitzchak Zelman
    MARCUS & ZELMAN, LLC
    1500 Allaire Avenue
    Suite 101
    Ocean, New Jersey 07712
    845-367-7146
    yzelman@marcuszelman.com

FOR THE DEFENDANT GC SERVICES:
    Ms. Margaret Meier
    THE RUDNICKI FIRM
    6305 Waterford Blvd.
    Suite 325
    Oklahoma City, KO 73118
    405-342-4995
    margie@rudnickifirm.com

FOR THE DEFENDANT CREDIT ONE BANK, N.A.,(Telephonically):
    Mr. Alex Wade
    CARLSON & MESSER LLP
    5901 W. Century Boulevard
    Suite 1200
    Los Angeles, California 90045
    (310) 242-2200
    wadea@cmtlaw.com

## Page 3

                INDEX              PAGE
Appearances ............................  2
SHON SHERMAN
    Examination by Mr. Zelman ...........    4
Signature and changes  .................  90
Reporter's Certificate .................  92


                EXHIBIT INDEX
NO.         DESCRIPTION              PAGE
EXHIBIT 1  Notice of deposition ..............    7
EXHIBIT 2  Call log .........................   35
EXHIBIT 3  Excerpt manuals ..................   72
EXHIBIT 4  Responses to Plaintiff's request ..   79

## Page 4

1          SHON SHERMAN
2   having been first duly sworn, testified as follows:
3               EXAMINATION
4   BY MR. ZELMAN:
5       Q.  Good morning, can you please state your name
6   for the record.
7       A.  Shon Sherman.
8       Q.  And you're testifying here today on behalf
9   of GC Services?
10      A.  Yes.
11      Q.  What is your role with GC Services?
12      A.  I'm compliance manager and legal counsel.
13      Q.  And how long have you been doing that for?
14      A.  I've been in my current role for about a
15   year and a half.
16      Q.  And what were you doing before that?
17      A.  I was previously compliance adviser.
18      Q.  As compliance manager and legal counsel can
19   you describe your legal -- I mean, not your legal --
20   your duties and responsibilities?
21      A.  Yes, I am responsible for the day-to-day
22   oversight of the compliance and law department.  I
23   manage the department staff.  I'm also responsible for
24   providing guidance to our operations division
25   regarding legal compliance and regulatory matters.  We

Shon Sherman
June 6, 2018

## Page 5

1  handle complaints and lawsuits.
2      Q.  In any part of your day-to-day role, do you
3  work with the dialing system used by GC Services?
4      A.  Do you mean do I actually use the dialer?
5      Q.  Sure.
6      A.  No.
7      Q.  Do you interact with it at all?
8      A.  No.
9      Q.  Have you ever used it?
10     A.  No.
11     Q.  Okay.  Do you know how it works?
12     A.  Yes.
13     Q.  Okay.  And when you say you know how it
14  works, what's that based off of?
15     A.  Interactions with our operations division
16  and our IT department.  It is necessary for me in my
17  role in working on lawsuits and complaints and
18  standard operating procedures that I understand how
19  our various systems function.
20     Q.  So are you saying that your understanding of
21  the dialing systems is based upon what people from IT
22  or operations tell you?
23     A.  Correct.
24     Q.  Now, you're an attorney, right?
25     A.  Yes.

## Page 6

1      Q.  And you have an attorney here.  So the
2  question I have for you is it's going to be a little
3  tricky, but I want to know what you did to prepare for
4  today's deposition and it shouldn't involve any
5  conversations you had with your counsel or I guess any
6  conversations that you as counsel had with
7  GC Services.  That's why it's a little tricky.
8      MS. MEIRER:  I think are you asking what did
9  she review?
10     Q.  (By Mr. Zelman) What did you do to prepare
11  for today's deposition?
12     A.  So I understand where you're going with the
13  privileged conversations with other people with
14  GC Services -- within GC Services.
15     Q.  Yeah.
16     A.  We're not claiming privilege on those
17  conversations that I had with other employees at
18  GC Services to prepare for this because I was -- I was
19  doing that in my role as the corporate representative
20  and not legal counsel.
21     Q.  Perfect.
22     A.  Okay.
23     Q.  Okay.  So who did you speak to?
24     A.  Okay.  So I spoke to the management group
25  that oversees the Credit One Bank program.

## Page 7

1      Q.  Okay.
2      A.  And then I also spoke with one of the
3  employees in the IT department who oversees Aspect.
4      Q.  And who was that employee?
5      A.  That is Craig Simpson.
6      Q.  How do you spell Craig, C-r-a-i-g?
7      A.  Yes.
8      Q.  And Simpson is "p" in the middle there?
9      A.  Yes.  In addition I reviewed the notice of
10  deposition, I reviewed call detail reports and then,
11  of course, I met with counsel.
12     Q.  Okay.
13     A.  Oh, and I also did take a gander at the
14  manuals.
15     Q.  Okay.  Anything else?
16     A.  I believe that was everything.
17     Q.  Did you look at the discovery responses
18  served by GC Services in this matter?
19     A.  I did not because those were not outlined as
20  potential categories for this deposition.
21     Q.  Okay.  So you said you reviewed the
22  deposition notice.  Let's mark that as Exhibit A --
23  we'll use Exhibit 1.
24         (Exhibit 1 marked.)
25         MR. ZELMAN:  Alex, I'm just handing the

## Page 8

1  witness the deposition notice for today's deposition.
2      Q.  (By Mr. Zelman) So if you take a look at
3  the deposition notice, you'll see a number of
4  categories and separately numbered paragraphs.  If
5  you can just take a look through those categories
6  and let me know if you're prepared to testify about
7  the information sought in those categories?
8      A.  I am.
9      Q.  Okay.
10         MS. MEIRER:  I would only interject subject
11  to responses and objections we provided, she's
12  prepared.
13         MR. ZELMAN:  Certainly.
14     Q.  (By Mr. Zelman) Do you know what today's
15  case is about?
16     A.  Yes.
17     Q.  In your own words, what is it?
18     A.  This is a TCPA case.  In this situation the
19  plaintiff is a minor.  An allegation in the case says
20  that we called a cell phone number belonging to the
21  minor using an auto dialer without consent.
22     Q.  The phone number that we're talking about
23  here ends in 9847.  Is that your understanding?
24     A.  Yes.
25     Q.  Great.  So we're just going to call it the

Shon Sherman
June 6, 2018

## Page 9

1  9847 number for today's deposition.  Is that all
2  right?
3       **A.  Yes.**
4       Q.  Did GC Services call the 9847 number?
5       **A.  Yes.**
6       Q.  Do you know how many times they called that
7  number?
8       **A.  According to our records we placed 48 calls**
9  **to that phone number.**
10       Q.  And what records are you referring to when
11  you say that?
12       **A.  There's a document referred to as the call**
13  **detail report.**
14       Q.  Okay.  And that's something maintained by
15  GC Services in the course of their business?
16       **A.  Yes.**
17       Q.  So based upon everything you have in front
18  of you, you believe that the most accurate count of
19  calls made by GC Services to the 9847 number on behalf
20  of Credit One Bank is 48, right?
21       MS. MEIRER:  Object to form.
22       **A.  Yes.**
23       Q.  (By Mr. Zelman) If Credit One Bank told us
24  that GC Services made 42 calls on their behalf, that
25  would not be accurate according to you, right?

## Page 10

1       **A.  Not according to the records that I have**
2  **reviewed.**
3       Q.  Okay.  So why were you calling the 9847
4  number?
5       **A.  We were attempting to contact the account**
6  **holder with which that phone number was associated in**
7  **order to discuss the Credit One account belonging to**
8  **that account holder.**
9       Q.  What was the account holder's name that you
10  were trying to reach?
11       **A.  I will be happy to provide you with**
12  **initials, but under the FDCPA since that account**
13  **holder is not a party to this lawsuit, I feel it would**
14  **inappropriate for me to divulge the name of that**
15  **account holder.**
16       Q.  Okay.
17       **A.  That would be third-party -- a third-party**
18  **disclosure.  So we will go with DV, if that's okay**
19  **with you.**
20       Q.  Sure.  Did you ever make contact with DV at
21  that phone number?
22       **A.  No.**
23       Q.  Did you ever make contact with anybody at
24  that phone number?
25       **A.  No.**

## Page 11

1       Q.  All right.  And how long did you have this
2  account for on behalf of Credit One Bank?
3       MS. MEIRER:  Object to the form.  This
4  account, or do you mean how long were they calling
5  this number?
6       Q.  (By Mr. Zelman) Well, you were calling
7  this number because Credit One assigned the account
8  to you to collect, right?
9       **A.  Correct.**
10       Q.  Did they give you the phone number to call?
11       **A.  Yes.**
12       Q.  Did you guys skip trace it, or did you get
13  it from Credit One Bank directly?
14       **A.  We obtained the number directly from**
15  **Credit One.**
16       Q.  And how long?  Meaning did they give this
17  account to you for a specific amount of time?
18       MS. MEIRER:  I'm going object to form.  I
19  think it's outside the scope of the notice, but you
20  can answer if you know.
21       **A.  I can answer the question to the best of my**
22  **ability.**
23       Q.  (By Mr. Zelman) Sure.
24       **A.  Based on the records that we have, that**
25  **would only be the call detail report and the call**

## Page 12

1  **detail report indicates that we were calling on this**
2  **account from March 18th of 2017 to March 26th of 2017.**
3       Q.  So that's about a week, right, is that what
4  you're saying?
5       MS. MEIRER:  I'm going to object.
6  Mischaracterizes the testimony.  Go ahead.
7       **A.  About 12 days, I'm bad at math.**
8       Q.  (By Mr. Zelman) March 18th to March 26 is
9  that what you said?
10       **A.  Yes.**
11       Q.  So it's like eight days, I think.
12       **A.  Okay.**
13       Q.  Okay.  So why so short?
14       **A.  That would be purely speculation on my part**
15  **as to why that particular account was closed out and**
16  **removed from our system.**
17       Q.  I mean, typically does GC Services have an
18  account for longer than eight days?
19       MS. MEIRER:  I'm going to object.  It's
20  outside the scope of the notice.  There's too many
21  variables.  Go ahead.
22       **A.  I would not testify as to what is typical.**
23  **Is it possible to have an account for eight days, does**
24  **that happen, yes.  We also have accounts for 30 days,**
25  **15 days.**

Shon Sherman
June 6, 2018

Page 13

1    Q.   (By Mr. Zelman) Is 15 or 30 days a set
2  period that's typically an account would be assigned
3  for?
4         MS. MEIRER:  Same objections.
5    A.   There are many variables that determine the
6  amount of time that an account is placed with
7  GC Services for collection.
8    Q.   (By Mr. Zelman) Sure.  So let's -- just to
9  clarify, I'm just talking about Credit One, not
10  collections placed by any other creditor?
11   A.   I understand.
12   Q.   When Credit One assigns an account to go to
13  GC Services for collection, what are the typical
14  amount of time that account is with GC Services?
15        MS. MEIRER:  Same objections.
16   A.   As I stated before, that is dependent on
17  different variables, such as did we make contact with
18  the consumer, are we working towards an active
19  arrangement with the consumer, was there some sort of
20  a dispute or complaint made on an account, was a
21  lawsuit filed on an account, those type of things
22  impact the length of time that an account would be
23  placed with GC Services.
24   Q.   (By Mr. Zelman) Now, if none of those
25  things happened, how -- is there's -- what's the

Page 14

1  typical that you would have the account for?
2         MS. MEIRER:  Same objections.  It's outside
3  the scope of the notice.  It's an incomplete
4  hypothetical, too many variables.  And it's asked and
5  answered.
6    A.   As I said before, there is no, quote,
7  unquote, typical time frame.  It's contingent upon the
8  variables that I outlined previously.
9    Q.   Sure.  Are you familiar with GC Services'
10  work on behalf of Credit One?
11   A.   Yes.
12   Q.   Okay.  Do you know what the typical account
13  parameters are for them to send the account to
14  GC Services?
15   A.   Do you mean the amount of delinquency?
16   Q.   Yes.
17   A.   These would be early out delinquency
18  accounts.  So 30 days maybe 60 days.
19   Q.   So, you're not getting five-day lates,
20  right?
21   A.   I do not believe so, right.
22   Q.   You're getting accounts that are between 30
23  and 60 days late?
24   A.   Yes.
25   Q.   And then if an account becomes, like, with

Page 15

1  you guys and now it's like 120 days late, are you
2  still collecting on that?
3         MS. MEIRER:  Object to form.  It's been
4  asked and answered.  That's incomplete hypothetical,
5  too many variables.  I think it's also outside the
6  scope of the notice, but go ahead and answer if you
7  can.
8    A.   So the work that we do for Credit One is
9  what is called first-party work where we perform
10  collection activity in the name of Credit One and this
11  is done on early out delinquencies.  When you start
12  getting into longer term delinquency periods, there is
13  a different collection methodology used and we do not
14  handle those.
15   Q.   (By Mr. Zelman) So you're talking about
16  third-party collections, right?
17   A.   Yes.
18   Q.   And you don't to third-party collections for
19  Credit One, right?
20   A.   No.
21   Q.   Right.  And I understand that so my question
22  is if you have an account that you're collecting on
23  for Credit One; and it's between 30 and 60 days late,
24  do you keep it for long enough that it's 120 days late
25  or at some point it goes back?

Page 16

1         MS. MEIRER:  Object to form.  It's outside
2  the scope of the notice, and an incomplete
3  hypothetical, too many variables and it's asked and
4  answered.  You can answer one more time.
5    A.   I feel like you're asking me to testify as
6  to what Credit One does with an account when it gets
7  beyond that 60-day delinquency period.  I'm a GC
8  Services representative, so I cannot answer questions
9  regarding what Credit One does with an account outside
10  the scope of the collection activity that we perform
11  on accounts for them.
12   Q.   (By Mr. Zelman) Sure.  So you're saying
13  that you guys don't send back an account, Credit One
14  decides when to pull back an account?
15   A.   Yes.
16        MS. MEIRER:  Objection, mischaracterizes
17  testimony.  Go ahead.
18   A.   Credit One makes a determination about when
19  they assign an account to us for collection.
20  Credit One makes the determination about when
21  GC Services will no longer be assigned an account for
22  collection.
23   Q.   (By Mr. Zelman) If, for example, you're
24  calling someone on behalf of Credit One and that
25  someone tells you you have a wrong number, are you

Shon Sherman
June 6, 2018

## Page 17

1  going to send that account back to Credit One?
2      MS. MEIRER: Objection, it's incomplete
3  hypothetical, too many variables. I think it's
4  outside the scope of the notice, but you can answer.
5      **A.  As I previously explained, we do not send**
6  **back accounts. Credit One makes a determination about**
7  **when an account will no longer be assigned to**
8  **GC Services for collection.**
9      Q.  (By Mr. Zelman) Okay. And do you know if
10 it's typical that if GC Services says, "Hey, we
11 called this number, they said stop calling," does
12 Credit One typically pull back the accounts at that
13 point?
14     MS. MEIRER: Same objections.
15     **A.  I can explain to you how we handle such**
16 **requests, but again I cannot testify today regarding**
17 **what Credit One does with an account or why Credit One**
18 **makes any decisions regarding how an account can be**
19 **handled.**
20     Q.  (By Mr. Zelman) I'm not asking about what
21 Credit One is thinking when they do something. What
22 I'm asking is in your experience on the GC Services
23 side, is that something you've typically seen?
24     MS. MEIRER: Wait. Just a second, what is
25 the question? Can you repeat it?

## Page 18

1      Q.  (By Mr. Zelman) Sure. What I'm asking is
2  do you typically see that after a do not call
3  request is received that that account gets pulled
4  from GC Services back to Credit One?
5      MS. MEIRER: I'm going to object as an
6  incomplete hypothetical. Go ahead and answer it.
7      **A.  I feel like the best way to help you**
8  **understand the process is to explain to you the**
9  **different types of do not call requests that we**
10 **receive and how those are handled. If we have contact**
11 **with the consumer on an account and the consumer**
12 **indicates that they do not wish to have any more**
13 **communication with us, the account would be noted as**
14 **such and those phone numbers would be, for lack of a**
15 **better word, removed from the account so that no more**
16 **calls could be placed on that account.**
17     **If a third-party indicates that we**
18 **have reached a wrong number or they ask to not call**
19 **them any more, we would remove that number from an**
20 **account; but if there are other phone numbers on the**
21 **account, there would be no reason to stop calling**
22 **those other phone numbers.**
23     Q.  Okay. That's helpful. So I'm referring to
24 a situation where either they tell you don't call me
25 any more or wrong number and that's the only number

## Page 19

1  you have on the account, either way you're not going
2  to call that account any more, correct?
3      **A.  Yes, that is correct.**
4      Q.  And in that situation do you typically see
5  that Credit One Bank will pull the account back, or do
6  they typically leave that with GC Services?
7      MS. MEIRER: I'm going to object as
8  incomplete hypothetical. I believe she's already
9  answered it, but go ahead.
10     **A.  I think again I'm going to have to answer**
11 **your question in a roundabout way.**
12     Q.  (By Mr. Zelman) I prefer you didn't.
13     **A.  So there is no -- on first-party collections**
14 **it didn't function like third-party collections. So**
15 **accounts are not placed with us and housed in our**
16 **collection system and in our inventory. On**
17 **first-party collections with Credit One we receive**
18 **files on a daily basis where we are asked to attempt**
19 **to collect on those accounts. So it is not as easy as**
20 **saying do you see the accounts being closed in your**
21 **system because the accounts are not ever really in**
22 **possession of GC Services. We receive them in that**
23 **daily data file.**
24     Q.  Okay. So you're saying that if an account
25 is in your data file on Monday, it may not be there

## Page 20

1  Tuesday; but it might be back on Wednesday?
2      **A.  That is correct.**
3      Q.  Okay. And at all the times the accounts are
4  stored in Credit One's system?
5      **A.  That is correct.**
6      Q.  So you call that first-party work, right,
7  first-party collections?
8      **A.  Yes.**
9      Q.  And whose idea was it to do first-party
10 work? Is that something GC Services said we're going
11 to do, or did Credit One hire you to do first-party
12 collections?
13     MS. MEIRER: I'm going to object that is
14 outside the scope of notice; but if you know, you can
15 answer. If you don't know, you don't know.
16     **A.  First party work has been a part of the**
17 **GC Services business model for many, many years. So**
18 **that decision would have happened long ago.**
19     Q.  (By Mr. Zelman) Just to clarify what I'm
20 asking, what I'm asking specifically is when you
21 call a Credit One debtor do you identify yourself as
22 GC Services or as Credit One?
23     **A.  We identify that we are calling from**
24 **Credit One.**
25     Q.  Do you mention the name GC Services at all?

Shon Sherman
June 6, 2018

Page 21

1    A.  We do not.
2    Q.  Okay.  Is that something you can do or are
3    you required by Credit One to identify as Credit One?
4    A.  We are required pursuant to our agreement
5    with Credit One to conduct business as first-party
6    collections in the name of Credit One.
7    Q.  Okay.  Now, when you call someone and they
8    don't answer, do you know what phone number they would
9    see on their phone?
10    A.  Yes.
11    Q.  What is that?
12    MS. MEIRER:  Can I just object to be the
13    scope.  For this particular case?
14    MR. ZELMAN:  Sure.
15    A.  I actually have the three phone numbers that
16    were out pulsed when we were attempting to contact the
17    account holder --
18    Q.  I'll take them.
19    A.  -- in this case.
20    The first phone number is
21    201-285-8331, the second phone number is
22    201-354-1241 and the third phone number is
23    201-354-1242.
24    Q.  Now, if I was to call those phone numbers,
25    who's going to answer the phone?

Page 22

1    MS. MEIRER:  I'm going to object.  It's
2    outside the scope of the notice, but you can answer if
3    you know.
4    A.  A representative from GC Services on behalf
5    of Credit One.
6    Q.  (By Mr. Zelman) So are they going to
7    introduce themselves as a representative for Credit
8    One Bank or a representative of GC Services?
9    A.  They will answer the call as representative
10    of Credit One.
11    Q.  Okay.  And now, if I want to make a payment
12    on my account because that's why you're calling me, I
13    assume, and I offer to give my bank account
14    information, are you guys going to take that payment
15    and then hand it off to Credit One; or how does that
16    work?
17    MS. MEIRER:  I'm going to object to the
18    form.
19    THE WITNESS:  Also outside the scope of the
20    notice.
21    MS. MEIRER:  I was just going to add that.
22    You got to it.  Do you mean for a Credit One?
23    MR. ZELMAN:  For a Credit One account, yes.
24    MS. MEIRER:  Okay.  Same objections.  I
25    believe it's outside the scope of notice and the form

Page 23

1    is a little better, but you can answer if you know.
2    A.  I'm going to have to -- because that
3    question is outside the scope of the notice, I did not
4    speak with operations to get a refresher on exactly
5    how payments are taken, but I can tell you that all
6    work that we do on behalf of Credit One is documented
7    in the system, Credit One's system.  So if a consumer
8    calls in to make a payment, that information should be
9    documented in Credit One's system?
10    Q.  (By Mr. Zelman) So are you saying that
11    you're working with Credit One's own collection
12    software when working on behalf of Credit One?
13    A.  Yes.
14    Q.  Do you know what software that is?
15    A.  It's called the CASH system.
16    Q.  That's C-A-S-H, right?
17    A.  Yes.
18    Q.  I think they also have CAS system, C-A-S.
19    Do you guys have that as well?
20    A.  It is my understanding that we do not have
21    access to the CAS system.  So if we needed information
22    that was maintained in that system, we would have to
23    call Credit One and get the information from them.
24    Q.  So what's the difference between the two
25    systems?

Page 24

1    MS. MEIRER:  I'm going to object that it's
2    outside the scope of the notice.
3    A.  You are going to have to talk to a
4    Credit One representative regarding their collection
5    system.  In particular the CAS system they do have or
6    have access to.
7    Q.  (By Mr. Zelman) Okay.  But to the best of
8    your understanding when you get a payment from a
9    Credit One debtor, do you guys input that directly
10    into the CASH system?
11    MS. MEIRER:  I'm going to object that
12    mischaracterizes prior testimony.  It's outside the
13    scope of the notice, but you can answer if you know.
14    A.  My answer is the same as it was before.
15    Because that question is outside the scope of the
16    deposition notice, I did not specifically speak to our
17    operations division about how payments were processed.
18    We spoke in general terms regarding how collection
19    activity is recorded, and it is my understanding that
20    all collection activity be recorded in the cash
21    system.
22    Q.  (By Mr. Zelman) When you say collection
23    activity, do you include collection calls in that
24    category?
25    A.  Yes.

Shon Sherman
June 6, 2018

7 (Pages 25 to 28)

## Page 25

1    Q.  So let's say on a given day you made four
2  calls on behalf of Credit One to a phone number.
3  Would you input that directly into the CASH system?
4    **A.  Yes.**
5    Q.  Okay.  Is there a separate, like, report at
6  the end of the day that you guys make to Credit One
7  telling them all the activities you made on all these
8  accounts; or there's no separate report, it's all real
9  time right into the CASH system?
10    MS. MEIRER:  I'm going to object, compound
11  question.  Which question do you want her to answer?
12    MR. ZELMAN:  I was trying to make it clear,
13  but we do it separately.
14    Q.  (By Mr. Zelman) Is there a separate report
15  other than the activity input into the CASH system?
16    **A.  I am honestly not aware if there is a**
17  **separate report that we submit to Credit One on a**
18  **daily basis.  My knowledge is that everything is**
19  **documented within the CASH system and that is how our**
20  **work is conveyed to the client.**
21    Q.  So to the best of your understanding what
22  you guys see in this CASH system is the same thing as
23  Credit One sees in this CASH system?
24    **A.  I am not --**
25    MS. MEIRER:  I'm going to object that it's

## Page 26

1  outside the scope of notice and it requires her to
2  speak on behalf of another entity; but go ahead, you
3  can answer if you know.
4    **A.  I am not able to testify as to what a**
5  **Credit One employee sees in this CASH system.**
6    Q.  (By Mr. Zelman) Do you guys record your
7  calls made on behalf of Credit One Bank?
8    **A.  Yes.**
9    Q.  All of them?
10    **A.  Yes.**
11    Q.  How long do you keep those recordings for?
12    **A.  Four years.**
13    Q.  Okay.  Is that whether or not contact was
14  made?
15    **A.  When you say contact, do you mean actual --**
16  **an actual conversations with a human; or when you say**
17  **contact, are you referring to an answering machine?**
18    Q.  Human.
19    **A.  Then the answer is yes.**
20    Q.  Okay.  If contact is made with an answering
21  machine, do you leave a message?
22    **A.  No.  Well --**
23    MS. MEIRER:  I'm going to object.  It's
24  outside of the scope of the notice, but you can answer
25  if you know.

## Page 27

1    **A.  If the call was placed using the predictive**
2  **mode of Aspect, the system will recognize that an**
3  **answering machine picked up and the call will be**
4  **terminated with no message being left.  If a call is**
5  **made in the preview mode, the account representative**
6  **may choose to leave the message.**
7    Q.  (By Mr. Zelman) Is that something the
8  account representative is going to leave personally,
9  or is it a prerecorded message?
10    MS. MEIRER:  I'm going to object.  It's
11  outside the scope of the notice except for the
12  prerecorded message part.  Go ahead.
13    **A.  We do not leave prerecorded messages.  So**
14  **any messages left would be left by a live person.**
15    Q.  (By Mr. Zelman) Okay.  So you just made
16  the distinction there between calls made by the
17  predictive mode and calls made by the preview mode.
18  Do you understand what mode was used to make the
19  calls in this case?
20    **A.  I cannot tell you with absolute certainty**
21  **which mode was used to place these calls.  I can tell**
22  **you that we used both preview and predictive mode to**
23  **make calls on behalf of Credit One.**
24    Q.  Is there anything in your records that will
25  tell you which mode you used?

## Page 28

1    **A.  No.**
2    Q.  Nothing in the dialer records or under the
3  Aspect records?
4    **A.  I asked specifically this question to my IT**
5  **of point contact yesterday, and his response to me was**
6  **that there is no way to know for sure which mode was**
7  **used to place these calls.**
8    Q.  Just to clarify, both preview and predictive
9  modes are on the same dialer system?
10    MS. MEIRER:  Object to the form.  You mean
11  for the Aspect.
12    Q.  (By Mr. Zelman) For Aspect.
13    **A.  Correct.  We use Aspect in both the**
14  **predictive and preview mode.**
15    Q.  I think we got a little ahead of ourselves.
16  So just to back track for one second.  What dialing
17  system was used to call my client's phone number?
18    **A.  Aspect.**
19    Q.  Do you know what version?
20    **A.  We were using Aspect 6.7 up until March 20th**
21  **of 2017, at which point we upgraded to Aspect 7.3**
22  **beginning March 21st, 2017.**
23    Q.  Did you guys ever use the Aspect 7.2?
24    MS. MEIRER:  Object to form.  For this case?
25    MR. ZELMAN:  Ever.

Shon Sherman
June 6, 2018

Page 29

1    MS. MEIRER: Object to form.  And it's
2  outside of the scope of what we were prepared to speak
3  about today subject to our objections.
4    A.  Not to my knowledge.
5    Q.  (By Mr. Zelman) Okay.  I mean, the only
6  reason I'm asking is because we got manuals for the
7  6.7, the 7.2 and the 7.3 from Credit One in this
8  case.  So you don't think you guys used the 7.2,
9  right?
10    A.  The explanation that has been provided to me
11  from our IT group was that we upgraded from 6.7 to
12  7.3.
13    Q.  Okay.  Now, you said that calls were made in
14  both preview and predictive mode in the Aspect dialer,
15  right?
16    A.  Yes.
17    Q.  Do you know what would determine which mode
18  is going to be used?
19    MS. MEIRER: Object to form.  As it relates
20  to this case?
21    Q.  (By Mr. Zelman) As it relates to this
22  case.
23    A.  Decisions on the methodology used to contact
24  accounts is a business strategy decision made by the
25  manager overseeing the program.  So in this case the

Page 30

1  Credit One management.
2    Q.  So you're saying Credit One decides whether
3  or not you use predictive mode or preview mode?
4    A.  My apologizes.  When I say Credit One
5  management, I was referring to our management,
6  GC Services operational management who oversee the
7  Credit One program.
8    Q.  Is there an individual or is that more than
9  one person?
10    A.  On a day-to-day basis it is typically one
11  person over each office.
12    Q.  What do you mean over each office?
13    A.  Credit One accounts are worked out of two
14  offices.  So the manager for each of those offices
15  would make that determination on a day-to-day basis.
16    Q.  Okay.  Who are the managers?
17    A.  Tina --
18    MS. MEIRER: Okay.  This is outside the
19  scope of the notice.  You can answer if you know.
20    A.  Tina Brown is the manager over the office in
21  Copperas Cove.  At this moment I am unable to recall
22  the name of the young woman who is the manager over
23  the Knoxville Credit One program.
24    Q.  (By Mr. Zelman) What was first location
25  you said?

Page 31

1    A.  Copperas Cove.  That is C-o-p-p-e-r-a-s,
2  separate word Cove, C-o-v-e, Texas.
3    Q.  And then there's another location in
4  Knoxville, is that Tennessee?
5    A.  Yes.
6    Q.  Do you know the location these calls were
7  made out of?
8    MS. MEIRER: Objection.  It's outside the
9  scope of the notice.  Go ahead and answer if you know.
10    A.  Honestly I do not know which office was
11  working this particular account at this time.
12    Q.  (By Mr. Zelman) Okay.  So you're saying
13  either Tina Brown or whoever managed the Knoxville
14  location or the Credit One program at the Knoxville
15  location would have decided whether to use preview
16  or predictive mode on any given day?
17    A.  Correct.
18    Q.  What about any of the other modes in the
19  Aspect systems, are any of those used?
20    A.  No.
21    Q.  So I believe there is a blaster mode.  Is
22  that ever used?
23    A.  No.
24    Q.  What about the manual mode, is that ever
25  used?

Page 32

1    A.  No.
2    Q.  So we spoke quickly about recordings.  I
3  just want to hit my last questions on that topic which
4  is if you talk to a live person, you record it and you
5  keep it for four years, you don't leave voice message
6  if you get a voicemail machine.  So do you record all
7  calls?  Meaning do you record a call that just rings
8  and no one answer and then hangs up?
9    MS. MEIRER: Objection, mischaracterizes
10  prior testimony.  Go ahead.
11    A.  Okay.  As Margie stated that is bit of a
12  mischaracterization of my prior testimony.
13    Q.  (By Mr. Zelman) I'm not trying to
14  mischaracterize.  Tell me what I missed.
15    A.  So when a call is placed in predictive mode,
16  the system will recognize if an answering machine
17  picks up or if there is a ring, no answer, the call
18  will be terminated at that time and no call recording
19  will be made.  If we make contact with a person, the
20  system will then record the call.  If a call is made
21  in preview mode, if there is a ring, no answer, there
22  will not be a call recorded.  If an answering machine
23  picks up or if we have a conversation with a live
24  person, a call recording will be made.
25    Q.  Okay.  So you're saying that the recording

Shon Sherman
June 6, 2018

9 (Pages 33 to 36)

Page 33

1   only starts rolling once a human voice is detected on
2   the other side, right?
3        MS. MEIRER:  Objection.  It mischaracterizes
4   prior testimony.  I think it's outside the scope of
5   the notice, but you can answer if you know.
6        **A.  I have never had it explained to me in those**
7   **terms.  For example, if as I stated in preview mode,**
8   **it will record an answering machine outgoing message.**
9   **So to say that a system would only record a live human**
10  **is not entirely accurate.**
11       Q.  (By Mr. Zelman) Understood.  So if you
12  called a phone number in preview mode and it
13  detected an answering machine, there would be a
14  recording of that call, right?
15       **A.  Yes.**
16       MS. MEIRER:  Same objections.  It's outside
17  of the scope and outside of what we were
18  prepared to talk to today, but go ahead.
19       **A.  Based on my understanding, that is correct.**
20       Q.  (By Mr. Zelman) Do you have any recordings
21  in this case?
22       **A.  No.**
23       Q.  So to the best of your understanding, does
24  that mean that calls were either not placed in preview
25  mode or if they were placed in preview mode, you did

Page 34

1   not reach a voicemail?
2        MS. MEIRER:  Object, it calls for
3   speculation.
4        **A.  I can tell you that the call detail report**
5   **that I reviewed in preparation for my deposition today**
6   **provides a call disposition and all of the call**
7   **dispositions on the call detail report for this**
8   **account indicated no answer or that an answering**
9   **machine picked up.**
10       Q.  (By Mr. Zelman) But there was no
11  recording, right?
12       **A.  That is correct.**
13       Q.  So if there is an answering machine picked
14  up and no recording, would that indicate to you that a
15  predictive mode was used in that case?
16       MS. MEIRER:  I'm going to object.  It calls
17  for speculation.  It's outside the scope of the
18  notice.  It's also asked and answered.  Go ahead.
19       **A.  As I explained previously there is no way to**
20  **know with certainty whether predictive or preview mode**
21  **was used to place a call.  So at this moment you are**
22  **speculating -- asking me to speculate based on the**
23  **information in the call detail report and lack of call**
24  **recordings is what occurred.  I am not prepared**
25  **to speculate.**

Page 35

1        Q.  I don't think it's quite speculation.  Let's
2   take a look at the call report that you're referring
3   to.  Let's mark that as Exhibit 2.
4        (Exhibit 2 marked.)
5        MR. ZELMAN:  Alex, this is Bates stamped
6   GCS-LEMOS0001.
7        Q.  (By Mr. Zelman) Is this the call report
8   you said you reviewed?
9        **A.  Yes.**
10       Q.  All right.  So where do you see anything
11  about answering machine detected?
12       **A.  That does not appear to be on this version**
13  **of the report.**
14       Q.  So you were looking at a different version
15  of it?
16       **A.  If I may, we obtain call detail reports**
17  **through two methods.  When the law department staff is**
18  **preparing a file, they typically reach out to our**
19  **operations management and ask them to provide a call**
20  **detail report.  When myself or one of the other**
21  **attorneys needs a call detail report we're typically**
22  **asking IT directly.  I have noticed that those reports**
23  **on indication may contain additional fields.  So it**
24  **appears that though the report that was provided to**
25  **you was one of the versions of the reports that we**

Page 36

1   **have in our file.**
2        Q.  So based upon your understanding, this would
3   be the operations report?
4        **A.  I honestly am not able to tell you at this**
5   **time which one comes from which group.  I can tell you**
6   **that the information regarding the call dates, the**
7   **start date, the account number, the dialed number are**
8   **all the same.  These other fields don't have any**
9   **relevancy to me.  So I don't pay any attention to**
10  **them, but it's just like any other report.  They can**
11  **run it with different parameters.  So it appears as**
12  **though the version you have did not include this call**
13  **disposition parameters, but it's an accurate report**
14  **regarding the number of calls made and the dates and**
15  **times for the calls that were placed.**
16       Q.  Okay.  So I don't know if this is going to
17  give us the answers we're looking for, but I'm just
18  going back to my earlier line of questioning then?
19       **A.  Okay.**
20       Q.  Which was -- and I don't think this is
21  speculation.  One, we've established that the only
22  time you'd have a recording in predictive mode is if
23  you make contact with a live human.  Then we've
24  established that you will have a recording in preview
25  mode if you either connect with a live human or detect

Page 37

1    an answering machine.  Now, in this case you testified
2    that there are no recordings.  And so my question is
3    simply that if there are no recordings and you've said
4    that there are some dispositions that said you have
5    reached an answering machine, would that indicate to
6    you that those calls were not made by preview mode and
7    they were made via predictive mode?
8         MS. MEIRER:  I'm just going to object.  It
9    mischaracterizes her prior testimony.  I'm not trying
10   to get in your way, but I'm trying to help understand.
11   I think you're a little off with the preview mode and
12   when a recording is made.  I don't believe she said
13   it's every time an answering machine picks up.
14        Q.  (By Mr. Zelman) I'm trying to be very
15   specific.  I got two lawyers on that side of the
16   table, but if you want to tell me where I'm
17   missing --
18        MS. MEIRER:  I'm not trying to get in your
19   way, but I'm trying to help you understand what she
20   said.
21        MR. ZELMAN:  Sure.
22        A.  I think what Margie was getting at is that
23   it is not accurate to say that every time an answering
24   machine is detected in preview mode a call recording
25   would be made.  Our system is set so that if a call is

Page 38

1    on the line for a set period of time, then a recording
2    will pick up.  So if an answering machine picks up and
3    the representative makes the decision to not leave a
4    voice message and terminates the call before that time
5    period, there will be no recording.
6         Q.  (By Mr. Zelman) So if a call is made in
7    preview mode, answering machine is detected but then
8    the customer service agent hangs up, that won't be
9    recorded?
10        A.  Prior to I believe it's six seconds.  So if
11   the voice message starts, but then the account
12   representative terminates the call before the
13   expiration of six seconds, you're not going to have a
14   call recording.
15        Q.  Okay.  So going back to this call report
16   that you have in front of you.
17        A.  Okay.
18        Q.  On the far right where you see talk time,
19   does that mean anything to you?
20        A.  Yes.
21        Q.  What does that mean to you?
22        A.  That would indicate the length of time that
23   a call was connected.
24        Q.  Is that in minutes or seconds?
25        MS. MEIRER:  I think it is outside the --

Page 39

1    object it's outside the scope of the notice.  You can
2    answer if you know.
3         A.  Typically it would be in minutes and
4    seconds.
5         Q.  (By Mr. Zelman) So it's all zero in that
6    category except for at the top where I see 3.  Is
7    that what you see?
8         A.  Yes.
9         Q.  So to the best of your understanding was
10   there a three-minute conversation on June 28, 2017?
11        A.  No.
12        Q.  So what's that 3 means?
13        MS. MEIRER:  I'm going to object.  It's
14   outside the scope.  You can answer if you know.
15        A.  As you will see, there is no information in
16   this account number field and you see this ANI --
17   let's see here, my apologies.  This is very different
18   from looking at an Excel spreadsheet on my desktop.
19        So here's what I am taking away from
20   looking at this report, but I would have to go back
21   and verify.  You see how it has a user ID number,
22   that would indicate to me that an actual
23   representative either placed the call or received a
24   call.  This would not be -- which based on my
25   knowledge of the fact that it was either preview or

Page 40

1    predictive would indicate this was probably an
2    inbound call.  Now, I'm guessing this is going to be
3    3 seconds.  So it looks like we received an inbound
4    call and the person terminated the call after we
5    provided a greeting.  So somebody answered the phone
6    and said, "You've reached Credit One," and then the
7    person on the other line terminated the call and
8    because it was only 3 seconds long, we don't have a
9    recording for that.
10        Q.  (By Mr. Zelman) Sure.  So on the left side
11   I see a call start date and call end date.  Do you
12   see that?
13        A.  Yes.
14        Q.  All right.  So call start date is the date
15   and time the call started?
16        A.  Okay.
17        Q.  Down to the millisecond it looks like.
18        A.  Okay.
19        Q.  Am I right?
20        A.  5:42:59, 5:44:52, yes.
21        Q.  And then this call end date is the date and
22   time the call ended?
23        A.  Yes.
24        Q.  So that call that we were talking about
25   where you think it was 3 seconds, it looks like it

## Page 41

1    started at 6:36:30 and then ended at 6:37:38 seconds.
2    Do you see that?
3        **A.   My apologies, I was looking at the wrong**
4    **row.   Yes.**
5        Q.   So would that call have lasted a minute?
6        MS. MEIRER:  I'm going to object.  It's
7    outside of the scope of the notice and it calls for
8    speculation.  You can answer if you know.
9        **A.   I believe that the date here speaks for**
10   **itself.  I can tell you that we do not have any call**
11   **recordings for this account.**
12       Q.   (By Mr. Zelman) So even though your
13   records reflect that there may be a minute long call
14   at that date and time, you don't have a recording of
15   that call, right?
16       **A.   That is correct.**
17       Q.   On the back to the far right where I see
18   "Agent ID," is that Agent Disposition ID?  Third
19   column from right-hand.
20       **A.   Right.  We typically look to the User ID to**
21   **see what agent was taking part in that call.**
22       Q.   Okay.  Now, if calls are made in preview
23   mode, would there be an agent listed there?
24       **A.   I believe so.**
25       Q.   If calls were made in predictive mode, would

## Page 42

1    there be an agent listed there?
2        **A.   No.**
3        Q.   So would it just list "NUL" instead of an
4    agent?
5        **A.   Yes.  In addition if an inbound call was**
6    **received, the Agent ID who received the call would**
7    **appear in that User ID field.**
8        Q.   But you don't see any Agent ID for the 48
9    outgoing calls, right?
10       **A.   No.**
11       Q.   Does that indicate to you that the
12   predictive mode was used to make these calls?
13       MS. MEIRER:  I'm going to object that it's
14   outside the scope of the notice, calls for
15   speculation, asked and answered.
16       MR. ZELMAN:  I never asked that.
17       **A.   In a roundabout way.  As I stated before,**
18   **when I spoke to our IT representatives and I asked him**
19   **is there any way for me to know for certain whether a**
20   **call was placed in predictive mode or preview mode,**
21   **his response to me was no.  So I cannot sit here today**
22   **and tell you the answer to that question is anything**
23   **different than my understanding, which is no.**
24       Q.   (By Mr. Zelman) But it is your
25   understanding that if a call was made in preview

## Page 43

1    mode, there would be an Agent ID or User ID, right?
2        **A.   Yes.**
3        Q.   And to the best of your understanding, is
4    Aspect 6.7 a predictive dialer?
5        MS. MEIRER:  Objection, for calls for a
6    legal conclusion and incomplete hypothetical.
7        **A.   I will not provide a legal conclusion.  I**
8    **can tell you that we use Aspect in the predictive**
9    **mode.**
10       Q.   Okay.  Do you know what a predictive dialer
11   is?
12       **A.   Yes.**
13       Q.   In your own words what is a predictive
14   dialer?
15       **A.   A predictive dialer is a tool that is used**
16   **to build a list of phone numbers based on the**
17   **parameters determined by the person overseeing the**
18   **collection activity, which allows us to create a**
19   **strategy to make calls that hopefully will lead to**
20   **positive outcomes, meaning we would be able to**
21   **successfully reach an account holder.**
22       Q.   Okay.  Now, you mentioned an overseeing
23   person.  Is that like the dialer manager?
24       **A.   That would be the manager that I described**
25   **earlier, such as Tina Brown.**

## Page 44

1        Q.   Okay.  So are you saying that the two
2    different locations with the two different managers
3    might have different numbers that you're calling for
4    different strategy?
5        MS. MEIRER:  Object, that's outside of the
6    scope of notice.  You can answer if you know.
7        **A.   Yes.**
8        MR. ZELMAN:  Okay.  So I don't know if this
9    is a good time to take a quick break.  We've been
10   going for a little over an hour.
11       (Recess taken)
12       Q.   (By Mr. Zelman) So the reason I wanted to
13   take a break there is because I want to talk a
14   little about a dialer.  The last thing you said is
15   that the predictive dialer is a tool that is used to
16   build a list of phone numbers based on parameters
17   built in by the overseeing person.  So I guess my
18   question is -- for example, Tina, the manager of the
19   Texas location, does she decide what numbers are
20   going to be called that day?
21       **A.   Yes.**
22       Q.   How does she do that?
23       **A.   I'm going to start from the beginning.  As I**
24   **mentioned previously, every day we receive a file from**
25   **Credit One.  That file is run through software where**

Page 45

1    it parses the accounts out into what I call buckets.
2    These buckets can be based on the state of residence
3    for the consumer, the length of delinquency for the
4    consumer, variables of that nature.  At that point the
5    manager will make a strategy decision about which
6    buckets she wants the staff to work that day and which
7    phone numbers within those accounts she wants called.
8    So she may make a determination that on Monday she
9    wants to call all consumers who are 30 days late, and
10   she wants to place calls to their home numbers and
11   their cell phone numbers.  And so the system would
12   then create a list of numbers based on that criteria
13   determined by the manager.
14       Q.  Is that it?
15       A.  I'm not sure how far you want me to go on
16   this particular question.
17       Q.  Keep going.
18       A.  At that point the calling list would be
19   generated and Aspect -- I'm trying to think the best
20   way to describe this.  At that point the manager would
21   run the Aspect program and calls would start being
22   placed.
23       Q.  So just I think we made a little leap there
24   that I don't necessarily connect.  You said the system
25   would create a list of numbers and then she runs the

Page 46

1    Aspect software.  How does it get into the Aspect
2    system?
3           MS. MEIRER:  I'm going to object to form.
4    Depending on what mode you're asking about, I don't
5    know what you're asking.
6        Q.  (By Mr. Zelman) Is there a difference on
7    the mode?
8        A.  I am talking about predictive mode because
9    that is what we were talking about prior to our break.
10       Q.  Sure.  And just to clarify because there's
11   different dialers in this case, we're talking about
12   the 6.7 or 7.3 or both?
13       A.  Both.
14       Q.  So in the predictive mode of the systems,
15   she is creating this list of numbers, and is the list
16   of numbers being generated in the system itself, in
17   Aspect itself?
18       A.  Yes.  So the data is run through software,
19   and it gets loaded into Aspect through that software.
20       Q.  Right.  So every day a file is received from
21   Credit One, right, and that comes in a data file of
22   some sort or another?
23       A.  Yes.
24       Q.  And then that file gets loaded into Aspect
25   right away?

Page 47

1        A.  It's my understanding that the data gets
2    processed through software and that is where the
3    accounts are placed into buckets and that is where the
4    manager starts choosing the parameters.
5        Q.  Okay.
6        A.  At that point -- I'm trying to think of the
7    best way to explain this, let me back up.  The file
8    comes in, the accounts are placed into buckets,
9    they're run through the software, at which point
10   that's when they get into Aspect and that is where the
11   manager starts setting the parameters based on the
12   buckets.
13       Q.  I don't want to cut you off.  The software,
14   is that Aspect or a different software?
15       A.  It is a different software.
16       Q.  Do you know the name of it?
17       A.  I do not.
18       Q.  Okay.  So it's run through this other
19   software --
20       A.  Uh-huh.
21       Q.  -- and then it's put into Aspect?
22       A.  Yes.
23       Q.  And then the calling list is generated in
24   that software or in Aspect?
25       A.  In Aspect.

Page 48

1        Q.  Now you said the file comes over every day
2    from Credit One, right?
3        A.  Yes.
4        Q.  What time do calls start?
5           MS. MEIRER:  Object to form.
6        A.  That is a variable question.
7        Q.  (By Mr. Zelman) Okay.  Does it -- well,
8    what time does work start at GC Services?
9           MS. MEIRER:  Object to form.  Which
10   location?
11       A.  That is also a variable question.
12       Q.  (By Mr. Zelman) Sure.  When working on
13   Credit One files, you are either working out of the
14   Texas location or the Tennessee location, correct?
15       A.  Yes.
16       Q.  All right.  Which one starts work first?
17          MS. MEIRER:  Object that it's outside the
18   scope of the notice, but you can answer if you know.
19       A.  I think I know what you're trying to
20   determine.  So I'm going to answer that.
21       Q.  Okay.
22       A.  We place calls on any given account based on
23   the permissible calling times provided in the FDCPA
24   for the consumer's location.  So account
25   representatives may show up to work at 7:00 a.m. in

Shon Sherman
June 6, 2018

Page 49

1   **Central time.  They would not be placing calls to any**
2   **consumers who live in a part of the country where it**
3   **is also 7:00 a.m.**
4       Q.  I understand that.  I guess my question is:
5   Tennessee and Texas, I just checked they're both an
6   hour behind the East Coast, right?
7           MS. MEIRER:  I mean, obviously it's outside
8   the scope of the notice.  You can answer if you know.
9       **A.  Texas is in the Central time zone.**
10  **Knoxville is in the Eastern time zone.**
11      Q.  (By Mr. Zelman) I just googled Tennessee,
12  it gave me that Knoxville is different.  I guess the
13  state is different?
14      **A.  It's a long one.**
15      Q.  I got you.  So the question I have does work
16  start in Knoxville and in Texas at the same time, or
17  do people first show up in the Knoxville location and
18  an hour later they start showing up at the Texas
19  location?
20          MS. MEIRER:  Object to form.  It's outside
21  the scope of the notice.  You can answer if you know.
22      **A.  I cannot tell you what time the business**
23  **hours are for each of those locations.**
24      Q.  (By Mr. Zelman) Okay.  Now obviously you
25  can call people in New York hours before you can

Page 50

1   call people in California, right?
2       **A.  Yes.**
3       Q.  Do you know what time the earliest call
4   GC Services will place is?  Is it 7:00 in the morning,
5   9:00?
6           MS. MEIRER:  Object to form.  Outside the
7   scope of the notice.  I believe she's already
8   testified to this.  Go ahead.
9       **A.  We actually do not place calls at**
10  **7:00 o'clock in the morning.  As I stated previously,**
11  **we only place calls within the allowable calling times**
12  **per the FDCPA.  That time frame is 8:00 a.m. to**
13  **9:00 p.m., wherever that consumer is located.**
14      Q.  (By Mr. Zelman) Okay.  So all I'm trying
15  to really get to is what time approximately does the
16  file come over from Credit One on a daily basis?
17      **A.  I do not know.**
18      Q.  It would have to be prior to the start of
19  the workday, right?
20          MS. MEIRER:  Object to the form.
21      **A.  It would be entirely in the realm of**
22  **possibility for Tina Brown to show up in the office at**
23  **7:00 in the morning and the file to come over from**
24  **Credit One at a later time.**
25      Q.  (By Mr. Zelman) To the best of your

Page 51

1   understanding when customer service representatives
2   show up to their jobs here at GC Services to start
3   talking to Credit One debtors, Ms. Brown is not
4   still creating campaigns or buckets at that time,
5   right?
6           MS. MEIRER:  Object to form.  Outside the
7   scope of notice.  Calls for speculation.  You can
8   answer if you know.
9       **A.  The extent of my conversations with our**
10  **operations management regarding this process did not**
11  **go into that type of detail.**
12      Q.  (By Mr. Zelman) So you don't know?
13      **A.  No.**
14      Q.  Do you know approximately what time
15  Ms. Brown loads the call list into Aspect?
16          MS. MEIRER:  Same objections.  It's outside
17  the scope of the notice and object to the form.
18      **A.  No.**
19      Q.  (By Mr. Zelman) Do you believe she does
20  this in the morning of that calls are going to be
21  made, or do you think she does this the night
22  before?
23          MS. MEIRER:  Same objections.
24      **A.  I believe that process occurs in the**
25  **morning.**

Page 52

1       Q.  (By Mr. Zelman) Okay.  And throughout the
2   day, the Aspect system is making calls based off of
3   this list, right?
4           MS. MEIRER:  Object to form.  Go ahead.
5       **A.  Yes.**
6       Q.  (By Mr. Zelman) At the end of the workday,
7   what happens to that list?  Is it deleted, is it
8   purged from the system, is it stored in the system?
9           MS. MEIRER:  Object to the form.  Which
10  list?  The one created by the manager, the data file
11  from Credit One?
12          MR. ZELMAN:  The one created by the manager.
13          MS. MEIRER:  Okay.
14      **A.  I believe that we have a record of which**
15  **parameters were used, and we have a record of which**
16  **phone numbers were called.  I don't know if Aspect**
17  **maintains it in the form in which you're asking, a**
18  **record.**
19      Q.  (By Mr. Zelman) It's not really what I'm
20  asking.  I'm more asking that the list is created
21  and loaded into Aspect in the morning; and then
22  calls are made out off that list throughout the day,
23  right?
24          MS. MEIRER:  Object, mischaracterizes prior
25  testimony, but go ahead.

Shon Sherman
June 6, 2018

Page 53

1    **A.   The list itself of the accounts and the**
2    **numbers that we're going to call is created within the**
3    **Aspect platform.**
4        Q.   (By Mr. Zelman) Okay.  And that list is
5    created in the Aspect platform and it's stored in
6    the Aspect platform during the course of the day?
7        MS. MEIRER:  Object to the form.  Outside
8    the scope of the notice.  You can answer if you know.
9        **A.   When you say -- maybe I'm having a hard time**
10   **with the word "stored."  The numbers are coming from**
11   **that list created in Aspect, but I don't know if there**
12   **is actually a report or a document that shows the,**
13   **quote, unquote, list.  We would have a record of the**
14   **parameters used, and we would have a record of the**
15   **actual phone numbers called.  I don't know if we have**
16   **the ability to generate a, quote, unquote, list.**
17       Q.   (By Mr. Zelman) I'm not asking for that.
18   I think you're mistaking what I'm asking.  That's
19   what I'm trying to clarify.  All I'm asking is
20   during the course of the day itself, let's say --
21   what's today, Wednesday.  So you guys are still
22   using Aspect today?
23       **A.   Correct.**
24       Q.   Okay.  Yesterday I would --
25       MS. MEIRER:  Wait, what was your last

Page 54

1    question?
2        Q.   (By Mr. Zelman) Are you guys still using
3    Aspect today?
4        **A.   Actually --**
5        MS. MEIRER:  We need to -- I'm only
6    interjecting because I don't think she -- I think she
7    got a little confused on that question.
8        **A.   I did.  The answer to that question is**
9    **actually no.**
10       Q.   (By Mr. Zelman) So you guys are no longer
11   using Aspect?
12       **A.   Not on Credit One.**
13       Q.   Why not?
14       **A.   The operations division decided to move to a**
15   **new platform that had more, quote, unquote, bells and**
16   **whistles and better business productivity.**
17       Q.   Do you know which platform they moved to?
18       MS. MEIRER:  I'm going to object.  That is
19   outside the scope of notice.  You can answer if you
20   know.
21       **A.   I do.**
22       Q.   (By Mr. Zelman) Which one?
23       **A.   LiveVox.**
24       Q.   Do you know which version?
25       MS. MEIRER:  Same objection.  Outside the

Page 55

1    scope of the notice.  You can answer if you know.
2        **A.   Not right off the top of my head.**
3        Q.   Do you know if it's the HCI version.
4        MS. MEIRER:  She just answered she doesn't
5    know.  Same objection.
6        **A.   I know that we do use the HCI mode of**
7    **LiveVox.  I've never heard it called the HCI version**
8    **of LiveVox.**
9        Q.   (By Mr. Zelman) Fair enough.  I think I
10   made that up.
11       **A.   I appreciate your honesty.**
12       Q.   Now, the reason why I ask is because Live
13   Vox has that version HCI human contact initiate or
14   something?
15       **A.   Human call interphase.**
16       Q.   I believe Aspect has something called AIC,
17   which is agent initiated contact.  Do you guys use
18   agent initiated contact in relation to the Aspect
19   software?
20       MS. MEIRER:  Object to the form.  You mean
21   for Credit One in this case?
22       MR. ZELMAN:  Ever.
23       MS. MEIRER:  I'm going object to object
24   again to form and that it's outside the scope of the
25   notice and its outside of our responses and objections

Page 56

1    to what we're prepared to talk about today, but you
2    can answer if you know.
3        **A.   I do not know if that mode of Aspect is used**
4    **on any of our client programs.**
5        Q.   (By Mr. Zelman) Do you know if it's used
6    in relation to Credit One at all?
7        MS. MEIRER:  Same objection.
8        **A.   I know that we only used predictive and**
9    **preview modes.**
10       Q.   (By Mr. Zelman) So going back to my
11   question, which I started working on this
12   hypothetical and then completely abandoned it
13   because you said you no longer use Aspect which
14   threw me for a loop.  When did you stop using
15   Aspect?
16       MS. MEIRER:  Object, it's outside of the
17   scope of notice, but go ahead and answer.
18       **A.   We switched to LiveVox on March 1st of 2018.**
19       Q.   (By Mr. Zelman) Okay.  So I'm going to
20   change the hypothetical for it to now make sense.
21   It's a cold day in January 2018.  Ms. Brown comes to
22   work, you know, takes the file from Credit One.  A
23   list is generated in the Aspect software and numbers
24   are called from that list throughout the workday.
25   At the end of the workday, does she delete those

Shon Sherman
June 6, 2018

15 (Pages 57 to 60)

Page 57

1    numbers from the Aspect system?
2        MS. MEIRER: I'm going to object to the
3    form. It's too many variables. It's incomplete
4    hypothetical, outside the scope of the notice. Calls
5    for speculation. I believe it's asked and answered.
6    And also cold day in January in Texas?
7        THE WITNESS: It happens. Okay. It happens
8    by our standards, fine, 55 for us.
9        MS. MEIRER: Anyway go ahead and answer if
10   you know.
11       **A.   I'm trying to come up with the best way to**
12   **explain what happens. At any point during the day the**
13   **manager can determine or decide to terminate that call**
14   **list and say we are not going to look at these**
15   **accounts any more. We're going to change course and**
16   **look at a different set of accounts and a different**
17   **group of phone numbers that we would like to call.**
18   **From a technological standpoint, I don't know**
19   **internally in Aspect what Aspect does with those phone**
20   **numbers. I just know that we are able to terminate**
21   **calls from continuing on any given list.**
22       Q.  (By Mr. Zelman) Until those calls
23   are terminated -- until that list is terminated,
24   numbers are being called from that list, right?
25       MS. MEIRER: Object. That's outside the

Page 58

1    scope of the notice to form, and I think it
2    mischaracterizes prior testimony, but go ahead.
3        **A.   In part, yes. Another part of the**
4    **determination made by the manager is how many times**
5    **any given phone number type will be called. So once**
6    **we have called a phone number the designated amount of**
7    **times, that phone number will not be called again.**
8        Q.  (By Mr. Zelman) But the phone number is
9    still on the list, it just won't be called any more,
10   right? The system will skip it?
11       MS. MEIRER: Object to the form. Same
12   objection as before. I think it's outside the scope
13   of the notice, mischaracterizes her testimony. You
14   can answer if you know.
15       **A.   That is not a level of detail that I am able**
16   **to provide to you at this time.**
17       Q.  (By Mr. Zelman) I'm really just focused on
18   what happens during the workday. During the workday
19   while calls are being made and people are answering
20   calls and whatnot, this list of numbers is stored in
21   the Aspect software, correct?
22       MS. MEIRER: Object to --
23       Q.  (By Mr. Zelman) At least for the workday.
24       MS. MEIRER: Object to form. Calls for
25   legal conclusion. It's outside the scope of the

Page 59

1    notice. Go ahead and answer, if you know.
2        **A.   I think for a lack of a better description,**
3    **that would be a fair way to explain what is happening.**
4        Q.  (By Mr. Zelman) About how many customer
5    service representatives does GC Services have for
6    Credit One accounts?
7        MS. MEIRER: Object to form. In what time
8    period?
9        Q.  (By Mr. Zelman) I guess I should back up
10   for a second. When customers service
11   representatives are working Credit One accounts, are
12   they also working on accounts for other creditors,
13   or are they just devoted to Credit One?
14       MS. MEIRER: Object to form. It's outside
15   the scope of notice. You can answer if you know.
16       **A.   Our representatives would be strictly**
17   **designated to perform collection activity on behalf of**
18   **Credit One.**
19       Q.  (By Mr. Zelman) Great. So during this
20   time period which we're talking about in this case,
21   which I believe is an eight-day period of
22   March 2017, about how many customer service
23   representatives were working on Credit One accounts?
24       MS. MEIRER: I'm going to object. It's
25   outside the scope of notice. You can answer if you

Page 60

1    know.
2        **A.   Because that concept was outside the scope**
3    **of the notice, I'm not able to tell you with any**
4    **degree of certainty how many employees we would have**
5    **had working during that time frame.**
6        Q.  (By Mr. Zelman) Do you have the ability to
7    approximate?
8        **A.   It would --**
9        MS. MEIRER: Object, it calls for
10   speculation.
11       **A.   -- literally be a guess.**
12       Q.  (By Mr. Zelman) More than 50?
13       MS. MEIRER: Same objections.
14       **A.   I don't know.**
15       Q.  (By Mr. Zelman) So can you walk me through
16   a day in the life of a customer service
17   representative working on Credit One accounts back
18   in March 2017 when they come to work. How do they
19   start working, how do they make calls or take calls?
20   How does that all work?
21       **A.   So the customer service representative would**
22   **come into work. They would need to log-in to the CASH**
23   **system, then they would need to log-in to the Aspect**
24   **system and then they would begin handling calls based**
25   **on whatever strategy management had chosen for that**

Shon Sherman
June 6, 2018

16  (Pages 61 to 64)

| Page 61 | Page 63 |
|---|---|

**Page 61**

1  day.
2      Q.  Okay.  So let's focus on -- we said calls
3  can be made in one of two ways; predictive or preview.
4  So let's focus on predictive.  If calls were being
5  made in predictive that day, how does that customer
6  service representative take their first call?
7      **A.  So calls begin being placed.  Once we make**
8  **contact with a consumer, calls would be assigned to an**
9  **account representative.  There would be a screen that**
10  **would pop up on their computer that would provide**
11  **information related to that account holder so that the**
12  **account representative would be able to assist that**
13  **consumer.**
14      Q.  So you said that calls would be placed and
15  then assigned once contact is made.  So are you saying
16  there is no customer service representative assigned
17  to the call before contact is made?
18      **A.  Correct.**
19      Q.  So who is making the calls then?
20          MS. MEIRER:  Object to the form.
21      **A.  The calls are being made from Aspect from**
22  **that list that was created by the manager that**
23  **morning.**
24      Q.  (By Mr. Zelman) Sure.  So the manager
25  creates the list in the morning, and who decides

**Page 62**

1  what number is being called first?
2          MS. MEIRER:  I'm going to object to the
3  form.  I believe it's asked and answered.  Go ahead.
4      **A.  So the system would go down the list as it**
5  **was created based on the parameters that had been**
6  **chosen that morning.**
7      Q.  (By Mr. Zelman) Okay.  So would it call
8  the first number on that list, and then it would
9  call the next number on the list?
10      **A.  Yes.**
11      Q.  In that order?
12      **A.  Yes.**
13      Q.  Do you know what the order is?
14      **A.  I believe that order would be dependent on**
15  **the different parameters that were used to create the**
16  **list.**
17      Q.  Do you know if -- well, let me back up.  You
18  said that there are different buckets, right, for
19  delinquency and state and such different
20  characteristics and then those buckets all form a
21  list.  Right?
22      **A.  (Witness shakes head side to side.)**
23      Q.  I'm not using your exact words, but the
24  point is you have buckets that tell you these are the
25  groups that we're going to work on today?

**Page 63**

1          MS. MEIRER:  I'm going to object, it
2  mischaracterizes testimony.
3      Q.  (By Mr. Zelman) You're shaking your head,
4  so what am I missing?
5      **A.  The buckets are used as the bottom level**
6  **parameters.  So the manager would say I'm going to**
7  **work Bucket No. 2 today, whatever criteria Bucket No.**
8  **2 is.  Bucket No. 2 would then go through the process**
9  **of the manager saying, okay, in Bucket No.2 I want to**
10  **call all numbers or on all accounts that meet these**
11  **different sets of criteria that I'm selecting for**
12  **today, and from that then a list would be created.**
13      Q.  Sure.  So what I'm trying to drill down to
14  is a bucket might be created with some characteristics
15  such as, you know, I want to call everyone who is 15
16  to 30 days late over a certain amount on the
17  East Coast.  Does that sound about right?
18          MS. MEIRER:  Object, mischaracterizes prior
19  testimony.  Go ahead.
20      **A.  It's my understanding that the bucket would**
21  **be broader, higher level sorting of accounts.**
22      Q.  (By Mr. Zelman) Okay.  So leave out the
23  East Coast.  It would be everyone who is 15 to 30
24  days late --
25      **A.  And stop there.**

**Page 64**

1      Q.  Stop there.  And then the system itself
2  won't call California numbers before it's 9:00 o'clock
3  in California, but it might call New York number
4  because it's 9:00 o'clock there, right?
5          MS. MEIRER:  Object to form.  Go ahead.
6      **A.  That is part of the process, yes.**
7      Q.  (By Mr. Zelman) So my question is:  If you
8  have a group of numbers in this same bucket, right,
9  they all meet the same exact criteria, you got 20
10  accounts that are all 15 to 30 days late and all
11  over a certain amount and all in the East Coast, do
12  you know how those numbers are sorted or those
13  accounts are sorted in that little subgroup?
14          MS. MEIRER:  I'm going object to form.  It's
15  incomplete hypothetical.  It's outside the scope of
16  the notice, but you can answer if you know.
17      **A.  I do not know.**
18      Q.  (By Mr. Zelman) Who would know that?
19          MS. MEIRER:  Same objections.
20      **A.  My first step would be to ask our IT**
21  **department if they are able to provide that**
22  **information.**
23      Q.  (By Mr. Zelman) Who specifically in the IT
24  department would you talk to?
25      **A.  I would not --**

Shon Sherman
June 6, 2018

Page 65

1          MS. MEIRER:  Same objections.  Go ahead.
2          **A.  I would not direct that question to a**
3   **specific person.  We have a distribution list for our**
4   **different groups within IT.  So I would send that**
5   **question to the IT dialer group and they would**
6   **determine who would be the best person to answer that**
7   **question.**
8          Q.  (By Mr. Zelman) So there is a dialer
9   manager for Aspect at GC Services?
10         **A.  There is not someone with a title of dialer**
11  **manager for Aspect.**
12         Q.  Is there someone with that role?
13         MS. MEIRER:  I'm going to object.  It's
14  outside the scope of the notice.  Go ahead and answer
15  if you know.
16         **A.  There is a person who is the manager of the**
17  **group that is the dialer group.**
18         Q.  (By Mr. Zelman) Is that Craig Simpson?
19         **A.  No.**
20         Q.  Who is that?
21         MS. MEIRER:  The same objection.  Outside
22  the scope of the notice.  Go ahead.
23         **A.  That is Debra Cominsky.**
24         Q.  (By Mr. Zelman) Does she work -- what
25  location does she work at?

Page 66

1          MS. MEIRER:  Same objections.
2          **A.  She is in our Houston office.**
3          Q.  (By Mr. Zelman) Is that the one on
4   Gulfton?
5          **A.  Yes.**
6          Q.  And what is her title?
7          MS. MEIRER:  Same objections.
8          **A.  I do not know her exact title.  I just know**
9   **that she is the head of that group.**
10         Q.  (By Mr. Zelman) Okay.  So let's get back
11  to the day in the life we were doing here.  So we
12  said the customer service representative gets
13  assigned, after contact is made, then they talk to
14  the customer.  Whatever happened on that call
15  happens, and then what?
16         MS. MEIRER:  I'm going to object to form.
17  It's incomplete hypothetical.  Go ahead.
18         **A.  The -- whatever happened on the call would**
19  **be documented in the collection system.**
20         Q.  (By Mr. Zelman) Okay.  That's in CASH,
21  right?
22         **A.  Yes.**
23         Q.  And then what happens?
24         ATTORNEY5:  Object to the form.  Go ahead.
25         **A.  Are you asking what the account**

Page 67

1   representative would do next, or are you asking me
2   what happens with the account next?
3          Q.  (By Mr. Zelman) What would the account
4   representative do next?
5          **A.  They would take the next call.**
6          Q.  Okay.  How does the system know that account
7   representative is ready to take another call?
8          MS. MEIRER:  Object to form.  Outside the
9   scope of notice of what we're prepared to talk about
10  today; but you can answer, if you know.
11         **A.  I don't know if the system -- I'm trying to**
12  **think of how to answer this.  The system will**
13  **recognize -- let me back up.  The account**
14  **representative logs into Aspect in the morning, and**
15  **part of the process of them logging into Aspect is**
16  **they then enter the phone number that's associated**
17  **with the phone on their desk.  So Aspect has the**
18  **ability to interact with the phone to understand if**
19  **that line is currently in use.**
20         Q.  (By Mr. Zelman) So while that line is in
21  use, will Aspect send another call to that agent?
22         MS. MEIRER:  Object to form.  Same
23  objections as prior question.  Go ahead.
24         **A.  The only time -- actually that's -- the**
25  **answer is no.  If we happen to get someone on the line**

Page 68

1   **and there are no available representatives, the system**
2   **would hold the call until a representative became**
3   **available and then it would pass the call to the next**
4   **available representative.**
5          Q.  (By Mr. Zelman) So you're saying the
6   system is making calls and then if more people
7   answer the calls then they have available agents,
8   they're going to have to wait on hold?
9          **A.  That is possible.  However we use our**
10  **experience and knowledge to attempt to set the**
11  **parameters and the pace to prevent that from ever**
12  **happening.**
13         Q.  Does it happen?
14         **A.  It can happen, and Credit One holds us**
15  **accountable for those types of situations.**
16         Q.  How do they hold you accountable?
17         MS. MEIRER:  Object to the form.  It's
18  outside of scope of the notice, but go ahead.
19         **A.  That is the call abandonment rate and they**
20  **tell us what an allowable parameters would be for that**
21  **to occur, which is a very, very low number and that**
22  **call abandonment rate is part of the measurement of**
23  **our performance.**
24         Q.  (By Mr. Zelman) Do you know what the call
25  abandonment rate is?

Page 69

1      A.  No.
2      Q.  It's two numbers I'm asking about.  One is
3  do you know what the allowable call abandonment rate
4  is, and do you know what the effective call
5  abandonment rate is?
6      MS. MEIRER:  Object to the form.
7      A.  I actually looked at the required --
8  **required call abandonment rate yesterday and I think**
9  **it was no more than 5 percent, but I'm not 100 percent**
10  **certain.  I do not know what our actual call**
11  **abandonment rate is.**
12      Q.  Is that 5 percent of the calls you make
13  cannot result in abandoned calls?
14      A.  Yes.
15      Q.  Do you know approximately how many calls are
16  made on behalf of Credit One?  And for a time
17  reference people we'll just use March of 2017.
18      A.  No.
19      Q.  Do you know how many are made in the current
20  time period?
21      MS. MEIRER:  Object that it's outside the
22  scope of the notice.  You can answer if you know.
23      A.  No.
24      Q.  (By Mr. Zelman) Do you know how many calls
25  are made on typical daily basis on behalf of Credit

Page 70

1  One Bank?
2      MS. MEIRER:  Same objection.  Outside the
3  scope of notice and outside what we're prepared to
4  talk about per our responses and objections.  Go
5  ahead.
6      A.  No.  I would add that that would vary
7  **depending on the collection strategy for any given**
8  **day.**
9      Q.  (By Mr. Zelman) I understand it can vary,
10  things change.  My question is simply:  Do you have
11  a general idea about how many calls are made?
12      MS. MEIRER:  Same objections.
13      A.  No.
14      Q.  (By Mr. Zelman) So when the customer
15  service representative is sitting at his desk or her
16  desk, is she physically dialing any phone numbers
17  when these calls are being placed?
18      MS. MEIRER:  Object to the form, too many
19  variables.  It's incomplete hypothetical.  You can
20  answer if you know.
21      A.  If the calls are being made in predictive
22  **mode, the account representative would not be**
23  **physically dialing the number.  If the calls are being**
24  **made in preview mode, the account representative would**
25  **go into an account and select the number that they**

Page 71

1  wanted to call and launch the call.
2      Q.  (By Mr. Zelman) Now, let's just talk about
3  that really briefly for a second.  In preview mode
4  does the account representative select the account
5  that's going to be called next or does the system
6  pop up on their screen what account is next?
7      A.  **The system would provide an account.**
8      Q.  Okay.
9      A.  **Present an account to the representative.**
10      Q.  And the point is to give the account
11  representative a moment to look over the account
12  before speaking to someone?
13      A.  **That is a --**
14      MS. MEIRER:  Object to form.  Go ahead.
15      A.  **That would be a fair assessment.  It would**
16  **give the account representative an opportunity to**
17  **familiarize themselves with an account.**
18      Q.  (By Mr. Zelman) And then at that point,
19  does the system place the call automatically or does
20  the customer service representative have to actively
21  click something in order for the call to be placed?
22      MS. MEIRER:  We're still talking about
23  preview mode, right?
24      Q.  (By Mr. Zelman) Preview mode.
25      A.  **The account representative would have to**

Page 72

1  **actively select the number to be called.**
2      **(Exhibit 3 marked.)**
3      Q.  (By Mr. Zelman) I'm going to hand you
4  what's been Bates stamped as GCS-LEMOS 218.  It's a
5  composite exhibit.  It's basically an excerpt from
6  the manuals produced in this action.
7      MR. ZELMAN:  And, Alex, I'll call out the
8  Bates number as we're on them.
9      Q.  (By Mr. Zelman) If you need to take a
10  moment to familiarize yourself with the document,
11  feel free to do so.  Let me know when you're ready.
12      A.  **I'm ready.**
13      MR. WADE:  Could I interject really quick?
14  I only have Bates -- I don't have the document that
15  you're referring to.  So I'll just, you know, refer to
16  the exhibits after the deposition.
17      MR. ZELMAN:  Sure.  I think these were
18  provided to us via, like, an online file sharing
19  website.  So I don't know if they also sent you access
20  to that or not.  I'm sure we can work that out
21  afterwards.
22      MR. WADE:  Sure.  Okay.  I've got it.
23      Q.  (By Mr. Zelman) So if you can take a look
24  at what you have in front of you, Bates No. 218
25  should be the first page, and this page appears to

Shon Sherman
June 6, 2018

---

Page 73

1   talk about the different modes available in the 6.7
2   dialer system.  Do you see that?
3       **A.  Yes.**
4       Q.  So I see preview, which is at the very
5   bottom of the page.  And it says:  "The telephony
6   adapter communications server passes the call to the
7   agent who has the opportunity to preview a call record
8   and then dial the call.  If you choose preview
9   dialing, the timed preview option is enabled."  Do you
10  know what the timed preview option is?
11      MS. MEIRER:  Object, it's outside the scope
12  of the notice, but you can answer if you know.
13      **A.  Yes.**
14      Q.  (By Mr. Zelman) What is that?
15      **A.  That is a tool in Aspect that allows us to**
16  **have some level of control over the productivity of**
17  **our account representatives.**
18      Q.  And what does that mean?
19      **A.  It means that we are able to prevent an**
20  **account representative from sitting there and staring**
21  **at an account for 30 minutes without performing any**
22  **work.**
23      Q.  Sure.  So according to this, the timed
24  preview option sets the preview time out to a default
25  of 30 seconds.  What happens after 30 seconds?

---

Page 74

1       **A.  I actually don't know.  Let me rephrase**
2   **that.  At this moment I cannot recall.**
3       Q.  Sure.  If you turn the page, it says:
4   "Enter the previewed timeout seconds.  If the preview
5   dialing mode and timed preview is selected, the amount
6   of time that an automated call is previewed to an
7   agent before being dialed.  Timed previews can range
8   from 1 to 600 seconds, the default is set at 1.5
9   seconds."  So is it your understanding that after the
10  time preview period, the system automatically dials
11  the call?
12      MS. MEIRER:  I'm just going to object.  It's
13  outside the scope of notice and our responses and
14  objections we said we'd be prepared to talk about.  Go
15  ahead and answer if you know.
16      **A.  As Margie stated that is outside the scope**
17  **of my discussions with operations regarding how they**
18  **use preview mode.**
19      Q.  (By Mr. Zelman) Sure.  But it's not
20  outside the scope of the notice, which is why I'm
21  trying to inquire into it.  We stated that today
22  we're going to be talking about the name, make,
23  model and mode of how calls are made including the
24  day-to-day use of a system and the step-by-step
25  process on how calls are made.  So I'm just trying

---

Page 75

1   to get the step-by-step process on how calls are
2   made in the preview mode if the contention is that
3   calls were made using the preview mode?
4       MS. MEIRER:  Is there a question?  Do you
5   have a question?
6       Q.  (By Mr. Zelman) Yes.  The question is
7   simply:  Sitting here today do you know how calls
8   are made in the preview mode?  Does the system
9   automatically dial the number after the preview
10  timeout period?
11      **A.  I do not know the answer to that.  I**
12  **previously explained to you my understanding of how we**
13  **utilize preview mode.**
14      Q.  What's that understanding based off of?
15      MS. MEIRER:  Objection, asked and answered.
16  Go ahead.
17      **A.  My discussion with our operations management**
18  **who oversee the Credit One program.**
19      Q.  (By Mr. Zelman) Did you ask any of them
20  the question that I'm asking you now?
21      **A.  No.**
22      Q.  I asked you about blaster mode earlier, and
23  you said it's not used, right?
24      **A.  Yes.**
25      Q.  What is blaster mode?

---

Page 76

1       MS. MEIRER:  Objection.  It's outside the
2   scope of notice and objection, no foundation.  She
3   said they don't use it.
4       **A.  Since we do not utilize that function of**
5   **Aspect, I am not familiar with its use or**
6   **capabilities.**
7       Q.  (By Mr. Zelman) Do you know generally what
8   it does?
9       MS. MEIRER:  Same objections.
10      **A.  Not at all.**
11      Q.  (By Mr. Zelman) What about precision mode,
12  are you familiar with that one?
13      MS. MEIRER:  Same objections.  It's outside
14  the scope of what we said we would be prepared to talk
15  to today.  She already testified that they don't use
16  it, and she's not qualified to talk about it, but go
17  ahead.
18      **A.  I do not.**
19      Q.  (By Mr. Zelman) If you turn to Bates stamp
20  821, it will be in there.
21      **A.  Okay.**
22      Q.  This is a glossary.  It has the term
23  "blaster dialing mode" towards the bottom there.  Do
24  you see that?
25      **A.  Yes.**

Shon Sherman
June 6, 2018

Page 77

1    Q.  And the glossary gives the definition of
2    blaster dialing mode.  Sitting here today do you have
3    any reason to believe that is not accurate?
4         MS. MEIRER:  Same objections.  It's outside
5    the scope of notice and what we said we'd be prepared
6    to talk about today.  She's already previously
7    disqualified herself by saying they do not use blaster
8    mode.
9         MR. ZELMAN:  That's a capability of the
10   dialer system that was used so that's why I'm asking.
11        MS. MEIRER:  I'm going to object to that
12   counsel is now testifying, and my same objections
13   apply.  Go ahead and answer if you know.
14        A.  I'm sorry, can you please repeat the
15   question?
16        Q.  (By Mr. Zelman) Sure.  There's a
17   definition in front of you about what the blaster
18   mode is.  Sitting here today do you have any reason
19   to believe that is inaccurate?
20        MS. MEIRER:  Same objections.  Answer if you
21   know.
22        A.  I am in no position to testify regarding a
23   mode in Aspect that is not utilized by GC Services.
24        Q.  (By Mr. Zelman) Okay.  What about -- go to
25   Bates stamp 835, and there is a definition there of

Page 78

1    predictive dialing mode.  Do you see that?
2         A.  Yes.
3         Q.  All right.  Now that is a system that was
4    used by GC Services to make calls on behalf of Credit
5    One Bank.  So you read that definition, do you have
6    any reason to believe that is inaccurate?
7         MS. MEIRER:  I'm just going to object.
8    She's not a technological expert.  It's outside what
9    we said we'd be prepared to talk about which is
10   generally how the systems are used, but she can answer
11   if she knows.
12        A.  That definition appears to be correct.
13        Q.  (By Mr. Zelman) Okay.  Is Credit One
14   indemnifying you from making these calls?
15        MS. MEIRER:  I'm going to object.  That's
16   outside the scope of the notice.  It calls for a legal
17   conclusion and also it's not something that I believe
18   is relevant on this case, but you can answer if you
19   know.
20        A.  I do not know.
21        Q.  (By Mr. Zelman) Do you believe they
22   should?
23        MS. MEIRER:  Same objections.  Also calling
24   for a legal conclusion.
25        A.  I wouldn't even begin to know how to answer

Page 79

1    that question.  I don't think it's an appropriate
2    question to ask a corporate representative, and I'm
3    not going to provide a personal opinion on that topic
4    and GC Services is not going to provide a personal
5    opinion on that topic.
6         Q.  (By Mr. Zelman) All right.  I'm going to
7    hand you what we'll mark as Exhibit 4.
8         (Exhibit 4 marked.)
9         MR. ZELMAN:  Alex, Exhibit 4 is defendant's
10   responses to request for admissions.
11        MR. WADE:  I have those I think.
12        MR. ZELMAN:  I sent them to you.
13        Q.  (By Mr. Zelman) I believe you said you
14   didn't review these documents before today's
15   deposition, right?
16        A.  That is correct.
17        Q.  If you want to take a moment to review them
18   now, or we can just go through them.
19        A.  I will review the topic as you bring them
20   up, if that's okay.
21        Q.  Sure.  Okay.  So Request for Admission No. 1
22   asks:  "Admit Credit One contracted with GC Services
23   to dial the Phone No. 916-308-9847 during the time
24   period of July 18th, 2013, to the present."  There's a
25   series of objections and then:  "Defendant admits only

Page 80

1    that it called the phone number and denies the
2    remainder of the requests."  Do you know why that was?
3         MS. MEIRER:  It's outside -- object, it's
4    outside the scope of the notice for her to be prepared
5    as discovery responses.  It also calls for legal
6    conclusion.  You can answer if you know.
7         A.  I would say that stating that we were
8    calling the phone number from July 18, 2013, to
9    present is an inaccurate statement based on the
10   records available to me.  We were calling the phone
11   number during the time frame that I provided earlier
12   which was March 8th, 2017, to March 26, 2017.
13        MS. MEIRER:  I think you mean March 18th,
14   wasn't it?
15        A.  Oh, March 18th, yes.
16        Q.  (By Mr. Zelman) All right.  The Request
17   For Admission 2, I'm not going to read each
18   question, but the question is:  Do you know why this
19   was denied?
20        MS. MEIRER:  Same objections.  Outside the
21   scope of notice.  She was not asked to be prepared to
22   talk about this today, and it also calls for a legal
23   conclusion.
24        A.  We admitted that we called the number.
25        Q.  (By Mr. Zelman) Right.  And the rest of

Shon Sherman
June 6, 2018

Page 81

1  the request was denied, and I'm asking do you know
2  why.
3      A.  I would --
4      MS. MEIRER:  Same objections.  I believe her
5  prior answer applies.  Go ahead.
6      A.  My prior answer does apply.  The time period
7  of July 18, 2013, to present is inaccurate based on my
8  knowledge and understanding for this account.
9      Q.  (By Mr. Zelman) Okay.  Request for
10  Admission 3 asks: "Admit that GC Services used the
11  Aspect Unified IP 6.7 dialer to dial the phone
12  number on behalf of Credit One Bank during that same
13  time period and defendant only admits that it called
14  the phone number and denies the remainder of the
15  requests.  Now GC Services did use the Aspect 6.7
16  dialer to dial the 9847 number during the time
17  period of July 18, 2013 to present, right?
18      MS. MEIRER:  I'm going to object.  Same
19  objections as before, and also misstates her prior
20  testimony regarding when the 6.7 dialer was used and
21  the time period of this account.  It's outside the
22  scope of the notice and calls for legal conclusion.
23  Go ahead.
24      A.  Can you please repeat the question?
25      Q.  (By Mr. Zelman) Sure.  Did GC Services use

Page 82

1  the Aspect Unified IP 6.7 dialer to dial the 9847
2  number on behalf of Credit One Bank at any point in
3  time during the period of July 18, 2013, to the
4  present?
5      MS. MEIRER:  Same objections.  And it's also
6  a different question than what you asked before and
7  different than what is in the request for admission.
8      Q.  (By Mr. Zelman) That's right.  I'm not
9  reading that verbatim.  This is my question to you.
10      A.  Yes, I have already testified that Aspect
11  6.7 was used.
12      Q.  And at any time between July 2013 and the
13  present did GC Services use the predictive mode of the
14  6.7 dialer to call the 9847 number?
15      MS. MEIRER:  Object to form.  It's been
16  asked and answered:  It's also different than if
17  you're trying to refer to this same request for
18  admission, which is unclear to me.  It is different
19  from what that says, go ahead.
20      A.  I would just again like to point out that I
21  take issue with the time frame.  I would say that we
22  did utilize the predictive mode of Aspect when we
23  placed calls to the 9847 number.
24      Q.  (By Mr. Zelman) Okay.  Quick question, I
25  meant to ask you earlier.  You gave me three phone

Page 83

1  numbers that were the outgoing phone numbers.  Where
2  did you get those phone numbers from?
3      A.  I -- well, not me personally, a member of
4  our department reached out to IT, who then obtained
5  those numbers for us.
6      Q.  Okay.  Now, does Credit One ask you guys
7  what dialer you're using?
8      A.  It is my understanding that Credit One
9  leaves it to GC Services to determine how to conduct
10  business.
11      Q.  Right, but my question was not that at all.
12  It's simply when GC Services decides how to conduct
13  business, does Credit One ask GC Services what dialer
14  are you going to use to make these calls?
15      A.  Those conversations may or may not have
16  happened.  I would not have been a part of those.
17  Those would have occurred at the time that the
18  relationship was being developed.
19      Q.  Do you know when that was?
20      A.  I believe that we've had that relationship
21  with Credit One for 19 years.  I don't know what year
22  that comes out to be.
23      Q.  So is it your understanding that when the
24  relationship was formed 19 years ago, approximately,
25  that's when Credit One would have been told about what

Page 84

1  dialing system or equipment will be used to make the
2  calls?
3      MS. MEIRER:  Objection to form,
4  mischaracterizing prior testimony.  I think what he's
5  getting at -- I'm trying to help you out here because
6  I think I know what you're trying to ask her.  I think
7  he wants to know does GC Services ever tell Credit One
8  what they're using?  Is that what you're asking?
9      MR. ZELMAN:  Sure.
10      MS. MEIRER:  In some manner do they check on
11  you, do they -- I think that's what he's trying to get
12  at.  There seems to be a disconnect.
13      A.  I was taking your question to be directed at
14  some sort of a formal discussion.  Of course, Credit
15  One knows what system we are using.  I couldn't point
16  out specific conversations that occurred or we said to
17  Credit One we will be using Aspect.
18      Q.  (By Mr. Zelman) Right.  But at some point
19  before you started using Aspect, Credit One would
20  have known about that?
21      MS. MEIRER:  Object to the form.
22      A.  I have no way of knowing that as the
23  relationship has existed for a very long time.
24      Q.  (By Mr. Zelman) Let me ask you this:  You
25  switched to a new dialer a couple of months ago,

Shon Sherman
June 6, 2018

Page 85

1    right?
2        A.  Yes.
3        Q.  Do you know if when that decision was being
4    made, someone notified Credit One that there was going
5    to be a new dialer that was going to be used to make
6    those calls?
7        A.  Yes.
8           MS. MEIRER:  Outside the scope.  Go ahead
9    and answer if you know.
10       A.  Yes.
11       Q.  (By Mr. Zelman) When was that, before the
12   dialer was put in place?
13          MS. MEIRER:  Same objection.
14       A.  Yes.
15       Q.  (By Mr. Zelman) Now you guys switched from
16   6.7 to 7.3 in 2017, right?
17       A.  Yes.
18       Q.  Do you know if at that time someone notified
19   Credit One and said, hey, we're upgrading from if 6.7
20   to 7.3?
21       A.  I do not have factual knowledge of that, no.
22       Q.  Do you know if that's something that's
23   typically done when a system is upgraded or changed?
24       A.  I would say for something -- upgrading a
25   system that is currently in use, I don't know that

Page 86

1    there would have been a pointed statement to Credit
2    One that we were upgrading.  I'm sure that when
3    conversations did occur between our operations
4    management and the client, that would have probably
5    come up in conversation; but I don't know that for
6    certain.
7        Q.  Okay.  We spoke earlier about how calls were
8    made and how daily operation is run using the 6.7
9    system.  Did anything change when we talked about the
10   7.3 system?
11       A.  No.
12       Q.  So why did you guys upgrade?
13       A.  It's my understanding that this was just a
14   typical system upgrade.  So Aspect had a newer version
15   available.  We acquired it.  It was my understanding
16   that that did not change the functionality of Aspect
17   in the way that we use it on the Credit One program.
18          MR. ZELMAN:  I want to take a quick break.
19          (Recess taken)
20          MR. ZELMAN:  Going back on the record.
21       Q.  (By Mr. Zelman) Do you know what a
22   reassign number scrub is?
23          MS. MEIRER:  I'm going to object.  It's
24   outside the scope of notice.  You can answer, if you
25   know.

Page 87

1        A.  I have never heard that term used, but based
2    on my knowledge of the business, I could guess as to
3    what that is.
4        Q.  (By Mr. Zelman) What do you think it is?
5        A.  That would --
6           MS. MEIRER:  I'm just going to object.  It
7    calls for speculation.  Go ahead and answer if you
8    know.
9        A.  As she said this would be me taking a guess.
10   That would be when a number previously belonged to
11   Mr. Zelman and now it belongs to Ms. Sherman, the
12   scrub would identify transfers in ownership of a phone
13   number.
14       Q.  (By Mr. Zelman) Does GC Services utilize
15   any such scrub?
16          MS. MEIRER:  I'm going to object that it's
17   outside the scope of notice, also to form.  Are you
18   talking about Credit One accounts?
19       Q.  (By Mr. Zelman) Sure.  Credit One
20   accounts.
21       A.  No.
22       Q.  All right.  Do you have any sort of the
23   vetting of the phone numbers provided to you by Credit
24   One?
25       A.  No.

Page 88

1        Q.  Why not?
2        A.  In the ordinary course of business in
3    handling Credit One accounts, it is our understanding
4    that the phone numbers being provided to us by
5    Credit One are, quote, unquote, good contact numbers
6    for the consumer.
7        Q.  So GC Services gets phone numbers from
8    Credit One and doesn't do any of its own vetting to
9    make sure that those numbers are accurate?
10          MS. MEIRER:  I'm going to object.  I think
11   it is mischaracterizing prior testimony and also
12   outside the scope of notice, but go ahead and answer.
13       A.  I would like to sort of clarify what you
14   just said.  We don't run any type of scrub, but if we
15   call a phone number for Mr. Zelman and someone else
16   answers the phone and says this number does not reach
17   Mr. Zelman, that would result in the number being
18   removed from the account.  So that is how we would
19   take an action to determine that the number is not a
20   good phone number.
21       Q.  Right.  And I understand that aspect of
22   things.  What I'm only asking really is do you run the
23   phone numbers you get from Credit One through any
24   other sort of database or software or anything to just
25   double-check if that's the right number for the person

Shon Sherman
June 6, 2018

23 (Pages 89 to 92)

## Page 89

1    you're trying to reach?
2        **A.  No.**
3            MR. ZELMAN:  I have no further questions for
4    this witness.  Alex, do you have any?
5            MR. WADE:  I do not.
6            MR. ZELMAN:  Do you have any cross?
7            MS. MEIRER:  I do not.  Read and sign.
8            MR. ZELMAN:  That finishes the deposition
9    and then we begin the next one, but I got to get the
10   other counsel for Credit One on the phone.
11           (Deposition concluded 12:24 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 90

1            CHANGES AND SIGNATURE
2    WITNESS NAME: SHON SHERMAN
3    DATE OF DEPOSITION:  June 6, 2018
4    PAGE LINE   CHANGE                   REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

## Page 91

1
2        I,_____, do hereby certify that I
3    have read the foregoing pages, and that the same is a
4    correct transcription of the answers given by me to the
5    questions therein propounded, except for the corrections
6    or changes in form or substance, if any, noted in the
7    attached Errata Sheet.
8
9        _____
10       WITNESS NAME DATE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 92

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF CALIFORNIA
2                 SACRAMENTO DIVISION
3    N.L., an infant by his mother )  CIVIL CASE NO.:
     and natural guardian         )2:17-cv-01512-JAM-DB
4    SANDRA LEMOS,               )
             Plaintiff,          )
5                                )
     vs.                         )
6                                )
     CREDIT ONE BANK, N.A., GC   )
7    SERVICES LIMITED PARTNERSHIP )
     IENERGIZER HOLDINGS, LIMITED, )
8    and FIRST CONTACT, LLC a/k/a )
     IQUOR HOLDINGS, INC.        )
9
10           REPORTER'S CERTIFICATION FOR THE
11           ORAL DEPOSITION OF SHON SHERMAN
12                JUNE 6, 2018
13       I, Jill M. Vaughan, Certified Shorthand Reporter in
14   and for the State of Texas, hereby certify pursuant to
15   the Federal Rules and/or agreement of the parties present
16   to the following:
17       That the witness, SHON SHERMAN, was duly sworn by
18   the officer and that the transcript of the oral
19   deposition is a true record of the testimony given by the
20   witness;
21       That the deposition transcript was duly submitted on
22   _____ to the witness or to the attorney for
23   the witness for examination, signature, and return to
24   Stratos Legal Services
25   by _____.

Shon Sherman
June 6, 2018

24 (Page 93)

Page 93

1      I further certify that I am neither counsel for,
2  related to, nor employed by any of the parties in the
3  action in which this proceeding was taken, and further
4  that I am not financially or otherwise interested in the
5  outcome of this action.
6      Certified to by me on this 15th day of
7  June, 2018.
8        _Jill M. Vaughan_____
           Jill M. Vaughan, CSR, RPR
9        CSR No. 6192
           Expiration date: 12-31-19
10     Stratos Legal Services
           Firm No. 125
11     4295 San Felipe
           Suite 125
12     Houston, TX 77027
           713-481-2180
13
14
15
16
17
18
19
20
21
22
23
24
25